UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FREDERICK WEICHEL, <br><br> Plaintiff, <br><br> v. <br><br> TOWN OF BRAINTREE, *et al.*, <br><br> Defendants. | * <br> * <br> * <br> * <br> * Civil Action No. 1:20-cv-11456-IT <br> * <br> * <br> * <br> * |

MEMORANDUM & ORDER

May 14, 2021

TALWANI, D.J.

In 1981, Plaintiff Frederick Weichel was convicted of first-degree murder and sentenced to life in prison without the possibility of parole. Thirty-six years later, a state court judge granted Weichel's motion for a new trial and vacated his conviction, and the Commonwealth dropped the charges against him.

On August 3, 2020, Weichel brought this action against the Town of Braintree, the City of Boston, and former officers of the Braintree police department, the Boston police department, and the Massachusetts State police. Weichel contends that the officers suppressed exculpatory evidence and deliberately framed him for a murder that he did not commit, in violation of his rights under federal and state law.

On March 12, 2021, State Trooper Edward Whelan filed the pending Motion to Dismiss [#73], arguing that Weichel failed to state a claim against him and that, in the alternative, his claims are barred by issue preclusion and qualified immunity. For the following reasons, the motion is GRANTED IN PART and DENIED IN PART.

I.      **Factual Background**

Drawing all favorable inferences in Weichel's favor, the facts alleged in the Complaint [#1] are as follows. Shortly after midnight on May 31, 1980, Robert LaMonica was shot twice and killed in Braintree. Compl. ¶ 38 [#1]. Weichel had nothing to do with the murder. Id. at ¶ 40. No physical evidence connected Weichel to the scene of the murder or to the murder itself. Id. at ¶ 152. A wiretap of Weichel's phone yielded no incriminating evidence. Id. at ¶ 155. And multiple witnesses confirmed that Weichel was with them miles away in Boston at the time of the shooting. Id. at ¶¶ 41-42.

The case against Weichel rested on an eyewitness identification by a teenager who, with three teenage companions, had been drinking in a nearby park on the night of the murder. Id. at ¶¶ 44, 48, 161. The teenagers heard four loud bangs and then saw a man running in the dark toward a parked car. Id. at ¶¶ 45, 48-52. All four of them described the running man as being 5'11" or taller. Id. at ¶¶ 49-51, 55. Weichel is 5'7". Id. at ¶ 57. One of the four, John Foley, claimed to have seen the man's face for approximately one second under a streetlight. Id. at ¶ 52. Foley described the man as having bushy eyebrows and dark, curly sideburns. Id. at ¶ 61. Weichel did not have bushy eyebrows or sideburns. Id.

Three of the teenagers described the running man's hair as "dark curly hair" or "dark frizzy hair." Id. ¶ 87. The following day, State Investigator John Sprague and Braintree Detective Robert Wilson showed three of the teenagers a photo array, but only one or two of the photographs—including the one of Weichel—matched the teenagers' general description of the running man's hair. Id. at ¶¶ 89, 91. The officers told the teenagers to pick a photograph if it resembled the running man "in any way." Id. at ¶ 96. They reported that Foley selected Weichel from the array but did not document the fact that Foley noted several differences between the

2

running man and the individual in the photograph. Id. at ¶¶ 94-95. The other two teenagers each picked out two or three photographs, including the one of Weichel, but did not positively identify him. Id. at ¶¶ 97-98. A week or two later, the three teenagers were shown a second array, which was the same as the first but with one additional photograph. Id. at ¶ 99. Foley again picked out Weichel's photograph but noted the differences between it and the running man, and the other two teenagers selected multiple pictures. Id.

Shortly thereafter, State Investigator Sprague, State Trooper Whelan, or both officers took Foley and two other teenagers for a van ride around South Boston to look for Weichel. Id. at ¶ 101. The teenagers did not make any identifications, but the officers did not document that fact. Id. at ¶ 102.

Sprague and Whelan took Foley for a second van ride on June 12, 1980. Id. at ¶ 103. LaMonica's two brothers were also in the van and directed the search, though there is no police report explaining their presence. Id. at ¶¶ 103-04. At some point, Sprague or Whelan said to Foley "isn't he the one," after which Foley identified Weichel. Id. at ¶ 105. Sprague or Whelan then took a photograph of Weichel, which was introduced into evidence at the trial. Id. at ¶ 107.

