## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FREDERICK WEICHEL, | ) | |
| | ) | Case No. 20-CV-11456-IT |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TOWN OF BRAINTREE, BRAINTREE | ) | |
| POLICE CHIEF JOHN VINCENT | ) | |
| POLIO, BRAINTREE POLICE | ) | |
| OFFICERS JAMES LEAHY, ROBERT | ) | |
| WILSON, THEODORE BUKER, and | ) | |
| UNKNOWN BRAINTREE POLICE | ) | |
| OFFICERS, ESTATE OF BOSTON | ) | |
| POLICE OFFICER EDWARD WALSH, | ) | |
| BOSTON POLICE OFFICER WALTER | ) | |
| DERBY, and STATE POLICE OFFICERS | ) | |
| JOHN R. SPRAGUE and EDWARD | ) | |
| WHELAN, | ) | **JURY TRIAL DEMANDED** |
| | | |
| Defendants. | | |

## AMENDED COMPLAINT [LEAVE TO FILE GRANTED ON MAY 26, 2021]

Plaintiff, FREDERICK WEICHEL, by his attorneys LOEVY & LOEVY,

complains of the TOWN OF BRAINTREE, Braintree Police Chief JOHN VINCENT

POLIO, Braintree Police Officers JAMES LEAHY, ROBERT WILSON, THEODORE

BUKER, and UNKNOWN OFFICERS OF THE BRAINTREE POLICE

DEPARTMENT; ESTATE of Former Boston Police Officer EDWARD WALSH and

Boston Police Officer EDWARD DERBY, Massachusetts State Police Officers JOHN R.

SPRAGUE and EDWARD WHELAN, as follows:

### INTRODUCTION

1.     Plaintiff Frederick Weichel was wrongly accused and convicted of the

1980 murder of Robert LaMonica.

1

2.      Plaintiff spent more than 36 years imprisoned for the murder of Robert LaMonica, a crime that he did not commit.

3.      There was no legitimate evidence connecting Plaintiff to the murder.

4.      Instead, Defendants fabricated evidence in order to quickly "solve" the case.

5.      In particular, they fabricated a false eyewitness identification of Plaintiff.

6.      This identification was purportedly obtained from one of four teenaged friends who were in a nearby park and saw a man running from a distance of at least 180 feet (60 yards). The teenagers only saw the man for a few seconds.

7.      There is no way that any of the teenagers could have made a facial identification of the person they saw in the dark from that far distance.

8.      Despite this impossibility, Defendants in general, and Defendants Sprague and Wilson in particular, fabricated evidence that each of the teenagers expressly identified Plaintiff as being the man they saw.

9.      In order to further the wrongful prosecution of Plaintiff, Defendants Sprague and Wilson falsely claimed that up to all four teenagers identified Plaintiff. In reality, none of the witnesses was able to identify the face of the running man.

10.      Defendants, including but not limited to Defendant Sprague, used this false evidence, that one or more of the teenagers expressly identified Plaintiff, to develop probable cause to arrest and prosecute Plaintiff.

11.     They did this even though the purported eyewitness (and his three companions) described the height and build of the person as someone who looked completely different than Plaintiff.

12.     Defendant Wilson used the vague facial description from the teenager to develop a composite picture.

13.     Defendants, including but not limited to Defendants Leahy and Wilson, learned during the investigation that eleven credible witnesses told investigators that the composite picture looked like a convicted murderer who had unlawfully failed to return to prison from a furlough.

14.     The four teenagers' physical descriptions of height and build also matched that convicted murderer.

15.     Defendants never disclosed the exculpatory evidence that eleven credible witnesses told them that the composite picture looked like that convicted murderer. Plaintiff was, therefore, deprived of this evidence at trial.

16.     Plaintiff was further deprived of the evidence that the physical descriptions (height and build) also matched that convicted murderer and not Plaintiff.

17.     That evidence was highly exculpatory given that the only thing purportedly tying Plaintiff to the scene of the murder was the fabricated identification of a teenager who was at least 180 feet away, too far to view the man's facial features.

18.     To support their false story and prevent their case from unravelling, Defendants hid exculpatory evidence from Plaintiff and prosecutors.

19.     Defendants also fabricated additional evidence suggesting Plaintiff's guilt.

20.     In order to ensure that Plaintiff would be charged and prosecuted, Defendants, including but not limited to Defendants Wilson and Sprague, also created an unduly suggestive identification procedure to coerce an eyewitness into identifying Plaintiff. Their suggestive identification procedures failed to induce that witness' three companions (and also eyewitnesses) to implicate Plaintiff.

21.     Based on the force of the fabricated evidence and the suppression of all exculpatory evidence, Plaintiff was charged, prosecuted, and wrongly convicted of murder.

22.     The actions of the individual Defendants reflected the Braintree Police Department's unwritten custom or policy to not investigate exculpatory evidence and to withhold it from criminal defendants. The policymakers of Defendant Town of Braintree routinely failed to properly supervise and train its police officers and failed to discipline officers who withheld or fabricated evidence.

23.     Plaintiff was sentenced to life imprisonment without possibility of parole. Plaintiff was condemned to die in prison for something he had not done.

24.     Plaintiff never stopped professing his innocence—starting with his refusal to plea to lesser charges through his exoneration, Plaintiff fought for justice.

