# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FREDERICK WEICHEL, | ) | Case No. 20-CV-11456-IT |
| | ) | |
| Plaintiff, | ) | Hon. Indira Talwani, |
| | ) | District Judge |
| v. | ) | |
| | ) | Hon. M. Page Kelley, |
| TOWN OF BRAINTREE, *et al*., | ) | Magistrate Judge |
| | ) | |
| Defendants. | ) | **JURY TRIAL DEMANDED** |

## PLAINTIFF'S COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS WILSON, POLIO, BUKER, LEAHY, TOWN OF BRAINTREE, DERBY, AND WALSH'S MOTIONS TO DISMISS (DOC. 99, 102, 104, 114, 118)[1]

**ATTORNEYS FOR PLAINTIFF**
**FREDERICK WEICHEL**

Jon Loevy*
Debra Loevy, Bar No. 569212
Mark Loevy-Reyes, Bar No. 707974
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
mark@loevy.com
*Admitted *pro hac vice*

---

[1] Plaintiff was granted leave to file this combined response in excess of the page limits. Doc. No. 117. After leave was granted, Defendant Estate of Walsh filed the fifth pending motion to dismiss. Doc. Nos. 118-119. Plaintiff incorporates his response to that motion here for those issues that overlap with the other pending motions to dismiss. Plaintiff is also filing a separate opposition to Defendant Walsh's motion to address the factual allegations that relate only to Plaintiff's claims against Defendant Walsh.

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................1

Plaintiff Was Convicted of Murder Based on Fabricated Evidence ................................1

Defendants Inexplicably Focused on Plaintiff...................................................................2

Defendants Used Increasingly Suggestive Techniques to Secure an Identification of
Plaintiff ............................................................................................................................2

Defendants Fabricated Confidential Informant Evidence.................................................3

Defendants Buried Evidence that Witnesses Identified an Alternate Suspect.................4

Plaintiff was Wrongly Arrested, Prosecuted, and Convicted ..........................................4

ARGUMENT ........................................................................................................................5

A. PLAINTIFF TIMELY FILED HIS COMPLAINT AGAINST EACH DEFENDANT ............5

    1.   Plaintiff's Complaint is Timely under *Heck* and *McDonough*. ..........................6

    2.   *Wallace v. Kato* Does not Apply. ......................................................................7

    3.   Defendants' Arguments are Contrary to Accrual Rules. ...................................9

    4.   Defendants' Arguments Contradict Comity Principles. ...................................11

B.     PLAINTIFF PROPERLY SERVED DEFENDANT TOWN OF BRAINTREE
     AND THE CITY OF BOSTON FOR CLAIMS AGAINST THEIR DECEASED
     EMPLOYEES.........................................................................................................11

       1.     Plaintiff's Potential Claims against Representatives of the Deceased
           Defendants Are Timely......................................................................................12

       2.     Plaintiff's Claims are for "Personal Injury."...................................................13

       3.     The City of Boston is a Direct Liability Insurer of Defendant Derby. ................13

       4.     Defendant Town of Braintree Holds Liability Insurance. .....................................14

5.      Discovery is needed about the Extent of Defendant Town of Braintree and City of Boston's Additional Obligations to Indemnify. ........................................14

6.      Plaintiff Properly Served Process on the Municipalities. ......................................15

C.     THE ISSUE OF SERVING DECEASED DEFENDANTS THROUGH THEIR MUNICIPAL EMPLOYERS DOES NOT IMPLICATE THE STANDING DOCTRINE ...................................................................................................................19

D.     DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY ........................21

1.      Qualified Immunity does not Shield Defendants from Plaintiff's Malicious Prosecution Claim...............................................................................................22

2.      Qualified Immunity does not Shield Defendants from Plaintiff's Failure to Intervene Claim...................................................................................................26

E.     PLAINTIFF AGREES THAT HIS INTENTIONAL TORTS CLAIMS ARE PLED ONLY AGAINST THE INDIVIDUAL DEFENDANTS .....................................27

CONCLUSION...............................................................................................................................27

## TABLE OF AUTHORITIES

*Bazinet v. Thorpe*, 4:14-CV-40082-TSH, 2016 WL 3149657 (D.Mass. June 3, 2016) ...............25

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...........................................................5

*Boykin v. KeyCorp*, 521 F.3d 202 (2nd Cir. 2008) .......................................................21

*Brown v. Mississippi*, 297 U.S. 278 (1936) ................................................................24

*Casey v. Mass. Elec. Co.*, 467 N.E.2d 1358 (Mass. 1984) .........................................15

*City of Bos. v. Bos. Police Patrolmen's Ass'n, Inc.*, 48 Mass. App. Ct. 74 (1999) ......19

*Coggins v. O'Brien*, 188 F.2d 130 (1st Cir. 1951) ......................................................24

*Drumgold v. Callahan*, 707 F.3d 28 (1st Cir. 2013) ...................................................25

*Echavarria v. Roach*, No. 16-CV-11118-ADB, 2017 WL 3928270
    (D. Mass. Sept. 7, 2017) ..........................................................................................16

*Gilles v. Davis*, 427 F.3d 197 (3d Cir. 2005) .............................................................10

*Haley v. City of Boston*, 657 F.3d 39 (1st Cir. 2011).................................................25

*Hardin v. Straub*, 490 U.S. 536 (1989)......................................................................17

*Heck v. Humphrey*, 512 U.S. 477 (1994)................................................................6, 10

*Jones v. Han,* 993 F.Supp.2d 57 (D. Mass. 2014) .....................................................25

*Katz v. Pershing*, 672 F.3d 64 (1st Cir. 2012) ...........................................................19

*Limone v. Condon*, 372 F.3d 39 (1st Cir. 2004) ................................................. *passim*

*Manuel v. Joliet,* 137 S. Ct. 911 (2017)..................................................................7, 9

*McDonough v. Smith*, 139 S. Ct. 2149 (2019)................................................... *passim*

*Miller v. Pate*, 386 U.S. 1 (1967)...............................................................................25

*Mlodzinski v. Lewis*, 648 F.3d 24 (1st Cir. 2011) ......................................................22

*Mooney v. Holohan*, 294 U.S. 103 (1935) .................................................................24

*Morris v. McAllester*, 702 F.3d 187 (5th Cir. 2012) ..................................................10

*Napue v. Illinois*, 360 U.S. 264 (1959) ...................................................................................25

*Nutter v. Woodard*, 614 N.E.2d 692 (Mass. App. Ct. 1993)..........................................16

*Opalenik v. LaBrie*, 945 F. Supp. 2d 168 (D.Mass. 2013)............................................27

*Pagán v. Calderón*, 448 F.3d 16 (1st Cir.2006).............................................................20

*Pyle v. Kansas*, 317 U.S. 213 (1942) ...............................................................................24

*Rosario v, Waterhouse*, No. 1:19-CV-10532-LTS, 2019 WL 4765082
    (D. Mass. Sept. 27, 2019) ......................................................................................... *passim*

*Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1 (1st Cir. 2007) ...........................5

*SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348 (2018) .............................................................17

*Savory v. Cannon*, 947 F.3d 409 (7th Cir. 2020) ...........................................................10

*Siegert v. Gilley*, 500 U.S. 226 (1991).............................................................................22

