UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FREDERICK WEICHEL, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | *   Civil Action No. 1:20-cv-11456-IT |
| | * |
| TOWN OF BRAINTREE, *et al.*, | * |
| | * |
| Defendants. | * |

MEMORANDUM & ORDER

February 16, 2022

TALWANI, D.J.

Plaintiff Frederick Weichel's Amended Complaint [Doc. No. 93] asserts claims against the Town of Braintree and former officers of the Braintree police department, the Boston police department, and the Massachusetts State police. Now before the court are Braintree's Motion to Dismiss [Doc. No. 102] claims asserted against the town; Braintree Detective John Leahy's Motion to Dismiss [Doc. No. 104]; and the Estate of Boston Detective Edward Walsh's Motion to Dismiss [Doc. No. 118].[1]

**I.   Factual Background**

Drawing all favorable inferences in Weichel's favor, the facts alleged in the Amended Complaint [Doc No. 93] are as follows. Shortly after midnight on May 31, 1980, Robert LaMonica was shot twice and killed in Braintree. Am. Compl. ¶ 38 [Doc. No. 93]. Weichel had nothing to do with the murder. Id. at ¶ 40. No physical evidence connected Weichel to the scene of the murder or to the murder itself. Id. at ¶ 152. A wiretap of Weichel's phone yielded no

---

[1] The court will address the Motions to Dismiss [Doc. Nos. 99, 114] brought by Braintree and non-party City of Boston as to the claims against other deceased defendants in a separate order.

incriminating evidence. Id. at ¶ 155. And multiple witnesses confirmed that Weichel was with them miles away in Boston at the time of the shooting. Id. at ¶¶ 41-42.

The case against Weichel rested on an eyewitness identification by a teenager who, with three teenage companions, had been drinking in a nearby park on the night of the murder. Id. at ¶¶ 44, 48, 161. The teenagers heard four loud bangs and then saw a man running in the dark toward a parked car. Id. at ¶¶ 45, 48-52. All four of them described the running man as being 5'11" or taller. Id. at ¶¶ 49-51, 55. Weichel is 5'7". Id. at ¶ 57. Three of the teenagers described the running man as having "dark curly hair" or "dark frizzy hair." Id. at ¶ 87. The fourth, John Foley, claimed to have seen the man's face for approximately one second under a streetlight. Id. at ¶ 52. Foley described the man as having bushy eyebrows and dark, curly sideburns. Id. at ¶ 61. Weichel did not have bushy eyebrows or sideburns. Id. at ¶ 62.

Based on Foley's description, Braintree Detective Robert Wilson, State Investigator John Sprague, and at least one other unknown officer worked with Foley to create a composite sketch of the running man. Id. at ¶ 63. The sketch was published in a local newspaper along with an article about the murder, and on June 6, 1980, Braintree Detective John Leahy received a phone call from an acquaintance who told him that the individual in the sketch was undoubtedly a man named Rocco Balliro. Id. at ¶¶ 68, 70.

Balliro, a convicted murderer who was serving a sentence at Massachusetts Correctional Institution-Bridgewater ("MCI-Bridgewater"), had been released on furlough the day before the murder and had unlawfully failed to return to prison. Id. at ¶¶ 54, 71. He was 5'11½" tall, weighed between 165 and 190 pounds, and had curly hair, thick eyebrows, thick sideburns, and a broad nose—much as Foley described the running man. Id. at ¶¶ 56, 59, 65, 72. On June 8, 1980, Detective Leahy went to MCI-Bridgewater and showed the sketch to ten corrections officers,

who all confirmed that the sketch resembled Balliro. Id. at ¶ 71. The next day, Leahy drafted a police report that documented the phone call and the subsequent identifications of Balliro by the MCI-Bridgewater corrections officers. Id. at ¶ 74. Braintree Captain Theodore Buker assigned Detective Wilson to investigate the Balliro connection, but there is no evidence that any such investigation ever occurred. Id. at ¶ 75.

