# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FREDERICK WEICHEL, | ) | Case No. 20-CV-11456-IT |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| TOWN OF BRAINTREE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS BUKER, DERBY, POLIO, AND WILSON

*Attorneys for Plaintiff*

Mark Loevy-Reyes, BBO No. 707974
LOEVY & LOEVY
398 Columbus Avenue, #294
Boston, MA 02116
(312) 243-5900
mark@loevy.com

Jon Loevy*
Quinn K. Rallins*
Debra Loevy, BBO No. 569212
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
*Admitted *pro hac vice*

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................ii

TABLE OF AUTHORITIES ........................................................................................ v

I.      INTRODUCTION ................................................................................ 1

II.     RELEVANT PROCEDURAL BACKGROUND ........................................... 3

III.    STATEMENT OF UNDISPUTED MATERIAL FACTS FOR
        INDEMNIFICATION ........................................................................... 4

        TOWN OF BRAINTREE ....................................................................... 4

        CITY OF BOSTON ............................................................................... 5

IV.     STATEMENT OF UNDISPUTED MATERIAL FACTS FOR
        LIABILITY .......................................................................................... 6

        THE ROBERT LAMONICA MURDER ..................................................... 6

        FOUR YOUNG WITNESSES .................................................................. 7

        SUPPRESSION OF EXCULPATORY EVIDENCE: DEFENDANTS
        BUKER, POLIO, AND WILSON ........................................................... 10

        SUGGESTIVE IDENTIFICATION PROCEDURES ................................... 12

        DEFENDANTS FABRICATED AND SUPPRESSED
        ADDITIONAL EVIDENCE .................................................................... 15

        DEFENDANTS BUKER, POLIO, AND WILSON HID THE
        BALLIRO EVIDENCE .......................................................................... 16

                Plaintiff's Wrongful Conviction, and Imprisonment............................ 18

                Defendant Polio ....................................................................... 20

Plaintiff's Exoneration ........................................................................... 21

V.      ARGUMENT .................................................................................... 21

A.    DEFENDANT TOWN OF BRAINTREE AND THE CITY
      OF BOSTON EACH HAD A POLICY TO INDEMNIFY ITS
      POLICE OFFICERS.................................................................. 22

B.    DEFENDANTS BUKER, DERBY, POLIO, AND WILSON
      ADMIT THE WELL-PLEADED ALLEGATIONS IN THE
      COMPLAINT .............................................................................. 25

C.    BASED ON THEIR ADMISSIONS, DEFENDANTS BUKER,
      DERBY, POLIO, AND WILSON SUPPRESSED
      EXCULPATORY EVIDENCE ................................................... 26

      1.  Defendants Buker, Polio, and Wilson hid evidence of the
          Balliro report. ..................................................................... 27

      2.  Defendants Buker, Polio and Wilson Suppressed Exculpatory
          Evidence Related to the Composite.................................... 30

      3.  Defendant Wilson hid evidence of a drawing by one of
          the witnesses ....................................................................... 30

      4.  Defendants Buker, Polio, and Wilson hid evidence of alternate
          suspects ................................................................................ 31

      5.  Defendants Buker, Polio, and Wilson hid evidence of
          inducements to Foley to identify Plaintiff ....................... 31

D.    INDEPENDENTLY, DEFENDANT WILSON USED UNDULY
      SUGGESTIVE IDENTIFICATION PROCEDURES THAT
      TAINTED PLAINTIFF'S CRIMINAL TRIAL (AND
      SUPPRESSED EVIDENCE OF ITS SUGGESTIVENESS)................ 32

E.    DEFENDANTS DERBY AND WILSON FABRICATED
      INCULPATORY INFORMANT EVIDENCE....................... 35

F.    DEFENDANTS BUKER, DERBY, POLIO, AND WILSON
      MALICIOUSLYPROSECUTED PLAINTIFF....................... 36

G.      DEFENDANTS BUKER, DERBY, POLIO, AND WILSON
        ARE LIABLE FOR SECTION 1983 CONSPIRACY ............................ 37

H.      DEFENDANTS BUKER AND POLIO'S SUPERVISORY
        INDIFFERENCE CAUSED THE VIOLATIONS OF
        PLAINTIFF'S CONSTITUTIONAL RIGHTS ....................................... 38

VI.     CONCLUSION ............................................................................................. 40

# TABLE OF AUTHORITIES

**Cases**    **Page(s)**

*Alexander v. City of South Bend,*
433 F.3d 550 (7th Cir. 2006) .................................................................. 32

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ................................................................................ 22

*Avery v. City of Milwaukee,*
847 F.3d 433 (7th Cir. 2017) .................................................................. 36

*Banco Bilbao Vizcaya Argentaria v. Family Restaurants, Inc.*
*(In re The Home Restaurants, Inc.),*
285 F.3d 111 (1st Cir. 2002) ................................................................... 25

*Brady v. Maryland,*
373 U.S. 83 (1963) .................................................................................. 26

*Brockton Savings Bank v. Peat, Marwick, Mitchell & Co.,*
771 F.2d 5 (1st Cir. 1985) ....................................................................... 25

*Camilo-Robles v. Hoyos,*
151 F.3d 1 (1st Cir. 1998) ....................................................................... 38

*Camilo-Robles v. Zapata,*
175 F.3d 41 (1st Cir. 1999) ..................................................................... 39

*Com. v. Watson,*
388 Mass. 536 (1983) .............................................................................. 24

*Conley v. United States,*
415 F.3d 183 (1st Cir. 2005) ................................................................... 27

*Connick v. Thompson,*
563 U.S. 51 (2011) .................................................................................. 23

*Drumgold v. Callahan,*
707 F.3d 28 (1st Cir. 2013) ..................................................................... 26

*Eisler v. Stritzler,*
535 F.2d 148 (1st Cir. 1976) ................................................................... 25

*Estate of Bennett v. Wainwright,*
    548 F.3d 155 (1st Cir. 2008) ................................................................ 37

*Figueroa-Torres v. Toldeo-Davila,*
    232 F.3d 270 (1st Cir. 2000) ................................................................ 39

*Franco v. Selective Ins. Co.,*
    184 F.3d 4 (1st Cir. 1999) .................................................................... 25

*Giglio v. United States,*
    405 U.S. 150 (1972) ..................................................................... 26, 27

*Goldman, Antonetti, Ferraiouli, Axtmayer & Hertell v. Medfit Int'l., Inc.,*
    982 F.2d 686 (1st Cir. 1992) ................................................................ 25

*Haley v. City of Boston,*
    657 F.3d 39 (1st Cir. 2011) .................................................................. 26

*Hampton v. Hanrahan,*
    600 F.2d 600 (7th Cir. 1979) ............................................................... 37

*Hernandez-Cuevas v. Taylor,*
    723 F.3d 91 (1st Cir. 2013) .................................................................. 37

*Kyles v. Whitley,*
    514 U.S. 419 (1995) ..................................................................... 26, 27

*Limone v. Condon et al.,*
    372 F.3d 39 (1st Cir. 2004) .................................................................. 36

*Maldonado-Denis v. Castillo-Rodriguez,*
    23 F.3d 576 (1st Cir. 1994) .................................................................. 39

*Manuel v. Joliet,*
    580 U.S. 357 (2017) .......................................................................... 36

*Mason v. Brathwaite,*
    432 U.S. 98 (1977) ............................................................................ 32

*Monell v. Dep't of Soc. Serv.,*
    436 U.S. 658 (1978) .......................................................................... 23

*Mooney v. Holohan,*
    294 U.S. 103 (1935) ............................................................................ 36

*Napue v. Illinois,*
    360 U.S. 264 (1959) ...................................................................... 26, 36

*Neil v. Biggers,*
    409 U.S. 188 (1972) ........................................................................... 33

*Perry v. New Hampshire,*
    565 U.S. 228 (2012) ........................................................................... 32

*Pyle v. State of Kansas,*
    317 U.S. 213 (1942) ........................................................................... 26

*Rosario v. Waterhouse,*
    1:19-cv-10532, 2019 WL 4765082 (D. Mass. Sept. 27, 2019) ................ 24

*Santiago v. Fenton,*
    891 F.2d 373 (1st Cir. 1989) .............................................................. 37

*Schand v. City of Springfield,*
    380 F. Supp. 3d 106 (2019) ................................................................ 23

*Simmons v. U.S.,*
    390 U.S. 377 (1968) ........................................................................... 32

