EXHIBIT 2

# In the Matter of:

*Frederick Weichel vs*

*Town of Braintree, et al.*

---

*Michael Want*

*November 01, 2023*

---

68 Commercial Wharf • Boston, MA 02110
888.825.3376 - 617.399.0130
Global Coverage
Magnals.com



Case 1:20-cv-11456-IT   Document 237-2   Filed 01/29/24   Page 3 of 19

Frederick Weichel vs                              30(b)(6)                          Michael Want
Town of Braintree, et al.                                                    November 01, 2023

Page 3

```
1              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MASSACHUSETTS
2
3
4
5    _____
6    FREDERICK WEICHEL
7         PLAINTIFF,
8    V.               CASE NO. 20-CV-11456-IT
9    TOWN OF BRAINTREE, ET AL.,
10        DEFENDANTS.
11   _____
12
13
14
15
16
17       30(b)(6) DEPOSITION OF THE TOWN OF BRAINTREE
18            THROUGH ITS DESIGNEE:
19              MICHAEL WANT
20            CONDUCTED REMOTELY
21            BOSTON, MASSACHUSETTS
22   WEDNESDAY, NOVEMBER 1ST, 2023 AT 9:00 A.M. EST
23
24
```

Page 4

```
1
2    _____
3
4         S T I P U L A T I O N S
5
6       The 30(b)(6) deposition of the TOWN OF BRAINTREE through
7    its designee MICHAEL WANT was taken remotely via Zoom from
8    Boston, Massachusetts on Wednesday, the 1st day of
9    November, 2023 at 9:00 a.m., said deposition was taken pursuant
10   to Notice for use in accordance with the Federal Rules of Civil
11   Procedure.
12
13       It is agreed that Kelley K. Bohan, being a Notary Public
14   and Court Reporter for the Commonwealth of Massachusetts, may
15   swear the witness remotely and that the reading and signing of
16   the completed transcript by the witness is not waived.
17
18
19
20
21
22
23
24
```

Page 2

```
1         A P P E A R A N C E S
2    ON BEHALF OF THE PLAINTIFF, FREDERICK WEICHEL:
3      MARK LOEVY-REYES, ESQ.
4      LOEVY & LOEVY
5      398 COLUMBUS AVENUE, #294
6      BOSTON, MASSACHUSETTS 02116
7      TELEPHONE NO. (312) 243-5900
8      E-MAIL: MARK@LOEVY.COM
9
10   ON BEHALF OF THE DEFENDANT, TOWN OF BRAINTREE:
11     THOMAS R. DONOHUE
12     BRODY HARDOON PERKINS & KESTEN, LLP
13     265 FRANKLIN STREET, 12TH FLOOR
14     BOSTON, MASSACHUSETTS 02110
15     TELEPHONE NO. (617) 880-7100
16     E-MAIL: TDONOHUE@BHPKLAW.COM
17
18   ON BEHALF OF THE DEFENDANT, THE ESTATE OF EDWARD WALSH:
19     JAMES MEGEE, ESQ.
20     BOSTON POLICE DEPARTMENT
21     OFFICE OF THE LEGAL ADVISOR
22     ONE SCHROEDER PLAZA
23     BOSTON, MASSACHUSETTS 02120
24     E-MAIL: JAMES.MEGEE@BOSTON.GOV
```

Page 3

```
1              I N D E X
2                            PAGE
3    DIRECT EXAMINATION BY MR. LOEVY-REYES         6
4
5
6    _____
7
8         E X H I B I T S
9
10   NUMBER       DESCRIPTION          PAGE
11
12
13
14   * NO EXHIBITS MARKED OR ATTACHED
15
16
17
18
19
20
21
22
23
24
```

Frederick Weichel vs
Town of Braintree, et al.

30(b)(6)

Michael Want
November 01, 2023

---

**Page 5**

1    P R O C E E D I N G S

2         COURT REPORTER:  We are going on the record.  This is

3    Kelley Bohan.  I am a court reporter, and I am a notary public

4    in the Commonwealth of Massachusetts.

5         This deposition is being taken remotely.  This witness

6    is appearing remotely from Boston, Massachusetts.

7         The attorneys participating in this proceeding

8    acknowledge their understanding that I am not physically present

9    in the proceeding room, nor am I physically present with the

10   witness and that I will be reporting this proceeding remotely.

11   They further acknowledge that, in lieu of an oath administered

12   in person, the witness will verbally declare his testimony in

13   this matter under the pains and penalties of perjury.  The

14   parties and their counsel consent to this arrangement and waive

15   any objections to this manner of proceeding.

16        Please indicate your agreement by stating your name

17   and your agreement on the record, after which I will swear in

18   the witness and we may begin.

19        MR. LOEVY-REYES:  On behalf of Plaintiff, Mark

20   Loevy-Reyes; we consent to that arrangement.

21        MR. DONOHUE:  Tom Donohue for Braintree, we consent.

22        MR. MEGEE:  And James Megee on behalf of the Estate of

23   Edward Walsh, we also consent.

24

---

**Page 6**

1    _____

2              MICHAEL WANT

3         having been duly sworn, was examined

4              and testifies as follows:

5

6         DIRECT EXAMINATION

7    BY MR. LOEVY-REYES:

8    Q.  All right, good morning.  Can you please state your

9    name and spell it.

10   A.  Sure.  My name is Michael Want.  The last name is

11   spelled W-A-N-T.

12   Q.  Mr. Want, did you review any documents to prepare for

13   today's deposition?

14   A.  I did.

15   Q.  What did you review?

16   A.  Multiple documents from various insurance agents,

17   letters back and forth from the Town of Braintree to those

18   insurance companies.

19   Q.  Did you review anything else?

20   A.  Contracts, union bargaining -- collective bargaining

21   contracts.

22   Q.  Anything else?

23   A.  That I can think of, no.

24   Q.  And you are aware that you are being called to testify

---

**Page 7**

1    and provide binding testimony on behalf of the Town of Braintree

2    this morning; is that right?

3    A.  Yes, sir.

4    Q.  Okay.  I'm going to ask you some questions about

5    various topics.  I think we only have three topics listed for

6    today.  But you previously have provided binding testimony on

7    behalf of the Town of Braintree; is that right?

8    A.  I did, sir.

9    Q.  And that binding testimony would have related more

10   specifically to the operations of the police department; is that

11   a fair summary?

12   A.  Yes.

13   Q.  Okay, okay.  I'm going to show you what I've

14   previously marked as Exhibit 200.

15        Okay, I'm sharing my screen showing what's been marked

16   as Weichel Deposition Exhibit 200; are you able to see that?

17   A.  Yes, sir.

18   Q.  Okay.  And you've reviewed the notice of deposition

19   for today; is that right?

20   A.  Yes.

21   Q.  All right.  I'm going to go down to topic one.  I'm

22   going to read it and ask you some questions about the topic and

23   then in more detail about the topic.

24        Topic one reads:  "The policies, practices, and

---

**Page 8**

1    procedures of the Braintree Police Department/City of Braintree

2    from 1975 to the present relating to the indemnification of any

3    claim by the Town of Braintree for any liability for conduct

4    related to any law enforcement officer's activity in the scope

5    of his/her employment.  This topic expressly includes testimony

6    about each and every claim for liability against any officer and

7    whether the City of Braintree indemnified the officer related to

8    any such claim."

9         You reviewed the topic, topic number one, before

10   coming to today's deposition; is that right?

11   A.  Yes, sir.

12   Q.  Are you prepared to provide binding testimony on

13   behalf of the Town of Braintree regarding topic number one?

14   A.  I am.

15   Q.  Okay.  I'm going to start from the second sentence in

16   topic one, and that is testimony about each and every claim for

17   liability against any officer and whether the City of Braintree

18   indemnified the officer related to any such claim.

19        Has the Town of Braintree, from 1975 to the present,

20   ever denied indemnifying a law enforcement employee related to

21   claims that arose during the scope of that employee's employment

22   with the Town of Braintree?

23   A.  Not that I'm aware of.

24   Q.  Okay.  How many times have there been claims,

---

Case 1:20-cv-11456-IT   Document 237-2   Filed 01/29/24   Page 5 of 19

Frederick Weichel vs
Town of Braintree, et al.

30(b)(6)

Michael Want
November 01, 2023

Page 9

1   including lawsuits, administrative complaints, any sort of claim
2   that has been brought by an officer of the Town of Braintree for
3   conduct that was in the scope of that officer's employment from
4   1975 to the present.
5       A.   I just want to be clear, in the beginning of the
6   question, you said brought by an officer?  And I just want to --
7       Q.   No, brought against an officer, thank you.  If I said
8   "by," that was a mistake.  Brought against any officer based on
9   the scope of that officer's employment.
10      A.   And could we just go through the question one more
11  time?  I just want to make sure --
12      Q.   Sure, sure.  Let me rephrase it.  So from 1975 to
13  present, how many claims, including lawsuits or any claim for
14  monetary damages, has been brought against a Town of Braintree
15  law enforcement officer?
16      A.   I don't know the total number.  There have been
17  claims, but I don't know the total number.
18      Q.   Okay.  Have you ever reviewed any documents that
19  relate to the total number?
20      A.   No.
21      Q.   Can you estimate the total number?
22      A.   I can only speak to -- I spoke with Retired Chief Paul
23  Frazier who was the chief from, I think, 1993 to about 2012.  I
24  spoke to him about prior lawsuits.  I'm aware of some since my

Page 10

1   employment with the Town of Braintree that started in October
2   '04.  There's, to my knowledge, three that I can think of off
3   the top of my head:  The one we're currently in with yourself,
4   two others; and besides that, I don't know the total number
5   beyond that.
6       Q.   Okay.  And when you say that you had talked to the
7   prior chief about lawsuits, identify all the lawsuits that you
8   are aware of that have been brought against the Town of
9   Braintree law enforcement officers?
10      A.   The ones that I'm aware of myself?
11      Q.   That you are aware of and prepared to testify about
12  today, yes.
13      A.   Sure.  The one we're currently in.
14           We also have a lawsuit, a current federal lawsuit.
15  It's the Estate of -- I believe the title is the Estate of
16  Charles Donati in the Town of Braintree.
17           And I'm also aware of a civil lawsuit, I think it was
18  in federal court, against two officers that I'm aware of --
19  there might have been more -- regarding an arrest that happened
20  I think about three or four years ago now.
21      Q.   Okay.  And then --
22      A.   Oh, then I'm aware of one in -- I don't know the
23  years.  I believe early '90s during a labor dispute up at Kmart
24  in the Town of Braintree involving our K9 officer.