On August 13, 1980, Weichel was arrested for LaMonica's murder. Id. at ¶ 157. A jury found him guilty of the murder on August 20, 1981, and he was sentenced to life in prison without the possibility of parole. Id. at ¶¶ 165-66.

On June 2, 2010, Weichel's attorneys made a public records request for all exculpatory materials relating to the LaMonica murder. Id. at ¶ 143. The responsive documents included, among other things, a police report that detailed how numerous state corrections officers had looked at a composite sketch produced by the police based on Foley's description and stated that it looked like a convicted murderer who had been granted furlough the day before the murder. Id.

3

at ¶¶ 54, 63, 68, 70-71, 74, 138, 145. On April 10, 2017, a Massachusetts Superior Court judge granted Weichel's motion for a new trial and vacated his conviction based on the revelation of this new evidence. Id. at ¶ 26; Superior Court Decision ¶¶ 82-85 [#73-2]. The judge concluded that if Weichel had had Leahy's report in time for the trial, he could have mounted a much stronger defense, and the jury could have "reached a very different conclusion" regarding his guilt. Superior Court Decision ¶ 85 [#73-2]. The Commonwealth appealed, and the Supreme Judicial Court of Massachusetts upheld the Superior Court judge's order. Compl. ¶ 181 [#1]. On August 7, 2017, the Commonwealth opted not to re-try Weichel and entered a *nolle prosequi*, dropping all charges against him. Id. at ¶¶ 27, 182. By the time of his release, Weichel had spent thirty-six years in prison. Id. at ¶ 171.

## II.     Standard of Review

In evaluating a motion to dismiss for failure to state a claim, this court assumes "the truth of all well-pleaded facts" and draws "all reasonable inferences in the plaintiff's favor." Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006). To survive dismissal, a complaint must contain sufficient factual material to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . [f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." Id. at 555 (internal citations omitted). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009). Additionally, "an adequate complaint must include not only a plausible claim but also a plausible defendant." Penalbert-Rosa v. Fortuno-Burset, 631 F.3d 592, 594 (1st Cir. 2011). "[E]ach defendant's role . . . must be sufficiently alleged to make him or her

4

a plausible defendant. After all, '[the court] must determine whether, *as to each defendant,* a plaintiff's pleadings are sufficient to state a claim on which relief can be granted.'" Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 16 (1st Cir. 2011) (quoting Sánchez v. Pereira–Castillo, 590 F.3d 31, 48 (1st Cir. 2009)) (emphasis in original).

"While most Rule 12(b)(6) motions are premised on a plaintiff's putative failure to state an actionable claim, such a motion may sometimes be premised on the inevitable success of an affirmative defense." Nisselson, 469 F.3d at 150. A court may allow a Rule 12(b)(6) motion based on an affirmative defense if "(i) the facts establishing the defense are definitively ascertainable from the complaint and the other allowable sources of information, and (ii) those facts suffice to establish the affirmative defense with certitude." Id. (quoting Rodi v. S. New Engl. Sch. of Law, 389 F.3d 5, 12 (1st Cir. 2004)).

### III. Discussion

Weichel brings four claims pursuant to 42 U.S.C. § 1983 against the individual officers who were involved in the investigation of LaMonica's murder: violation of due process, malicious prosecution, conspiracy, and failure to intervene. Compl. ¶¶ 184-242 [#1]. He also brings a claim under state law for intentional infliction of emotional distress. Id. at ¶¶ 243-49. Trooper Whelan argues that the Complaint [#1] should be dismissed against him because he "was so remotely related to this investigation" that Weichel is unable to state a claim against him. Whelan's Mot. to Dismiss 1 [#73]. Alternatively, he argues for dismissal on the grounds that the claims are barred by issue preclusion and that he is entitled to qualified immunity. Id. at 2.