25.     His fight was vindicated with the discovery of the buried exculpatory evidence described above in Braintree Police Department's hidden basement files.

26.     On April 10, 2017, Judge Raymond Veary, Jr. of the Massachusetts Superior Court granted Plaintiff's Third Motion for New Trial.

27.     On August 7, 2017, after Plaintiff had spent more than three decades behind bars, the Commonwealth of Massachusetts dropped all charges against him.

28.     Plaintiff now seeks justice for the harm that Defendants caused and redress for the loss of liberty and the terrible hardship that Plaintiff has endured and continues to suffer as a result of Defendants' misconduct.

## JURISDICTION AND VENUE

29.     This action is brought under 42 U.S.C. § 1983 and Massachusetts law to redress Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

30.     This Court has jurisdiction of Plaintiff's federal claims under 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims under 28 U.S.C. § 1367.

31.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district and the events and omissions giving rise to Plaintiff's claims occurred within this judicial district. Moreover, on information and belief, many of the Defendants reside in Massachusetts and are subject to the personal jurisdiction of the courts in this judicial district.

## PARTIES

32.     Plaintiff Frederick Weichel is a man who spent 36 years wrongfully imprisoned for a crime that he did not commit. Mr. Weichel is a college graduate whose life was greatly and adversely impacted by the events giving rise to this matter.

33.     Defendants James Leahy, Robert Wilson, Theodore Buker, John Vincent Polio, and Unknown Officers of the Braintree Police Department (collectively "Braintree Police Defendants") were all Braintree police officers at the time of the events giving rise to this matter; Defendants Estate of Edward Walsh and Edward Derby, (collectively "Boston Police Defendants") were Boston police officers at the time

of the events giving rise to this matter; Defendants John R. Sprague and Edward Whelan were both Massachusetts State Police officers at the time of the events giving rise to this matter. All of these Defendants were responsible for investigating crimes, including the crime at issue in this case, and/or for supervising other police officer Defendants. They committed, facilitated, and approved the constitutional violations at issue in this case.

34.     Defendant Town of Braintree, Massachusetts is a municipality of the Commonwealth of Massachusetts, which oversees the Braintree Police Department. Braintree Police Defendants referenced above were employed by the Town of Braintree or were acting as agents of the Town of Braintree and/or the Braintree Police Department while conducting the investigation described in this Complaint. Defendant Town of Braintree is responsible for the policies and practices of the Braintree Police Department that were implemented by Defendants in this case. Finally, Defendant Town of Braintree is responsible under Massachusetts law for any judgment entered against Defendants.

35.     Defendants John R. Sprague and Edward Whelan are current or former officers of the Massachusetts State Police. These Defendants were responsible for investigating crimes, including the crime at issue in this case, and for supervising other police officer Defendants. These Defendants committed, facilitated, and approved the constitutional violations at issue in this case.

36.     At all times relevant to the events described in this Complaint, each of the Defendants identified above acted under color of law, within the scope of his employment, and as an investigator.

6

37.     Each of the Defendants is sued in his individual capacity, unless otherwise noted.

## FACTS

### The LaMonica Murder

38.     Shortly after midnight on May 31, 1980, Robert LaMonica was shot twice and killed in the Town of Braintree.

39.     Mr. LaMonica was killed as he returned home from work.

40.     Plaintiff had absolutely nothing to do with the murder.

41.     At the time of the murder, Plaintiff was miles away in Boston, Massachusetts.

42.     Multiple witnesses confirmed that Plaintiff was with them in Boston at the time of the murder.

43.     Braintree and Massachusetts State Police officers responded to the scene of the murder, investigated the scene, gathered some evidence, and spoke to nearby residents.

44.     The only possible witnesses identified by Defendants were four teenagers who were in the park near the scene of the murder.

45.     These four teenagers saw a man running in the dark at a far distance for a matter of a few seconds.

46.     It was a physical impossibility that any of those witnesses could identify the face of the man.

**Three Eyewitnesses Gave Physical Descriptions of a Man They Saw at a Distance—None of these Matched Plaintiff**

47.     Defendants identified no witness to the fatal shooting itself.

48.     The four teenagers were in the park at nighttime after going to a movie. They had been drinking beers. They were at least 180 feet from the street when they heard four loud bangs and saw a man running quickly to a car parked onthe street.

49.     Teenage witness Frederick Laracy described the running man to Defendant Sprague and other Defendants as 6'1". Laracy said he did not see the running man's facial features.

50.     Teenage witness Lisa Krause described the running man as 5'11" with a slim, athletic build. She did not see his facial features, only that the man had a "round" face.

51.     Teenage witness Jean Castonguay described the running man as 5'10" or 5'11" and as tall and skinny. She could not see his facial features, only that the man had a "short, round" face.

52.     Teenage witness John M. Foley, who had drunk four to five beers, claimed to have seen the running man's face for approximately one second under a street light.

53.     Mr. Foley's description (along with the body-type descriptions of his friends) did not match Plaintiff.

54.     Mr. Foley's description was consistent with Rocco Balliro, a convicted murderer who had unlawfully failed to return to prison from a furlough the day before the murder, or Mr. Balliro's identical twin brother.