*Snyder v. Collura*, 812 F.3d 46 (1st Cir. 2016)..................................................................5

*Swierkiewicz* v. Sorema, 534 U.S. 506 (2002)................................................................21

*Wallace v. Kato*, 549 U.S. 384 (2007) ..................................................................6, 7, 9, 10

*Williams v. City of Boston*, 771 F. Supp. 2d 190 (D. Mass. 2011) ...................................6

*Williams v. City of Brockton*, No. 12-10430-JGD, 2013 WL 254778
    (D. Mass. Jan. 23, 2013) ....................................................................................................18

## Statutes & Other Authorities

Black's Law Dictionary 200 (Bryan A. Garner ed., 9th ed. 2009) ..................................................15

Fed. R. Civ. P. 8 .......................................................................................................................5

Federal Rule of Civil Procedure 12(b)(6) ...........................................................................5

42 U.S.C. § 1988 .......................................................................................................................17

M.G.L. c. 190B, § 3-803(a) ...................................................................................................13

M.G.L. c. 190B, §3-803(d)(2) ..................................................................................12, 14, 15

Mass. Gen. Laws ch. 258, § 13 .............................................................................................15

## INTRODUCTION

Plaintiff seeks redress for decades of wrongful imprisonment. The primary culprits who violated his rights that led to this injustice are police officers from the Town of Braintree, Commonwealth of Massachusetts, and City of Boston. Defendants participated in an effort to manufacture false eyewitness evidence and then affirmatively buried exculpatory evidence for decades, causing Plaintiff to be wrongly imprisoned. Plaintiff brings timely and viable claims against these Defendants and the Town of Braintree under federal and state law.

To bring all claims to this Court, Plaintiff properly served process on Defendant Town of Braintree and the City of Boston as liability insurers/bondholders on behalf of deceased Defendants. Those claims should be allowed to proceed. Any factual issues raised by Defendants about whether they provide liability insurance/bonds require discovery and can be revisited on a fully developed record as this Court has previously advised. Moreover, there is no basis to claim protection from Plaintiff's claims through qualified immunity.

## BACKGROUND

### Plaintiff Was Convicted of Murder Based on Fabricated Evidence

Plaintiff was wrongfully convicted of the 1980 murder of Robert LaMonica in Braintree, Massachusetts and served 36 years of wrongful imprisonment. Doc. No. 93, ¶¶1-2, 23.  His prosecution rested primarily on fabricated identification testimony of one teenage witness, John Foley. Defendants claimed that Foley (who had drunk several beers) was able to identify a running man who he saw for seconds from at least 180 feet away in the dark. *Id*., at ¶¶4-8, 52, 83, 85, 152, 161, 163. That purported identification was impossible. *Id*., at ¶¶84, 86. In fact, Foley's three teenage companions could not provide any descriptive details of the running man. *Id*., at ¶¶6, 20, 49-51, 111. There was simply no way that the teenager could have made anything

more than a vague identification based on the distance, the light, and the length of opportunity to see the running man. *Id.*, at ¶¶5-8, 48.

To frame Plaintiff, Defendants used unduly suggestive identification procedures to fabricate Foley's claimed identification. *Id.*, at ¶¶3-5, 20. Foley's initial vague physical description on the night of the murder did not match Plaintiff's body type or facial features. *Id.*, at ¶¶53-62. But by the end of the suggestive techniques, Defendants compelled a tenuous, but ultimately successful, false identification of Plaintiff.

### Defendants Inexplicably Focused on Plaintiff

The murky trail of how Defendants came to target Plaintiff and show the teenage witnesses Plaintiff's photograph has not been revealed. *Id.*, at ¶156. What is known is that, for some reason, the day after the murder, Defendants included Plaintiff's picture as the suspect in a photo array shown to the witnesses (of whom, Defendants were able to convince only Foley to tentatively identify Plaintiff). *Id.*, at ¶¶89-90. No known report explains why Plaintiff's photo was included in a photo array or why Defendants targeted Plaintiff as the culprit. *Id.*, at ¶90.

### Defendants Used Increasingly Suggestive Techniques
### to Secure an Identification of Plaintiff

The photo array was stacked against Plaintiff, with only one photo besides Plaintiff's that could possibly have matched the teenager's vague physical description of the running man. *Id.*, at ¶¶91-92. Defendant Sprague's instructions further undermined the identification by instructing the teenager to pick a photo if it "resembled in any way" the running man. *Id.*, at ¶96. Even with the suggestive photo array, Foley stated that Plaintiff's photo merely resembled the running man, with at least two significant differences in appearance. *Id.*, at ¶95.

Defendants destroyed the reports of the equivocal nature of Foley's statements about Plaintiff's photograph. *Id.*, at ¶95. Defendant Wilson admitted that he took notes and wrote a

report about the photo arrays, but the notes and report disappeared. *Id*., at ¶113. The same

suggestive arrays were done twice more to cement the equivocal identification. *Id*., at ¶¶99-100.

Also stacked against Plaintiff was a suggestive identification tactic in which Defendants

Sprague and Whelan drove two of the murder victim's brothers around the streets of Boston

looking for Plaintiff. *Id*. at ¶¶101-108, 111, 140. Sprague and Whelan used this tactic so that they

could suggest to the teenage witness that Plaintiff, who the teenager was seeing for the first time

in person, was the murderer. *Id*. This unorthodox technique was fundamentally improper. *Id*.

**Defendants Fabricated Confidential Informant Evidence**

To provide *post hoc* justifications for having targeted Plaintiff as a suspect the day after

the murder, Wilson and Sprague claimed almost two weeks later that Defendant Walsh, a Boston

police officer, told them at an unknown date and time that a confidential informant from South

Boston said that he heard rumors that Plaintiff committed the murder. *Id*., at ¶117. There is not

one police report before the photo array supporting that assertion. *Id*., at ¶¶118-122.  Nor is there

any report that identifies any information substantiating this purported confidential informant

evidence. *Id*. Similarly, without any report documenting support, Defendants claimed that

Defendant Derby, another Boston police officer, told them that a confidential informant from

South Boston said that he heard that Plaintiff was the murderer. *Id*., at ¶¶118-122.

The purported confidential informant evidence stemming from Derby and Walsh was

totally fabricated. *Id*., at ¶¶117-122. The naked unsubstantiated reports included no facts to

support the claims. *Id*. Because Plaintiff had absolutely nothing to do with the murder, there was

no basis for any such informant chatter. *Id*., at ¶¶23-24, 40. Plaintiff does not currently know

whether it was Walsh or Derby who fabricated the false confidential informant tale or whether it

was the other Defendants who made it up. *Id*., at ¶¶117-122.  It could be either or both. *Id*.

### Defendants Buried Evidence that Witnesses Identified an Alternate Suspect

Defendants also hid important exculpatory evidence that would have undermined Defendants' case against Plaintiff. This included a report that multiple credible witnesses told police that another man may have been the murderer. Based on Foley's initial vague description, Defendants Wilson, Sprague, and another officer created a composite drawing. *Id*., at ¶¶12, 63, 88. The composite drawing did not look like Plaintiff. *Id*., at ¶64. But the composite sketch did look like an escaped murderer, Rocco Balliro. *Id*., at ¶¶65, 72-73.