Meanwhile, the day after the murder, Investigator Sprague and Detective Wilson showed three of the teenagers a photo array, but only one or two of the photographs—including the one of Weichel—matched the teenagers' general description of the running man's hair. Id. at ¶¶ 89, 91. The officers told the teenagers to pick a photograph if it resembled the running man "in any way." Id. at ¶ 96. The officers reported that Foley selected Weichel from the array but did not document the fact that Foley noted several differences between the running man and the individual in the photograph. Id. at ¶¶ 94-95. The other two teenagers each picked out two or three photographs, including the one of Weichel, but did not positively identify him. Id. at ¶¶ 97-98. A week or two later, the three teenagers were shown a second array, which was the same as the first but with one additional photograph. Id. at ¶ 99. Foley again picked out Weichel's photograph but noted the differences between it and the running man, and the other two teenagers selected multiple pictures. Id.

Shortly thereafter, Investigator Sprague, State Trooper Edward Whelan, or both officers took Foley and two other teenagers for a van ride around South Boston to look for Weichel. Id. at ¶ 101. The teenagers did not make any identifications, but the officers did not document that fact. Id. at ¶ 102.

Investigator Sprague and Trooper Whelan took Foley for a second van ride on June 12, 1980. Id. at ¶ 103. LaMonica's two brothers were also in the van and directed the search, though

3

there is no police report explaining their presence. Id. at ¶¶ 103-04. At some point, Sprague or Whelan said to Foley "isn't he the one," after which Foley identified Weichel. Id. at ¶ 105. Sprague or Whelan then took a photograph of Weichel, which was introduced into evidence at the trial. Id. at ¶ 107.

Several months later, the three teenagers were shown a third photo array, identical to the first. Id. at ¶ 100. At that point Foley again picked out Weichel's photograph while noting differences, one teenager again chose multiple photographs, including Weichel's, and the third was unable to make any identification at all. Id.

Although the entire case against Weichel rested on Foley's tenuous eyewitness identification, as alleged in the Amended Complaint [Doc. No. 93], the officers intentionally misrepresented the eyewitness evidence to make it seem stronger than it was. Id. at ¶ 115. In an undated report seeking the wiretap, Investigator Sprague wrote that "four eye witnesses" had picked Weichel's photo from the array, even though only Foley had a made a positive identification. Id. at ¶¶ 109-11. The report also stated that Foley had identified Weichel "as a look-alike of the assailant," leaving out the fact that Foley had noted multiple difference between the running man and the photo, and that a second teenager had picked Weichel as a "a definite look-alike," even though she was always adamant that she could not identify the running man. Id. at ¶¶ 110-11, 126. The report additionally left out the fact that a third teenager had viewed the array and failed to make a positive identification. Id. at ¶ 110.

The Amended Complaint [Doc. No. 93] alleges that the officers destroyed or suppressed exculpatory evidence from both Weichel and the Commonwealth. Id. at ¶¶ 18, 115. Detective Wilson destroyed the composite sketch with the edits that were generated by Foley's original description. Id. at ¶ 116. Officers hid or destroyed all evidence of the suggestive photo

identification procedures, including the array itself and Wilson's notes and report about it. Id. at ¶¶ 93, 112-14. They suppressed Detective Leahy's report pegging Balliro as the individual in the sketch. Id. at ¶ 133. They hid the fact that during the van ride, one of the officers had suggestively said "isn't he the one" to get Foley to identify Weichel. Id. at ¶ 140. They withheld the information that Foley received favorable treatment in a criminal case of his own in exchange for his testimony against Weichel. Id. at ¶ 139. And, finally, although the apparent murder weapon was found the day after the murder less than half a mile away from the scene, it was never examined for fingerprints or biological evidence. Id. at ¶ 153. At some point, the officers "misplaced" the weapon, such that no further testing could be done. Id. at ¶ 154.

The Amended Complaint [Doc. No. 93] alleges further that the officers fabricated evidence from purported confidential informants suggesting that Weichel and a man named Thomas Barrett had murdered LaMonica. Id. at ¶ 117. Specifically, on June 12, 1980—after Investigator Sprague and Detective Wilson had already targeted their investigation at Weichel—Wilson wrote a report stating that an informant had told Boston Detective Edward Walsh or Boston Officer Walter Derby that Weichel was involved in the murder. Id. at ¶¶ 118-19. Walsh and Derby then suppressed any information related to the identity of the purported confidential informants and to the information they provided. Id. at ¶¶ 121-23. Sprague also fabricated motive evidence to connect Weichel to LaMonica. Id. at ¶¶ 128-29.