*Smith v. Cain,*
    565 U.S. 73, 132 S. Ct. 627 (2012) .............................................. 26, 27

*Tolan v. Cotton,*
    572 U.S. 650 (2014) ........................................................................... 21

*United States v. Agurs,*
    427 U.S. 97 (1976) ............................................................................. 27

*United States v. Bagley,*
    473 U.S. 667 (1985) ........................................................................... 26

*United States v. Henderson,*
    320 F.3d 92 (1st Cir. 2003) .......................................................... 32, 33

*United States v. Holliday,*
    457 F.3d 121 (1st Cir. 2006) .............................................................. 32

*United States v. Sepulveda,*
   15 F.3d 1216 (1st Cir. 1993) .................................................................. 26

*Voutour v. Vitale,*
   761 F.2d 812 (1st Cir. 1985) .................................................................. 40

*Wearry v. Cain,*
   577 U.S. 385 (2016) ....................................................................... 26, 27

**Other Statutes and Authorities**

42 U.S.C. §1983 ...................................................................................... 22

Mass. Gen. Laws ch. 190B, § 3-803(d)(2) ................................................ 24

## I.     INTRODUCTION

Fredrick Weichel was wrongly convicted of Robert LaMonica's murder.  Not one piece of physical evidence ever connected Plaintiff to the murder scene. The only evidence ever presented that Plaintiff was near the scene of the murder was an identification that modern eyewitness identifications science concludes was an impossibility. Despite that impossibility, the witness wrongly identified Plaintiff's photo through a suggestive photo array developed by Defendant Wilson of the Braintree Police Department.

Plaintiff's photograph was in that photo array because Defendants Walsh and Derby of the Boston Police Department provided false information that a confidential informant had information suggesting that Plaintiff had committed the murder. Defendant Walsh was connected to James "Whitey" Bulger, a notorious organized crime figure in Boston. And Bulger had a reason to falsely implicate someone—Bulger was dating Veronica Barrett, whose son Thomas Barrett later confessed to committing the murder. Bulger used Walsh and Derby to inject false information, to take any suspicion off Barrett by placing it on Plaintiff. Bulger also may have wanted to set up Plaintiff to take pressure off himself because police also investigated ties between him and LaMonica.

Through a suggestive photo array, Defendant Wilson was able to fabricate one eyewitness identification against Plaintiff. This photo array was improperly repeated with the witness to reinforce his false identification.

But because the identification was impossible, it was always going to be contested through trial. Defendants therefore fixed the criminal trial by hiding evidence that could be used to undermine the flimsy identification.

First, Defendants Polio, Buker, Leahy (who is not the subject of this motion), and Wilson hid evidence that 11 corrections officers had seen a composite created by the witness and Wilson of the person running from the crime (the "running man") and had said that the composite looked like Rocco Balliro, who was in prison for murder and had failed to return from furlough on the day of the murder. Balliro previously murdered someone while out on furlough from prison.

Second, Defendants Buker, Polio, and Wilson hid evidence of alternate suspects who they investigated. The murder victim had previously been involved with the murder of a man in Hull named Freeman "Punchy" Clifford. When first questioned about who would want to kill LaMonica, his family members told police that it could be in retaliation for the Clifford murder.

Defendant Buker hid in a binder that police investigated at least two associates of Clifford, one of whom had a violent history and was living with Clifford's widow. Like the Balliro evidence, the alternate suspect evidence was hidden in the basement of the Braintree Police Department until after 2010, when Braintree's investigation file was finally produced to Plaintiff in response to a public records request.

Defendants' original successful prosecution was based on rumors, fabricated evidence, and suppressed exculpatory evidence. After the full facts were revealed,

Plaintiff's conviction was reversed, and he was released. Plaintiff seeks compensation for the years that he was imprisoned based on Defendants' misconduct.

## II.     RELEVANT PROCEDURAL BACKGROUND

On August 03, 2020, Plaintiff filed a Complaint against various Defendants including Defendants Polio, Derby, and the Estates of Buker and Wilson. Dckt. No. 1. On November 20, 2020, Plaintiff filed a motion to proceed against deceased Defendants—Buker, Derby, and Wilson (the motion also included Defendant Walsh, but that issue was resolved later because he had died within one year of the filing of the Complaint and had an estate). Dckt. Nos. 29, 71. The City of Boston (COB) and Defendant Town of Braintree (TOB) opposed Plaintiff's motion. Dckt. Nos. 36, 37, 66.

On May 12, 2021, the Court heard argument on Plaintiff's motion. Dckt. No. 83. At that hearing, counsel for the COB and Defendant TOB were present (these same attorneys continue to represent parties in this case). *See* Ex. 1, Hearing Transcript, at 2. The Court denied Plaintiff's motion to serve deceased Defendants and granted Plaintiff leave to file an amended Complaint naming the deceased Defendants who died more than one year before the filing of Plaintiff's Complaint as parties while serving the municipality that was the liability bondholder or insurer. Dckt. No. 86; *see also*, Ex. 1, at 14-16, 21-27, 35. The Court also dismissed Plaintiff's indemnification claims against the TOB and COB. Dckt. No. 85.

Plaintiff did file the Amended Complaint on May 26, 2021, naming Defendants Buker, Derby, Polio, and Wilson as party Defendants. Dckt. No. 93. On May 20, 2021, Plaintiff served the TOB with summons and Plaintiff's original complaint for Defendant Polio. Dckt. No. 91. On June 3, 2021, Plaintiff served the TOB (for Defendants Buker and Wilson) and the COB (for Defendant Derby) with summons and Plaintiff's Amended Complaint. Dckt. 95-97. None of those Defendants answered either Plaintiff's Complaint or his Amended Complaint.

## III.   STATEMENT OF UNDISPUTED MATERIAL FACTS FOR INDEMNIFICATION

### TOWN OF BRAINTREE

1.      From 1975 to present, the TOB has never failed to indemnify a law enforcement officer for liability stemming from the officer's scope of employment. Ex. 2, Town of Braintree Deposition under Rule 30(b)(6) (Nov. 1, 2023), 6:24-7:12, 7:21-8:23.

2.      The TOB had no written policy related to denying or approving indemnifying a police officer for alleged misconduct in the scope of his/her duty. *Id.*, 14:13-18.

3.      In addition, from before 1980 to present, the TOB has maintained insurance for general liability and policies related specifically to claims against police officers stemming from actions in the scope of employment. *Id.*, 20:7-20, 23:7-24:10, 24:22-25:13, 32:16-21, 35:21-39:23, 42:17-43:24, 45:3-46:17, 46:24-48:23, 49:3-6, 49:13-21, 50:4-55:11, 55:20-59:8, 59:17-62:11, 63:5-24, 64:7-65:2.

4.     But the TOB did not have a known location where it retained its insurance policies. *Id.*, 34:8-10.

5.     Included among prior insurance coverage was the payment to provide the defense related to a lawsuit filed in 1980 against, among others, John V. Polio, who is also a named Defendant here. *Id.*, 37:20-39:23.

6.     That insurance also provided for paying liability for law enforcement officers who were acting in the scope of their employment. *Id.*

7.     The TOB and/or its insurers are providing legal defense for the Braintree Defendants in this case. *Id.*, 18:1-14, 26:16-31:15.

## CITY OF BOSTON

8.     At all relevant times, the COB was self-insured. Ex. 3, City of Boston Declaration, at ¶2.

9.     From 2018 to present, the COB paid 23 judgments/settlements related to claims against police officers. *Id.*, ¶4.

10.    Those payments totaled $44,361,000. *Id.*, ¶4 and Ex. A to Declaration.

11.    In addition to indemnifying those 23 cases, the COB has provided legal representation for other officers accused of misconduct (though COB cannot identify how many cases it has provided representation). *Id.*, ¶5.

12.    Since 2018, there is only one case in which a Boston police officer was not indemnified or provided legal counsel for claims of misconduct in the scope of employment. *Id.*, ¶6 and Ex. B to Declaration. That one time related to Boston

police officer Kevin Smith, who had been fired for the misconduct that was the subject of the claim. *Id.*

13.     The COB has no written policy to guide it about deciding whether to indemnify and/or defend claims related to law enforcement misconduct by its officers acting in the scope of employment. *Id.*, ¶7.