Page 11

1       Q.   And the one from the early '90s, what was the claim in
2   that one?
3       Q.   What I've heard, this is just secondhand, but I did
4   speak -- well, I should say firsthand, I spoke with the K9
5   handler himself.  He's now a lieutenant rank.  And it was a
6   labor dispute.  I'm not sure what the background is.  I'm
7   assuming the company that was building Grossman Drive are the
8   companies that are now up on Grossman Drive, Kmart, et cetera,
9   was built by a nonunion company, and there was a demonstration
10  by union employees or union workers.  And it turned, at some
11  point, the K9, I'm assuming, bit someone, one of the protesters
12  or organizers, and there was a lawsuit generated out of that.
13      Q.   Okay.  And so that would have been a claim, I would
14  imagine, for excessive force; is that right?
15      A.   That's my thought, but I just don't know.
16      Q.   Okay.  But the claim would have related to a dog bite
17  from a police dog?
18      A.   That's my understanding of it.  But like I said, I
19  didn't look at documents, I just heard about it, and then
20  speaking to the person involved about it.
21      Q.   Okay.  You indicated that there was a prior lawsuit
22  about an arrest.  What were the claims in that one?
23      A.   I believe that was an excessive force case.  My memory
24  of it is that it started in another town.  A person, I'm not

Page 12

1   sure what the original incident was or action or behavior that
2   generated it, but the person fled the town of Holbrook.  Drove
3   at one of our sergeants, the patrol supervisor in his vehicle.
4   There was a brief pursuit.  He called it off.  The person ended
5   up crashing into a wall and fleeing.  Was apprehended by our K9
6   unit and was injured during this arrest and filed suit.
7       Q.   Okay.  Finally, you indicated outside of this lawsuit
8   that we're here for today, Frederick Weichel's claims, you said
9   there's another pending lawsuit regarding Town of Braintree law
10  enforcement officers, correct?
11      A.   Yes.
12      Q.   What's the name of that lawsuit?
13      A.   The Estate of Charles Donati.  It's D-O-N-A-T-I.
14      Q.   What are the claims made in that lawsuit?
15      A.   The claim, I'm not sure of the actual claim language,
16  but a person was in custody, turned himself in.  I'm not sure
17  how much I should get into of his -- you know, of the crimes
18  committed, et cetera.  But he turned himself into the station.
19  He was found unresponsive, taken to the hospital, subsequently
20  passed away, and his estate is suing the Town of Braintree.
21      Q.   I see, okay.  And the lawsuit then relates to his
22  death in custody; is that right?
23      A.   Yes.
24      Q.   Okay, I see.  Do you know, does the Town of Braintree

Frederick Weichel vs
Town of Braintree, et al.

30(b)(6)

Michael Want
November 01, 2023

## Page 13

1  maintain records or a database at all that relates to claims
2  that were made against law enforcement officers from 1975 to the
3  present?
4      A.  We do not.  The database we started, we have an IA
5  tracking system that we started in 2017.  Before that, it was
6  paper records.  And then we have the database we sent up to the
7  POST Commission, Police [phonetic] Officers Standards and
8  Training Commission in Massachusetts.
9      Q.  Of course, of course.  And for the paper records
10 regarding lawsuits or claims made for damages from law
11 enforcement officers, do you know where those are kept, the
12 paper copies?
13     A.  We have paper copies of internal investigations that
14 are kept in the chief's office.
15     Q.  I see, I see.  And those would be for internal affairs
16 investigations; those are internal investigations, correct?
17     A.  Yes.
18     Q.  Okay.  Do you know if the Town of Braintree has ever
19 maintained records, separate from that, regarding any lawsuit or
20 claim for compensation related to alleged law enforcement
21 misconduct?
22     A.  Not that I'm aware of, no.
23     Q.  I see.  For the Town of Braintree from 1975 to present
24 for the Braintree Police Department, would it be the case that

## Page 14

1  any time a lawsuit was filed, an IA investigation would be
2  required to be opened?
3      A.  I can't speak to anything really before 2017 when I
4  took -- October of '17, I became the professional standards
5  lieutenant for the Town, uh, for the police department.  But in
6  that case now, if a complaint was generated now, yes, it'd be --
7      Q.  Okay, okay.
8      A.  -- in the IA tracking system.
9      Q.  Got it.  Is there an internal affairs complaint that
10 relates to Frederick Weichel's claims against the Town of
11 Braintree?
12     A.  Not that I'm aware of, no.
13     Q.  Okay.  All right, going back to topic number one.
14 Between 1975 and the present, did the Town of Braintree have any
15 written policy that related to when it would indemnify a police
16 officer related to claims that allegedly arose in the scope of
17 his or her employment?
18     A.  Not that I'm aware of.
19     Q.  Okay.  Are you aware of any practice during that same
20 time frame regarding indemnification of officers for claims that
21 arose during the scope of their employment?
22     A.  I've been involved in one of these meetings you're
23 talking about, the indemnification, personally, in the lawsuit
24 regarding Charles Donati, and it's a decision made by the Town's

## Page 15

1  insurance carrier.
2      Q.  Okay.  Who was the insurance carrier in that case?
3      A.  It's going to be MIIA, Massachusetts Interlocal
4  Insurance Association, I believe -- M, double I, A -- since, I
5  want to say, early 2000s, but I think they were incorporated in
6  maybe '82 or '87, looking at their website.
7      Q.  Okay.  And then finally regarding topic one, was there
8  any written or otherwise unwritten procedure that related to
9  when the Town of Braintree would indemnify officers for claims
10 that arose in the scope of their employment from 1975 to
11 present?
12     A.  Not that I'm aware of.  It seems like a case-by-case
13 basis in talks with our insurance carrier.
14     Q.  And I'm sorry, I missed the last part about the
15 insurance carrier.
16     A.  It, to my understanding, that it's conversations with
17 the insurance carrier, town leadership and our insurance
18 carrier.
19     Q.  And that would have been the entire time from '75 to
20 present?
21     A.  I just don't know.  I'm only aware of -- I've been in
22 one of those discussions myself, but that's my understanding.
23     Q.  Okay.  And just to be clear, it's your understanding
24 that that was the practice from 1975 to present?

## Page 16

1  A.  I just don't know what the practice is.  That's my
2  thought, but I don't know for a fact.
3      Q.  I see, I see.  And I think you testified earlier that
4  you know for a fact that's the practice since 2017; is that
5  right?
6      A.  Not for a fact.  That's my experience in that case,
7  and that's really all I can speak to is that one case I've been
8  involved with where I was actually in the meeting with an MIIA
9  representative.
10     Q.  I see, I see.  And so outside of that one meeting that
11 you were in, you're not aware of whether that was the practice
12 to include an insurance company in the conversations about
13 indemnification; is that right?
14     A.  I can only speak to the fact that, my understanding
15 just working in and these conversations in my role, that it's a
16 case-by-case basis.  We don't, like I said, we don't have that
17 many lawsuits since I've been there.  Or really since I've been
18 in this role, we've had three.  Two in this role, but three that
19 I'm aware of myself that I was, you know, made aware of or
20 involved with.
21     Q.  Is the ultimate decision-maker for indemnification
22 from the Town of Braintree from 1975 to present, is that the
23 town solicitor?
24     A.  That I'm not sure if it's the town -- like we have a

Frederick Weichel vs
Town of Braintree, et al.

30(b)(6)

Michael Want
November 01, 2023

---

Page 17

1 mayor now, I'm not sure if it's the mayor. My guess is the town
2 solicitor would advise, and then it's up to the Town and the
3 insurance carrier. But I just don't know how that final --
4    Q. And the conversation that you described earlier that
5 you were involved in, who was the decision-maker in that
6 situation?
7    A. There was no decision made. It was just a meeting
8 between myself; the Town solicitor; I believe the chief of
9 police at the time, Mark Dubois, was there; and the MIIA
10 representative.
11    Q. I see.
12    A. It's still ongoing so I don't think a decision yet --
13 I don't know if a decision has been made or not. It's beyond my
14 role.
15    Q. Okay, okay. Was there a discussion during that
16 meeting about who would provide legal representation for the
17 claims?
18    A. I can't -- I don't remember.
19    Q. Okay. Do you know who is providing legal
20 representation for those claims?
21    A. The Town is. I don't know if -- It's actually the
22 same law firm, Brody Hardoon Kesten & Perkins.
23    Q. The same firm as in this case?
24    A. Yes.