A.  *Section 1983 Claims*

Section 1983 creates a civil cause of action against an individual acting under color of state law who violates a plaintiff's federally protected rights. 42 U.S.C. § 1983. "A claim under section 1983 has two essential elements. First, the challenged conduct must be attributable to a person acting under color of state law" and "second, the conduct must have worked a denial of rights secured by the Constitution or by federal law." Soto v. Flores, 103 F.3d 1056, 1061 (1st Cir. 1997). Here, there is no dispute that Trooper Whelan was, at all times relevant, acting under color of state law. At issue is whether Whelan deprived Weichel of a legally cognizable right.

1.  Violation of Due Process

A state actor violates a criminal defendant's right to due process by deliberately concealing material exculpatory evidence that leads to the defendant's conviction, see Pyle v. Kansas, 317 U.S. 213, 216 (1942); Mooney v. Holohan, 294 U.S. 10, 112-133 (1935), or by "deliberately fabricating evidence and framing individuals for crimes they did not commit," Limone v. Condon, 372 F.3d 39, 45 (1st Cir. 2004).

Whelan argues that he is mentioned by name in only two paragraphs—and, even then, "only vaguely and tentatively, and not at all in any of the six counts"—and that these factual allegations are insufficient to support Weichel's section 1983 claims against him. Whelan's Mot. to Dismiss 4 [#73]. Weichel counters that he has adequately pleaded viable claims against Whelan where he alleges that Whelan "directly fabricat[ed] evidence through a scheme with [State Investigator] Sprague to convince the teenage witness that [Weichel] was the culprit and then, afterward, conceal[ed] the exculpatory evidence that the identification was fabricated through direct suggestion." Pl's Opp. to Whelan's Mot. to Dismiss ("Pl's Whelan Opp.") 3 [#75].

6

Weichel's characterization of the allegations in the Complaint [#1] contains embellishments that the court may not consider.[1] But taking the allegations as written, the court concludes that they suffice to state a claim for violation of due process. Specifically, Weichel alleges that Whelan may have been present during the first van ride, during which no identification was made, and that the evidence about this ride and the fact that it did not produce a positive identification was suppressed by the officers involved. Compl. ¶¶ 101-02 [#1]. He further alleges that during the second van ride, Whelan was present and may have been the individual who prompted Foley to identify Weichel. Id. at ¶¶ 104-05. Finally, Weichel alleges that these rides were staged for the purpose of framing of him. Id. at ¶ 106.

This is not, as Whelan argues, a case in which the plaintiff is painting with a broad brush and claiming that an entire police department is liable for the actions of a few of its officers. Rather, Weichel makes specific allegations about Whelan's conduct and how it is tied to the alleged attempt to frame him for a murder that he did not commit. The court recognizes that Weichel faces an uphill battle to muster the evidence to support his allegations. But although the allegations in the Complaint [#1] are slight, they contain sufficient factual detail to suggest a plausible claim that Whelan violated Weichel's right to due process by participating in a scheme to fabricate false eyewitness testimony against him.

2. Malicious Prosecution

To state a constitutional claim for malicious prosecution under the Fourth Amendment, a plaintiff must "establish that 'the defendant (1) caused (2) a seizure of plaintiff pursuant to legal

---

[1] If Weichel wishes the court to consider the allegations as he has characterized them in opposition to Whelan's motion, he may move to amend his pleadings pursuant to Federal Rule of Civil Procedure 15.

process unsupported by probable cause, and (3) criminal proceedings terminated in the plaintiff's favor.'" Hernandez-Cuevas v. Taylor, 723 F.3d 91, 101 (1st Cir. 2013) (quoting Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012)). Where Weichel alleges that Whelan helped to fabricate eyewitness evidence against him, which was used to support his arrest, prosecution, and imprisonment for thirty-six years, and where Weichel's conviction has been vacated, he has stated a claim for malicious prosecution.

3. Conspiracy

A civil rights conspiracy under section 1983 is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages." Estate of Bennett v. Wainwright, 548 F.3d 155, 178 (1st Cir. 2008) (citing Earle v. Benoit, 850 F.2d 836, 844 (1st Cir. 1988)). "In order to make out an actionable conspiracy under section 1983, a plaintiff has to prove not only a conspiratorial agreement but also an actual abridgment of some federally-secured right." Nieves v. McSweeney, 241 F.3d 46, 53 (1st Cir. 2001) (citations omitted).