55.     Mr. Foley described the running man as being 5'11" tall.

56.     Mr. Balliro was 5'11 ½" tall.

57.     Plaintiff is 5'7" tall.

58.     Mr. Foley described the running man as being athletic and weighing approximately 175 to 180 lbs.

59.     Mr. Balliro weighed between 165 to 190 lbs.

60.     Plaintiff weighed 155 lbs.

61.     Mr. Foley described the running man as having bushy eyebrows, and dark, curly sideburns.

62.     Plaintiff did not have bushy eyebrows or sideburns.

63.     Using Mr. Foley's vague description of the running man, Defendants, including but not limited to Defendants Wilson, Sprague, and at least one other unknown officer worked with Mr. Foley to create a composite sketch of the man that Foley saw running.

64.     This composite sketch did not look like Plaintiff, but instead included facial features that did not match Plaintiff. These features included, but were not limited to, thick eyebrows and dark, curly sideburns.

65.     Rather, the composite sketch looked very much like Rocco Balliro.

66.     In the alternative, the composite sketch looked very much like Salvatore Balliro, Rocco Balliro's identical twin brother.

67.     At least one of the four teenagers was asked to draw a picture of the running man. Defendants, including but not limited to Defendants Wilson and Sprague, suppressed and/or destroyed that picture.

### Eleven People Identify Balliro as the Man in the Composite

68.     Defendant Wilson's composite picture was published in a local paper along with an article about the murder.

69.     There are no known police reports after the publication of the composite sketch stating that anyone identified the image depicted in the composite as Mr. Weichel.

70.     On or about June 6, 1980, Defendant Leahy received a phone call from a well-known acquaintance that the composite picture was undoubtedly Rocco Balliro.

71.     Armed with that information, on or about June 8, 1980, Defendant Leahy went to Bridgewater prison and showed the composite picture to 10 prison guards, who all confirmed that the composite showed Mr. Balliro.

72.     Mr. Balliro looked like the man depicted in the composite picture, including a full head of curly hair, thick eyebrows, thick sideburns and a broad nose.

73.     In fact, comparing the composite picture with contemporary photos of Plaintiff and Mr. Balliro, the composite looks like Mr. Balliro "hands down."

74.     On or about June 9, 1980, Defendant Leahy drafted a police report ("Leahy Report") that documented that phone call and subsequent identifications.

75.     Defendant Buker assigned Defendant Wilson to investigate this evidence.  There are not reports that document the investigation.

76.     Defendants, including but not limited to Defendants Leahy, Wilson, and Sprague, never disclosed the Leahy Report or the information contained in that police report—instead, it was buried for three decades while Plaintiff, an innocent man, remained imprisoned.

77.     In addition to the positive identifications that the composite sketch matched Balliro, Defendant Leahy had conversations with ten prison guards, who would have known that Balliro had recently assaulted a different man named LaMonica, only ten days before the murder of Robert LaMonica.

78.      In addition, Mr. Balliro had once shot at and threatened a man, Freeman Clifford. Mr. Clifford survived.

79.     Later Mr. Clifford was shot and killed. Robert Lamonica, the murder victim here, was initially charged with the murder of Mr. Clifford, but all charges were dropped when Robert LaMonica's father pleaded guilty to manslaughter in the shooting of Mr. Clifford.

80.     Had the Leahy Report been provided to the prosecutor and defense counsel, the information above would have been uncovered.

81.     Defendants, including but not limited to Defendants Sprague, Wilson, and Leahy, hid all of the above evidence from Plaintiff, his defense, and prosecutors.

82.     There are no known police reports documenting whether the composite sketch resulted in identifications of any other persons.

### Defendants Conducted Suggestive Identification Procedures And Fabricated the Results

83.     The four teenage witnesses were at least 180 feet from the street when they saw the man running quickly to a parked car.

84.     Scientific studies "have demonstrated that, even with 20/20 vision and excellent lighting conditions, face perception begins to diminish at 25 feet, nears zero at about 110 feet, and faces are essentially unrecognizable at 134 feet."

85.     The man ran past them in seconds.

86.     These witnesses could not have observed the facial features of the running man.

87.     Mr. Laracy said the man had "dark curly hair" but he could not make an identification. Ms. Krause said the man had "dark frizzy hair." Ms. Castonguay said he had "dark curly hair (like a bushy afro)." Both female witnesses said they had only a side view of his face but they noted he had a "round" face.

88.     The fourth witness, Mr. Foley, who was no closer to the scene than the other witnesses, was coerced by Defendants Sprague and Wilson into claiming that he could identify the running man. Defendant Wilson prepared a composite drawing with Mr. Foley. Since Mr. Foley could not have seen the facial features of the running man, the composite was prepared based on suggestions from Defendants, including Defendants Wilson and Sprague.

89.     The next day, on June 1, Defendants, including but not limited to Defendants Sprague and Wilson, included Plaintiff's photograph in a suggestive photo array of men tendered to at least three of the teenagers. There is no document that suggests that Mr. Laracy was shown a photo array or, if he was, what he stated about the array.

90.     Defendant Sprague admits that Plaintiff was known to him on June 1, 1980, though not one police report ever identified how and why Plaintiff was purportedly known to be a suspect on that date. Defendants suppressed the underlying evidence before, during, and after Plaintiff's criminal trial.