A witness told Defendant Leahy that the composite looked like Balliro, who had failed to return to prison from furlough on the day of the murder. *Id*., at ¶¶ 13. 70. Leahy told Defendant Buker, who ordered Leahy to investigate. *Id*., at ¶75. Leahy discovered that at least 11 people said that the composite looked like Balliro, confirmed that he had failed to return to prison from furlough the day of the murder, and also confirmed that he had recently assaulted a man named LaMonica (the same name as the murder victim). *Id*., at ¶¶15, 71, 77.  Importantly, the general physical—height and weight—descriptions given by all four teenage witnesses matched Balliro, but not Plaintiff. *Id*. at ¶¶14, 54-62.

That report was hidden for over 33 years in a "basement archive" of the Braintree Police Department. *Id*., at ¶¶15, 25, 74-76, 80, 133-135, 138. It was discovered only after a freedom of information request in 2010.  *Id*., at ¶¶141-149, 162-164. Without Leahy's report, Plaintiff was deprived of key evidence that could have undermined the fabricated and highly tenuous identification. *Id*., at ¶¶16-17, 80.

### Plaintiff was Wrongly Arrested, Prosecuted, and Convicted

Based on the fabricated evidence, Plaintiff was arrested, tried, and convicted of the murder. *Id*., at ¶¶158-168. Plaintiff contested his guilt at every stage of his horrifying ordeal. *Id*.,

at ¶158. He refused plea deals that would have allowed him to go free because he was not guilty. *Id*., at ¶180. On August 7, 2017, all proceedings based on the above misconduct were terminated when Massachusetts decided to discontinue his prosecution. *Id*., at ¶27.

## ARGUMENT

No Defendant is entitled to dismissal of Plaintiff's claims. Each motion seeks dismissal under Federal Rule of Civil Procedure 12(b)(6), among others. Under Rule 12(b)(6) a court "must assume the truth of all well-plead[ed] facts and give plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citations omitted). A plaintiff need only plead facts and causes of action fairly raised by these facts. *Snyder v. Collura*, 812 F.3d 46, 50 (1st Cir. 2016) (citations omitted); *see also* FED. R. CIV. P. 8. A complaint need only plead facts but does not require legal theories. *Snyder v. Collura*, 812 F.3d 46, 50 (1st Cir. 2016) (citations omitted).

To survive a motion to dismiss, a complaint need merely state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id*. at 555. Dismissing a complaint is proper "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Limone v. Condon*, 372 F.3d 39, 43 (1st Cir. 2004) (citations omitted). Plaintiff's claims present viable claims for relief.

## A.    PLAINTIFF TIMELY FILED HIS COMPLAINT AGAINST EACH DEFENDANT

Plaintiff's Complaint was filed within three years of when it accrued and is, therefore, timely. Although the statute of limitations for a § 1983 case is based on state law (here three years), the accrual date of "is a question of federal law that is not resolved by reference to state

law." *Williams v. City of Boston*, 771 F. Supp. 2d 190, 201 (D. Mass. 2011) (quoting *Wallace v. Kato*, 549 U.S. 384, 388 (2007)). The point of accrual is when "the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief." *Heck v. Humphrey*, 512 U.S. 477, 488 (1994) (internal quotes and citation omitted). Plaintiff's Complaint sets out unambiguously that his conviction and underlying prosecution were invalid and would not have occurred but for fabrication and suppression of exculpatory evidence. Accrual, therefore, happened when those wrongful criminal proceedings against Plaintiff were dismissed.

Defendants devote considerable energy erroneously claiming that Plaintiff's claims accrued when his conviction was overturned, ignoring that the wrongful prosecution of Plaintiff that violated his right to due process continued until Massachusetts discontinued it.[2] Defendants' arguments contradict the express holdings in *McDonough v. Smith*, 139 S. Ct. 2149 (2019), and *Heck* that require the completion of the underlying state criminal proceedings before a subsequent section 1983 case may be commenced challenging the prior conviction, ignore the logic of those decisions, and would undermine the policy rationales that give rise to the favorable-termination requirement for purposes of accrual.

1. **Plaintiff's Complaint is Timely under *Heck* and *McDonough*.**

The Supreme Court could not have been clearer when it held in *McDonough* that "[o]nly once the criminal proceeding has ended in the defendant's favor, *or* a resulting conviction has been invalidated within the meaning of *Heck*, will the statute of limitations begin to run." 139 S. Ct. at 2158 (emphasis added) (internal citation omitted). The Supreme Court's clear statement of accrual in *McDonough*—that related to due process claims similar to those here—resolves this issue because termination of the underlying prosecution in favor of Plaintiff (upon its dismissal)

---

[2] Doc. 100, 7-12 (Buker, Polio, Wilson); 103, 3-8 (Braintree); 105, 3-7 (Leahy); 115, 6-8 (Derby), 119, 3-6 (Estate of Walsh).

was the triggering event that his claims accrued. Defendants' failure to even mention (Doc. 100) or analyze (Doc. 103, 105, 115, 119) *McDonough's* clear holding is particularly telling.

Faced with this clarity, Defendants' arguments depend on purported limitations of the *Heck-McDonough* accrual rule that are found nowhere in the Court's opinions, which hinge on whether the section 1983 plaintiff's claims impugned an ongoing criminal proceeding or its resulting judgment. According to *McDonough*, for a section 1983 claim to be cognizable, the state criminal proceeding *must* have ultimately resolved in the defendant's favor (here when all charges were dismissed and Defendants' schemes no longer placed Plaintiff in legal jeopardy), and *only* at that moment does the statute of limitations begin to run. *Id.*

*Heck*'s favorable-termination requirement has been reaffirmed repeatedly including in *Wallace*, 549 U.S. at 387-92, *Manuel v. Joliet,* 137 S. Ct. 911, 921 (2017), and *McDonough*. The Supreme Court's opinions resolve the accrual issue in this case, and Defendants' accrual arguments, which are directly contrary to the holding in *McDonough*, do not merit consideration.

## 2. *Wallace v. Kato* **Does not Apply.**

In formulaic arguments, Defendants argue that the decision in *Wallace* tolls the running of the statute of limitations for Plaintiff's Fourteenth Amendment claims at the time that Plaintiff's conviction was vacated.[3] That argument misapplies *Wallace*, which is a totally different type of case—a Fourth Amendment false arrest case that expressly distinguishes its accrual analysis under *Heck* from a claim, like the due process claim here, that attacks the fairness of the later criminal proceedings. *Wallace*, 549 U.S. at 389-90.

In *Wallace*, the Court expressly identified that claims that attack the fairness of the court proceedings themselves apply a totally separate accrual analysis under *Heck*, but that a false

---

[3] Doc. 100, 9 (Buker, Polio, Wilson); 103, 4-5 (Braintree); 105, 3-5 (Leahy); 115, 7-8 (Derby); 119, 3-6 (Walsh).

arrest claim under the Fourth Amendment terminates at the point that legal proceedings begin, so that the *Heck* concern about the validity of a conviction never attaches. *Id*. at 390. *Wallace* holds, therefore, that the *Heck* bar does not delay accrual of a Fourth Amendment § 1983 claim. *Id*. at 389-90, 394. A typical Fourth Amendment violation (*e.g.*, excessive force, wrongful arrest, or illegal search) is complete, at the latest, when an individual is bound over by a magistrate or arraigned on charges (*i.e.*, before the criminal case); and such a violation can easily coexist with a valid conviction later obtained. *Id*. As a result, the Supreme Court held in *Wallace* that a routine Fourth Amendment claim does not necessarily imply the invalidity of a conviction, and its accrual is not necessarily barred by *Heck*. 549 U.S. at 389-90, 394.