On August 13, 1980, Weichel was arrested for LaMonica's murder. Id. at ¶ 157. A jury found him guilty of the murder on August 20, 1981, and he was sentenced to life in prison without the possibility of parole. Id. at ¶¶ 165-66.

Between 1980 and 2009, Weichel made multiple public records requests to Braintree for exculpatory information. Id. at ¶ 141. Each time, Braintree withheld Detective Leahy's

exculpatory report. Id. On June 2, 2010, Weichel's attorneys made another public records request for all exculpatory materials relating to the LaMonica murder. Id. at ¶ 143. The responsive documents included, among other things, a police report that detailed how numerous state corrections officers had been shown a composite sketch produced by the police based on Foley's description and had stated that it looked like a convicted murderer who had been granted furlough the day before the murder. Id. at ¶¶ 54, 63, 68, 70-71, 74, 138, 145. On April 10, 2017, a Massachusetts Superior Court judge granted Weichel's motion for a new trial and vacated his conviction based on the revelation of this new evidence. Id. at ¶ 26; Superior Court Decision ¶¶ 82-85 [Doc. No. 73-2]. The judge concluded that if Weichel had possessed Leahy's report in time for the trial, he could have mounted a much stronger defense, and the jury could have "reached a very different conclusion" regarding his guilt. Superior Court Decision ¶ 85 [Doc. No. 73-2]. The Commonwealth appealed, and the Supreme Judicial Court of Massachusetts upheld the Superior Court judge's order. Am. Compl. ¶ 181 [Doc. No. 93]. On August 7, 2017, the Commonwealth opted not to re-try Weichel and entered a *nolle prosequi*, dropping all charges against him. Id. at ¶¶ 27, 182. By the time of his release, Weichel had spent thirty-six years in prison. Id. at ¶ 171.

## II.    Procedural Background

In August 2020, Weichel filed this action against Braintree and former Braintree police department officials, Chief John Polio, Captain Buker, Detective Leahy, Detective Wilson, and other unknown officers; Boston and former Boston police department officials, Detective Walsh and Officer Derby; and Massachusetts state police Investigator Sprague and Trooper Edward Whelan. The court granted Boston's Motion to Dismiss [Doc. No. 4] and Braintree's Motion to Dismiss Count VI [Doc. No. 41], which sought dismissal of Weichel's indemnification claim

against the municipalities, Elec. Order [Doc. No. 85], and dismissed Weichel's claim for failure to intervene against Trooper Whelan, Mem. & Order [Doc. No. 88].

With leave of court, Weichel thereafter filed an Amended Complaint [Doc. No. 93]. Against Braintree and the individual officers, he asserts four claims pursuant to 42 U.S.C. § 1983: violation of due process, malicious prosecution, conspiracy, and failure to intervene. Am. Compl. ¶¶ 184-242 [Doc. No. 93]. He also brings a claim against the officers under state law for intentional infliction of emotional distress. Id. at ¶¶ 243-49. Because Walsh died less than a year before Weichel filed the action, Weichel served process on Walsh's personal representative.

Braintree, Detective Leahy, and Detective Walsh's estate have moved to dismiss the Amended Complaint [Doc. No. 93] for failure to state a claim. Mots. to Dismiss [Doc. Nos. 102, 104, 118].

### III. Standards of Review

In evaluating a motion to dismiss for failure to state a claim, this court assumes "the truth of all well-pleaded facts" and draws "all reasonable inferences in the plaintiff's favor." Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006). To survive dismissal, a complaint must contain sufficient factual material to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . [f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." Id. at 555 (internal citations omitted). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009). Additionally, "an adequate complaint must include not only a

plausible claim but also a plausible defendant." Penalbert-Rosa v. Fortuno-Burset, 631 F.3d 592, 594 (1st Cir. 2011). "[E]ach defendant's role . . . must be sufficiently alleged to make him or her a plausible defendant. After all, '[the court] must determine whether, *as to each defendant,* a plaintiff's pleadings are sufficient to state a claim on which relief can be granted.'" Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 16 (1st Cir. 2011) (quoting Sánchez v. Pereira–Castillo, 590 F.3d 31, 48 (1st Cir. 2009)) (emphasis in original).