## IV.     STATEMENT OF UNDISPUTED MATERIAL FACTS FOR LIABILITY
## THE ROBERT LAMONICA MURDER

1.     Plaintiff Frederick Weichel spent 36 years wrongfully imprisoned for a crime that he did not commit. Dckt. No. 93, ¶32.

2.     Mr. Weichel is a college graduate whose life was greatly and adversely impacted by the events giving rise to this matter. *Id.*

3.     Defendants Wilson, Buker, and Polio, were all Braintree police officers at the time of the events giving rise to this matter. *Id.*, ¶33.

4.     Defendant Derby was a Boston police officer at the time of the events giving rise to this matter. *Id.*

5.     Defendants Buker, Derby, Polio, and Wilson were responsible for investigating crimes, including the crime at issue in this case, and/or for supervising other police officer Defendants. *Id.*

6.     These Defendants committed, facilitated, and approved the constitutional violations at issue in this case. *Id.*

7.     Defendant TOB is a municipality of the Commonwealth of Massachusetts, which oversees the Braintree Police Department. *Id.*, ¶34.

6

Defendants Buker, Polio, and Wilson were employed by or were acting as agents of the TOB while conducting the investigation described in this Complaint. *Id*.

8.      At all times relevant to the events described in this Complaint, each of the Defendants identified above acted under color of law, within the scope of his employment, and as an investigator. *Id.*, ¶36.

9.      Shortly after midnight on May 31, 1980, Robert LaMonica was shot twice and killed in the Town of Braintree. *Id.*, ¶38.

10.     Plaintiff had absolutely nothing to do with the murder. *Id.*, ¶40.

11.     At the time of the murder, Plaintiff was miles away in Boston, Massachusetts. *Id.*, ¶41.

12.     Multiple witnesses confirmed that Plaintiff was with them in Boston at the time of the murder. *Id.*, ¶42.

13.     Braintree Police officers responded to the scene of the murder, investigated the scene, gathered some evidence, and spoke to nearby residents. *Id.*, ¶43.

## FOUR YOUNG WITNESSES

14.     The only alleged witnesses identified by Defendants were four teenagers who were in the park near the scene of the murder. Dckt. No. 93, ¶44.

15.     These four teenagers saw a man running in the dark at a far distance for a matter of a few seconds. *Id.*, ¶45.

16.     It was a physical impossibility that any of those witnesses could identify the face of the man. *Id.*, ¶46.

7

17.     Three eyewitnesses gave physical descriptions of a man they saw at a distance—none of these matched Plaintiff. *Id.*

18.     Defendants identified no witness to the fatal shooting itself. *Id.*, ¶47.

19.     The four teenagers were in the park at nighttime after going to a movie. They had been drinking beer. *Id.*, ¶48.

20.     They were at least 180 feet from the street when they heard four loud bangs and saw a man running quickly to a car parked on the street. *Id.*

21.     Teenage witness Frederick Laracy described the running man as 6'1". *Id.*, ¶49. Laracy said he did not see the running man's facial features. *Id.*

22.     Teenage witness Lisa Krause described the running man as 5'11" with a slim, athletic build. *Id.*, ¶50. She did not see his facial features, only that the man had a "round" face. *Id.*, ¶50.

23.     Teenage witness Jean Castonguay described the running man as 5'10" or 5'11" and as tall and skinny. *Id.*, ¶51. She could not see his facial features, only that the man had a "short, round" face. *Id.*

24.     Teenage witness John M. Foley, who had drunk four to five beers, claimed to have seen the running man's face for approximately one second under a streetlight. *Id.*, ¶52.

25.     Mr. Foley's description (along with the body-type descriptions of his friends) did not match Plaintiff. *Id.*, ¶53.

26.     Mr. Foley's description was consistent with Rocco Balliro, a convicted murderer who had unlawfully failed to return to prison from a furlough the day before the murder, or Mr. Balliro's identical twin brother. *Id.*, ¶54.

27.     Mr. Foley described the running man as being 5'11" tall. *Id.*, ¶55.

28.     Mr. Balliro was 5'11 ½" tall. *Id.*, ¶56.

29.     Plaintiff is 5'7" tall. *Id.*, ¶57.

30.     Mr. Foley described the running man as being athletic and weighing approximately 175 to 180 lbs. *Id.*, ¶58.

31.     Mr. Balliro weighed between 165 to 190 lbs. *Id.*, ¶59.

32.     Plaintiff weighed 155 lbs. *Id.*, ¶60.

33.     Mr. Foley described the running man as having bushy eyebrows, and dark, curly sideburns. *Id.*, ¶61.

34.     Plaintiff did not have bushy eyebrows or sideburns. *Id.*, ¶62.

35.     Using Mr. Foley's vague description of the running man, Defendant Wilson worked with Mr. Foley to create a composite sketch of the man that Foley saw running. *Id.*, ¶63.

36.     This composite sketch included facial features that did not match Plaintiff. These features included, but were not limited to, thick eyebrows and dark, curly sideburns. *Id.*, ¶64.

37.     Rather, the composite sketch looked very much like Rocco Balliro. *Id.*, ¶65.

38.     At least one of the four teenagers was asked to draw a picture of the running man. *Id.*, ¶67. Defendant Wilson suppressed and/or destroyed that picture. *Id.*

39.     Defendant Wilson's composite picture was published in a local paper along with an article about the murder. *Id.*, ¶68.

40.     There are no known police reports after the publication of the composite sketch stating that anyone identified the image depicted in the composite as Mr. Weichel. *Id.*, ¶69.

### SUPPRESSION OF EXCULPATORY EVIDENCE: DEFENDANTS BUKER, POLIO, AND WILSON

41.     On or about June 6, 1980, Defendant Leahy received a phone call from a well-known acquaintance that the composite picture was undoubtedly Rocco Balliro. Dckt. No. 93, ¶70.

42.     Armed with that information, on or about June 8, 1980, Defendant Leahy went to Bridgewater prison and showed the composite picture to 10 prison guards, who all confirmed that the composite showed Mr. Balliro. *Id.*, ¶71.

43.     Mr. Balliro looked like the man depicted in the composite picture, including a full head of curly hair, thick eyebrows, thick sideburns, and a broad nose. *Id.*, ¶72.

44.     In fact, comparing the composite picture with contemporary photos of Plaintiff and Mr. Balliro, the composite looks like Mr. Balliro "hands down." *Id.*, ¶73; *see also* Ex. 5, Judge Veary's Order Granting Motion for New Trial.

45.     On or about June 9, 1980, Defendant Leahy drafted a police report ("Leahy Report") that documented that phone call and subsequent identifications. Dckt. No. 93, ¶74.

46.     Defendant Buker assigned Defendant Wilson to investigate this evidence. *Id.*, ¶75. There are no reports that document Wilson's investigation. *Id.*

47.     Defendants Buker, Polio, and Wilson never disclosed the Leahy Report or the information contained in that police report—instead, it was buried for three decades while Plaintiff, an innocent man, remained imprisoned. *Id.*, ¶76.

48.     In addition to the positive identifications that the composite sketch matched Balliro, Defendant Leahy had conversations with ten prison guards, who would have known that Balliro had recently assaulted a different man named LaMonica, only ten days before the murder of Robert LaMonica. *Id.*, ¶77.

49.     In addition, Mr. Balliro had once shot at and threatened Freeman "Punchy" Clifford, the man that LaMonica was implicated in killing. *Id.*, ¶78. Mr. Clifford survived Balliro's assault. *Id.*

50.     Robert LaMonica, the murder victim here, was later charged with the murder of Mr. Clifford, but all charges were dropped when Robert LaMonica's father pleaded guilty to manslaughter in the shooting of Mr. Clifford. *Id.*, ¶79. *See also* Ex. 4, Cardinale 10/22 Testimony, 49:5-50:10.

51.     Had the Leahy Report been provided to the prosecutor and/or defense counsel, the information above would have been uncovered. Dckt. No. 93, ¶80.

52.    Defendants Buker, Polio, and Wilson, hid all the above evidence from Plaintiff, his defense, and prosecutors. *Id.*, ¶81.

## SUGGESTIVE IDENTIFICATION PROCEDURES

53.    Scientific studies "have demonstrated that, even with 20/20 vision and excellent lighting conditions, face perception begins to diminish at 25 feet, nears zero at about 110 feet, and faces are essentially unrecognizable at 134 feet." Dckt. No. 93, ¶84, 85.