---

Page 18

1    Q. Okay. And in this case, the Town of Braintree is also
2 paying for the lawyers to provide legal representation regarding
3 Frederick Weichel's claims; is that right?
4    A. I don't know if the Town is paying or not.
5    Q. Okay, I see, I see. Do you know who is paying?
6    A. I'm not sure if it's the Town of Braintree or MIIA.
7    Q. I see. So it could be the insurance carrier?
8    A. Yes.
9    Q. I see. And that would be the insurance carrier for
10 the Town of Braintree?
11    A. Correct.
12    Q. Got it, okay. But it would be one of those two
13 entities?
14    A. That's my understanding, yes.
15    Q. Okay, okay. You testified that you reviewed
16 collective bargaining agreements; is that right?
17    A. Yes.
18    Q. Which collective bargaining agreements did you review
19 to prepare for today's deposition?
20    A. The 2019 to 2022; and also one, I forget which years,
21 in the '80s.
22    Q. Okay. And in any of those collective bargaining
23 agreements, was there any mention at all regarding
24 indemnification?

---

Page 19

1    A. Not that I found, no.
2    Q. Okay. Do you know if the issue of indemnification was
3 ever bargained between any law enforcement bargaining unit and
4 the Town of Braintree?
5    A. Not that I'm aware of.
6    Q. Okay. Are you aware of there being any discussions at
7 all between those two entities regarding indemnification?
8    A. No. I was the bargaining chair for the Braintree
9 Police Supervisors Offi-- uh, Superior Officers Association.
10 I'm not sure what year that was and not that I remember from
11 those discussions. And we now, in my new role, we just
12 completed negotiations with both supervisors and officer unions,
13 and I don't believe it came up then either. But I wasn't
14 involved in the meetings, I just -- I know it's been signed, and
15 I don't remember it ever being discussed as an issue.
16    Q. So as far as you know, you've never heard of any
17 bargaining unit raising the issue of indemnification with the
18 Town of Braintree; is that fair?
19    A. Yes, I do not.
20    Q. Okay, okay. All right, have we exhausted your
21 knowledge regarding how many times indemnification has been
22 requested by a law enforcement officer -- let me rephrase that.
23       Have we exhausted your knowledge about how many times
24 the Town of Braintree has indemnified a law enforcement officer

---

Page 20

1 for claims related to that officer's scope of employment?
2    A. To my knowledge, after speaking with Chief Frazier, is
3 that we don't know of any time that the Town has indemnified an
4 officer.
5    Q. And have we exhausted your knowledge about that?
6    A. Yes.
7    Q. Okay. Based on your review of documents, were you
8 able to determine whether the Town of Braintree had insurance
9 coverage in the summer of 1980?
10    A. The Town did; and well before that as well.
11    Q. Okay, okay. What coverage did it have in the summer
12 of 1980?
13    A. I don't recall off the -- by memory the name of the
14 company. I believe it was Aetna, but I'm not sure. There was
15 various companies from 1981 to the pres-- you know, up until
16 MIIA took over, I want to say early 2000s.
17    Q. Sure, sure.
18    A. And then I spoke with the town solicitor, Crystal
19 Huff, who stated that in Braintree town reports, there was also
20 mention of insurance dating back, you know, decades before 1981.
21       MR. DONOHUE: And so it's fine for you to convey
22 information, but don't -- we're not waiving any privileges, so
23 don't testify about what the town solicitor told you. But it's
24 fine to convey the information that you have.

---

Frederick Weichel vs
Town of Braintree, et al.

30(b)(6)

Michael Want
November 01, 2023

---

Page 21

1    THE WITNESS:  Received.

2    MR. LOEVY-REYES:  And I guess, you know, to that end,

3  I guess I would draw a distinction between conversations with

4  the town solicitor that relate to representation versus your

5  role as an employee of the Town of Braintree, I think.

6        I don't think we're going to necessarily have to worry

7  about that quite frankly, Tom.  But it might be an issue I guess

8  if it's overly objected to, but I don't think we're going to get

9  there quite frankly.

10    MR. DONOHUE:  Yeah, I don't think so either.  I just

11  want to make sure that we're not waiving any privilege.  He

12  certainly spoke with numerous people, including lawyers, to try

13  and prepare for today.

14    MR. LOEVY-REYES:  Yeah, exactly, I don't want any of

15  that stuff.  I think obviously we would agree that that's

16  privileged.  We like attorney-client privilege from our side

17  too.

18        So, yeah, if it sounds like I'm asking you for

19  conversations you had to prepare for the deposition today with

20  any of your lawyers, we're not asking for that, okay.

21    MR. DONOHUE:  Yeah, but to the extent you're asking

22  for information, what I'm telling him is I want him to convey

23  the information, just not necessarily the conversation.

24    MR. LOEVY-REYES:  Of course, of course.  No,

---

Page 22

1  absolutely, absolutely.

2        And I guess that's what I'm saying, don't tell me what

3  your said lawyers said or what you said to your lawyers.  So I

4  think we're on the same page.

5  BY MR. LOEVY-REYES:

6    Q.  I'm going to show you what I have marked as Weichel

7  Deposition Exhibit 204.  Do you see that on your screen?

8    A.  We can see most of it.  I don't know if there's some

9  language down below is cut off, but we can see most of it.

10    Q.  Yeah.  So I'll represent to you this is just a

11  two-page document.  This was produced by the Town of Braintree.

12  It has a Braintree Bates number of Braintree 7204.  And on top

13  of it, it indicates "1979 Town Report."  [Pause.]  Here we

14  go.  And in this, I'm just going to highlight a little bit, it

15  has an outlay of insurance general liability, and then it has a

16  number of I think $168,431; do you see that?

17    A.  If it's possible to enlarge it a little bit, that

18  would be --

19    Q.  Yeah, sure, absolutely.  It's definitely possible.

20    A.  The eyes come a little bit.

21        Yeah, perfect, I can see it now.

22    Q.  And I have it on a big screen, so I don't know what

23  kind of screen you have it on, but, um -- yeah, I have it on a

24  big screen.  So I've enlarged it.  Again, it has an outlay for

---

Page 23

1  insurance general liability; do you see that?

2    A.  Yes.

3    Q.  Do you know if in 1979 this outlay for general

4  liability insurance would have covered claims against law

5  enforcement officers?

6    A.  I don't know that, no.

7    Q.  Okay.  And I'm going to go down to page 2 of Exhibit

8  204, and this has a "1980 Town Report" on it again.  Under that,

9  it has an insurance general liability with a payment of

10  $190,363; do you see that?

11    A.  I do.

12    Q.  Okay.  And that would identify that the Town had

13  purchased general liability insurance in 1980; is that right?

14    A.  Yes, that what it appears, yes.

15    Q.  Okay.  And then again I'll just point out the Bates

16  number on this is Braintree 7205.  So this would have been a

17  document produced by the Town of Braintree; do you see?

18    A.  I'm -- I'm sorry?

19    Q.  Oh, I'm just saying on the bottom of it, there's a

20  Bates number of Braintree 7205; do you see that?

21    A.  Yes.  It kind of mixes in with the background, but I

22  see that.

23    Q.  It does, I know.  That's a tough one to read.  All

24  right, I'm going to go to page 3.  I know I said that Exhibit

---

Page 24

1  204 was a two-page exhibit, it's actually a three-page exhibit.

2  And again, I'm going to highlight a portion of this.  This looks

3  like it's in 1981 which has a generally liability component to

4  it, and it looks like an outlay of $182,000; do you see that?

5    A.  Yes.

6    Q.  Does that demonstrate that the Town of Braintree had a

7  general liability policy in 1981?

8    A.  [Pause.]  Yes.  I'm just reading up above it's "so

9  voted."  So, yeah, a town meeting, it looks like a town meeting

10  vote, yes.  I would say, yes.

11    Q.  Okay.  And then again I'll just point out, this is

12  Braintree 7206; do you see that?

13    A.  On this one it's completely washed out in the

14  background.

15    MR. DONOHUE:  It's at the bottom.

16    A.  Okay, I see it now.

17    Q.  There.  Do you see that?

18    A.  Yes.

19    Q.  All right, great.  That's the one downside of doing

20  Zoom is I don't know what you're looking.  I know what I can

21  see.

22        All right, I'm going to show you a couple of other

23  exhibits.  And actually before I do that, let's go through the

24  final two topics here.  So going back to Weichel Deposition 200,

---

Frederick Weichel vs
Town of Braintree, et al.

30(b)(6)

Michael Want
November 01, 2023

---

Page 25

1  topic two reads:

2      "The policies, practices, and procedures of the

3  Braintree Police Department/City of Braintree from 1975 to the

4  present relating to contracting for, obtaining, utilizing,

5  and/or the presentation/payment of any claims for any insurance

6  coverage to cover any liability for conduct related to any law

7  enforcement officer's activity in the scope of his/her

8  employment.  This topic expressly includes testimony about each

9  and every claim for liability against any officer and the

10  coverage of any insurance policy related to any such claim."

11      Are you prepared to provide binding testimony on

12  behalf of the Town of Braintree for that topic?

13      A.  I am.

14      Q.  Okay.  And on topic three, I'll read that as well;

15  also as long.  Topic three reads:

16      "The policies, practices, and procedures of the

17  Braintree Police Department/City of Braintree from 1975 to the

18  present relating to any agreement (written or unwritten) with

19  any collective bargaining unit for the City of Braintree to

20  provide indemnification for any law enforcement officer for any

21  liability for conducted related to any law enforcement officer's

22  activity in the scope of his/her employment.  This topic

23  expressly includes testimony about each and every time that the

24  Town of Braintree/Braintree Police Department and any collective

---

Page 26

1  bargaining unit agent discussed or otherwise negotiated for such

2  indemnification."

3      Are you prepared to provide binding testimony on

4  behalf the Town of Braintree regarding that topic?

5      A.  I am.

6      Q.  And I think you've already testified about the

7  collective bargaining topic.  Do you have any knowledge, outside

8  of what you've testified about, about any collective bargaining

9  provision related to indemnification?

10      A.  I do not.

11      Q.  Okay, okay.  So the only topic that I'll ask you

12  questions about that's remaining will be topic two, which will

13  be about insurance, and I'm going to go through various

14  documents regarding that.