As discussed above, Weichel has adequately pleaded violations of his Fourth and Fourteenth Amendment rights. In addition, the allegations support the inference that Whelan's alleged conduct was part of a scheme to fabricate eyewitness identification evidence against Weichel for the purpose of framing him. Weichel has therefore stated a claim for conspiracy.

4. Failure to Intervene

The First Circuit has recognized a cause of action for failure to intervene primarily in the context of a police officer's use of excessive force. See, e.g., Wilson v. Town of Mendon, 294 F.3d 1, 6 (1st Cir. 2002) ("An officer may be held liable not only for his personal use of

excessive force, but also for his failure to intervene in appropriate circumstances to protect an arrestee from the excessive use of force by his fellow officers"); Davis v. Rennie, 264 F.3d 86, 98 (1st Cir. 2001) ("An officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable under section 1983 for his nonfeasance"). However, the First Circuit has never explicitly limited failure-to-intervene claims to ones concerning excessive force. To the contrary, the First Circuit has described failure-to-intervene claims in broad language that could encompass other constitutional violations. See e.g., Torres-Rivera v. O'Neill-Cancel, 406 F.3d 43, 54 (1st Cir. 2005) (quoting O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir. 1988)) ("A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated *in his presence* by other officers") (emphasis in original); Clark v. Taylor, 710 F.2d 4, 9 (1st Cir. 1983) ("Liability under section 1983 may be imposed both for action that deprives a plaintiff of a constitutional right and for failure to act, when there is a duty to act, to prevent such a deprivation").

Here, Weichel alleges that, at the very least, Whelan was in the van during the second ride when a police officer prompted Foley to identify Weichel in order to fabricate a false identification. As the court has already stated, this is sufficient to allege a violation of Weichel's Fourteenth Amendment rights, and because Whelan was allegedly present, a failure to intervene.

      B.    *Intentional Infliction of Emotional Distress*

To state a claim for intentional infliction of emotional distress, a plaintiff must show that (1) the defendant intended to inflict emotional distress or should have known it was likely to result; (2) the defendant's conduct was extreme and outrageous; (3) the actions of the defendant caused the emotional distress; and (4) the emotional distress sustained by the plaintiff was

severe. See Doyle v. Hasbro, Inc., 103 F.3d 186, 195 (1st Cir. 1996) (citing Agis v. Howard Johnson Co., 371 Mass. 140, 144-45, 355 N.E.2d 315 (1976)). Weichel alleges that Whelan participated in a scheme to fabricate evidence against him and to suppress exculpatory evidence in order to frame him for a murder that he did not commit. Weichel was convicted of first-degree murder and then spent almost four decades in prison due to those alleged misdeeds. That is sufficient to support a claim for intentional infliction of emotional distress. See Limone v. United States, 497 F. Supp. 2d 143, 227 (D. Mass. 2007) ("Framing innocent men for a capital crime" is sufficiently outrageous to constitute intentional infliction of emotional distress).

    C.    *Whelan's Affirmative Defenses*

Whelan argues that, even if Weichel's constitutional rights were violated, he is entitled to qualified immunity. Whelan's Mot. to Dismiss 13-16 [#73]. He also claims that Weichel's due process claim is barred by issue preclusion. Id. at 6.

    1.    Qualified Immunity

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Courts evaluate claims for qualified immunity under a two-part test: "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009). Here, the court has determined that Weichel has stated claims for violation of his Fourth and Fourteenth Amendment rights, so it turns to the second prong.

As to the due process claim, Whelan argues that, in 1980, it was unclear that unduly suggestive identification procedures, such as the van rides, were improper. Whelan's Mot. to Dismiss 14 [#73]. But that misses the gist of Weichel's allegations. He is not just alleging that the van ride was suggestive; he is claiming that it was undertaken for the purpose of fabricating eyewitness evidence against him and that evidence favorable to him—including the lack of any positive identification during the first van ride and the fact that a police officer prompted Foley's identification—was suppressed. If Weichel can prove those allegations, that conduct is not entitled to qualified immunity.