91.     Defendants conducted unduly suggestive photo identification procedures. The suggestiveness of the photo array included, but was not limited to, that the photo array included only one or two photographs (including that of Plaintiff) that matched the general hair description of the running man given by the teenage witnesses. This was particularly suggestive because the witnesses viewed the man who was running quickly for (at most) several seconds at a great distance at night so that only very general features could be used to identify the running man.

92.     The photo array hid the significant height and weight disparity between Plaintiff and the teenagers' initial and consistent descriptions of the running man (as being much taller and thinner); therefore, the only feature that theteenagers could use to identify the running man from the photographs presented to them by Defendants Sprague and Wilson was hair style.

93.     Defendants did not retain a copy of the photo array.

94.     After preparing the composite based on suggestions from Defendants Wilson and Sprague, Defendants claim that Mr. Foley selected Plaintiff's photo from the array.

95.     In fact, each time that he looked at the photo array, Mr. Foley told Defendants Wilson and Sprague that the photograph merely resembled the running man but that there were at least two differences between the photograph and the running man. Defendants Wilson and/or Sprague did not document those statements from the two initial photo arrays or did document those statements but suppressed them.

96.     Defendant Sprague instructed the three witnesses to pick a photo if it "resembled in any way" the person they saw running.

97.     Defendant Sprague instructed the female witnesses to look at all the features of the photos in the array. He specifically suggested that they look at the hair.

98.     The two female witnesses each picked two or three photos from the array of nine photos as possibly being the running man based on the hairstyles. Both female witnesses said they liked the photo of Plaintiff because of his hair. They each picked more than one photo because there were characteristics they liked in multiple photos. These were not positive identifications.

99.     About a week or two after the first suggestive photo array, Defendants, including Defendant Sprague, tendered a second array to the three witnesses. The photos were the same, with the addition of a tenth photo of a Mr. James Mantville. Defendant Sprague says Mr. Mantville's photo was added because the victim's father had heard he was the shooter. The witnesses responded to the second array in essentially the same manner as the first; Mr. Foley picked out Plaintiff's photo as resembling the running man, but again noted that there were differences between the two, and the two female witnesses each picked out two to three photos including Plaintiff's photo.

100.    Months later, Defendants, including Defendant Sprague, tendered a third array to the three witnesses. This array contained only the original nine photos from the first array. Mr. Foley again picked out Plaintiff's photo as resembling the running man and said that the photo looked more "baby-faced." Ms. Castonguay again

picked out two or three photos and said she chose Plaintiff's photo because she liked his hair. Ms. Krause was "so unsure of herself she could not make any identification."

101.     In addition to the suggestive photo identification procedures, Defendants, including but not limited to Defendants Sprague and/or Defendant Whelan, conducted at least two van rides where they drove one or more of the witnesses around South Boston to look for Plaintiff.

102.     The first van ride included Mr. Foley, Ms. Krause, and/or Ms. Castonguay, but none of the witnesses identified the man that Defendants were targeting. Defendants did not document this exculpatory evidence, nor have they ever disclosed it.

103.     The second van ride occurred on June 12, 1980. Defendants Sprague and Whelan drove in a van with Mr. Foley and LaMonica's two brothers (who were not witnesses to the murder) around South Boston.

104.     The victim's brothers directed the location of the purported South Boston search, though there is no police report explaining why that occurred.

105.     One or more of the Defendants in the van stated to Mr. Foley, "isn't he the one" or words to that effect in reference to Plaintiff. Mr. Foley then purportedly identified Plaintiff.

106.     This "random" "identification" was unduly suggestive and staged to cause a false identification of Plaintiff.

107.     A photograph of Plaintiff taken during the suggestive van ride with Mr. Foley was introduced at trial against Plaintiff.

108.     Defendants, including but not limited to Defendants Wilson and Sprague, knew that there was no clear positive identification of Plaintiff, but they claimed that multiple witnesses identified Plaintiff.

109.     Defendant Sprague wrote a report seeking a wiretap of Plaintiff stating "All eye witnesses" and, then in handwriting, "Four eye witnesses" picked Weichel's photo from the array "as a look-a-like of the assailant." This statement was not true.

110.     Sprague's undated investigative report suggests that two witnesses identified Plaintiff. The report states that Mr. Foley picked Plaintiff's photo as a "look-alike of the assailant," and Ms. Krause picked it as "a definite look-alike of the assailant." The report does not mention that Castonguay also viewed the array.

111.     In fact, Mr. Foley's identification was coerced and the other witnesses had never positively identified Plaintiff.

112.     Defendants have hidden and/or destroyed virtually all evidence of the suggestive photo identification procedures.

113.     Defendant Wilson admitted that he took notes and wrote a report of the photo arrays, but those notes and report have been destroyed or suppressed.

114.     Defendants suppressed the exculpatory evidence that the purported positive identification of Plaintiff by each of the witnesses was false.

### Defendants Fabricated and Suppressed Additional Evidence

115.     Defendants fabricated additional evidence and/or suppressed exculpatory evidence to bolster their case against Plaintiff.

116.     Defendants, including but not limited to Defendant Wilson, destroyed the composite picture with edits that were generated from Mr. Foley's original

description, which could have been used to demonstrate that the description did not remotely match him.

117.     Defendants, including but not limited to Defendants Wilson, Sprague, Walsh, and Derby, fabricated evidence from purported informants that Plaintiff and a man named Thomas Barrett were the murderers.