Wallace* is, therefore, a context-specific application of *Heck* that applies only to routine Fourth Amendment claims. To put it more clearly, claims that relate to a wrongful arrest accrue on the date of the arrest under *Wallace*, but claims that relate to a wrongful conviction accrue only after the conviction has been invalidated *or* the criminal proceedings are terminated. *See McDonough*, 139 S. Ct. at 2158

Defendants' argument misunderstands the distinction the Supreme Court has drawn between Fourth Amendment claims, like those in *Wallace*, and due process claims under the Fourteenth Amendment, such as those at issue here that persist so long as a person is subjected to criminal proceedings based on the underlying constitutional violations. Defendants ignore that *Wallace* is limited to Fourth Amendment violations that are complete before prosecution.

Plaintiff's due process claims here entail misconduct in violation of his constitutional right to a fair criminal proceeding; and because this claim would have impugned the validity of his conviction and the legal proceedings underpinning it, it was barred by *Heck* until his exoneration was completed and all criminal proceedings concluded as mandated by *McDonough*.

Under Defendants' theory, a person convicted in Massachusetts on the basis of fabricated and concealed exculpatory evidence must file a § 1983 suit seeking to hold liable those who fabricated and concealed evidence that causes a conviction within three years of the date that the conviction was overturned even though the government is still pursuing an ongoing prosecution.

Here, it would mean that Plaintiff would have had to pursue claims in this Court that the evidence being used against him was fabricated while the Commonwealth pursued a prosecution based on that very evidence. Such a result is directly contrary to *McDonough*, which involved the due process right not to be subject to prosecution as a result of evidence fabricated by a government officer. *McDonough*, 139 S. Ct. at 2155, 2161.  Defendants' arguments would require wrongfully convicted individuals to file lawsuits before their innocence had been completely established through the termination of the underlying prosecutions.

For many criminal defendants this would mean filing a civil lawsuit concurrently with the criminal proceedings themselves, including post-trial motions, criminal appeals, state post-conviction proceedings, and federal *habeas corpus* actions—precisely the scenario that *Heck* and its progeny are designed to avoid. Adoption of this scheme would be contrary to *Heck* and *McDonough* and sound judicial administration of federal constitutional claims. Defendants' reading of *Wallace* is simply wrong. Nothing in *Wallace* renders Plaintiff's claims untimely.

### 3. Defendants' Arguments are Contrary to Accrual Rules.

*McDonough* reiterated the rule that a plaintiff's claim accrues only upon favorable termination of his criminal proceedings "follows . . . from the rule of the most natural common-law analogy," which instructs that accrual rules for section 1983 claims should be determined by considering "common-law principles governing analogous torts." 139 S. Ct. at 2155-56 (citing *Wallace*, 549 U.S. at 388); *see also Manuel*, 137 S. Ct. at 920-21. *McDonough* and *Heck* found

9

that claims challenging state criminal proceedings and their resulting judgments were analogous to common-law malicious prosecution. *McDonough*, 139 S. Ct. at 2156 ("At bottom, both claims challenge the integrity of criminal prosecutions undertaken 'pursuant to legal process.'"); *Heck*, 512 U.S. at 484. By contrast, the claims of false arrest at issue in *Wallace* were most analogous to common-law false imprisonment. 549 U.S. at 388-89.

Accordingly, whereas section 1983 claims challenging criminal proceedings or their resulting judgments accrue with favorable termination of the entire underlying case like malicious prosecution claims, *McDonough*, 139 S. Ct. 2156, the statute of limitations begins to run on section 1983 false arrest claims when the false imprisonment ends, just as it does for common law false imprisonment claims. *Wallace*, 549 U.S. at 389.

Plaintiff's claims challenging his conviction are plainly analogous to malicious prosecution—they challenge violations of his rights after legal process that resulted in his wrongful conviction—and not false imprisonment, meaning they accrued with favorable termination when his prosecution ended. Defendants' argument to narrow that analysis gets the analogy backward and advocates for exactly the wrong accrual rule.

Courts have long recognized the Supreme Court's framework for treating accrual that requires termination of an underlying state criminal prosecution in favor of the defendant for cases like Plaintiff's. *See e.g., Savory v. Cannon*, 947 F.3d 409, 417-418 (7th Cir. 2020) (suppression of exculpatory evidence and fabrication evidence claims resemble common law malicious prosecution and require that the underlying prosecution resolve in favor of the defendant); *Morris v. McAllester*, 702 F.3d 187, 192 (5th Cir. 2012) (plaintiff not excused from the "'favorable termination' rule of *Heck*, which instead relies on the dismissal of the indictment."); *Gilles v. Davis*, 427 F.3d 197, 209-12 (3d Cir. 2005) ("Because the holding of

*Heck* applies, [the plaintiff] cannot maintain a § 1983 claim unless successful completion of the ARD program constitutes a termination of the prior criminal proceeding in favor of the accused.") (internal quotations omitted). Defendants point to no First Circuit case that is contrary to the approach taken in *Heck* and *McDonough* nor would any such case survive the clear holding in *McDonough* that termination of the criminal prosecution starts the accrual period.

### 4. Defendants' Arguments Contradict Comity Principles.

In *Younger v. Harris*, the Supreme Court emphasized Congress's longstanding "desire to permit state courts to try state cases free from interference by federal courts." 401 U.S. 37, 43 (1971). Building on that principle, this Court in *Heck* noted it "has long expressed similar concerns for finality and consistency and has generally declined to expand opportunities for collateral attack [on criminal convictions]." 512 U.S. at 484-85. In *McDonough*, the Supreme Court again reaffirmed the importance of comity, noting that section 1983 cases should not serve as a mechanism to collaterally attack state criminal proceedings. 139 S. Ct. at 2155-59. Here, Defendants assertion that Plaintiff should have filed his Complaint while his prosecution was pending in state court would allow a mechanism to collaterally attack those underlying state criminal proceedings while they were ongoing. This would threaten parallel state and federal proceedings and result in different and conflicting state and federal judgments. *McDonough*, 139 S. Ct. at 2160. In sum, Defendants arguments would allow a breakdown in federal-state comity, and should be rejected.

### B.   PLAINTIFF PROPERLY SERVED DEFENDANT TOWN OF BRAINTREE AND THE CITY OF BOSTON FOR CLAIMS AGAINST THEIR DECEASED EMPLOYEES

Defendants are rehashing an issue that this Court has already addressed regarding whether the deceased Defendants employed by Defendant Town of Braintree or the City of

Boston can be brought into this case at this stage through service on the municipalities themselves. [4] This Court concluded that it was proper for Plaintiff to serve the municipalities with process to bring those claims to the Court and that the parties could then engage in discovery to determine to what extent, if any, that Plaintiff could establish the municipality's provision of liability insurance or bond. Doc. 86, at 2; Ex. 3, at 14-16, 19-27. Once discovery ends, the parties can either resolve the issue of the existence of liability insurance or bond or it could be resolved by the Court on a full record through pre-trial motions. Ex. 3, at 14-16, 19-27.