"While most Rule 12(b)(6) motions are premised on a plaintiff's putative failure to state an actionable claim, such a motion may sometimes be premised on the inevitable success of an affirmative defense." Nisselson, 469 F.3d at 150. A court may allow a Rule 12(b)(6) motion based on an affirmative defense if "(i) the facts establishing the defense are definitively ascertainable from the complaint and the other allowable sources of information, and (ii) those facts suffice to establish the affirmative defense with certitude." Id. (quoting Rodi v. S. New Engl. Sch. of Law, 389 F.3d 5, 12 (1st Cir. 2004)).

**IV.   Discussion**

   A.   *Statute of Limitations*

The first issue, raised in all the motions, is whether Weichel's claims are timely. In Massachusetts, claims brought under section 1983 are subject to a three-year statute of limitations. Nieves v. McSweeney, 241 F.3d 46, 51 (1st Cir. 2001). Federal law, however, governs when section 1983 claims accrue. McDonough v. Smith, 139 S. Ct. 2149, 2155 (2019) (quoting Wallace v. Kato, 549 U.S. 384, 388 (2007)). Generally, such claims accrue when the constitutional violation is "complete and the plaintiff has a present cause of action." Id. But where a plaintiff alleges a wrongful conviction, a cause of action under section 1983 "does not

8

accrue until the conviction or sentence has been invalidated." Heck v. Humphrey, 512 U.S. 477, 489-90 (1994).

In this case, a Superior Court judge granted Weichel's motion for a new trial and vacated his conviction on April 10, 2017. The Commonwealth appealed, and the Supreme Judicial Court upheld the order on July 21, 2017. Only after losing its appeal did the Commonwealth drop the charges against Weichel on August 7, 2017. Weichel filed this action on August 3, 2020.

Defendants argue that Weichel's cause of action accrued on April 10, 2017, when his conviction was set aside, or "at the latest" on July 21, 2017, at the conclusion of the Commonwealth's appeal, and that his claims are therefore time-barred. They argue that Heck's deferred accrual rule applies only where there is an "outstanding criminal judgment" and that where a conviction has been set aside but the charges remain pending, Heck does not bar an action that would "impugn an anticipated future conviction."

These arguments run counter, however, to the Supreme Court's guidance in Heck and, more recently, in McDonough. In McDonough, the plaintiff had been prosecuted twice based on allegedly fabricated evidence, with the first trial ending in a mistrial and the second in an acquittal. 139 S. Ct. at 2153-54. The plaintiff then brought a claim against the prosecutor for fabrication of evidence, which the Second Circuit held to be time-barred. Id. at 2154. The Supreme Court, relying extensively on its decision in Heck, reversed, holding that "[t]he statute of limitations for a fabricated-evidence claim . . . does not begin to run until the criminal proceedings against the defendant (*i.e.*, the § 1983 plaintiff) have terminated in his favor." Id. at 2154-55. This was necessary, the Court explained, because to conclude otherwise would mean that "[a] significant number of criminal defendants could face an untenable choice between (1) letting their claims expire and (2) filing a civil suit against the very person who is in the midst of

prosecuting them." Id. at 2158. This second option would "risk[] tipping [the plaintiff's] hand as to his defense strategy, undermining his privilege against self-incrimination, and taking on discovery obligations not required in the criminal context." Id. And such parallel litigation would also "run counter to core principles of federalism, comity, consistency, and judicial economy." Id.

The position advocated by Defendants would have Weichel's claims accrue when he was granted a new trial—even as the Commonwealth was appealing that decision. Or, alternatively, they suggest that the claims accrued when Supreme Judicial Court upheld the order granting Weichel a new trial—when the Commonwealth may have been preparing to prosecute him again. But McDonough cautioned against that very circumstance: a plaintiff cannot be expected to bring a civil suit while awaiting retrial. A contrary result would thwart the "pragmatic concerns with avoiding parallel criminal and civil litigation over the same subject matter and the related possibility of conflicting civil and criminal judgments" that underpinned the Court's decisions in Heck and McDonough. Id. at 2157. The court accordingly concludes that Weichel's claims accrued on August 7, 2017, and that this action was timely filed.