54.    These witnesses could not have observed the facial features of the running man. *Id.*, ¶86.

55.    Mr. Laracy said the man had "dark curly hair," but he could not make an identification. *Id.*, ¶87.

56.    Ms. Krause said the man had "dark frizzy hair." *Id.*

57.    Ms. Castonguay said he had "dark curly hair (like a bushy afro)." *Id.*

58.    The fourth witness, Mr. Foley, who was no closer to the scene than the other witnesses, was induced by Defendant Wilson into claiming that he could identify the running man. *Id.*, ¶88.

59.    Since Mr. Foley could not have seen the facial features of the running man, the composite was prepared based on suggestions from Defendant Wilson. *Id.*

60.    The next day, on June 1, Defendant Wilson, included Plaintiff's photograph in a suggestive photo array of men tendered to at least three of the teenagers. *Id.*, ¶89.

12

61.    Defendants Wilson conducted unduly suggestive photo identification procedures. *Id*., ¶91.

62.    The suggestiveness of the photo array included, but was not limited to, that the photo array included only one or two photographs (including that of Plaintiff) that matched the general hair description of the running man given by the teenage witnesses. *Id*. This was particularly suggestive because the witnesses viewed the man who was running quickly for (at most) several seconds at a great distance at night so that only very general features could be used to identify the running man. *Id*.

63.    The photo array hid the significant height and weight disparity between Plaintiff and the teenagers' initial and consistent descriptions of the running man (as being much taller and thinner); therefore, the only feature that the teenagers could use to identify the running man from the photographs presented to them by Defendant Wilson was hair style. *Id*., ¶92.

64.    Defendants did not retain a copy of the photo array. *Id*., ¶93.

65.    After preparing the composite based on suggestions from Defendant Wilson, Defendant Wilson claimed that Mr. Foley selected Plaintiff's photo from the array. *Id*., ¶94.

66.    In fact, each time that he looked at the photo array, Mr. Foley told Defendant Wilson that the photograph merely resembled the running man but that there were at least two differences between the photograph and the running man. *Id*., ¶95.

13

67.     Defendant Wilson did not document those statements from the two initial photo arrays or did document those statements but suppressed them. *Id*.

68.     The two young women each picked two or three photos from the array of nine photos as possibly being the running man based on the hairstyles. Both witnesses said they liked the photo of Plaintiff because of his hair. *Id.*, ¶98. They each picked more than one photo because there were characteristics they liked in multiple photos. *Id*. These were not positive identifications. *Id*.

69.     About a week or two after the first suggestive photo array, Defendant Wilson tendered a second array to the three witnesses. *Id.*, ¶99. The photos were the same, with the addition of a tenth photo of James Mantville. *Id.*, ¶99.

70.     The witnesses responded to the second array in essentially the same manner as the first; Mr. Foley picked out Plaintiff's photo as resembling the running man, but again noted that there were differences between the two, and the two female witnesses each picked out two to three photos including Plaintiff's photo. *Id*.

71.     Months later, Defendants tendered a third array to the three witnesses. *Id.*, ¶100. This array contained only the original nine photos from the first array. *Id*.

72.     Mr. Foley again picked out Plaintiff's photo as resembling the running man and said that the photo looked more "baby-faced." *Id*. Ms. Castonguay again picked out two or three photos and said she chose Plaintiff's photo because she liked

his hair. *Id*. Ms. Krause was "so unsure of herself she could not make any identification." *Id*.

73.    Defendant Wilson knew that there was no clear positive identification of Plaintiff, but he claimed that multiple witnesses identified Plaintiff. *Id*., ¶108.

74.    Defendants Buker, Polio, and Wilson hid and/or destroyed virtually all evidence of the suggestive photo identification procedures. *Id*., ¶112.

75.    Defendant Wilson admitted that he took notes and wrote a report of the photo arrays, but those notes and report have been destroyed or suppressed. *Id*., ¶113.

76.    Defendant Wilson suppressed the exculpatory evidence that the purported positive identification of Plaintiff by each of the witnesses was false.  *Id*., ¶114.

## DEFENDANTS FABRICATED AND SUPPRESSED ADDITIONAL EVIDENCE

77.    Defendant Wilson destroyed the composite picture with edits that were generated from Mr. Foley's original, which could have been used to demonstrate that the description did not remotely match Plaintiff. Dckt. No. 93, ¶116.

78.    Defendants Wilson and Derby fabricated evidence from purported informants that Plaintiff and a man named Thomas Barrett were the murderers. *Id*., ¶117.

79.    The first dated report identifying any basis about why Plaintiff might be a suspect occurred on June 12, 1980—only after Defendant Wilson targeted Plaintiff.

15

80.     The June 12, 1980-report by Defendant Wilson states that confidential informants told Defendants Walsh and/or Derby that Plaintiff was involved. *Id*., ¶119.

81.     Defendant Wilson either falsified that information and/or Defendants Derby and Walsh fabricated the false reports and gave them to Defendant Wilson. *Id*., ¶120.

82.     There is no police report nor any other evidence ever produced to substantiate the existence of the purported confidential informants or any details obtained from them outside of the vague claim that Plaintiff and Thomas Barrett were involved in the murders. *Id*., ¶121.

83.     Defendant Derby suppressed any evidence relating to information from these purported informants. *Id*., ¶122.

## DEFENDANTS BUKER, POLIO, AND WILSON
## HID THE BALLIRO EVIDENCE

84.     Defendants Buker, Polio, and Wilson hid the exculpatory evidence that Defendant Leahy confirmed that eleven other people identified Rocco Balliro as matching the composite sketch created by Wilson. Dckt. No. 93, ¶133.

85.     That evidence was kept in a binder retained by Defendant Buker. *Id*., ¶134. *See also* Ex. 4, 5:11-23, 6:15-7:6; 7:17-8:5, 21:19-21, 27:11-22, 86: 2-88:21, 93:5-94:8, 121:1-125:5, 156:9-18, 164:9-165:8.

86.     That binder was placed in a secret, secluded section of the Braintree Police Department called the "Basement Archive," which was inaccessible to

16

Plaintiff, the prosecution, or anyone from the public. Dckt. No. 93, ¶135; *see also*, Ex. 4, 22:4-23:7, 23:16-25, 27:11-13, 40:10-18.

87.     Had Plaintiff's defense been armed with the Leahy Report and a photograph of Balliro, it could have undermined the prosecution's contention at the criminal trial that Foley identified Plaintiff. Dckt. No. 93, ¶136; *see also*, Ex. 5.

88.     That evidence would have contradicted the heart of the prosecution's case. Dckt. No. 93, ¶137; *see also* Ex. 5.

89.     Also hidden in the Buker binder in the Basement Archive was evidence that another man, Lawrence Estrella, who had a long record including violent assaults, was investigated for the LaMonica murder. Dckt. No. 93, ¶138.

90.     Defendants further hid from Plaintiff that the sole witness against him, Mr. Foley, received favorable treatment in a criminal case of his own in another jurisdiction in exchange for his testimony against Plaintiff. *Id*., ¶139. *See also*, Ex. 4, 46:23-48:15.

91.     Between 1980 and 2009, Plaintiff and his counsel tendered multiple public records requests for exculpatory information to the Town of Braintree. Dckt. No. 93, ¶141.

92.     For the first time in August 2010, police revealed Defendant Buker's binder on the LaMonica murder investigation, which had been hidden by the Braintree Defendant investigators and/or police supervisors (Defendants Buker, Polio, and Wilson) in Defendant Buker's stash of documents in the "Basement Archive" of the Braintree Police Department. *Id*., ¶144.

17

93.     Defendant Buker's binder contained additional internal Braintree police reports, including but not limited to the Leahy Report relating to the multiple identifications of Balliro discussed above, exculpatory evidence that supported that Plaintiff was not the murderer. *Id.*, ¶145.

94.     Prosecutors associated with prosecuting the case against Plaintiff had no knowledge of the Leahy Report. *Id.*, ¶150.

95.     Plaintiff's counsel in the criminal case against him similarly had no knowledge of the Leahy Report. *Id.*, ¶151.

96.     To this day, there is not one piece of physical evidence that ties Plaintiff to the scene of the murder, let alone the murder itself. *Id.*, ¶152; *see also*, Ex. 4 21:5-7.

## Plaintiff's Wrongful Conviction, and Imprisonment

97.     In 1980, because of Defendants' misconduct and the false evidence they created, Plaintiff was charged, prosecuted, and tried by a jury. Dckt. No. 93, ¶158.