15      A.  Yes, sir.

16      Q.  I'm going to show you what's been marked as Weichel

17  Deposition Exhibit 202.  Are you able to see that on your

18  computer, just the top of page 1 of the exhibit?

19      A.  Yes, down to "claim," uh --

20      Q.  Yes, exactly, exactly.  You testified earlier that you

21  reviewed letters regarding insurance coverage.  Just looking at

22  this portion of it, did you review this letter?

23      A.  I did.

24      Q.  Okay.  I just have a few questions regarding the

---

Page 27

1  letter itself.

2      All right, first paragraph of this letter indicates a

3  claim for insurance coverage on behalf of Braintree defendants

4  regarding this case.  And then it states something about an

5  alleged policy issued by Atlanta International Insurance

6  Company, Drake Insurance Company of New York, Wellfleet New York

7  Insurance Company, or their affiliates, successors, and

8  predecessors to the Town of Braintree between the years 1980 to

9  2017.

10      First question, did the Town of Braintree make a claim

11  of insurance coverage from those various insurance companies?

12      A.  It looks like they did, yes.

13      Q.  Okay.  And the next sentence reads that Resolute

14  Management, which is the author of the letter, is a third-party

15  administrator for certain insurers.  Do you know what insurers

16  that Resolute Management is a third-party administrator for?

17      A.  I do not.

18      Q.  Okay.  And I think just kind of going down, it looks

19  like, certainly it doesn't say all that they are, but it says

20  that Resolute has assumed the administration and handling of

21  claims on behalf of AIIC, which looks like it's those insurance

22  firms that we just mentioned above because they're collectively

23  called AIIC; do you see that?

24      A.  Yes.

---

Page 28

1      Q.  So it looks like they're responding on behalf of those

2  insurance companies; is that fair?

3      A.  Yes, sir.

4      Q.  Okay.  Do you know if any insurance company has agreed

5  that it could be liable for Plaintiff's claims here?

6      A.  I believe later in the letter it does talk about, um,

7  it does talk about that in the letter down below, if I'm not

8  mistaken, I just can't be sure without a full review.

9      Q.  Sure, sure, okay.  And then just going to the second

10  paragraph on page 1 of Exhibit 202.  It references a prior

11  correspondence from the Town of Braintree asking for defense and

12  indemnification regarding Fred Weichel's claims here; do you see

13  that?

14      A.  Yes, sir.

15      Q.  And then it indicates that AIIC was unable to locate a

16  copy of the insurance policy.  Do you know if any copy of an

17  insurance policy was ever found regarding policy number PPL

18  03140 with a date of loss of January 13th, 1980 and a per person

19  limit of liability of $100,000?

20      A.  Not to my knowledge, no.

21      Q.  Okay.  Because that paragraph then references that

22  they were asking the Town of Braintree to look for records

23  relating to that policy.  Do you know if a search was ever

24  conducted regarding that policy?

---

Frederick Weichel vs
Town of Braintree, et al.

30(b)(6)

Michael Want
November 01, 2023

Page 29

1    A.  I believe our town solicitor did conduct a search.

2  I'm not sure about that exact policy, but I know there was a

3  search conducted in relation to that.

4    **Q.  Got it.**

5    MR. LOEVY-REYES:  Do you guys mind if we take a quick

6  five-minute break?

7    THE WITNESS:  No.

8    MR. DONOHUE:  Sure.

9  (Whereupon, a break was taken from 9:34 a.m. to 9:40 a.m.)

10 BY MR. LOEVY-REYES:

11   **Q.  All right, going down further, I think you indicated**

12 **earlier -- we're still on Exhibit 202 -- there is a paragraph**

13 **toward the middle which reads:**

14   **"Based upon these assumptions, and subject to the full**

15 **reservations of rights stated below, AIIC hereby offers to**

16 **participate in the defense of the Braintree Defendants against**

17 **the Weichel claim and to pay a share of the reasonable and**

18 **necessary defense cost incurred by or on behalf of the Braintree**

19 **Defendants since September 14th, 2022, the date Braintree first**

20 **attempted to send notice to AIIC of the Weichel claim."**

21   **That's what you referenced earlier when you said that**

22 **there was an agreement to provide some coverage regarding the**

23 **insurance claim; is that right?**

24   A.  That's my memory.  But I'm hoping we could -- you

Page 30

1  could put it back up on the screen just to make sure I'm --

2    **Q.  Oh, yeah, I thought I was still sharing the screen.**

3  **Thank you.**

4    A.  No problem.

5    **Q.  There we go.**

6    A.  Thank you.

7    **Q.  Yeah, again, you know, I know what I'm looking at; I**

8  **sometimes lose track of what you're looking at.  It's the**

9  **problem with not having paper copies I can hand you.**

10   **So the first sentence of the paragraph I just read is**

11 **kind of right in the middle of the page, and it starts with**

12 **"based upon."  So if you want to take a look at that.**

13   A.  Yes, sir.  [Pause.]

14   Yes, they're agreeing to pay a share of the reasonable

15 and necessary defense cost incurred by or on behalf of the

16 Braintree defendants since September 14th, '22.

17   **Q.  Right, right.**

18   A.  Then requesting --

19   **Q.  Exactly, then they're requesting some information**

20 **that's identified in the bullet points below; fair enough?**

21   A.  Yes, sir.

22   **Q.  Okay.  And then it says "based on the assumptions,"**

23 **and then the assumptions are in the bullet points just above**

24 **that; is that fair?**

Page 31

1    A.  Yes.

2    **Q.  Okay, okay.  All right, going to the third page of**

3  **this letter.  After the bullet points, the next paragraph reads:**

4    **"AIIC will contact other involved insurers to discuss**

5  **appropriate division of defense costs.  The Braintree**

6  **Defendants' defense costs currently are being paid by one or**

7  **more of its other insurers."**

8    **Two questions regarding that.  One is, do you know if**

9  **AIIC contacted other insurers about dividing up defense costs?**

10   A.  I do not know.

11   **Q.  Okay.  Second question is, what other insurers were**

12 **providing defense costs besides AIIC?**

13   A.  I'm not aware of one.  And my thought is that MIIA is

14 potentially paying the cost of this defense, but I don't know

15 that.

16   **Q.  Okay.  And MIIA is the one that you testified about**

17 **earlier, correct?**

18   A.  Yes, sir.

19   **Q.  All right, I'm going to show you what's been marked as**

20 **Weichel Deposition Exhibit Number 216.  Page 1 is an e-mail, but**

21 **I'm going to go down to the next page, which should be marked as**

22 **Braintree 7396 on the bottom.  Just looking at the top half of**

23 **that page, is this one of the letters that you reviewed before**

24 **today's deposition?**

Page 32

1    A.  I believe it is.

2    **Q.  Okay, okay.  And the subject line or the subject**

3  **section indicates that this letter is about the present lawsuit;**

4  **is that right?**

5    A.  Yes.

6    **Q.  And then it looks like the e-mail that this letter**

7  **came with enclosed policy declarations for various times**

8  **periods, and those are identified in the bullet points on the**

9  **page -- well, I guess it would be on page Braintree 7396; is**

10 **that right?**

11   A.  Yes.

12   **Q.  Okay.  And these look like they relate to National**

13 **Casualty Insurance Company; do you see that in the first**

14 **paragraph?**

15   A.  Yes.

16   **Q.  Okay.  The Town of Braintree had policies with**

17 **National Casualty during that time frame?**

18   A.  I believe so.  I'm not sure though.

19   **Q.  The letter indicates that it did though; is that fair?**

20   A.  Yes.  There was a bunch of different companies from

21 '81 to now, I just can't remember if that's in there.

22   **Q.  Sure, sure.  And we'll go through some of those**

23 **documents in a little bit.**

24   **All right, going to bottom paragraph on Braintree**

Frederick Weichel vs
Town of Braintree, et al.

30(b)(6)

Michael Want
November 01, 2023

---

Page 33

1 7396. The first two sentences read:

2     "As you can see on each declarations for the policies

3 listed above, it is stated: 'This is a claims made policy.

4 Please read it carefully.' Claims-made policies require that a

5 claim be made against the insured during the policy period

6 before coverage can be afforded to the insured."

7     Do you see that?

8     A. I do.

9     Q. Okay. Do you know if that was the type of insurance

10 that Braintree had during 1988 through 1993?

11     A. I don't know, sir.

12     Q. Okay. Then going to page Braintree 8397, the first

13 full paragraph reads:

14     "With regard to the comprehensive law enforcement

15 liability policies allegedly issued by National Casualty to the

16 Town of Braintree Police Department, National Casualty is not in

17 possession of those policies."

18     The question for you is, did the Town of Braintree

19 have a law enforcement liability policy from 1984 through 1985,

20 which is referenced in the bottom of this paragraph?

21     A. I don't know.

22     Q. Okay. And then the next paragraph, the first sentence

23 reads: "Finally, we are attaching a copy of the comprehensive

24 law enforcement liability policy coverage form that we believe

---

Page 34

1 would have been included with any comprehensive law enforcement

2 liability policy issued by National Casualty to the Town of

3 Braintree Police Department."

4     Do you know if at any point in the '80s there was a

5 National Casualty comprehensive law enforcement liability policy

6 that the Town of Braintree had?

7     A. I don't know.

8     Q. Okay. Did the Town of Braintree have a central

9 repository where it kept its insurance policies?

10     A. I don't -- I'm not aware.

11     Q. Okay. Because it sounds like with both the letters

12 that we looked at in the prior exhibits that the insurance

13 companies were asking the Town to provide copies of its

14 insurance policy. Do you know if the Town was ever able to find

15 its insurance policies?

16     A. I do not know.

17     Q. Okay. All right, now we get to the fun part: I'm

18 going to show you some insurance documents.