In 1935, the Supreme Court explained that due process

> is a requirement that cannot be deemed to be satisfied by mere notice and hearing if a State has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured.

Mooney, 294 U.S. at 112. The next year, the Court reaffirmed that the Fourteenth Amendment forbids convictions predicated on deliberate deceptions. See Brown v. Mississippi, 297 U.S. 278, 286 (1936). In 1942, the Court once again stated that "allegations that [the petitioner's] imprisonment resulted from perjured testimony, knowingly used by the State authorities to obtain his conviction, and from the deliberate suppression by those same authorities of evidence favorable to him . . . sufficiently charge a deprivation of rights guaranteed by the Federal Constitution." Pyle, 317 U.S. at 216. And, finally, in 1967, the Court reiterated that

> [m]ore than 30 years ago this Court held that the Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence. There has been no deviation from that established principle.

Miller v. Pate, 386 U.S. 1, 7 (1967) (citations omitted). Based on this authority, the court has little trouble concluding that, at the time of the events at issue here, the law clearly prohibited the

11

deliberate fabrication of evidence and the framing of individuals for crimes that they did not commit.

The court concludes that this applies equally to Weichel's malicious prosecution and conspiracy claims. Although Whelan argues that the First Circuit did not recognize a malicious prosecution cause of action under the Fourth Amendment until 2013 and that this entitles him to qualified immunity, the question is not whether the *cause of action* existed but whether the alleged *conduct* was prohibited. As the court has determined that the law clearly established that the conduct underlying Weichel's malicious prosecution was prohibited, Whelan is not entitled to qualified immunity based on Weichel's allegations.

The failure to intervene claim is a different matter. As the court noted, while the First Circuit has not limited failure-to-intervene claims, nor has it explicitly required officers to intervene—other than in excessive force cases—when an individual's constitutional rights are being violated. As a result, it was not clearly established in 1980 that Whelan had a duty to intervene, and he is therefore entitled to qualified immunity as to that claim.

2.  Issue Preclusion

"It is well-established that the doctrine of collateral estoppel applies in civil rights actions brought pursuant to 42 U.S.C. § 1983." Johnson v. Mahoney, 424 F.3d 83, 93 (1st Cir. 2005) (citing Allen v. McCurry, 449 U.S. 90, 96 (1980)). "Federal courts must give to state-court judgments the same preclusive effect as would be given by the courts of the state from which the judgments emerged." Id. (citing Kremer v. Chem. Constr. Corp., 456 U.S. 461, 466 (1982) and Allen, 449 U.S. at 96). In Massachusetts, "[t]he doctrine of issue preclusion provides that when an issue has been actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action

between the parties whether on the same or different claim." Jarosz v. Palmer, 436 Mass. 526, 530, 766 N.E.2d 482 (2002) (quotation marks and citation omitted).

Whelan argues that the issue of whether the van rides used to identify Weichel were unduly suggestive has been litigated, multiple times, and that relitigation at this juncture is precluded. Whelan's Mot. to Dismiss 7 [#73]. Specifically, Whelan points to a 1981 order on Weichel's motion to suppress the identification evidence, wherein a Superior Court judge concluded that the van identification was "unusual" but not "suggestive." Id. at 7-8.

But, critically, there is no "valid and final judgment" in that case. Weichel's conviction has been vacated. And "it is hornbook law that '[a] vacated judgment has no preclusive force either as a matter of collateral or direct estoppel or as a matter of the law of the case.'" Jackson v. Coalter, 337 F.3d 74, 85 (1st Cir. 2003) (quoting No East–West Highway Comm. v. Chandler, 767 F.2d 21, 24 (1st Cir. 1985)). Without a judgment of conviction, an order on a motion to suppress may be persuasive—assuming the new facts that warranted vacating the conviction do not call its conclusions into question—but it has no preclusive effect.

## IV.     Conclusion

For the forgoing reasons Trooper Whelan's Motions to Dismiss [#73] is GRANTED as to the claim for failure to intervene (Count IV) and DENIED as to all other claims.

IT IS SO ORDERED.

May 14, 2021                                              /s/ Indira Talwani
                                                                              United States District Judge