118.     More specifically, the first dated report identifying any basis why Plaintiff might be a suspect occurred on June 12, 1980—only after Defendants, including but not limited to Defendants Wilson and Sprague, directed their investigation at Plaintiff.

119.     The June 12, 1980 report by Defendant Wilson states that confidential informants told Defendants Walsh and/or Derby that Plaintiff was involved.

120.     Defendant Wilson either falsified that information and/or Defendants Walsh and/or Derby fabricated the false reports to Defendant Wilson.

121.     There is no police report or any other evidence every produced to substantiate the existence of the purported confidential informants or any details obtained from them outside of the vague claim that Plaintiff and Thomas Barrett were involved in the murders.

122.     Defendants, including but not limited to Defendants Walsh and Derby, suppressed any evidence relating to information from these purported informants.

123.     Defendants fabricated identification evidence from Mr. Foley, by coercing him into changing his description of the murderer that was given shortly after the murder so that his description would be closer to that of Plaintiff at trial.

124.     Similarly, Defendants, including but not limited to Defendant Sprague, fabricated evidence that Ms. Castonguay had identified Plaintiff.

125.     In doing so, Defendants, including but not limited to Defendant Sprague, suppressed evidence that would reveal this fabrication.

126.     Defendants, including but not limited to Defendants Sprague and/or Wilson, fabricated a false statement from Ms. Krause that Plaintiff's photograph was a "definite look-alike" for the man she had seen when, in fact, Ms. Krause was always adamant that she could not identify the running man at all.

127.     Defendants, including but not limited to Defendants Sprague and/or Wilson, did not document Ms. Krause's statement that she could not identify the running man and did not disclose her statement to prosecutors or the defense.

128.     Moreover, Defendants, including but not limited to Defendant Sprague, fabricated motive evidence related to a purported street fight to further the prosecution of Plaintiff.

129.     Specifically, Defendants, including but not limited to Defendant Sprague, fabricated the existence of prior incidents purportedly involving Plaintiff and LaMonica to introduce false motive evidence for the murder.

130.     Defendant Skinner took statements from all four teenagers right after the murder. These statements undermine the fabricated evidence that anyone besides Foley claimed to have seen the face of the running man.

131.     Defendants suppressed evidence of the above fabrications so that they would not come to light.

132.     Braintree Police Defendants acted under the policy and practice of the Town of Braintree, which, as described below, undermined any efforts to conform policing activities to the constitution.

## For Over Three Decades,
## Defendants Hid Exculpatory Evidence from Plaintiff

133.     Defendants hid the exculpatory evidence that Defendant Leahy confirmed that eleven other people identified Rocco Balliro as matching the composite sketch created by Wilson.

134.     That evidence was kept in a binder retained by Defendant Buker.

135.     That binder that was placed in a secret, secluded section of the Braintree Police Department called the "Basement Archive," which was inaccessible to Plaintiff, the prosecution, or anyone from the general public.

136.     Had Plaintiff's defense been armed with the Leahy Report and a photograph of Balliro, it could have undermined the prosecution's contention at the criminal trial that Foley identified Plaintiff.

137.     That evidence would have contradicted the heart of the prosecution's case.

138.     Also hidden in the Buker binder in the Basement Archive was evidence that another man, Lawrence Estrella, who had a long record including violent assaults, was investigated for the LaMonica murder.

139.     Defendants further hid from Plaintiff the fact that the sole witness against him, Mr. Foley, received favorable treatment in a criminal case of his own in another jurisdiction in exchange for his testimony against Plaintiff.

140.     Defendants suppressed from Plaintiff and prosecutors that they told
Foley "isn't he the one" or words to that effect in order to get Foley to identify Plaintiff.

**In 2010, a Public Records Request
Results in the First Disclosure of the Balliro Evidence**

141.     Between 1980 and 2009, Plaintiff and his counsel tendered multiple
public records requests for exculpatory information to the Town of Braintree. The
Town withheld the Leahy Report in response to each of these public records requests.

142.     As a result of the Town's failure to provide the Leahy Report, Plaintiff
remained in prison.

143.     On June 2, 2010, Plaintiff's attorneys again made a public records
request for all exculpatory materials related to the LaMonica murder.

144.     In response, for the first time in August 2010, police revealed Defendant
Buker's binder on the LaMonica murder investigation, which had been hidden by the
Braintree Defendant investigators and/or police supervisors in Defendant Buker's
stash of documents in the "Basement Archive" of the BraintreePolice Department.

145.     The Buker binder contained additional internal Braintree police
reports, including but not limited to the Leahy Report relating to the multiple
identifications of Balliro discussed above, exculpatory evidence that supported that
Plaintiff was not the murderer.

146.     It was the policy and/or practice of the City of Braintree to allow
documents to be hidden in the "Basement Archive" of the Braintree Police Department.

147.     These documents, including the Leahy Report, were again produced in the ordinary course of business by members of the Braintree Police Department in 2013.

148.     The Leahy Report is an authentic record of the Braintree Police Department and is of a type frequently generated by members of the Braintree Police Department.

149.     Moreover, the Leahy Report was kept in the ordinary course of business related to the Robert LaMonica murder investigation.

150.     Prosecutors associated with prosecuting the case against Plaintiff had no knowledge of the Leahy Report.

151.     Plaintiff's counsel in the criminal case against him similarly had no knowledge of the Leahy Report.

**There Has Never Been any Credible EvidenceTying Plaintiff to the Murder**

152.     To this day, there is not one piece of physical evidence that ties Plaintiff to the scene of the murder, let alone the murder itself.