This arrangement puts the onus on the parties to do the work needed to make such a determination rather than ask the Court to do so on a scant record without discovery. This solution does not prejudice any party. Defendant Town of Braintree is already a party and, therefore, a participant in discovery that can address the issue. In addition, attorneys for the City of Boston are appearing on behalf of Defendant Walsh (who died within a year of Plaintiff's filing this suit so that there can be a separate cause of action against his estate). Doc. 86, 112, 118, 119. Therefore, all the entities necessary for the parties to pursue discovery on the issue will be participating in this case regardless. To the extent that the Court wishes to reconsider the same issues it has already decided, Plaintiff responds below.

### 1.    Plaintiff's Potential Claims against Representatives of the Deceased Defendants Are Timely.

Under Massachusetts law, Plaintiff may proceed directly against deceased Defendants who do not have an estate through service on Defendant Town of Braintree and the City of Boston as liability bondholders or insurers of the deceased Defendants (Buker, Derby, Polio, and Wilson). M.G.L. c. 190B, §3-803(d)(2). To proceed in this fashion, liability for claims against the deceased Defendants must be made through the liability insurer or bond holders and must be

---

[4] Doc. 100, 5-7 (Buker, Polio, Wilson); 115, 9-13 (Derby).

filed within three years of accrual for claims related to "personal injury or death" *Id*. This three year accrual rule supersedes the general rule that actions must be commenced within one year of the death of the deceased. *See* M.G.L. c. 190B, § 3-803(a).

As stated above, Plaintiff's claims accrued on August 7, 2017, and his lawsuit was filed within three years. Plaintiff intends only to pursue satisfaction of any judgment against any deceased Defendant through the municipalities as liability insurers or bondholders, not from any estate. Finally, Plaintiff has not identified a personal representative for Defendants Wilson, Buker, Polio, or Derby.[5]

### 2. Plaintiff's Claims are for "Personal Injury."

A claim that the violations of rights caused a wrongful conviction is inherently one for personal injury, so the three year accrual rule applies. *See Rosario v, Waterhouse*, No. 1:19-CV-10532-LTS, 2019 WL 4765082, at *3 (D. Mass. Sept. 27, 2019) (citations omitted). Plaintiff's claims against the deceased Defendants, therefore, falls under the three-year accrual. Even if the nature of Plaintiff's claims were not inherently ones for personal injury (which they are), Plaintiff expressly claims personal injury caused by Defendants' misconduct. Doc. No. 93, at ¶¶169-179. Plaintiff brings claims against all Defendants for personal injury.

### 3. The City of Boston is a Direct Liability Insurer of Defendant Derby.

Plaintiff previously tendered to the Court the City of Boston's public admission that it is self-insured for employee liability.[6] *See* Ex. 1 at 59 ("The City is self-insured in most areas of

---

[5] Defendant Town of Braintree, Wilson's last employer, and the City of Boston, Derby's last employer, suggest that Plaintiff has not established that no estate exists for either. Doc. 100, at 12; Doc. 115 at 9. But Plaintiff has made such a determination. *See* Ex. 7, Decl. of Monica Fuentes.

[6] *See* City of Boston's website at: https://www.cityofboston.gov/images_documents/CAFR_FINAL_SECURED_tcm3-42531.pdf.

risk including general liability..."). Defendant Derby, through the City of Boston, does not contest that the City of Boston is a liability insurance holder for its employees' liabilities. This demonstrates the propriety of serving the City of Boston to pursue claims against Defendant Derby under §3-803(d)(2) through the holder of the liability bond or insurance.

### 4. Defendant Town of Braintree Holds Liability Insurance.

Similarly, Defendant Town of Braintree maintained insurance coverage from multiple carriers for claims such as Plaintiff's that arise from law enforcement liability. *See* Ex. 2, at Braintree 542-48, 552, 555, 559, 561-99; Ex. 4, at Braintree 608, 617, 645-47. Plaintiff will need to pursue discovery about how many years the insurance coverage was provided, but, at a minimum, Braintree provided insurance coverage that would cover a substantial portion of damages caused by Plaintiff's wrongful imprisonment while the individual Braintree Defendants continued to hide exculpatory evidence in the Braintree Police Department's "basement archive." *See Id*.

### 5. Discovery is needed about the Extent of Defendant Town of Braintree and City of Boston's Additional Obligations to Indemnify.

As stated above, Massachusetts law allows for a plaintiff to proceed against an entity if that entity may be obligated to cover a resulting judgment. This Court has already suggested that pursuing discovery about such an obligation is the proper path to proceed, and that if there is insufficient evidence of the required obligation then that can be resolved through pre-trial motion. *See* Ex. 3, 14-16, 19-27. Discovery may establish that one or both municipalities have additional obligations (beyond their insurance obligations described above) to pay for liability so that they can be considered liability bondholders. For instance, there is evidence that Defendant City of Boston has affirmatively obligated itself to indemnify (and provide a defense for) its police officer employees for claims against them, such as Plaintiff's claims here. *See* Ex. 5-6.

14

6.    **Plaintiff Properly Served Process on the Municipalities.**

That each municipality has agreed to be a *de facto* liability insurer and/or bondholder allows Plaintiff to serve each to pursue claims against its deceased employees who do not have estates. *See Rosario*, 2019 WL 4765082, at *3-4. Although the Court in *Rosario* focused on the obligation of mandatory indemnification under Mass. Gen. Laws ch. 258, § 13, we need not get caught up in that artificial distinction here. What was at issue in *Rosario* was whether the municipality would be called upon to cover the liability of its employees so that the obligation could be considered a "policy of liability bond" under Mass. Gen. Laws ch. 190B, §3-803(d)(2). *See Rosario*, 2019 WL 4765082, at *3-4.

The Court in *Rosario* noted that the definition of "liability bond" was not defined in the statute itself, so it used the term in its ordinary sense. *Rosario*, 2019 WL 4765082, at *3 (citing *Casey v. Mass. Elec. Co.*, 467 N.E.2d 1358, 1362 (Mass. 1984)). It then noted that "at its most elementary, a bond is simply a 'written promise to pay money or do some act if certain circumstances occur.'" *Id.* (citing Black's Law Dictionary 200 (Bryan A. Garner ed., 9th ed. 2009)). A "liability bond" is a "bond intended to protect the assured from a loss arising from some event specified in the bond." *Id.*

Whether the promise to pay or commit an act is actually labeled a "liability bond" is irrelevant to determine whether a party can proceed against a municipality as Plaintiff seeks here:

> Critically, in determining whether the City's indemnification obligation is a liability bond for purposes of the statute, the Court "disregard[s] nomenclature and look[s] at the substance of the bond itself," noting that "it makes no difference whether a bond is designated by that name or by some other, if it possesses the characteristics of a bond."

*Rosario*, 2019 WL 4765082, at *3 (citations omitted).