  B. *Merits*

    1. Qualified Immunity

The individual officers' motions raise the issue—previously addressed by the court—of whether the officers are entitled to qualified immunity on a motion to dismiss as to Weichel's claims for malicious prosecution or failure to intervene. In rejecting Trooper Whelan's qualified immunity argument as to the malicious prosecution claim, the court explained that "the question is not whether the *cause of action* existed but whether the alleged *conduct* was prohibited." Mem. & Order 12 [Doc. No. 85]. In contrast, the court granted Whelan qualified immunity as to

Weichel's claim for failure to intervene, concluding that the First Circuit has not "explicitly required officers to intervene—other than in excessive force cases—when an individual's constitutional rights are being violated." Id. In both cases, the court's reasoning applies equally to the remaining officers.

        2.        Claims Against Officer Walsh

Officer Walsh's estate argues that all the claims against him must be dismissed because Weichel's allegations are insufficient to state a claim. Assuming the truth of all well-pleaded facts and drawing all reasonable inference in Weichel's favor, Walsh's alleged conduct is as follows.

LaMonica was shot on May 31, 1980. Am. Compl. ¶ 38 [Doc. No. 93]. On June 1, 1980, and again a week or two later, Detective Wilson and Investigator Sprague showed the teenage eyewitnesses two photo arrays that included Weichel, but only Foley was able to make a positive identification, which was equivocal. Id. at ¶¶ 89, 95, 98-99. Given the weak evidence linking Weichel to the murder, the officers involved in the investigation fabricated additional evidence and suppressed exculpatory evidence to bolster their case. Id. at ¶ 115. Some of that evidence came from Walsh. Id. at ¶¶ 117, 119-20, 122. Specifically, Walsh, along with other officers, fabricated informant evidence suggesting that Weichel and a man named Thomas Barrett had murdered LaMonica. Id. at ¶ 117. Walsh provided that false information to Detective Wilson and then suppressed any information relating to the purported informant. Id. at 119-22. As a result of the officers' conduct in framing him and suppressing exculpatory evidence, Weichel was arrested, prosecuted, and imprisoned for thirty-six years. Id. at ¶ 171.

Where Weichel has made specific allegations regarding how Walsh's conduct was directed toward framing him for a murder that he did not commit, he has stated a plausible claim

11

that Walsh violated Weichel's right to due process by participating in a scheme to fabricate evidence against him. See Limone v. Condon, 372 F.3d 39, 45 (1st Cir. 2004). The allegations also support an inference that Walsh helped to cause Weichel's seizure pursuant to legal process unsupported by probable cause, as required for a claim of malicious prosecution under the Fourth Amendment. See Hernandez-Cuevas v. Taylor, 723 F.3d 91, 101 (1st Cir. 2013) (quoting Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012)). Where Weichel alleges that Walsh's conduct was part of a scheme to fabricate evidence to bolster the case against Weichel, he has stated a claim for conspiracy. See Estate of Bennett v. Wainwright, 548 F.3d 155, 178 (1st Cir. 2008) (citing Earle v. Benoit, 850 F.2d 836, 844 (1st Cir. 1988)). And, finally, Weichel's allegations that Walsh participated in this scheme to frame him and that he then spent almost four decades in prison for a murder that he did not commit suffice to state a claim for intentional infliction of emotional distress. See Limone, 497 F. Supp. at 227.

## IV.   Conclusion

For the forgoing reasons:

- Braintree's Motion to Dismiss [Doc. No. 102] is DENIED;

- Leahy's Motion to Dismiss [Doc. No. 104] is GRANTED as to Count IV and DENIED as to all other claims; and

- the estate of Walsh's Motion to Dismiss [Doc. No. 118] is GRANTED as to Count IV and DENIED as to all other claims.

IT IS SO ORDERED.

February 16, 2022                                        /s/ Indira Talwani
                                                         United States District Judge