98.     Plaintiff contested guilt at every stage of his arrest and prosecution. *Id.*, ¶159. *See also* Ex. 4, 45:17-46:16.

99.     During the trial, the false evidence described above was the only thing suggesting that Plaintiff was guilty of murder. Dckt. No. 93, ¶161. Specifically, Foley's fabricated identification testimony was the only evidence tying Plaintiff to the location of the murder. *Id.*

100.     Moreover, Plaintiff was unable to defend himself because he was denied access to the exculpatory evidence described above. *Id.*, ¶162. Among other

things, he was deprived of evidence to undermine the fabricated identification evidence against him, to introduce evidence that eleven other people identified Balliro as looking like the composite sketch, and/or to present evidence that the composite did look like Balliro or that Balliro committed the crime. *Id*.; *see also* Ex. 5.

101.    As a result of the suppression of the exculpatory evidence, Plaintiff was unable to rebut the prosecutor's sole argument against Plaintiff—that an eyewitness had identified only Plaintiff through comparing the composite with Plaintiff's photograph. Dckt. No. 93, ¶163; *see also* Ex. 5.

102.    Had Plaintiff had the exculpatory evidence described above, he would have been able to establish that Balliro is the one whose photograph matched the composite "hands down." Dckt. No. 93, ¶162; *see also* Ex. 5.

103.    On August 20, 1981, a jury found Plaintiff guilty of the LaMonica murder. Dckt. No. 93, ¶165.

104.    Plaintiff was sentenced to life in prison without possibility of parole. *Id*., ¶166.

105.    Without Defendants' fabricated evidence, there was no evidence to support criminal proceedings against Plaintiff. *Id*., ¶167.

106.    Likewise, had Defendants disclosed the exculpatory evidence they suppressed, Plaintiff never would have been arrested, let alone convicted. *Id*., ¶168.

19

**Defendant Polio**

107.    Defendant Polio was chief of the Braintree Police Department in 1980 and the final policymaker for the Braintree Police Department as authorized by the Town of Braintree. Dckt. No. 93, ¶204.

108.    Mr. Polio joined the Braintree Police Department in 1950 and became chief in 1962, retiring in 1987. *Id.*, ¶205.

109.    As police chief, Polio was responsible for all the policies, practices, and customs of the department. *Id.*, ¶206.

110.    Polio was known for being "cunning, controlling, and eccentric," and was an "autodidact" who "didn't trust anybody." *Id.*, ¶207.

111.    At the time of the LaMonica murder investigation, all the investigation decisions went through Chief Polio. *Id.*, ¶208.

112.    Polio was critical of his officers receiving training unless it was his own idea. *Id.*, ¶209.

113.    By discouraging and mocking training, Chief Polio sent a message to officers that the subjects covered in training, such as constitutional standards in criminal procedure and police practices, were not important within the Braintree Police Department. *Id.*, ¶210.

114.    Officers in turn were emboldened to ignore constitutional requirements, including the duty to disclose exculpatory evidence, because they were denigrated within the department. *Id.*, ¶211.

115.    Had training been taken seriously, Braintree police officers would have followed up on the tip about Rocco Balliro and produced the Leahy Report to the prosecution. *Id.*, ¶212.

116.    At the time of the murder investigation, Polio failed to supervise offices in the Braintree Police Department. *Id.*, ¶213.

117.    For instance, he did not hold meetings for his staff and communicated with officers only through general orders which were read aloud to officers each shift. *Id.*, ¶214.

**Plaintiff's Exoneration**

118.    Plaintiff always proclaimed his innocence. Dckt. No. 93, ¶180.  During the criminal trial, he rejected a guilty plea to a lesser charge because he refused to concede that he was involved in any way in the LaMonica murder. *Id.*

119.    On August 7, 2017, the Commonwealth of Massachusetts dropped all charges against Plaintiff. *Id.*, ¶182.

120.    Plaintiff walked out of prison a free man after 36 years of wrongful imprisonment. *Id.*, ¶183.

## V.    ARGUMENT

To decide Plaintiff's motion for summary judgment, this Court assesses the record evidence in the light most favorable to parties opposing summary judgment and draws reasonable inferences in their favor. *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014). Summary judgment is warranted if there is no genuine issue of fact on any of Plaintiff's claims and he is entitled to judgment as a matter of law. *Id.*

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Because Defendants have not answered Plaintiff's Amended Complaint (or the original Complaint), all well-pleaded facts stated above are admitted.  These facts establish that Plaintiff is entitled to judgment as a matter of law against these Defendants with a trial needed to assess Plaintiff's damages.

### A.   DEFENDANT TOWN OF BRAINTREE AND THE CITY OF BOSTON EACH HAD A POLICY TO INDEMNIFY ITS POLICE OFFICERS

The Court granted Plaintiff leave to file an amended Complaint naming the deceased Defendants who died more than one year before the filing of Plaintiff's Complaint as parties while serving the municipality that was the liability bondholder or insurer for each. Dckt. No. 86. Plaintiff did so. Dckt. Nos. 91, 95-97.

Despite being present at the May 12, 2021-hearing on the subject at which the Court articulate its ruling on the subject, the COB and Defendant TOB chose not to answer Plaintiff's Amended Complaint, though each was served with process—in effect playing chicken, hoping that something would break their way regarding the indemnification issue.

It did not. Rather, the undisputed evidence demonstrates that both the COB and TOB have practices so consistent and pervasive as to constitute municipal policies to indemnify officers for misconduct occurring in the scope of employment. In deciding what constitutes municipal policy for claims under 42 U.S.C. §1983, the

22

United States Supreme Court has stated that government practices that are persistent and widespread can practically have the force of law (or policy). *See Connick v. Thompson*, 563 U.S. 51, 60-61 (2011) (citations omitted). This is consistent with the long line of cases supporting that even if there is no official municipal policy, a plaintiff may prove the existence of a policy based on practices that are "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 690, 691 (1978) (citations omitted); *see also Schand v. City of Springfield*, 380 F. Supp. 3d 106, 131 (2019).

That standard should apply here—a municipality's ongoing practices can constitute policy for purposes of indemnifying employees for purposes of proceeding against deceased defendants. Even though the municipalities here technically have the discretion to decide indemnification, they never exercise that discretion to deny indemnification for actions taken in the scope of employment. Their pervasive practice to always indemnify law enforcement officers for claims of misconduct in the scope of employment have the force of policy.

Even traditional liability bondholders or insurers have discretion to decide whether to pay the bond or insurance (determinations are always made whether the conditions are met to pay the bond or insurance). This does not set them outside Massachusetts law allowing for actions to be taken directly against them for defendants who died more than one year before the commencement of the action.

So should it be for municipal indemnification. Here, the TOB and COB have created uniform and consistent practices to defend and indemnify law enforcement

officers for liability in the scope of employment. Those practices have the force of policy to indemnify similarly situated officers, such as Defendants Buker, Derby, Polio, and Wilson.

Since 1975, the TOB has always indemnified law enforcement officers for liability stemming from police actions. Statement of Undisputed Material Facts for Indemnification (SUMF-I), ¶1. It has also obtained insurance for that indemnification. *Id.*, ¶3-6.

The COB from 2018 obligated itself to defend and indemnify all but one officer (who was fired for the conduct, therefore placing it outside the scope of employment) for liability stemming from actions taken in the scope of employment. *Id.*, ¶¶9-12. That indemnification included paying more than $44 million in that five-year period. *Id.*, ¶10. The COB's indemnification and payments included cases that can be traced back to misconduct occurring at the same time as when Defendants framed Plaintiff (*see* Exhibit A to Ex. 3, identifying payments to Fred Clay and James Watson, who were both wrongfully convicted of a 1979 murder—*Com. v. Watson*, 388 Mass. 536 (1983)). As a self-insured entity, the COB has the sole responsibility for deciding whether to indemnify, and it always chooses to do so (unless it has fired the officer for the exact same conduct, a situation that did not happen here). *Id.*, ¶¶7-13.

These indemnification policies make each municipality the equivalent of a liability bondholder or insurer under Massachusetts law. Mass. Gen. Laws ch. 190B, § 3-803(d)(2); *Rosario v. Waterhouse*, 1:19-cv-10532, 2019 WL 4765082, at *3 (D.