19     A. I've been training my whole life for this.

20     Q. Yeah, I know, I'm not surprised, I'm not surprised.

21     All right, I'm going to show you what's been marked as

22 Weichel Deposition Exhibit 203. Have you ever seen this

23 document before? I know it's just showing the top part of it,

24 and I'll see if I can zoom out a little bit. This has a

---

Page 35

1 Braintree 7093 number on the bottom. I'll highlight that. But

2 have you ever seen this before, it's got a title of Drake

3 Insurance Company of New York?

4     A. I'm not sure to be honest.

5     Q. Okay. I'm going to go down to the second page of

6 Exhibit 203, and this has a counter signature endorsement on it.

7 It looks like it's dated 4-15-79. Do you know anything about

8 this?

9     A. No.

10     Q. Okay. Part of it is redacted where it says "issued

11 to." Do you know what the redaction was?

12     A. No, I don't.

13     Q. Okay. And I would assume that since you've never seen

14 this before; that's fair, right?

15     A. I don't think I have.

16     Q. Okay.

17     A. I've reviewed so many documents, I just can't remember

18 a hundred percent if that's one of them.

19     Q. Sure, sure.

20     A. I wish I could.

21     Q. Of course. All right, I'm going to go down to page

22 Braintree 7096. And this has, on the bottom, it says "police

23 professional liability policy," and then it says "Atlanta

24 International Insurance company." Do you know what that relates

---

Page 36

1 to?

2     A. No. My guess is coverage for police actions.

3     Q. Sure. All right, going to the next page, which is

4 Braintree 7097. I highlighted a little portion of this. It has

5 a "Coverage A - Personal Injury"; do you see that?

6     A. Yes. If possible, could you just make it a touch

7 larger for my --

8     Q. Yeah, absolutely. Like I said, it's on a very big

9 screen for me, but I don't know what your screen is like.

10     A. No, that's great.

11     Q. All right, good.

12     A. Thank you.

13     Q. So you see where it lists out personal injury on

14 there?

15     A. Yes.

16     Q. Okay. And then it says: "Personal injury to which

17 this policy applies, and the company shall have the right and

18 duty to defend any suit against the insured seeking damages on

19 account of such personal injury or bodily injury...."

20     Do you see that?

21     A. I do.

22     Q. Do you know if that was the policy that the Town of

23 Braintree had?

24     A. That is my thought, yes.

---

Frederick Weichel vs
Town of Braintree, et al.

30(b)(6)

Michael Want
November 01, 2023

---

Page 37

1   Q.  Okay.  And then down under "supplementary payments,"
2   it reads:
3       "The company will pay, in addition to the applicable
4   limits of liability:  All expenses incurred by the company, all
5   costs taxed against the insured in any suit defended by the
6   company and all interest on the entire amount of any judgment
7   therein which accrues after entry of the judgement and before
8   the company has paid or tendered or deposited in court that part
9   of the judgment which does not exceed the limit of the company's
10  liability thereon."
11      Did the Town of Braintree have that provision in its
12  insurance policy?
13      A.  Based on this, I would say yes.
14      Q.  Okay.  And then going down to the bottom under
15  "definitions," it defines personal injury means false arrest,
16  false imprisonment -- just below -- and then malicious
17  prosecution.  Do you see that?
18      A.  Yes.
19      Q.  Did the Town of Braintree have that policy?
20      A.  It looks like they did, yeah.
21      Q.  I'm going to show you what's been marked as Weichel
22  Deposition Exhibit 212.  I'm going to scroll down a little bit.
23  Do you see on the top where it says Atlanta International
24  Insurance Company, and then it has a date of June 23rd, 1980.

---

Page 38

1   Do you know, is this one of the letters that you reviewed to
2   prepare for today's deposition?
3       A.  I'm not sure of this one, but yes, I did see
4   something, at least a couple of documents with Atlanta
5   International Insurance Company dated --
6       Q.  Okay, okay.
7       A.  -- addressed to Arthur Smith, our former town
8   attorney.
9       Q.  Got it.  And this has a claimant of a John Ruggiano;
10  do you see that?
11      A.  Yes.
12      Q.  Do you know what that claim was about?
13      A.  No, I -- If this is the same document I reviewed, it
14  talks about at least three officers, the Town was looking for
15  coverage for three officers based on a claim by Mr. Ruggiano.
16      Q.  Sure, sure.  And then if we go down, I'll highlight
17  the three officers and see if this was the document you looked
18  at.  It lists out a Thomas D. Brown, John V. Polio, and Robert
19  Jordan; were those the three officers?
20      A.  Yes.  I've never heard -- I don't know the names
21  Thomas Brown or Robert Jordan, but obviously Chief Polio I
22  recognize.
23      Q.  And John Polio was the chief of police at the time in
24  the 1980; is that right?

---

Page 39

1   A.  Yes.
2   Q.  And it looks like, if we look at the first paragraph,
3   that Atlanta International Insurance Company, which apparently
4   was formerly Drake Insurance Company of New York, acknowledged
5   receiving the summons and complaint regarding Mr. Ruggiano's
6   lawsuit; is that right?
7   A.  Yes, sir.
8   Q.  Okay.  And then if we look at the second paragraph, it
9   looks like Atlanta International Insurance Company took on the
10  defense related to that lawsuit because then it says it's been
11  assigned to the law firm of Burn & Levinson; do you see that?
12  A.  Yes.
13  Q.  Okay.  Do you know what happened with that case?
14  A.  I do not, sir.
15  Q.  Okay.  And it looks like, so in the second from the
16  last paragraph on page Braintree 7291, it reads:  "In answering
17  for the inhabitants of the Town of Braintree, such answer is
18  only as to any vicarious liability arising from the liability of
19  the police officers involved."
20      Does that mean that the insurance company provided for
21  the payment of liability regarding law enforcement officers who
22  were acting in the scope of their employment?
23  A.  That's what it appears to say, yes.
24  Q.  Okay.  I'm going to show you what's been marked as

---

Page 40

1   Weichel Deposition Exhibit 213, and the highlighting on this is
2   the way that I received it.  And this has a claim number, it has
3   Atlanta Insurance -- or Atlanta International Insurance Company
4   on the left, a claim number, and a policy number.  Have you ever
5   seen this before?
6   A.  I'm not sure if I've seen this document or not.
7   Q.  Okay.  Then it lists out some dates.  It has a date
8   closed and then a date of loss.  And then the date of loss dates
9   appear to be from 1979, 1980, and 1980.  Do you know if these
10  show claims that were made regarding law enforcement officers in
11  the Town of Braintree regarding Atlanta International Insurance?
12  A.  I'm not sure.
13  Q.  Okay.
14  A.  I'm not sure what the basis of the claim or the
15  request for coverage is, unless it's up on another page.  I'm
16  just looking at --
17  Q.  Well, let's take a look and see because this was from
18  a spreadsheet so there's multiple.  So let's go to the second
19  page and see if that helps you identify the claim.
20      Does that help at all?
21  A.  I don't believe so, no.
22  Q.  Okay.  Then let's go to the third page and see if that
23  provides information that will help you.
24      Does that help at all?

---

Frederick Weichel vs
Town of Braintree, et al.

30(b)(6)

Michael Want
November 01, 2023

---

Page 41

1    A.  It just says "other liability - occurrence," there's

2  not really much detail.

3      Q.  Okay.  Then let's look at next page.  Does that

4  provide any information to show you what type of claim this is?

5    A.  No.

6      Q.  Okay.  And we'll do the same thing for the last page,

7  which has nothing on it; so I'm assuming that does not help you?

8    A.  Correct.

9      Q.  Okay, all right.  I'm going to show you what's been

10  marked Weichel Deposition Exhibit 56.  The first page has a

11  Braintree number on it, which I believe is 600, though it's a

12  little hard to read.  I'm going to scroll down there and see if

13  we can figure it out.

14      All right.  Does that look like Braintree 600 at the

15  bottom?

16    A.  It's hard to tell, but yeah, there's zeros --

17      Q.  And then just to kind of show you I'm not trying to

18  play tricks on you, the next one has a Braintree of 601; do you

19  see?

20    A.  Yeah.  No, I didn't think that, it's just hard to

21  read.  So, yeah, 601 is clear as day.

22      Q.  Oh, I mean I didn't think that you did, but I just

23  want to be clear.

24      All right.  So have you reviewed Weichel Deposition

---

Page 42

1  Exhibit 56 or at least page 1 of it before today's deposition?

2    A.  I believe I've seen it because I recognize that you

3  can only read about a third of it.

4      Q.  Right.

5      MR. LOEVY-REYES:  By the way, Tom, were you ever able

6  to see if you had original copies of these documents?

7      MR. DONOHUE:  Yeah, we don't.  These are the ones that

8  were attached to the e-mail, right, from the company?

9      MR. LOEVY-REYES:  Yeah.

10      MR. DONOHUE:  I think this is -- no, so we don't, is

11  what I'm told.  And I think the company had to find them on

12  microfiche or something, but that's --

13      MR. LOEVY-REYES:  Yeah.  And I assumed that was going

14  to be the answer, but I just wanted to make sure.  All right,

15  cool.

16  BY MR. LOEVY-REYES:

17      Q.  So looks like, based on the top page of the first page

18  of Weichel Deposition 56, this policy at least went from July of

19  1981 to July of 1982; is that right?

20    A.  That's what it looks like.  [Pause.]  It's hard to

21  tell though, the word up above 7-1-81 would be helpful, but it's

22  -- you can't even make it out.

23      Q.  Yeah, it looks like one of them is "period."  Right

24  above the 7-1-81, I think I can make out "period," but that's

---

Page 43

1  about it.

2    A.  Okay.

3      Q.  Do you see that?  I mean, does it look like "period"

4  to you?