153.     For instance, the murder weapon was found less than a half mile from the murder the following day. No fingerprints or biological evidence testing was ever done by Defendants. Such evidence could have exonerated Plaintiff.

154.     Moreover, the murder weapon was "misplaced" by Defendants so that no additional testing could be done regarding it. This constitutes ongoing suppression of exculpatory evidence.

155.     In August 1980, Defendants obtained a search warrant to record Plaintiff—it resulted in no incriminating evidence.

### Plaintiff's Arrest, Wrongful Conviction, and Imprisonment

156.     Almost immediately, Defendants, including but not limited to Defendant Sprague, focused on Plaintiff as the culprit for an unknown reason and coerced an eyewitness into changing his description and identifying Plaintiff.

157.     On August 13, 1980, Defendants arrested Plaintiff for the LaMonica murder.

158.     In 1980, as a result of Defendants' misconduct and the false evidence they created, Plaintiff was charged, prosecuted, and tried by jury.

159.     Plaintiff contested guilt at every stage of his arrest and prosecution.

160.     On November 25, 1980, Plaintiff's counsel sought all possible exculpatory evidence possessed by Defendants.

161.     During the trial, the false evidence described above was the only thing suggesting that Plaintiff was guilty of murder. Specifically, Foley's fabricated identification testimony was the only evidence tying Plaintiff to the location of the murder.

162.     Moreover, Plaintiff was unable to defend himself because he was denied access to the exculpatory evidence described above. Among other things, he was deprived the evidence to undermine the fabricated identification evidence against him, to introduce evidence that eleven other people identified Balliro as looking like the composite sketch, and/or to present evidence that the composite didlook like Balliro.

163.     As a result of the suppression of the exculpatory evidence, Plaintiff was unable to rebut the prosecutor's sole argument against Plaintiff—that an eyewitness

had identified only Plaintiff through comparing the composite with Plaintiff's photograph.

164.     Had Plaintiff had the exculpatory evidence described above, he would have been able to establish that Balliro is the one whose photograph matched the composite "hands down."

165.     On August 20, 1981, a jury found Plaintiff guilty of the LaMonica murder.

166.     Plaintiff was sentenced to life in prison without possibility of parole.

167.     Without Defendants' fabricated evidence, there was no evidence to support a criminal proceeding against Plaintiff.

168.     Likewise, had Defendants disclosed the exculpatory evidence they suppressed, Plaintiff never would have been arrested, let alone convicted.

### Plaintiff's Damages

169.     Plaintiff was in his late 20s, in the prime of his life, at the time that he was wrongly arrested and convicted.

170.     Plaintiff was arrested, prosecuted, and convicted for no reason at all.

171.     He would spend the next thirty-six years imprisoned for something he had not done.

172.     Plaintiff's whole life was turned upside down without any warning.

173.     Because of Defendants' misconduct, Plaintiff has missed out on the participating in the lives of his family and friends.

174.     In particular, it irrevocably, adversely impacted his relationship with his mother, who died while Plaintiff was imprisoned in 2000.

175.     Plaintiff was also deprived of opportunities to engage in meaningful labor, to develop a career, and to pursue his interests and passions. Plaintiff has been deprived of all of the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as anautonomous human being.

176.     During his decades of wrongful imprisonment, Plaintiff was detained in harsh and dangerous conditions in maximum security prisons. He was physically injured and assaulted numerous times, some of which resulted in painful medical treatment. These assaults included being stabbed and hit with heavy objects. His injuries included open wounds and a broken jaw. In addition, at least one assault occurred while Plaintiff was sleeping, thereby causing him ongoing fear.

177.     Plaintiff was forced to rely on his imprisoners to meet his basic needs. Among other hardships, he had difficulty getting medical care while he was in prison. Plaintiff had to wait long periods to obtain needed medical attention. Even when he received medical care, it was often substandard.

178.     His unlawful arrest, prosecution, and imprisonment caused him to suffer from mental and physical health problems, which continue to this day.

179.     In addition to the severe trauma of wrongful imprisonment and Plaintiff's loss of liberty, Defendants' misconduct continues to cause Plaintiff ongoing health effects.

## Plaintiff's Exoneration

180.    Plaintiff always proclaimed his innocence. During the criminal trial, he rejected a guilty plea to a lesser charge because he refused to concede that he was involved in any way in the LaMonica murder.

181.    On July 21, 2017, the Supreme Judicial Court of Massachusetts upheld the order granting Plaintiff a new trial, based on the discovery of the withheld exculpatory evidence that the only eyewitness identification was of someone else entirely.

182.    On August 7, 2017, the Commonwealth of Massachusetts dropped all charges against Plaintiff.

183.    Plaintiff walked out of prison a free man after 36 years of wrongful imprisonment.

## COUNT I
## 42 U.S.C. § 1983 – Due Process

184.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

185.    In the manner described more fully herein, Defendants, while acting as investigators, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

186.    Defendants deliberately withheld exculpatory evidence from Plaintiff and from state prosecutors, among others, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

187.    Defendants fabricated and solicited false evidence, including testimony that they knew to be false, implicating Plaintiff in the crime, obtained Plaintiff's conviction using that false evidence, and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

188.    In addition, Defendants produced a series of false and fraudulent reports and related documents, which they inserted into their file and presented to state prosecutors and judges. These documents, which were used to show Plaintiff's purported connection to the crime, contained statements and described events that were fabricated and that Defendants knew to be false. Defendants signed these reports, both as investigators and as supervisors, despite their knowledge that the information contained in those reports was false.