The municipal obligations to insure or indemnify their police officers through insurance and/or a collective bargaining agreement(s) are municipal policy. *See Id*. ("Upon ratification by the City [of the Massachusetts indemnification statute], this provision became municipal policy: a written promise to protect its employees from losses arising from specified events") (citing *Echavarria v. Roach*, No. 16-CV-11118-ADB, 2017 WL 3928270, at *14 n.14 (D. Mass. Sept. 7, 2017)).

Quibbling about the extent or the name of the indemnification term in the liability insurance policies and/or collective bargaining agreements is of no importance. *Id*. ("the statute's terms are capacious enough to include the types of policies that the legislature expressly envisioned") (citations omitted). The Municipal Defendants' agreements to insure and/or indemnify its employees for claims against its law enforcement employees is a "policy of liability bond" for purposes of serving the municipalities:

> Here, the legislature allowed personal injury plaintiffs to proceed against decedents when they are protected by precisely the sort of written promise that the City gives to its employees. Thus, the City's indemnification obligation must be understood as "a policy of liability bond" within the meaning of subsection (d)(2).

*Rosario*, 2019 WL 4765082, at *3.

There are very important policy reasons that support interpreting a duty to indemnify from a collective bargaining agreement as a "liability bond" for purposes of allowing a direct action against the obligor. "First, an alternative reading would provide a windfall to municipalities whenever their employees cause personal injury or death but pre-decease the expeditious filing of a lawsuit, thus visiting grave injustice on injured parties." *Id*., at *4 (citing *Nutter v. Woodard*, 614 N.E.2d 692, 695 (Mass. App. Ct. 1993) ("For us to rule against [the plaintiff] in these circumstances would be to allow the insurer [or bond provider] a windfall due to the fortuity that there was but one potentially negligent party for [the plaintiff] to sue.")). The

16

same public policy implication supports finding that the liability insurance provided by the municipalities for law enforcement liability brings Plaintiff's claims under the procedures to proceed against those municipalities.

Second, the legislative concerns that justify a shorter statute of limitations for claims against decedents have no force when municipal insurance and/or indemnification, rather than the assets of an estate, will support a final judgment. *Rosario*, 2019 WL 4765082, at *4. (citations omitted) (noting that the Massachusetts legislature truncated the statute of limitations to "facilitate the prompt settlement of estates"). Allowing Plaintiff's claims to proceed at this stage would, therefore, avoid a statutory "construction ... that would lead to an absurd and unreasonable conclusion," and instead adopt "a construction that would lead to a logical and sensible result." *Id*. (citations omitted).

Another basis to allow Plaintiff's claims is that it will effectuate the purposes of federal civil rights laws, including section 1983. Congress expressly provided in section 1988(a) that:

> the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil . . . cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, *shall* be extended to and govern the said courts in the trial and disposition of the cause[.]

42 U.S.C. § 1988 (emphasis added); *see also Hardin v. Straub*, 490 U.S. 536, 538 (1989). The statute's command that federal courts adopt state laws to the extent necessary to allow for civil rights actions to be prosecuted is mandatory. *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1354 (2018) ("The word 'shall' generally imposes a nondiscretionary duty.").

The municipalities take factual issue with Plaintiff's premise that each has obligated itself to indemnify its former employees. The City of Boston, despite its public admission on its own website of the collective bargaining agreements that include its obligations to indemnify police

officers, suggests that maybe the agreements do not apply or that there is an issue of how to enforce those agreements. Doc. No. 115, at 9-12. Defendant Town of Braintree does not address whether there are any collective bargaining agreements that require indemnification.

Regardless, any lack of conclusive evidence that one or both municipalities have provided the equivalent of a liability bond should not doom Plaintiff's claims here. Each certainly has provided insurance coverage for the type of liability at issue here. Moreover, the Court has already addressed the issue that Plaintiff be allowed to bring the deceased Defendants into this case through the municipalities, and then require the parties to engage in discovery to determine the extent of each municipality's obligation to indemnify, insure, and/or represent its employees. Ex. 3, 14-16, 19-27. Should discovery reveal no obligation to indemnify or insure, then the deceased Defendants could pursue a pre-trial motion. *Id*.

Nor does it matter that at the end of the day, indemnification or insurance may not attach, depending on the outcome at trial. What is relevant for purposes of Plaintiff's request here is the nature of the obligation at the start of the litigation. *See Rosario*, 2019 WL 4765082, at *3, n.4. Insurance disputes are common after judgments are entered depending on the nature of evidence offered to prove underlying claims. But such subsequent disputes do not impact the relationships between insurer and insured at the start of claims.

The City of Boston cites to *Williams v. City of Brockton*, No. 12-10430-JGD, 2013 WL 254778, at *8 (D. Mass. Jan. 23, 2013), to claim that its affirmatively agreed obligation to indemnify police officers cannot be considered a "liability bond." Doc. No. 115 at 9-10. *Williams* offers no guidance for the issues here because it dealt with an entirely different collective bargaining agreement—one that included a mechanism to certify whether indemnification would occur—not a mandatory provision as here. *Williams*, 2013 WL 254778, at

\*8. Such a mechanism is not included in Boston's obligation to indemnify its officers. Nor is *City of Bos. v. Bos. Police Patrolmen's Ass'n, Inc.*, 48 Mass. App. Ct. 74, 75 (1999), instructive because it involved only a determination of an interest arbitrator's authority to order mandatory indemnification that was not a part of the underlying collective bargaining agreement.

Defendant Town of Braintree and the City of Boston have obligated themselves to pay their police officers for judgments through self-insurance (Boston), liability insurance (Braintree), and/or collective bargaining. Plaintiff properly pursues claims against the deceased Defendants by serving the municipal holders of the liability insurance or bonds.

## C.    THE ISSUE OF SERVING DECEASED DEFENDANTS THROUGH THEIR MUNICIPAL EMPLOYERS DOES NOT IMPLICATE THE STANDING DOCTRINE

The City of Boston and Defendant Town of Braintree's insurance coverage and/or agreement to indemnify the municipal employees allows for Plaintiff to pursue service against the indemnifier or insurance provider for direct claims against the deceased Defendants. To be clear, at this stage, the Court need not rule that either municipality is ultimately obligated to indemnify or pay for a judgment in favor of Plaintiff, but instead should rule that those obligations allow Plaintiff to proceed against those deceased Defendants and pursue discovery about the extent of the liability insurance or equivalent of a liability bond.

Because no party is seeking to enforce any insurance or liability bond obligation at this stage, the City of Boston's invocation of a lack of Article III standing is not implicated.[7] Article III standing issues arise only with regard to specific claims in a complaint that are brought before the Court for actual adjudication: "The standing inquiry is claim-specific: a plaintiff must have standing to bring each and every claim that she asserts." *Katz v. Pershing*, 672 F.3d 64, 71 (1st

---

[7] Doc. 115, at 3-4, 9-11.

Cir. 2012) (citing *Pagán v. Calderón*, 448 F.3d 16, 26 (1st Cir.2006)). At this stage, there is no claim for payment under an insurance or liability bond obligation. There are only claims against the deceased Defendants at issue.