24

Mass. Sept. 27, 2019). Accordingly, the TOB was properly served for Defendants Buker, Polio, and Wilson and the COB was properly served for Defendant Derby as per this Court's order. This issue has already been litigated here, and both the TOB and COB chose not to Answer Plaintiff's Amended Complaint despite being served and being on notice of their potential liability.

### B.   DEFENDANTS BUKER, DERBY, POLIO, AND WILSON ADMIT THE WELL-PLEADED ALLEGATIONS IN THE COMPLAINT

A defendant who fails to answer a complaint admits all well-pleaded facts in the complaint. *See Banco Bilbao Vizcaya Argentaria v. Family Restaurants, Inc. (In re The Home Restaurants, Inc.)*, 285 F.3d 111, 114 (1st Cir. 2002) ("a party gives up right to contest liability 'when it declines to participate in the judicial process'"); *Franco v. Selective Ins. Co.*, 184 F.3d 4, 9 n.3 (1st Cir. 1999) ("[a] party who defaults is taken to have conceded the truth of the factual allegations in the complaint"); *Goldman, Antonetti, Ferraiouli, Axtmayer & Hertell v. Medfit Int'l., Inc.*, 982 F.2d 686, 693 (1st Cir. 1992) ("an entry of a default against a defendant establishes the defendant's liability"); *Brockton Savings Bank v. Peat, Marwick, Mitchell & Co.*, 771 F.2d 5 (1st Cir. 1985) ("there is no question that, default having been entered, each of [plaintiff's] allegations of fact must be taken as true and each of its [ ] claims must be considered established as a matter of law."); *Eisler v. Stritzler*, 535 F.2d 148, 153 (1st Cir. 1976) ("[t]he default judgment on the well-pleaded allegations in plaintiff's complaint established ... defendant's liability."). Here, under the Court's orders, Defendants Buker, Derby, Polio, and Wilson were properly served through the TOB and COB and failed to answer.

## C.    BASED ON THEIR ADMISSIONS, DEFENDANTS BUKER, DERBY, POLIO, AND WILSON SUPPRESSED EXCULPATORY EVIDENCE

The Supreme Court has long held that the suppression of evidence favorable to a defendant violates due process, applying that rule to all state actors—prosecutors and police alike. *Pyle v. State of Kansas*, 317 U.S. 213, 215-16 (1942). The Court has reiterated this constitutional rule repeatedly since. *E.g.*, *Brady v. Maryland*, 373 U.S. 83 (1963); *United States v. Bagley*, 473 U.S. 667 (1985); *Kyles v. Whitley*, 514 U.S. 419, 438 (1995). The First Circuit has long recognized that section 1983 due process claims may be brought against police who withhold exculpatory and impeachment evidence, causing wrongful convictions. *Drumgold v. Callahan*, 707 F.3d 28 (1st Cir. 2013); *Haley v. City of Boston*, 657 F.3d 39 (1st Cir. 2011).

The Supreme Court reaffirmed that evidence is material when there is "any reasonable likelihood" that it could have "affected the judgment of the jury." *Wearry v. Cain*, 577 U.S. 385, 392 (2016) (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972); *Napue v. Illinois*, 360 U.S. 264, 271 (1959)). A litigant "need not show that he 'more likely than not' would have been acquitted had the new evidence been admitted. . . . He must show only that the new evidence is sufficient to 'undermine confidence' in the verdict." *Id.* (citing *Smith v. Cain*, 132 S. Ct. 627, 629-31 (2012)); *see also United States v. Sepulveda*, 15 F.3d 1216, 1220 (1st Cir. 1993) ("[The] undermine confidence formula suggests that reversal might be warranted in some cases even if there is less than an even chance that the evidence would produce an acquittal.") (internal quotation marks omitted).

26

Critically, when conducting its analysis, courts must consider the suppressed evidence cumulatively, not piece by piece. *Wearry*, 577 U.S. at 394; *Kyles,* 514 U.S. at 436. Whether evidence is material also depends on the strength of other evidence used in the criminal proceedings—it might take only a little evidence to disturb an already-weak conviction. *United States v. Agurs*, 427 U.S. 97, 113 (1976). Importantly, it is firmly established that evidence that would impeach a key eyewitness is material. *Giglio*, 405 U.S. at 153-54; *see also Smith v. Cain*, 565 U.S. 73, 75 (2012) (impeachment evidence regarding eyewitness was material when the eyewitness was the only evidence connecting defendant to the crime); *Conley v. United States,* 415 F.3d 183, 191 (1st Cir. 2005) (holding that the suppression of evidence that impeached an essential government witness was material where the impeachment would have raised serious doubts about the witness' memory).

### 1. Defendants Buker, Polio, and Wilson hid evidence of the Balliro report.

The sole evidence presented at trial to tie Plaintiff to the scene of the murder was an impossible facial identification by one of four young people, John Foley, who had drunk four to five beers that night. Statement of Undisputed Material Facts on Liability (SUMFL), ¶¶14, 16, 24. After hearing loud bangs, these four saw a running man in the dark at least 180 feet away for only a few second. *Id.*, ¶¶15, 20. Their physical descriptions did not match Plaintiff—each described the man as four to six inches taller than Plaintiff's 5'7" height. *Id.*, ¶¶17, 22-25, 27-30. Those physical descriptions did, however, match Rocco Balliro, who was 5'11 ½ tall. *Id.*, ¶¶28, 31.

Foley's facial description (none of the other three said they could provide facial features) described the man as having bushy eyebrows or sideburns. *Id.*, ¶¶21-23, 33. Plaintiff did not have bush eyebrows or sideburns. *Id.*, ¶34.

Defendant Wilson did a composite picture using Foley's impossible identification as the source of information. *Id.*, ¶35. The composite did not look like Plaintiff—differences included the thick eyebrows and dark, curly sideburns. *Id.*, ¶36.

Like the physical descriptions given by the young people, the composite matched Rocco Balliro "hands down" (as stated by Judge Veary in his order granting Plaintiff a new trial). *Id.*, ¶¶37, 44; *see also* Ex. 5. Both the composite and Balliro had: (1) a full head of curly hair; (2) thick eyebrows; (3) thick sideburns; and (4) a broad nose. *Id.*, ¶43.

On or about June 6, 1980, Defendant Leahy received a telephone call from a well-known acquaintance who said that the composite picture undoubtedly showed Rocco Balliro. *Id.*, ¶41. Armed with that information, on or about June 8, 1980, Defendant Leahy went to Bridgewater Prison and showed the composite to 10 prison guards, who all said that the composite showed Balliro. *Id.*, ¶42.

Defendant Leahy drafted a police report to Defendant Buker that documented the phone call and identifications from the 11 people. *Id.*, ¶45. Defendant Leahy would have learned during those conversations with the ten prison guards that Balliro had recently assaulted another man named LaMonica only ten days before Robert LaMonica was murdered. *Id.*, ¶48. In addition, Balliro

28

had also been linked to Freeman "Punchy" Clifford, the man who Robert LaMonica was implicated in killing, before he himself was murdered. *Id.*, ¶¶49, 50. Balliro had escaped from prison the day of the LaMonica murder by failing to return from furlough. *Id.*, ¶26.

Defendant Buker assigned Defendant Wilson to investigate those reports. *Id.*, ¶46. Either Wilson did not draft any police reports to document his investigation, or they were destroyed; regardless none were ever produced. *Id.*, ¶46.

Defendant Polio was responsible for all investigation decisions. *Id.*, ¶111. Defendants Buker, Polio, and Wilson all hid Leahy's Report, and it remained hidden for three decades in the Braintree Police Department's "Basement Archive." *Id.*, ¶¶47, 52, 84, 93-95. Defendant Buker placed the Leahy Report into a binder (Buker Binder) of the Braintree Police Department's LaMonica murder investigation documents. *Id.*, ¶85. The "Basement Archive" was inaccessible to Plaintiff, prosecutors, or anyone from the public. *Id.*, ¶86. The Buker Binder was only discovered in 2010 through public records requests. *Id.*, ¶¶92-94.

The case against Plaintiff rested almost entirely on Foley's identification. Any evidence that would undermine that identification was exculpatory and its omission from production casts a pall over the entire proceedings. *Id.*, ¶¶87-88. That is especially true here, when there were reasons to believe that Balliro also had motive against LaMonica.