5    A.  It does.

6      Q.  Okay.  And then I'm just going to scroll down.

7  Braintree 608, it looks like in this policy there was a $500,000

8  aggregate for limits of liability; do you see that?

9    A.  Yes.

10      Q.  Is that consistent with your understanding of this?

11    A.  Yes.

12      Q.  And then under personal liability coverage for group

13  A, it defines false arrest, detention or imprisonment or

14  malicious prosecution as a group A coverage; is that fair?

15    A.  Yes, sir.

16      Q.  And then going further down, after where it has group

17  A, B and C, it says:

18        "Such offense is committed during the policy period

19  within the United States of America, its territories or

20  possession, or Canada, and the company shall have the right and

21  duty to defend any suit against the insured seeking damages on

22  account of such personal injury...?"

23        Was that the policy that the Town of Braintree had?

24    A.  It appears it is.

---

Page 44

1      Q.  And then this is a part that I had a hard time reading

2  where it indicates, uh, same page, which is Braintree 608,

3  "persons insured," do you know who was identified as being

4  persons insured?

5    A.  I can only read a few words of it myself.

6      Q.  Okay.  And which words can you read?

7    A.  Starting at "persons insured" headline or in bold.

8      Q.  Yes.

9    A.  "Of the following...insured under," maybe "this."

10      Q.  Okay.

11    A.  "...set forth below:  If the named insured is

12  designated in the," not sure, "individual, the person so

13  designated and," um, I think it says "his spouse."

14        Next line.  "...named insured is designated in the

15  declaration," would be my guess, "or joint venture, the

16  partnership...and any partner or member," I'm going to say.

17        Next line.  "...respect...his liability as such."

18        Next line.  "Named insured is designated in the," not

19  sure, I think "an individual partnership or joint venture...and

20  executive office director while acting within the scope of his

21  duties."

22        Next paragraph.  "...does not apply to personal injury

23  arising...partnership or joint venture...the insured...and which

24  is not designated in this...named insured."

---

Frederick Weichel vs
Town of Braintree, et al.

30(b)(6)

Michael Want
November 01, 2023

---

Page 45

1  Q.  Okay, okay.  Probably about as good as I could do too.

2  A.  I'm feeling good at 49.

3  Q.  All right, I'm going to take us to another page, and

4  this page has a number of Braintree 617.  I'm going to zoom out

5  just a little bit to show you the bigger part of the page.  Do

6  you recall ever reviewing this document?

7  A.  No.

8  Q.  Okay.  Do you know if this document demonstrates that

9  from 1988 to 1989, the Town of Braintree had a policy that

10  provided a $1,000 liability limit?

11  A.  Is it one thousand or one million?

12  Q.  I'm sorry, one million.  Thank you.

13  A.  It looks like to be, yes.

14  Q.  Okay.  And then same question regarding Braintree 621.

15  Does Braintree 621 appear to show that the Town of Braintree

16  from March of '89 to March of '90 had an insurance policy with a

17  $1 million liability limit?

18  A.  It does.

19  Q.  Okay.  All right, same question from Braintree 625.

20  Does this appear to show that between March of 1990 and July of

21  1991 the Town of Braintree had an insurance policy with a $1

22  million liability limit?

23  A.  It does.

24  Q.  And then the same question from Braintree 632.  Does

---

Page 46

1  this show that, at least from July of 1991 to July of 1992, the

2  Town of Braintree had an insurance policy with the National

3  Casualty Company with a $1 million liability limit?

4  A.  Yes.

5  Q.  And then going to Braintree 636.  Does Braintree 636

6  show that between July 1992 and July of 1993 the Town of

7  Braintree had an insurance policy with the National Casualty

8  Company with a $1 million liability limit?

9  A.  It does.

10  Q.  And then going to page Braintree 640.  Does that show

11  that the Town of Braintree had a policy with National Casualty

12  Company between 1984 September and September of 1985 that had a

13  $1 million liability limit?

14  A.  Yes, that's what's being billed for, it looks like.

15  Q.  Exactly.  And, right, it says "renewed" right in the

16  handwriting part, correct?

17  A.  Yes, sir.

18  Q.  Okay.  And then I'm going to go to Braintree 644, and

19  this has a "National Casualty Company - Comprehensive Law

20  Enforcement Liability Policy."  Do you know what years that the

21  Town of Braintree had a law enforcement liability policy with

22  National Casualty?

23  A.  I do not.

24  Q.  Okay.  Going to Braintree 645.  And I'm going to zoom

---

Page 47

1  in a little more for this.  [Pause.]  Going where it says

2  "insured agreement," it reads:  "The company will pay on behalf

3  of the insured all sums which the insured shall become legally

4  obligated to pay as damages because of wrongful acts which

5  results in...."  I'm going to go to "(a) personal injury," and

6  then, "...caused by an occurrence and arising out of the

7  performance of the insured's duties to provide law enforcement

8  and/or other departmentally approved activities as declared in

9  the application, or arising out of the ownership, maintenance or

10  use of the premises designated in the declarations...."

11    Do you know if the Town of Braintree had this policy

12  at any point between 1980 and the present?

13  A.  Based on this screen alone?

14  Q.  Based on anything that you have, any knowledge that

15  you have?

16  A.  This is the only screen I have, and I'm not sure if

17  the Town was billed for this or paid for it, or I just can't

18  remember if this was an actual policy we had or not.

19  Q.  Okay, okay.  Going to the next page, which is

20  Braintree 646.  This defines personal injury at the bottom.

21  "Personal injury means:"  And then under line 3, it reads,

22  "False arrest, detention or imprisonment, or malicious

23  prosecution."  Do you see that?

24  A.  Yes, sir.

---

Page 48

1  Q.  So at any time if Braintree had this policy with the

2  National Insurance, this would have been a definition for

3  personal injury; is that right?

4  A.  Yes.

5  Q.  And then going -- same page -- it identifies:

6    "Class A Employees - those employees who deal directly

7  with the public and exercise general powers of arrest.  Included

8  in this category are (a) county sheriff/police chief exercising

9  powers of arrest, and (b) peace officers exercising powers of

10  arrest."

11    At any point that the Town of Braintree had a law

12  enforcement policy with National Insurance, this would have been

13  the definition of who class A employees would be; is that right?

14  A.  Yes, sir.

15  Q.  I'm going to show you what's been marked as Weichel

16  Deposition Exhibit 59.  I'm going to zoom out on the first page

17  of this, which is Braintree 498, and ask if you've ever seen

18  this before?

19  A.  I'm not sure.

20  Q.  Okay.  This appears to be an insurance policy with The

21  Hartford by the Town of Braintree with an effective date of

22  7-1-85; is that right?

23  A.  Yes, sir.

24  Q.  Okay.

---

Frederick Weichel vs
Town of Braintree, et al.

30(b)(6)

Michael Want
November 01, 2023

---

Page 49

1    A.  And thank you.
2    Q.  No, that's all right.
3        And then going to page Braintree 514.  On page
4    Braintree 514, this appears to be a law enforcement officers
5    liability insurance; do you see that?
6    A.  Yes, sir.
7        MR. DONOHUE:  I'm sorry, Mark, can you tell us that
8    page number again?  We just don't have --
9        MR. LOEVY-REYES:  Yeah, it's Braintree 514.  I
10   believe?  Yes.
11       MR. DONOHUE:  514, thank you.
12   BY MR. LOEVY-REYES:
13   Q.  All right, going to Braintree 536.  I'll zoom out a
14   little bit.  Does this appear to be a law enforcement liability
15   coverage page that shows a limit of liability for $1 million
16   between July 2002 and July 2003?
17   A.  It does.
18   Q.  And then going to the next page, which is Braintree
19   537, this identifies an umbrella excess liability coverage; do
20   you see that?
21   A.  Yes, sir.
22   Q.  What's your understanding as to what the Town of
23   Braintree contracted for with an umbrella policy?
24   A.  Based on this document?

---

Page 50

1    Q.  Based on the document or any knowledge that you have.
2    A.  I don't have any knowledge of anything I would gather
3    from the documents you're showing me.
4    Q.  Okay, okay.  Under the umbrella policy that's shown on
5    Braintree 537, this appears to have a limit of liability for $2
6    million for the Town of Braintree from MIIA Property and
7    Casualty Group; do you see that?
8    A.  Yes, sir.
9    Q.  I think you had testified earlier that that's still
10   the insurance carrier that the Town of Braintree has; is that
11   right?
12   A.  Yes.
13   Q.  And I think you testified earlier, when did the Town
14   of Braintree first contract with MIIA for insurance?
15   A.  My memory is in the early 2000s, but I know -- I read
16   that they started in the late '80s, but I want to say Braintree
17   might've in the early 2000s.
18   Q.  Okay.  And certainly if we look at Braintree 536 and
19   537, they were doing it as early as -- let's see what we have --
20   2002; is that right?
21   A.  Yes, sir.
22   Q.  And that's consistent with your testimony that it was
23   early 2000s; fair enough?
24   A.  Yes, sir.

---

Page 51

1    Q.  All right, going to Braintree 540.  This appears to
2    show a contract period between -- it's kind of hard to see the
3    contract period, but certainly between 2002 to 2004 for law
4    enforcement liability coverage between Town of Braintree and
5    MIIA, correct?
6    A.  Yes, sir.
7    Q.  And this looks like it also has a limit of liability
8    of $1 million; is that right?
9    A.  Yes, each person 1 million; aggregate 3.
10   Q.  And then going down to the next page, which is
11   Braintree 541.  This also appears to show an umbrella coverage
12   between 2002 to 2004 for the Town of Braintree by MIIA with the
13   limit of liability as $2 million; is that correct?
14   A.  Yes, sir.
15   Q.  And going to Braintree 544.  Braintree 544 shows that
16   between July 2004 and July 2005 the Town of Braintree had
17   insurance from MIIA for law enforcement liability coverage with
18   a limit of $1 million; is that right?
19   A.  Yes, sir.
20   Q.  Okay.  Going to Braintree 545.  This shows that the
21   Town of Braintree had insurance from MIIA between July 2004 and
22   July 2005 as an umbrella coverage with a limit of liability of
23   $2 million; is that right?
24   A.  Yes, sir.