189.    Defendants also procured false eyewitness identifications of Plaintiff, implicating him in the crime, and they used unduly suggestive identification techniques to obtain those false identifications. Defendants used the resulting false identifications to taint Plaintiff's criminal trial.

190.    In addition, Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

191.    Defendants who were supervisors charged with overseeing the investigation and the other Defendants knew full well of this misconduct, the suppression of exculpatory evidence, and the fabrication of a false case against Plaintiff. These supervisors nevertheless intentionally ignored Defendants' misconduct, and decided to make Plaintiff responsible for a crime he did not commit, rather than directing the officers to go out and fully investigate the murder.

192.     Defendants' misconduct directly resulted in the unjust criminal conviction of Plaintiff, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued.

193.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and/or in total disregard of the truth and Plaintiff's clear innocence.

194.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

195.     Plaintiff's injuries were caused by the official policies of Defendant Town of Braintree and the Braintree Police Department, by the practices and customs of Defendant Town of Braintree, the Braintree Police Department and by the actions of final policymaking officials for Defendant Town of Braintree, and the Braintree Police Department. For example, the Braintree Police Department maintained an unwritten custom or policy to not investigate exculpatory evidence and to withhold it from criminal defendants.

196.     Mr. Weichel's wrongful conviction further resulted from the failure to supervise and train Braintree police officers regarding the proper handling of exculpatory evidence and the government's obligation to disclose it to criminal defendants. The Town's failure to supervise and train its officers showed deliberate

27

indifference to the risk that an innocent person like Mr. Weichel would be convicted of a crime he did not commit.

197.    In addition, the Braintree Police Department maintained a "Basement Archive" into which exculpatory evidence was placed in secrecy. The basement archive was not available to anyone outside of the Braintree Police Department.

198.    At all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant Town of Braintree promulgated rules, regulations, policies, and procedures governing witness interviews, photo lineups, live lineups, preservation and disclosure of investigative materials and evidence, questioning of criminal suspects, in-court testimony, preparation and presentation of witness testimony, fire/arson investigations, and training, supervision, and discipline of employees and agents of the Town of Braintree, including employees and agents of the Braintree Police Department.

199.    These rules, regulations, policies, and procedures were implemented by employees and agents of Defendant Town of Braintree, including the Defendants, who were responsible for conducting investigations of crimes in and around Braintree, Massachusetts.

200.    In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant Town of Braintree had notice of a widespread practice by its officers and agents under which individuals suspected of criminal activity, such as Plaintiff, were routinely deprived of exculpatory evidence, were subjected to criminal proceedings based on false evidence, and were deprived of their liberty without probable cause, such that individuals were routinely

implicated in crimes to which they had no connection and for which there was scant evidence to suggest that they were involved.

201.     These widespread practices were allowed to flourish because the leaders, supervisors, and policymakers of Defendant Town of Braintree directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and discipline their officers, agents, and employees who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful prosecutions and convictions.

202.     The above-described widespread practices, which were so well settled as to constitute the *de facto* policy of the Town of Braintree, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

203.     The misconduct described in this Count was undertaken pursuant to the policy and practices of Defendant Town of Braintree in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the Town of Braintree and the Braintree Police Department, or were actually committed by persons with such final policymaking authority.

204.     John Vincent Polio was chief of the Braintree Police Department in 1980 and the final policymaker for the Braintree Police Department as authorized by the Town of Braintree.

205.     Mr. Polio joined the Braintree Police Department in 1950 and became chief in 1962, retiring in 1987.

29

206.     As police chief, Polio was responsible for all the policies, practices, and customs of the department.

207.     Polio was known for being "cunning, controlling, and eccentric," according to an article in the February 11, 2013 issue of the *New Yorker*. The article also says he was an "autodidact" who "didn't trust anybody."

208.     At the time of the LaMonica murder investigation, all of the investigation decisions went through Chief Polio.

209.     Polio, whose formal education ended when he when he was fifteen years old and dropped out of high school, was critical of his officers receiving training unless it was his own idea.

210.     By discouraging and mocking training, Chief Polio sent a message to officers that the subjects covered in training, such as constitutional standards in criminal procedure and police practices, were not important within the Braintree Police Department.

211.     Officers in turn were emboldened to ignore constitutional requirements, including the duty to disclose exculpatory evidence, because they were denigrated within the department.

212.     Had training been taken seriously, Braintree police officers would have followed up on the tip about Rocco Balliro and produced the Leahy Report to the prosecution.

213.     At the time of the murder investigation, Polio failed to supervise offices in the Braintree Police Department.

214.    For instance, he did not hold meetings for his staff and communicated with officers only through general orders which were read aloud to officers each shift.

215.    Had Braintree police officers been properly supervised, Defendants would have produced the Leahy Report and/or refrained from engaging in suggestive identification procedures.