Indeed, indemnitors and insurers frequently contest paying judgments depending on the evidence that is presented at trial to establish liability and whether the evidence falls under the obligation to provide coverage. Judge Sorokin seemingly recognized this fact in *Rosario* when he concluded that an indemnitor municipality could be ordered to accept service on behalf of deceased Defendants: "If a judgment is eventually entered, the City *may* be required to 'indemnify and save harmless' the personal representatives of the Deceased Defendants 'from personal financial loss and expense including reasonable legal fees and costs.'" *Rosario*, 2019 WL 4765082, at *4 (emphasis added). Judge Sorokin, therefore, did not decide that there was an absolute, uncontestable requirement to indemnify, nor did he issue any order about whether indemnification was required. Rather, he allowed the plaintiff's claims to proceed against all potential wrongdoers because of the potentiality that a municipality "may" have to indemnify.

Similarly, Plaintiff properly brings his claims against all of the deceased Defendants before the Court. Plaintiff is not bringing a claim for indemnification or otherwise inserting himself into a collective bargaining agreement or insurance contract. Rather, just as Judge Sorokin noted, Plaintiff is merely saying that because the municipalities may be obligated to indemnify or insure their deceased municipal employees for misconduct that occurred in the scope of their employment, Plaintiff properly served the municipalities to bring the underlying claims before the Court and then pursue discovery regarding the extent of any obligation. *Id*.

Whether the deceased Defendants' misconduct might ultimately be found to be within the scope of employment or whether there is any post-judgment dispute about any obligation to

insure, or otherwise hold an employee harmless, are not before the Court. Also not before the Court is any request by Plaintiff to enforce a provision of liability insurance or a collective bargaining agreement. The only issue is whether the municipalities' actions in providing insurance and/or obligating themselves to indemnify brings them under the statute allowing for service on the obligors. As this Court has previously determined, it does at this stage. Ex. 3, 14-16, 19-27.

This outcome is consistent with the Rules of Civil Procedure. The pleading standard relies on liberal discovery to define disputed facts and issues. *Swierkiewicz* v. Sorema, 534 U.S. 506 (2002) at 512 (citations omitted). "The provisions for discovery are so flexible and the provisions for pretrial procedure and summary judgment so effective, that attempted surprise in federal practice is aborted very easily, synthetic issues detected, and the gravamen of the dispute brought frankly into the open for the inspection of the court." *Swierkiewicz*, 534 U.S. at 512-13, (citations omitted). Moreover, where, as here, circumstances giving rise to the case show that the defendants have sole possession of relevant information, pleading standards are relaxed. *See*, *e.g.*, *Boykin v. KeyCorp*, 521 F.3d 202, 215 (2nd Cir. 2008) (involving a post-*Twombly* challenge). There is no basis to dismiss Plaintiff's claims against the deceased Defendants.

## D.    DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

This is not a qualified immunity case. First, qualified immunity is almost always a poor fit for dismissal at the 12(b)(6) stage, and that is certainly true here, where the Complaint contains everything required to state a § 1983 claim based on: (1) fabricating eyewitness identifications; (2) suppressing the evidence surrounding that fabrication; and (3) suppressing exculpatory evidence that further undermined that identification, all in violation of the Fourteenth Amendment.  Second, Defendants will never be entitled to qualified immunity on this

claim—regardless of the stage of the case—because it was clearly established at the time that

Plaintiff was arrested and prosecuted (and for many decades before that) that the Fourteenth

Amendments bars police from falsely creating evidence, suppressing that fact for use in criminal

cases, and suppressing exculpatory evidence generally. In fact, there are few constitutional

protections more deeply rooted than this one. Nevertheless, Defendants Buker, Leahy, Polio,

Wilson, and Walsh all seek the shelter of qualified immunity, despite the nature of Plaintiff's

claims that Defendants violated his clearly established rights. [8]

The First Circuit employs the following analysis to evaluate whether a particular

defendant is entitled to qualified immunity:

> (1) whether the facts alleged or shown by the plaintiff make out a violation of a
> constitutional right; and (2) if so, whether the right was "clearly established" at
> the time of the defendant's alleged violation. The second prong, in turn, has two
> parts. We ask (a) whether the legal contours of the right in question were
> sufficiently clear that a reasonable officer would have understood that what he
> was doing violated the right, and (b) whether in the particular factual context of
> the case, a reasonable officer would have understood that his conduct violated the
> right. The salient question is whether the state of the law at the time would have
> given a reasonably competent officer clear notice that what he was doing was
> unconstitutional.

*Mlodzinski v. Lewis*, 648 F.3d 24, 32-33 (1st Cir. 2011) (internal citations and quotations

omitted). On a motion to dismiss, the issue is whether the facts alleged, viewed in the light most

favorable to the plaintiff, show that the officer's conduct violated a constitutional right. *Siegert v.*

*Gilley*, 500 U.S. 226, 232-33 (1991). There is no ground for finding qualified immunity here.

### 1. Qualified Immunity does not Shield Defendants from Plaintiff's Malicious Prosecution Claim.

Defendants are not entitled to qualified immunity for Plaintiff's malicious prosecution

claim. First, this Court has already rejected a finding of qualified immunity regarding Plaintiff's

---

[8] Doc. 100, 12-15 (Buker, Polio, Wilson); 105, 8-10 (Leahy); 119, 14-18 (Walsh).

malicious prosecution claim here, with a detailed explanation as to why it is not proper. Doc. 85, 10-12. Moreover, as noted above, Plaintiff has pled sufficient allegations that Defendants denied him a fair trial under the Fourteenth Amendment and maliciously prosecuted him in violation of his rights. Second, at the time that they framed Plaintiff, it was clearly established both that it violated Plaintiff's constitutional rights to fabricate and suppress evidence to frame him for murder, thereby violating Plaintiff's rights to a fair trial and to be free from prosecution without probable cause.

As this Court has determined, "the question is not whether the *cause of action* existed but whether the alleged *conduct* was prohibited." Doc. 85 at 12 (emphasis in original). As this Court concluded, the law was clearly established that the *conduct* of fabricating evidence and hiding exculpatory evidence in order to bring charges without probable cause was unlawful long before Defendants committed misconduct against Plaintiff. *Id.*

The First Circuit, in categorically rejecting a similar qualified immunity defense as that raised by Defendants here, described the analysis about whether the right to be free at trial from manufactured and suppressed evidence was clearly established (almost 15 years before Defendants' misconduct) as "easy pickings." *Limone*, 372 F.3d at 44. The same is true here.

In *Limone*, the plaintiffs sued the defendants relating to allegations that they were framed for a murder that resulted in their convictions in 1968. *Id*. at 42. As here, the plaintiffs there claimed that the defendants engaged in an active conspiracy to secure and sustain convictions against innocent men by purposefully suborning false testimony from a key witness and suppressing exculpatory evidence. *Id*. at 44, 46. Similarly, the allegations there "include[d] suballegations that occasionally involved[d] *Brady* violations" as an "integral part of the overall story." *Id*. at 46-47.

Plaintiff here, like those plaintiffs, "asseverate that an individual's right not to be convicted by these tawdry means—his right not to be framed by the government—is beyond doubt." *Id*. at 44. The First Circuit agrees:

> …if any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit. Actions taken in contravention of this prohibition necessarily violate due process (indeed, we are unsure what due process entails if not protection against deliberate framing under color of official sanction). Thus, we resist the temptation to expound needlessly upon the first element in the qualified immunity catechism and simply pronounce that requirement satisfied.