On top of that, the prosecution against Plaintiff displayed Plaintiff's photo side-by-side with the Wilson composite. Had Plaintiff been armed with a photo of

Balliro, that would have more closely matched the composite, it would have been compelling evidence to undermine the only evidence tying Plaintiff to the murder scene. But due to Defendants Buker, Polio, and Wilson's suppression, Plaintiff was denied the ability to use this important exculpatory evidence. *Id*., ¶¶100-101.

### 2. Defendants Buker, Polio and Wilson Suppressed Exculpatory Evidence Related to the Composite.

The composite picture was published in the local newspaper along with an article about the murder. SUMFL, ¶ 39. Despite the publication of the composite in the newspaper, outside of the Report by Defendant Leahy (discussed above) there is no known police report about any tips from it. *Id*., ¶40. Any such exculpatory reports, which could have been used to undermine Foley's in-court identification, were suppressed from Plaintiff by Defendants Buker, Polio, and Wilson.

Defendant Wilson also destroyed the composite that he made with Foley, which would have shown edits that would undermine any similarity to Plaintiff and support its similarity to Balliro. *Id*., ¶77.

### 3. Defendant Wilson hid evidence of a drawing by one of the witnesses.

In addition to hiding the Leahy Report, Defendants Wilson also hid evidence that Plaintiff could have used to undermine the Foley identification. One of the four witnesses to the running man drew a picture of the person she saw. SUMFL, ¶38. Defendant Wilson hid or destroyed the picture, which has never been seen since. *Id*. Armed with this evidence, Plaintiff's lawyers could have used it to undermine Foley's impossible identification.

### 4. Defendants Buker, Polio, and Wilson hid evidence of alternate suspects.

Also hidden in the Buker Binder in Braintree's "Basement Archive" were documents about alternate suspects. One of them was Lawrence Estrella, who had a long record of violent assaults. Dckt. No. 93, ¶138. Plaintiff could have investigated Estrella and introduced his appearance as another possible person (besides Balliro) that matched the four witnesses' physical descriptions.

### 5. Defendants Buker, Polio, and Wilson hid evidence of inducements to Foley to identify Plaintiff.

Defendants Buker, Polio, and Wilson further hid evidence from Plaintiff that Foley—the young man who provided impossible identification testimony against Plaintiff at his trial—received favorable treatment in a criminal case of his own in exchange for his testimony against Plaintiff. Dckt. No. 93, ¶139. This evidence could have been used by Plaintiff to undermine the only evidence presented by the Commonwealth tying him to the crime scene.

In a case with such scant evidence against Plaintiff, the Leahy Report was highly exculpatory and suppressed. Plaintiff is entitled to judgment as a matter of law based on their suppression of that evidence alone. Similarly, the other withheld evidence was individually exculpatory and combined was extraordinarily so. Plaintiff is entitled to judgment as a matter of law based on Defendants' suppression of exculpatory evidence individually and collectively.

**D.     INDEPENDENTLY, DEFENDANT WILSON USED UNDULY SUGGESTIVE IDENTIFICATION PROCEDURES THAT TAINTED PLAINTIFF'S CRIMINAL TRIAL (AND SUPPRESSED EVIDENCE OF ITS SUGGESTIVENESS)**

Police violate due process when they employ unduly suggestive identification procedures that taint a criminal case. *Mason v. Brathwaite*, 432 U.S. 98 (1977); *Perry v. New Hampshire*, 565 U.S. 228, 239 (2012). To determine whether such a due process violation has occurred, this Court asks: (1) whether there were impermissibly suggestive identification procedures; and (2) whether the resulting identification was unreliable and undermined the fairness of the criminal trial. *United States v. Henderson*, 320 F.3d 92, 100 (1st Cir. 2003); *see also Alexander v. City of South Bend*, 433 F.3d 550, 555 (7th Cir. 2006).

Each of these two questions must be resolved in Plaintiff's favor at summary judgment. The Supreme Court has said that identification procedures that highlight who the suspect is are unduly suggestive. *Simmons v. U.S.*, 390 U.S. 377, 383 (1968); *United States v. Holliday*, 457 F.3d 121, 125-26 (1st Cir. 2006) (noting the importance of evaluating whether the police could have restored to less-suggestive procedures).

To get around the impossibility of the identification, Defendant Wilson stacked the deck. SUMFL, ¶¶60-61. The photo array included only one or two photos (including Plaintiff's) that matched the vague hair description given by the four young people. *Id.* ¶62. The hair and build were important because the viewing conditions prevented an accurate facial identification. *Id.*, ¶¶62-63. The female

witnesses selected only photos that had that similar hair because they could not give an accurate facial identification. *Id.*, ¶¶68, 70, 72.

Defendant Wilson compounded the suggestiveness of the photo array by repeatedly showing it to Foley and the other witnesses. *Id.* ¶¶69-71

The Supreme Court has set out five factors that courts consider when assessing whether a suggestive identification was unreliable: (1) the opportunity for the witness to view the perpetrator at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description; (4) the level of certainty demonstrated by the witness when making the identification; and (5) the length of time between the crime and the in-court identification. *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). The final factor examines the length of time between the crime and the in-court identification, which here was fifteen months. While such a gap might be insignificant if other factors suggest a reliable identification, *United States v. Henderson*, 320 F.3d 92, 101 (1st Cir. 2003), in this case all the factors point to the lack of reliability.

Each of these factors supports summary judgment. As described above, Foley's identification was a physical impossibility. Scientific studies "have demonstrated that, even with 20/20 vision and excellent lighting conditions, face perception begins to diminish at 25 feet, nears zero at about 110 feet, and faces are essentially unrecognizable at 134 feet." *Id.*, ¶¶53-54. Accordingly, none of Foley's companions could give any facial identification. *Id.*, ¶54-57. Despite having no

better view, only Foley could be persuaded by Defendant Wilson to identify Plaintiff. *Id.*, ¶58.

Foley's attention was impaired by his consumption of beer, the brief time he claims to have seen the running man, and the conditions. He viewed the man from at least 180 feet away, in darkness, for a brief second, and while the man was running. He had no opportunity or attention to see the man.

Foley's prior description, immediately after questioning, differed markedly from his in-court identification. Foley's companions also gave markedly different descriptions of the running man's build that did not match Plaintiff's.

Foley described someone of completely different stature than Plaintiff initially. This impossibility to identify anyone was evident in Foley's initial statements to police, which were equivocal at best.

Even with the deck stacked, Foley wavered each time he viewed the photo array (he never saw an in-person lineup that would have revealed the height discrepancy before trial—the first time Foley confronted Plaintiff). Foley continuously described Plaintiff's photo as resembling the running man, but that there were at least two differences between the photo and the running man. *Id.*, ¶¶66, 72.

Ultimately, Defendant Wilson was able to get his fabricated identification to the jury when Foley testified at trial against Plaintiff. *Id.*, ¶¶98, 100. But the suggestive nature of the identification techniques is evident here based on the Supreme Court's factors and that Foley ultimately identified Plaintiff, who did not

meet his initial physical identifications. It was only after multiple sessions with Wilson and the suggestive photo array that Wilson was able to get Foley to testify at trial that he could identify Plaintiff (despite the scientific impossibility of the identification).

Defendant Wilson hid Foley's equivocal identification based on the suggestive photo array. *Id.*, ¶67. Instead, he falsely proclaimed that multiple witnesses had identified Plaintiff. *Id.*, ¶73. Wilson also took notes and wrote a report about the photo arrays, but suppressed or destroyed those documents to suppress the suggestive nature of the photo arrays. *Id.*, ¶¶75-76. This separately violated Plaintiff's right to due process.

### E. DEFENDANTS DERBY AND WILSON FABRICATED INCULPATORY INFORMANT EVIDENCE

Plaintiff's photo was included in the suggestive photo array just 36 hours after Robert LaMonica's murder, on June 1, 1980. There was no police report that showed why. The first report was 11 days later—and it was written by Defendant Wilson. SUMFL, ¶79. This report demonstrates that both Defendants Wilson and Derby conspired to fabricate evidence of a purported confidential informant after-the-fact to justify implicating Plaintiff. *Id.*, ¶¶80-81. There has never been any report that substantiates anything about a confidential informant—including any explanation about when such information became available or why police might believe that the information was reliable. *Id.*, ¶82.