---

Page 52

1    Q.  Going to Braintree 548.  The dates are a little hard
2    to read here so I'm going to actually start with Braintree 549
3    because I think these are the same two dates.  But looking at
4    Braintree 549, does this show that the Town of Braintree had
5    insurance from MIIA with an umbrella policy of a $2 million
6    limit between July of 2005 and July of 2006?
7    A.  Yes.
8    Q.  And then going back up to Braintree 548.  Does this
9    appear to show insurance between July of 2005 and July of 2006
10   for law enforcement liability coverage for the Town of Braintree
11   from MIIA with a limit of liability of $1 million?
12   A.  I can't read the period, the months and years, but the
13   liability --
14   Q.  Yeah.
15   A.  -- enforcement, yes.
16   Q.  And in fact, even where it has member name and address
17   where it says Town of Braintree in other places, that's actually
18   hard to read too; is that right?
19   A.  Yes.
20   Q.  Okay.  Let's go to Braintree 551.  Does Braintree 551,
21   the top part where it has "D," does that show that the Town of
22   Braintree had a law enforcement liability policy from 2005 July
23   to 2006 July --
24   A.  Yes.

---

Frederick Weichel vs
Town of Braintree, et al.

30(b)(6)

Michael Want
November 01, 2023

---

Page 53

1    Q.  Okay.

2    A.  It looks for a million dollars each claim; annual

3  aggregate, it looks like a "K."

4    Q.  Yeah, can't quite read that one?

5    A.  No.

6    Q.  But has for each person and each occurrence, it's a

7  million dollar limit though, right?

8    A.  Yes, sir.

9    Q.  Okay.  And then going to Braintree 552.  Does this

10  show that Braintree had an insurance policy with MIIA for law

11  enforcement liability with a limit of liability for $1 million

12  with a $3 million aggregate between July of 2006 and July of

13  2007?

14    A.  Yes.

15    Q.  Going to Braintree 559.  Does Braintree 559 show that

16  the Town of Braintree had insurance coverage with a law

17  enforcement liability, although it's misspelled L-A-K, of $1

18  million per occurrence between July 2007 and July 2008?

19    A.  Yes.

20    Q.  Going to Braintree 560.  Does that show that the Town

21  of Braintree had insurance coverage with MIIA between July of

22  2008 and July of 2009 for law enforcement liability with a $1

23  million limit of insurance per occurrence per person; and a $3

24  million aggregate limit?

---

Page 54

1    A.  Yes.

2    Q.  Does Braintree 561 show that the Town of Braintree had

3  an umbrella policy with MIIA between July 2008 and July 2009

4  with a $2 million limit of liability?

5    A.  Yes.

6    Q.  Going to Braintree 563.  [Pause.]  Let's skip that one

7  because we've already asked that question.

8       Let's go to Braintree 567.  Going to Braintree 567,

9  does this show that the Town of Braintree had -- again, "law" is

10  misspelled L-A-3 -- but a law enforcement policy between July

11  2009 and July 2010 with a $1 million limit of liability per

12  person per occurrence, and an annual aggregate of, uh -- that

13  doesn't show; does it show that it has that insurance?

14    A.  Yes.

15    Q.  Going to Braintree 568.  Does this show that between

16  July 2010 and July of 2011, the Town of Braintree had a contract

17  of insurance with MIIA for a law enforcement liability with a $1

18  million limit of liability and a $3 million aggregate?

19    A.  Yes.

20    Q.  Going to Braintree 569.  Does this show that between

21  July of 2010 and July of 2011, the Town of Braintree had an

22  umbrella coverage with MIIA insurance for a limit of liability

23  of $2 million?

24    A.  Yes.

---

Page 55

1    Q.  Going to Braintree 572.  Does that show that between

2  July of 2011 and July of 2012 that the Town of Braintree had an

3  insurance policy with MIIA for law enforcement liability with a

4  limit of liability of $1 million per person and occurrence and a

5  $3 million limit aggregate?

6    A.  Yes.

7    Q.  Going to Braintree 573.  Does Braintree 573 show that

8  the Town of Braintree had a policy with MIIA between July 2011

9  and July 2012 with an umbrella policy of a $2 million liability

10  limit?

11    A.  Yes.

12    MR. LOEVY-REYES:  All right.  Anyone mind if we take a

13  quick five-minute break?  This is getting a little boring, and I

14  just need to recharge a little and get some coffee.

15    MR. DONOHUE:  Yes, that's fine with us.

16    MR. LOEVY-REYES:  We'll come back in about five

17  minutes.

18  (Whereupon, a break was taken from 10:31 a.m. to 10:39 a.m.)

19  BY MR. LOEVY-REYES:

20    Q.  So going to Braintree 576.  Does Braintree 576 show

21  that the Town of Braintree had an insurance policy with MIIA

22  between July 2012 and July 2013 for law enforcement liability

23  with a limit of liability of $1 million per person and

24  occurrence and a $3 million aggregate limit?

---

Page 56

1    A.  I'm sorry, could we -- would you mind sharing your

2  screen one more time?

3    Q.  Oh, I thought I was again.  See, thank you.

4    A.  Oh, no problem at all.

5    Q.  There we go.

6    A.  Yes, sir, 2012 to 2013, $1 million and $3 million

7  aggregate.

8    Q.  Does Braintree 577 show that the Town of Braintree had

9  an insurance policy with MIIA between July 2012 and July 2013

10  with an umbrella policy limit of liability $2 million?

11    A.  Yes.  And could I ask one more favor?

12    Q.  Yeah.

13    A.  Can you enlarge it just one more?

14    Q.  What do you need?

15    A.  One more size up, enlarge the screen I mean.

16    Q.  Oh, absolutely, of course.

17    A.  Perfect.  Thank you.

18    Q.  No, absolutely.

19    A.  I'm not sure if you just covered this now, but this is

20  the umbrella --

21    Q.  Yes.

22    A.  -- liability coverage '12 to '13 and --

23    Q.  No, I think we're good.  I was just looking at the

24  next page to go to.

---

Frederick Weichel vs
Town of Braintree, et al.

30(b)(6)

Michael Want
November 01, 2023

Page 57

1    A.  Oh, okay.  Great.

2    Q.  All right, going to Braintree 580.  Does Braintree 580

3  show that between July of 2012 -- actually, that doesn't

4  actually say July, but that sometime between 2012 and 2014 the

5  Town of Braintree had a policy with MIIA for law enforcement

6  liability with a $1 million limit per person and a $3 million

7  aggregate limit?

8    A.  I can definitely, I can read the '12 and '14 and the

9  limits of insurance, but the months I can't read.

10    Q.  Okay.  Let's go to a different page.  Let's go to, uh,

11  Braintree 583 I think has the dates more clear.

12      Showing you Braintree 583, does this show that between

13  July 2012 and July of -- it should be, I'm assuming, 2012 and

14  2014 that there was a law enforcement liability policy of a $1

15  million aggregate per person and occurrence -- er, let me

16  rephrase it.

17      Does Braintree 583 show you that between 2012 and

18  2013, July of each, that there was a law enforcement policy by

19  the Town of Braintree with a $1 million limit per person per

20  occurrence and a $3 million aggregate limit?

21    A.  I'm sure it was just an oversight, you said '13, but

22  it looks like 2012 to 2014.  And it looks like July 1, '12 and

23  July 1, '14, yes; $1 million and then $7 million aggregate.

24    Q.  And then going to Braintree 584.  Does this show that

Page 58

1  between July of 2014 and July of 2015, the Town of Braintree had

2  an insurance policy with MIIA for law enforcement liability with

3  a $1 million limit of liability per person and occurrence and a

4  $3 million aggregate limit?

5    A.  Yes.

6    Q.  Does Braintree 585 show that between July of 2014 and

7  July of 2015, the Town of Braintree had an insurance policy with

8  MIIA with umbrella coverage with a $2 million limit?

9    A.  Yes.

10    Q.  I'm going to Braintree 591.  Does Braintree 591 show

11  that between July of 2015 and July of 2016 it had an insurance

12  coverage for law enforcement liability with a $1 million limit

13  per person and per occurrence?

14    A.  Yes.

15    Q.  All right.  Does Braintree 592 show that between July

16  of 2016 and July of 2017, the Town of Braintree had insurance

17  coverage with MIIA for law enforcement liability with a $1

18  million limit per person and occurrence and a $3 million

19  aggregate limit?

20    A.  Yes.

21    Q.  Does Braintree 593 -- oh, that one you can't read it

22  so let's go to a different one.

23      Does Braintree 596 show that between July of 2017 and

24  July of 2018, the Town of Braintree had a law enforcement

Page 59

1  liability insurance coverage with MIIA with a $1 million limit

2  of liability per person and occurrence and a $3 million

3  aggregate limit?

4    A.  Yes.

5    Q.  Does Braintree 599 show that between July of 2017 and

6  July of 2018, the Town of Braintree had an umbrella policy with

7  MIIA with a $2 million limit of liability?

8    A.  Yes.

9    Q.  Thankfully that is over.

10      I'm going to show you what's been marked as Weichel

11  Deposition Exhibit 201 and ask you to look at that and tell me

12  if you've seen that before.