216.    At the time of the murder investigation, the Braintree police officer assigned to a case was responsible for deciding what material from the case file to provide to the prosecution (and thereby the defense). The officer would provide the materials to his supervisor, who in turn would provide it to his superiors up the chain of command. Polio made the final determination as to what materials wouldbe provided to the prosecution.

217.    Through this system, exculpatory evidence was allowed to be banished to the "Basement Archive" and not produced to the prosecutor or defense.

218.    The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

219.    Plaintiff's injuries were caused by Defendants, many of whom were officers, agents, and employees of the Town of Braintree, and the Braintree Police Department including but not limited to the individually named Braintree Police Defendants, who acted pursuant to the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

31

## COUNT II
## 42 U.S.C. § 1983 – Federal Malicious Prosecution

220.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

221.     In the manner described above, Defendants, acting as investigators, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent.

222.     In doing so, Defendants caused Plaintiff to be unreasonably seized without probable cause and deprived of his liberty, in violation of Plaintiff's rights secured by the Fourth and Fourteenth Amendments.

223.     The false judicial proceedings against Plaintiff were instituted and continued maliciously, resulting in injury.

224.     Defendants deprived Plaintiff of fair state criminal proceedings, including the chance to defend himself during those proceedings, resulting in a deprivation of his liberty, and Massachusetts law does not provide an adequate state-law tort remedy to redress that harm.

225.     In addition, Defendants subjected Plaintiff to arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally framed for a crime of which he was totally innocent, through Defendants' fabrication and suppression of evidence and their use of unduly suggestive identification procedures.

32

226.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

227.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

228.     On August 7, 2017, the judicial proceedings against Plaintiff were terminated in his favor, in a manner indicative of his innocence.

229.      Braintree Police Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant Town of Braintree, and by Defendants who were final policymakers for Defendant Town of Braintree, in the manner more fully described above.

## COUNT III
### 42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights

230.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

231.     After the LaMonica murder, Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for murder, a crime he did not commit, and thereby to deprive him of his constitutional rights, all as described in the various paragraphs of this Complaint.

232.     In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

233.   In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

234.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

235.   As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

236.   Braintree Police Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant Town of Braintree, and by Defendants who were final policymakers for Defendant Town of Braintree, in the manner more fully described above.

## COUNT IV
## 42 U.S.C. § 1983 – Failure to Intervene

237.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

238.   In the manner described above, during the constitutional violations described herein, one or more Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

239.   As a result of Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional

distress and permanent physical damage. These Defendants had ample, reasonable opportunities to prevent this harm but failed to do so.

240.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

241.   As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

242.   Braintree Police Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant Town of Braintree, and by Defendants who were final policymakers for Defendant Town of Braintree, in the manner more fully described above.

## COUNT V
### Intentional Infliction of Emotional Distress

243.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

244.   As a proximate result of the initiation of the prosecution of Fredrick Weichel for the LaMonica murder without probable cause and with malice by defendants, Plaintiff was convicted and imprisoned for over 36 years.

245.   The acts and omissions of defendants in initiating the prosecution of Plaintiff was made without probable cause. Fabricating evidence and withholding exculpatory evidence in order to convict an innocent man is extreme and outrageous

conduct, beyond all possible bounds of decency and utterly intolerable in a civilized community.

246.     The defendants' acts and omissions caused Plaintiff to suffer severe emotional distress of a nature that no reasonable person could be expected to endure as described above.

247.     These actions constitute the tort of intentional infliction of emotional distress under Massachusetts law.

248.     As a result of the Defendants' intentional infliction of emotional distress, Plaintiff has suffered damages as described above.

249.     Defendants are liable to the Plaintiff for injuries and damages resulting from the fact that by their acts and omissions alleged herein, they intentionally inflicted emotional distress upon the Plaintiff.

WHEREFORE, Plaintiff, FREDERICK WEICHEL, respectfully requests that this Court enter a judgment in his favor and against the TOWN OF BRAINTREE, BRAINTREE POLICE CHIEF JOHN VINCENT POLIO, Defendants Braintree Police Officers JAMES LEAHY, ROBERT WILSON, THEODORE BUKER, and UNKNOWN OFFICERS OF THE BRAINTREE POLICE DEPARTMENT; ESTATE OF EDWARD WALSH and EDWARD DERBY, and Massachusetts State Police Officers JOHN R. SPRAGUE and EDWARD WHELAN, awarding compensatory damages, attorneys' fees and costs against each Defendant, punitive damages against each of the individual Defendants, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, FREDERICK WEICHEL, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED,

**FREDERICK WEICHEL**

BY: <u>/s/ Mark Loevy-Reyes</u>
*One of Plaintiff's Attorneys*

Jon Loevy*
Debra Loevy, Bar No. 569212
Mark Loevy-Reyes*, BBO 707974
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
mark@loevy.com
*Admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I, Mark Loevy-Reyes, an attorney, hereby certify that on May 26, 2021, I filed the

foregoing AMENDED COMPLAINT [LEAVE TO FILE GRANTED ON MAY 26, 2021] using

the Court's CM/ECF system, which effected service on all counsel of record.

/s/ Mark Loevy-Reyes
*One of Plaintiff's Attorneys*

Jon Loevy*
Debra Loevy, BBO No. 569212
Mark Loevy-Reyes*, BBO No. 707974
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
mark@loevy.com
*Admitted *pro hac vice*