*Id.* at 44-45. The right not to be framed by law enforcement officers was clearly established long before 1981. *Id*. at 46. Defendants were on notice of that clearly established right.

The First Circuit explained the long history supporting that the right not to be convicted with fabricated evidence goes back to the 1930s. *Id*. (citing *Mooney v. Holohan*, 294 U.S. 103 (1935) (*per curiam*)). In *Mooney*, the Supreme Court held that due process is violated by contriving a conviction through the deliberate deception of the court and jury by testimony known to be untrue. *Mooney*, 294 U.S. at 112. A year later, the Supreme Court "reaffirmed that the Due Process Clause forbids convictions predicated on deliberate deceptions." *Limone*, 372 F.3d at 46 (citing *Boykin v. KeyCorp*, 297 U.S. 278, 286 (1936)). In 1942, the Supreme Court "needed only a single paragraph and a citation to *Mooney* to buttress its conclusion that 'allegations that [the petitioner's] imprisonment resulted from perjured testimony, knowingly used by the State authorities to obtain his conviction, and from the deliberate suppression by those same authorities of evidence favorable to him . . . sufficiently charge a deprivation of rights guaranteed by the Federal Constitution.'" *Id*. (quoting *Pyle v. Kansas*, 317 U.S. 213, 216 (1942)). "Given these precedents, it is not surprising that, as early as 1951, [the First Circuit] described *Mooney*'s core premise as "well-settled." *Id*. (citing *Coggins v. O'Brien*, 188 F.2d 130, 138 (1st

Cir. 1951)). In 1959, the Supreme Court held that the *Mooney* right protected against

circumstances in which "the State, although not soliciting false evidence, allows it to go

uncorrected when it appears." *Id*. (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)).

In *Napue*, the court "established that a conviction obtained through use of false evidence,

known to be such by representatives of the State, must fall under the Fourteenth Amendment."

*Id*. The Court found that right "implicit in any concept of ordered liberty." *Id*. In 1967, a

unanimous Supreme Court expressly identified the long history of finding that due process

barred the use of knowingly false evidence:

> More than 30 years ago this Court held that the Fourteenth Amendment cannot
> tolerate a state criminal conviction obtained by the knowing use of false evidence.
> There has been no deviation from that established principle.

*Miller v. Pate*, 386 U.S. 1, 7 (1967) (citations omitted). The First Circuit's qualified immunity

analysis concludes that for decades the law was clearly established and officers were on notice

that they could not frame criminal defendants: "We conclude, without serious question, that

*Mooney* and its pre–1967 progeny provided reasonable law enforcement officers fair warning

that framing innocent persons would violate the constitutional rights of the falsely accused."

*Limone*, 372 F. 3d at 48. *See also Drumgold v. Callahan*, 707 F.3d 28 (1st Cir. 2013) (no

qualified immunity for suppressing material exculpatory evidence—the right was clearly

established in 1989); *Haley v. City of Boston*, 657 F.3d 39, 49 (1st Cir. 2011) ("Deliberate

concealment of material evidence by the police, designed to grease the skids for false testimony

and encourage wrongful conviction, unarguably implicates a defendant's due process rights.");

*Bazinet v. Thorpe*, 4:14-CV-40082-TSH, 2016 WL 3149657 at *7 (D.Mass. June 3, 2016)

(denying qualified immunity based on fabrication of evidence allegations); *Jones v. Han,* 993

F.Supp.2d 57 (D. Mass. 2014) at 67 (no qualified immunity for failing to disclose exculpatory evidence).

In analyzing a motion to dismiss about whether it would have been clear to an objectively reasonable officer that what he was doing violated the constitution, the legal analysis will go a long way toward answering that question. *Limone*, 372 F. 3d at 48.  This case demonstrates that it would have been "transparently clear to a reasonable officer situated similarly [to Defendants]" that fabricating eyewitness identifications and then using that evidence in court to maliciously prosecute Plaintiff would violate his rights. *Id.* "[No] reasonable law enforcement officer would have thought it permissible to frame somebody for a crime he or she did not commit." *Id.* at 50.

Taking the facts alleged in the Complaint as true, as is required at this stage, Defendants are not entitled to qualified immunity on Plaintiff's malicious prosecution claim. As detailed above, at no point could a reasonable police officer have believed that such conduct would be permissible to pursue the wrongful prosecution of Plaintiff.

### 2.    Qualified Immunity does not Shield Defendants from Plaintiff's Failure to Intervene Claim.

Plaintiff recognizes that this Court has already concluded that in 1980 it was not clearly established that there was a law enforcement duty to intervene beyond excessive force claims. Doc. 85, at 12. For purposes of preserving this claim, Plaintiff does not waive his opposition to this determination and incorporates his prior argument that qualified immunity is improper on his failure to intervene claim. Doc. 75, 19-20.

**E.**     **PLAINTIFF AGREES THAT HIS INTENTIONAL TORTS CLAIMS ARE PLED ONLY AGAINST THE INDIVIDUAL DEFENDANTS**

Defendant Town of Braintree argues that Plaintiff cannot pursue claims against it arising out of his intentional tort claims under Massachusetts law.[9] Plaintiff agrees that those claims are brought only against the individual Defendants and do not lie against Defendant Town of Braintree. *See Opalenik v. LaBrie*, 945 F. Supp. 2d 168, 195 (D.Mass. 2013).

## CONCLUSION

There is no basis to dismiss Plaintiff's claims against Defendants Buker, Derby, Leahy, Polio, Wilson, or Town of Braintree. Plaintiff's claims were filed within the statute of limitations after the claims accrued upon the final disposition of the wrongful prosecution against Plaintiff. Moreover, Plaintiff properly brings his claims against the deceased Defendants to this Court by serving the municipalities under Massachusetts law because there is sufficient evidence that those municipalities hold liability insurance and/or liability bonds to pay for any judgment. At this stage, the determination of whether the municipalities are liability insurance holders and/or liability bondholders does not implicate the issue of Article III standing. Finally, no Defendant is entitled to qualified immunity.

RESPECTFULLY SUBMITTED,

**FREDERICK WEICHEL**

BY:    /s/ Mark Loevy-Reyes
*One of Plaintiff's Attorneys*

---

[9] Doc. 103, 8.

Jon Loevy*
Debra Loevy, Bar No. 569212
Mark Loevy-Reyes, Bar No. 707972
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
mark@loevy.com
*Admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I, Mark Loevy-Reyes, an attorney, hereby certify that on July 29, 2021, I filed the foregoing PLAINTIFF'S **COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS WILSON, POLIO, BUKER, LEAHY, TOWN OF BRAINTREE, DERBY, AND WALSH'S MOTIONS TO DISMISS (DOC. 99, 102, 104, 114, 118)** using the Court's CM/ECF system, which effected service on all counsel of record.

/s/ Mark Loevy-Reyes
*One of Plaintiff's Attorneys*

Jon Loevy*
Debra Loevy, Bar No. 569212
Mark Loevy-Reyes, 707974
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
mark@loevy.com
*Admitted *pro hac vice*