The Supreme Court and First Circuit have held unequivocally that police officers violate due process when they fabricate evidence, including false witness

testimony, for use against a criminal defendant. *Mooney v. Holohan*, 294 U.S. 103, 112-13 (1935); *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Limone v. Condon et al.*, 372 F.3d 39, 44-45 (1st Cir. 2004). This due process theory is entirely independent of the suppression theory discussed above. *Avery v. City of Milwaukee*, 847 F.3d 433, 438-443 (7th Cir. 2017).

Defendants Derby and Wilson falsely inserted confidential information into the case to provide a false explanation as to why Plaintiff was ever a suspect in the first place. Without this convenient and fabricated information, Plaintiff could have attacked his inclusion in the suggestive photo array. But the fabricated informant evidence deprived him of this opportunity.

### F.   DEFENDANTS BUKER, DERBY, POLIO, AND WILSON MALICIOUSLY PROSECUTED PLAINTIFF

An arrest without probable cause alone is a basis for Fourth Amendment liability both before and after the legal process is started. *Manuel v. Joliet*, 580 U.S. 357, 367 (2017). Once the fabricated evidence is stripped away (including the suggestive identification by Foley—the only evidence presented tying Plaintiff to the murder scene), there was no probable cause to arrest or prosecute Plaintiff for the Robert LaMonica murder.

Plaintiff also prevails on a related claim of malicious prosecution. To succeed on his malicious prosecution claim, Plaintiff must "establish that: 'the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor.'"

*Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 101 (1st Cir. 2013) (citations omitted). As stated above, the first and second elements are established here.

Each of these elements are met here. Defendants Buker, Derby, Polio, and Wilson each contributed to Plaintiff's seizure and did so by fabricating evidence (Wilson and Derby) and/or suppressing exculpatory evidence (Buker, Derby, Polio, and Wilson) as demonstrated above. The criminal proceedings terminated in Plaintiff's favor and all charges dropped against him. SUMFL, ¶119; *see also*, Ex. 5.

## G.   DEFENDANTS BUKER, DERBY, POLIO, AND WILSON ARE LIABLE FOR SECTION 1983 CONSPIRACY

"A civil rights conspiracy is 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages.'" *Santiago v. Fenton*, 891 F.2d 373, 389 (1st Cir. 1989) (quoting *Hampton v. Hanrahan*, 600 F.2d 600, 620-21 (7th Cir. 1979)); *Estate of Bennett v. Wainwright*, 548 F.3d 155, 178 (1st Cir. 2008).

"A civil rights conspiracy is 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages.'" *Santiago v. Fenton*, 891 F.2d 373, 389 (1st Cir. 1989) (citations omitted); *Estate of Bennett v. Wainwright*, 548 F.3d 155, 178 (1st Cir. 2008).

37

Based on Defendants' admissions to Plaintiff's Amended Complaint, the undisputed facts establish a conspiracy among these Defendants to violate Plaintiff's rights. Defendant Buker, Polio, and Wilson all worked together in the LaMonica murder investigation. Wilson was the lead Braintree Detective, Buker the Head of Detectives, and Polio was the Chief of Police who oversaw all investigations. The burying of evidence in the Buker Binder in the Basement Archives was a communal act. Wilson was the primary investigator who worked with prosecutors. Buker compiled the Braintree Police Department investigation file into his binder. Wilson would know that those documents were not produced to the prosecutor. So too would Polio, who oversaw the entire investigation.

In addition, Wilson and Derby conspired to introduce the fabricated confidential informant evidence into the case. Wilson wrote a report that Derby generated the confidential informant evidence, and Derby never took any action to set the record straight that there was no such evidence.

## H.  DEFENDANTS BUKER AND POLIO'S SUPERVISORY INDIFFERENCE CAUSED THE VIOLATIONS OF PLAINTIFF'S CONSTITUTIONAL RIGHTS

Supervisors are liable under § 1983 for their own actions that result in violations of constitutional rights by subordinates. *Camilo-Robles v. Hoyos*, 151 F.3d 1, 6-7 (1st Cir. 1998). As discussed above, Defendants' admissions support that these Defendants violated Plaintiff's right to due process and to be free from arrest without probable cause. Similarly, the record permits a reasonable jury to conclude that those constitutional violations were also caused by the deliberate indifference

by supervisor Defendants Buker and Polio.

Plaintiff need only show that the constitutional violations he suffered were the foreseeable result of the supervisors' deliberate indifference to a substantial risk of harm. *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 582 (1st Cir. 1994). Deliberate indifference means a failure to take available measures to avoid a risk of harm of which the supervisor had actual or constructive knowledge. *Figueroa-Torres v. Toldeo-Davila*, 232 F.3d 270, 279 (1st Cir. 2000). Here, Buker and Polio's secreting of the LaMonica murder investigation in the "Basement Archives" constitutes deliberate indifference to a substantial risk of harm—the suppression of exculpatory evidence vital to Plaintiff's defense.

In addition, Plaintiff must establish a causal link between the indifference and the constitutional violations committed by the other Defendants. Causation in this context "need not take the form of knowing sanction, but may include tacit approval of, acquiescence in, or purposeful disregard of, rights-violating conduct." *Hoyos*, 151 F.3d at 7. In this case, causation is direct—hiding the Buker Binder caused the deprivation of Plaintiff's right to due process.

Finally, the supervisors' complete failure to train its officers on evidence documentation, maintenance, and disclosure is evidence of "deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation" *Camilo-Robles v. Zapata*, 175 F.3d 41, 44 (1st Cir. 1999); *Maldonado-Denis*, 23 F.3d at 582 (1st Cir. 1994) (noting that supervisors are liable for the "foreseeable consequences" of their indifference). The

39

First Circuit held in *Voutour v. Vitale*, 761 F.2d 812, 820-23 (1st Cir. 1985), that a police chief is liable as a supervisor for an analogous complete failure to train in such an obviously essential area.

Polio was the chief of the Braintree Police Department in 1980 and the final policymaker for the Braintree Police Department as authorized by the Town of Braintree. SUMFL, ¶107. He was responsible for all the policies, practices, and customs of the department. *Id*., ¶109. At the time of the LaMonica murder investigation, all the investigation decisions went through Chief Polio. *Id*., ¶111. Polio discouraged and mocked training, sending a message to officers that the constitutional standards in criminal procedure and police practices, were not important within the Braintree Police Department. *Id*., ¶112-113.

Officers in turn were emboldened to ignore constitutional requirements, including the duty to disclose exculpatory evidence, because they were denigrated within the department. *Id*., ¶114. Had they been properly trained, Defendants Buker and Wilson would have produced the Leahy Report to the prosecution. *Id*., ¶115. Polio is liable under this failure to train theory as well as the above supervisor liability theories.

## VI.    CONCLUSION

The TOB and COB have practices so prevalent to indemnify police officers for claims related to misconduct in the scope of employments to constitute municipal policies to indemnify. Plaintiff, therefore, properly served the TOB for Defendants Buker, Polio, and Wilson and the COB for Defendant Derby. Each of these

Defendants—despite the TOB and COB's lawyers' knowledge of this Court's rulings on the subject—failed to answer Plaintiff's Amended Complaint. These Defendants therefore have admitted Plaintiff's well pled allegations in the Amended Complaint.

Those admissions establish liability for Defendants Buker, Derby, Polio, and Wilson for violating Plaintiff's right to due process and to be free from arrest without probable cause/malicious prosecution. Those Defendants also conspired to deprive Plaintiff of his rights. Defendants Buker and Polio are separately liable as supervisors whose actions caused the violations of Plaintiff's rights under these same claims. Plaintiff is entitled to summary judgment as to Counts I, II, and III against Defendants Buker, Derby, Polio, and Wilson based on the lack of dispute of fact due to these Defendants' admissions.

RESPECTFULLY SUBMITTED,

/s/ Mark Loevy-Reyes
*One of Plaintiff's Attorneys*

Mark Loevy-Reyes, BBO No. 707974
LOEVY & LOEVY
398 Columbus Avenue, Suite 294
Boston, MA 02116
(312) 243-5900
mark@loevy.com

Jon Loevy*
Quinn Rallins*
Loevy & Loevy
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
(312) 243-5900
Fax: (312) 243-5902
*admitted *pro hac vice*

41

**CERTIFICATE OF SERVICE**

I, Mark Loevy-Reyes, an attorney, hereby certify that on January 29, 2024, I served the forgoing Plaintiff's Motion for Summary Judgment using the Court's CM/ECF system, which effected service on all counsel of record.

/s/ Mark Loevy-Reyes
*One of Plaintiff's Attorneys*