13    A.  Could you just enlarge the screen?

14    Q.  Sure, absolutely.

15    A.  Thank you.  [Pause.]

16      Yeah, I believe I do recognize this one, yes.

17    Q.  Is Weichel Deposition Exhibit 201, is that an occasion

18  that the Town of Braintree had an insurance policy with Great

19  American between 1994 and 1995?

20    A.  Yes, I see the effective date of 7-1-94.

21    Q.  Yeah.  And I'll go down to page 2, which should be

22  Weichel 6762.  Does it appear that it's an Great American

23  policy, highlighted, between July, it looks like this is July of

24  '94 and September of '94?

Page 60

1    A.  Yes.

2    Q.  Okay.  Do you know how long that Braintree had

3  insurance through Great American?

4    A.  I do not, no.

5    Q.  And this policy appears to have included police

6  professional liability; is that right?

7    A.  Yes.

8    Q.  And it also appears to have had an umbrella policy?

9    A.  Correct.

10    Q.  Okay.  I'm going to show you what's been marked as

11  Weichel Deposition 214.  And this has "Business Pro" on the

12  front and says "umbrella liability policy," and then the

13  "protector policy" on the front; and then down below it has

14  "Great American."  Have you ever seen this before?

15    A.  The cover looks familiar, yes, the cover page,

16  Business Pro.

17    Q.  And this shows, when you look at Weichel 694A, it has

18  an effective period again from, it looks like, July of 1997 to

19  July of '98; do you see that?

20    A.  Yes.

21    Q.  It looks like this policy includes a commercial

22  umbrella policy; is that right?

23    A.  Yes.

24    Q.  And then going to Weichel 6951.  This indicates that

Frederick Weichel vs
Town of Braintree, et al.

30(b)(6)

Michael Want
November 01, 2023

---

Page 61

1  again between the same dates, July of '97 and July of '98,
2  there's a law enforcement policy with a $1 million limit of
3  liability; is that right?
4      A.  That's what it looks like, yes.
5      Q.  Okay.  And then going to Weichel 6953.  There's a
6  definition on this page, which is the Great American Insurance
7  Companies' page, which has a definition of personal injury; and
8  then it says it's amended to included mental anguish and
9  humiliation; do you see that?
10     A.  Yes.
11     Q.  Was that a policy that the Town of Braintree had with
12  Great American?
13     A.  That's what it looks like based on these documents,
14  yes.
15     Q.  And then going to Weichel 6955.  Again, same policy
16  period, July '97 to July of '98.  Does this appear to have an
17  umbrella policy with a $1 million limit, occurrence, and
18  aggregate limit?
19     A.  Yes.
20     Q.  Going to Weichel 960.  Bottom of the page, section 2,
21  "who is an insured," paragraph B indicates:  "Each of the
22  following is also an insured (1) your employees, other than your
23  executive officers, but only for acts within the scope of their
24  employment by you."

---

Page 62

1          Was that a policy that the Town of Braintree had with
2  Great American?
3      A.  Yes.
4      Q.  Then going to Weichel 962.  There's a definition --
5  section 5 is definitions -- paragraph G defines "personal
6  injury" means "injury, other than bodily injury, arising out of
7  one or more of the following offenses (1) false arrest,
8  detention or imprisonment, or (2) malicious prosecution."
9          Was that a policy the Town of Braintree had with Great
10  American?
11     A.  Yes.
12     Q.  Okay, getting close.  I think this is my last exhibit.
13  I'm going to pull up Weichel Deposition Exhibit 215.
14         I'm showing you what's been marked as Weichel
15  Deposition Exhibit 215, do you recall seeing this before?
16     A.  As I stated earlier, I know the Business Pro cover
17  page sticks out amongst the documents.
18     Q.  Okay, okay.  And I'll just represent to you this is
19  similar to Exhibit 214, just different years.  [Pause.]
20         Actually, this looks like it's the same year as 2014.
21         MR. LOEVY-REYES:  You know, let's go off the record.
22  This might be a duplicate, so I might be done.  So let's take
23  five minutes.  I just want to review them and make sure that I
24  don't have any questions from this particular exhibit.  I think

---

Page 63

1  it's a duplicate of 2014.  Come back around 11?
2      MR. DONOHUE:  Sounds good.
3      (Whereupon, a break was taken from 10:54 a.m. to 11:00 a.m.)
4  BY MR. LOEVY-REYES:
5      Q.  So it does appear that Exhibits 215 and 214 are same
6  the coverage year.  Exhibit 215 has some additional documents,
7  which I'm going to ask you just a few questions about, and then
8  I think I'll be done.  So we're going to start off at Weichel
9  6796.  I'll make it a little bit bigger, and then I'll share my
10  screen.
11     A.  Thank you.
12     Q.  So this is Weichel 6796.  Does this appear to show
13  that the Town of Braintree had a contract with Great American
14  Insurance Companies between July of '97 and July of '98 to
15  provide law enforcement liability coverage which would be
16  included?
17     A.  Yes, it does appear that way.
18     Q.  Okay.  And then going down two pages to Weichel 6798.
19  [Pause.]  Actually, going further than that.  Going down to
20  Weichel 6829.  Does this appear to be an occasion that the law
21  enforcement liability coverages would include an aggregate limit
22  of $1 million and an occurrence limit of $1 million between July
23  of '97 and July of '98 for law enforcement liability?
24     A.  Yes.

---

Page 64

1      Q.  Okay --
2      MR. DONOHUE:  What's the Bates number on that one?
3      MR. LOEVY-REYES:  Oh, it's Weichel 6829.
4      MR. DONOHUE:  Thank you.
5      MR. LOEVY-REYES:  Of course.
6  BY MR. LOEVY-REYES:
7      Q.  And this appears, below that, it indicates under
8  "premium" that the named positions for full-time police officers
9  and part-time police officers would be included, is that right,
10  as part of the premium?
11     A.  Yes.
12     Q.  And then going to page 6845.  Does 6845 appear to be
13  the law enforcement liability coverage form from Great American
14  Insurance Companies?
15     A.  Yes.
16     Q.  Okay.  And I'm going to scroll down between 6845 to
17  6847.  And it appears I only have the odd number of pages for
18  these.  But do these appear to be, because it's three of five
19  pages for the law enforcement liability coverage, do those
20  appear to be provisions in the law enforcement liability
21  coverage form?
22     A.  Could we just go back up to the top, sir?  Just
23  because you were scrolling too fast.
24     Q.  Of course, absolutely.

---

Frederick Weichel vs
Town of Braintree, et al.

30(b)(6)

Michael Want
November 01, 2023

---

Page 65

1     A.  Uh, yes.  Section 1 right there, yes, law enforcement
2  liability.
3         MR. LOEVY-REYES:  Okay, okay, those are all the
4  questions I have.
5         MR. DONOHUE:  None for me.
6         MR. MEGEE:  None for me either.
7         MR. LOEVY-REYES:  All right, thank you for you
8  compelling testimony today.
9         MR. DONOHUE:  Kelley, if we could please order a
10  transcript.
11  (Whereupon, the deposition concluded at 11:04 a.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24

---

Page 66

1         ERRATA SHEET DISTRIBUTION INFORMATION
2         DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS
3
4         ERRATA SHEET DISTRIBUTION INFORMATION
5
6         The original of the Errata Sheet has been delivered to
7  Thomas R. Donohue, Esquire.
8         When the Errata Sheet has been completed by the
9  deponent and signed, a copy thereof should be delivered to each
10  party of record and the ORIGINAL forwarded to Mark Loevy-Reyes,
11  Esquire, to whom the original deposition transcript was
12  delivered.
13         INSTRUCTIONS TO DEPONENT
14
15         After reading this volume of your deposition, please
16  indicate any corrections or changes to your testimony and the
17  reasons therefor on the Errata Sheet supplied to you and sign
18  it.  DO NOT make marks or notations on the transcript volume
19  itself.  Add additional sheets if necessary.  Please refer to
20  the above instructions for Errata Sheet distribution
21  information.
22
23
24

---

Page 67

1  PLEASE ATTACH TO THE DEPOSITION OF:  Town of Braintree
2  CASE:  Frederick Weichel v. Town of Braintree, et al.
3  DATE TAKEN:  November 1st, 2023
4         ERRATA SHEET
5     Please refer to Page 66 for Errata Sheet instructions and
6  distribution instructions.
7  PAGE LINE     CHANGE     REASON
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  I have read the foregoing transcript of my deposition, and
17  except for any corrections or changes noted above, I hereby
18  subscribe to the transcript as an accurate record of the
19  statements made by me.
20
21     Executed this _____ day of _____, 2023.
22
23         _____
24         Town of Braintree

---

Page 68

1  COMMONWEALTH OF MASSACHUSETTS         HAMPSHIRE, ss.
2
3     I, KELLEY K. BOHAN, a Court Reporter and Notary Public duly
   commissioned and qualified in and for the Commonwealth of
4  Massachusetts, do hereby certify that there came before me on
   the 1st day of November, 2023, at 9:00 a.m., the person
5  hereinbefore named, identification as prescribed by Executive
   Order 455 (03-13) issued by the Governor of the Commonwealth of
6  Massachusetts, was by me duly sworn to testify to the truth and
   nothing but the truth of his knowledge concerning the matters in
7  controversy in this cause; that he was thereupon examined upon
   his oath, and his examination reduced to typewriting under my
8  direction; and that this is a true record of the testimony given
   by the witness to the best of my ability.
9     I further certify that I am neither attorney or counsel
   for, nor related to or employed by, any of the parties to the
10  action in which this deposition is taken, and further, that I am
   not a relative or employee of any attorney or counsel employed
11  by the parties hereto or financially interested in the action.
12
13
14  My Commission Expires:  December 25, 2026
15
16
17  _____
18
19  Kelley K. Bohan
   Court Reporter/Notary Public
20
21
22
23
24

---