# EXHIBIT 4

```
 1                                      Volume: 3
                                        Pages: 1-181
 2


 3
                     COMMONWEALTH OF MASSACHUSETTS
 4       SUFFOLK, SS.                SUPERIOR COURT DEPARTMENT
                                     OF THE TRIAL COURT
 5


 6       *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
         FREDERICK WEICHEL                  *
 7                                          *
         v.                                 *  Docket No. 1884CV02078-A
 8                                          *
         COMMONWEALTH OF MASSACHUSETTS *
 9                                          *
         *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
10
                 TRIAL
11               BEFORE THE HONORABLE CATHERINE HAM

12
         APPEARANCES:
13
         For the Plaintiff:
14       Law Offices of Howard Friedman, P.C.
         1309 Beacon Street
15       3rd Floor
         Brookline, MA 02446
16       By:  Howard Friedman, Esquire

17       Loevy and Loevy
         311 N. Aberdeen Street
18       3rd Floor
         Chicago, IL 60607
19       By:  Mark Loevey-Reyes, Esquire

20

21

22

23

24

25
```

```
 1   For the Defendant
     Office Attorney General
 2   One Asburton Place
     Room 1813
 3   Boston, MA 02108
     By:  Kate Isley, Esquire
 4   By:  Abigail Fee, Esquire

 5

 6
                          Suffolk, Massachusetts
 7                        Courtroom 304
                          October 11, 2022
 8

 9
                  Sara E. Adams
10                Official Court Transcriber

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1
                          I N D E X
2

3

4

5   WITNESS:              DIRECT   CROSS     REDIRECT      RECROSS

6
    Anthony Cardinale
7   (By Mr. Friedman)     5
    (By Ms. Fee)                   50
8
    Sydney Hanlon
9   (By Mr. Leovy-Reyes)  106                 166
    (BY Ms. Fee)                   144
10
    Melissa Greenwood
11  (By Mr. Rowlands)     170

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2    (Court called to order.)

3

4         THE COURT:  Good morning.

5         MR. LOEVY-REYES:  Good morning.

6         MS. FEE:  Good morning, your Honor.

7    (Jury present in the courtroom.)

8    (The call not transcribed.)

9         THE CLERK:  Jury trial continues in the case of

10   Frederick Weichel versus the Commonwealth of

11   Massachusetts, Civil Action Number 2018-2078.

12        THE COURT:  Good morning, jurors.  It's good to see

13   you.  I hope you had a good, long weekend.  We start

14   today with a new witness by the plaintiff.

15             So, before we begin the evidence, I want to

16   ask you the same questions that I've asked you pretty

17   much every single day.  Were you all able to follow my

18   directions and not talk to anyone about this case?

19   Number two, not do any independent research or any ask

20   anyone to do so?  If there were any media coverage to

21   not review or read or anything about it, not post

22   anything on social media about your jury duty service?

23   And lastly, not talk to each other about this case?

24   Thank you so much for following my instructions.

25             We are going to start this morning with

 1   Attorney Loevy-Reyes or Attorney Friedman.

 2        MR. FRIEDMAN:  Recall Anthony Cardinale to the

 3   stand.

 4        THE WITNESS:  Officer.  Thank you, sir.

 5        THE COURT OFFICER:  Right this way.

 6             ANTHONY CARDINALE, (SWORN)

 7        THE COURT:  Good morning.

 8        THE WITNESS:  Good morning, your Honor.

 9                  DIRECT EXAMINATION

10   BY MR. FRIEDMAN:

11     Q.  Good morning, sir.  Can you introduce yourself

12   to the jury.

13     A.  Yes.  Anthony Cardinale.

14     Q.  And best --

15     A.  Spelled for the record, C-A-R-D-I-N-A-L-E.

16     Q.  And back in 1980, how were you employed?

17     A.  I was an attorney here in Boston.

18     Q.  Where did you work?

19     A.  I worked with the Law Office of F. Lee Bailey.

20     Q.  What kind of work did you do?

21     A.  Criminal defense work.

22     Q.  Are you still an attorney?

23     A.  I am.

24     Q.  Did you review some documents to prepare

25   yourself for testimony today?

1     A.  I did.

2     Q.  What did you review.

3     A.  I reviewed a number of documents.  I reviewed the

4  testimony of certain witnesses at a motion to suppress

5  that I conducted.

6     Q.  Just -- just -- you reviewed documents.

7     A.  I didn't know if you wanted exact --

8     Q.  No, that's enough.

9     A.  Oh, yeah.

10     Q.  Okay.  And did that help you refresh your memory

11  about the events that took place at the trial --

12     A.  Yes.

13     Q.  -- in 1981?

14     A.  Yes.

15     Q.  Thank you.  When did you first meet Frederick

16  Weichel?

17     A.  I first met Fred Weichel some time within a year

18  or so prior to the time that he was arrested on the

19  murder charge that I later represented him in.

20     Q.  How did you happen to meet him?

21     A.  There was a bar and restaurant in the financial

22  district of Boston then called Exchange.  It was owned

23  by a good friend of mine named Kevin McCormick.  And

24  Friday nights used to be a night where a lot of people,

25  particularly lawyers, would gather and other people

1   would gather Friday night there, and once or twice

2   before Mr. Weichel was arrested, I had met him,

3   introduced by Kevin McCormick.

4       Q.   When were you hired to represent Mr. Weichel?

5       A.   My best recollection is about a week or within

6   days after he was arrested for the charge of murder.

7       Q.   When you began to -- when you began to represent

8   him, did you receive written statements, reports and

9   such from the prosecution to assist you?

10      A.   Yes, I did.

11      Q.   When did you get those?

12      A.   My -- my best present memory consistent with

13  other cases, it would have been shortly after the

14  arraignment and after I entered my appearance within a

15  month or so of that time, we would have gotten documents

16  from the district attorney concerning the case.

17      Q.   When you learned the facts of the case, what

18  investigative steps did you take?

19      A.   The first thing I did was to go to the scene on

20  Faxon Street in Braintree.

21      Q.   Why did you do that?

22      A.   Based on what I was reading, I wanted to see what

23  the particular individuals' frame of reference would

24  have been and where they -- where they were looking from

25  when they alleged to have made an identification.  I

1    wanted to see that area of the street, the park, the

2    things that were in the park, the distances, etcetera.

3        Q.   When you say "people," are you referring to the

4    four young people in the park?

5        A.   Yes.

6        Q.   Okay.  And as a result of that visit to the

7    scene, what did you do?

8        A.   As a result of that, I engaged an engineering

9    firm to go to the site and with the aid of whatever they

10   did, I wasn't there when they did it, an engineering

11   firm drew an exact scale drawing of the area in

12   question, the park, Faxon Street, Commercial Street,

13   etcetera.

14       Q.   When was that scale diagram or whatever plot

15   plan you prepared?

16       A.   Within -- within the first six to eight weeks

17   after the case began.

18       Q.   All right.  I'd like to put that up on an easel

19   for you --

20       A.   That's fine.

21       Q.   -- because I'd like to go over some of that.

22   Now, the jurors are going to be hearing soon recorded

23   testimony of witnesses, but the diagrams that they drew

24   are no longer here.  So what I'm going to ask you to

25   do, to the best of your memory as refreshed, to show

 1   where they were at certain points.  Is that okay?

 2      A.   Certainly.

 3      Q.   Great.  First, can you use that to show where

 4   the individuals parked the van that they were in --

 5      A.   Yes.

 6      Q.   -- the other people?

 7       MS. FEE:  Objection.

 8       THE COURT:  Yes.  Let me see you at sidebar.

 9   (Sidebar discussion not transcribed; begins at 9:11:19.)

10       THE COURT:  The objection is sustained.  He's going

11   to rephrase the question.

12            The four teenagers and -- or any witnesses

13   that might or might have not been there at the park, at

14   the scene of the crime, there were references each

15   witnesses marked either on a motion prior to the trial

16   or at the motion, and you may hear from actual

17   transcript that you're going to give, they're marking

18   it, and it's this diagram that they're marking.

19   Unfortunately, those marked exhibits that were by each

20   witnesses no longer -- we don't have it, through no

21   fault of any of these parties, but we no longer have

22   those exhibits.

23            So, when there's any references to it in the

24   transcript that you're going to be reading, you're going

25   to be hearing, that's what we're talking about. We don't

1  have them to produce to you, and Attorney Friedman is

2  going to ask the next questions with Attorney Cardinale

3  regarding any markings that might have been that he

4  recalls.

5           All right. Go ahead.

6  BY MR.  FRIEDMAN:

7     Q.  Mr. Cardinale, could you tell the jury and show

8  them perhaps using a green marker where the van was

9  parked based on the testimony of Mr. Foley?

10    A.  Yes.

11        MS. FEE:  Objection.

12        THE COURT:  I'm sorry.

13        THE WITNESS:  The van that they arrived in?

14        MR. FRIEDMAN:  The van that they arrived in, yes.

15        THE COURT:  I'm sorry. There was an objection.

16  That's overruled.

17        THE WITNESS:  The van that they arrived in?

18        MR. FRIEDMAN:  Yes.

19        THE WITNESS:  Draw it?

20        MR. FRIEDMAN:  Draw it right on there, sure.

21        THE WITNESS:  On this diagram you see a four-foot

22  chain fence.  There's an opening in the fence here.

23  BY MR. FRIEDMAN:

24    Q.  Can you draw a square where -- where they -- a

25  green square?

 1     A.   Where I made the square is --

 2     Q.   Okay.

 3     A.   -- is where the van was parked.

 4          THE COURT:   According to?

 5   BY MR. FRIEDMAN:

 6     Q.   According to?

 7     A.   My memory of where the two witnesses placed that

 8   van; Jean Canstonguay and Foley.

 9     Q.   And then --

10     A.   John Foley, I believe.

11     Q.   Did -- did the witnesses -- Mr. Foley and Ms.

12   Canstonguay explain how they got into the park?

13     A.   Yes. They came through the opening in the

14   chain-link fence between the second and third houses.

15   You can see on the diagram there's an opening.

16     Q.   Can you draw a circle where the chain-link fence

17   opening is?

18     A.   Green?

19     Q.   You can use green still, yes.

20     A.   (Witness complying.)

21     Q.   Now, can you tell us, according to the testimony

22   of Canstonguay or Krause, where they went once they

23   entered the park.

24     A.   Yes.

25     Q.   Can you --

1    A.   They --

2    Q.   Can you show that?

3    A.   Yes.   They entered the park and two men proceeded

4    to this tree line to this edging of the tree line here,

5    past the swings into the woods here.

6    Q.   Could you draw a green line from the opening of

7    the fence to where the two young men went?

8    A.   Yes.

9         MS. FEE:   Objection.

10        THE COURT:   Can you rephrase the question so that

11   it's clear.

12        MR. FRIEDMAN:   Okay.

13        THE WITNESS:   From my memory?

14   BY MR. FRIEDMAN:

15   Q.   From your memory based on the testimony of, I

16   guess it would be Mr. Laracy and Mr. Foley about where

17   they went?

18   A.   Yes.   With a line?

19   Q.   Yes.   Draw a line.

20   A.   Green.

21   Q.   Now if you could pick another color.

22   A.   If I could.   We stopped first here by the swings,

23   the second set of swings, and then from there the two

24   men went from the swings into the tree area to relieve

25   themselves right about there, but this is the first stop

1  if you want me to put it.

2      Q.  Do you want to put a square at the first stop.

3  Put a green square near some swings.  Is that --

4      A.  Yeah, there's some swings.  There's three sets.

5  The second set of swings is where all four people came.

6  The two men continued on beyond the tree line and into

7  the trees.

8      MS. FEE:  Objection; just based on the testimony

9  and his memory.

10      MR. FRIEDMAN:  Well --

11      THE WITNESS:  Based on my memory of the events in

12  the motion to suppress and the trial, this is where they

13  said they were.

14      THE COURT:  Let me give an instruction. Certainly

15  Cardinale does not have any personal information because

16  he was not there that night with the four teenagers in

17  1980. He is testifying, just to be clear, this is what

18  the objection is, just to be clear, he is testifying to

19  the testimonies either by motions or trials when the

20  teenagers testified as to where they say they went.

21           Certainly at that time, they marked the

22  drawing.  We don't have that marking.  And the only

23  person who observed that marking is Attorney Cardinale.

24  That 's why we have him here today.

25           So anything he says, it's according to his

1   memory of what the four teenagers said and marked. All

2   right.  So just -- that's the objection with that

3   instruction so you understand.

4             Go ahead.  Next question.

5        MR. FRIEDMAN:  I want to make sure, all the jurors

6   can actually see the diagram from here?

7        THE WITNESS:  I'm sorry if I'm in the way.  Want me

8   to turn it?

9        THE COURT:  No, you're fine.

10  BY MR. FRIEDMAN:

11       Q.  So when you were in court you saw them actually

12  make markings on a diagram like this one?

13       A.  Yes.

14       Q.  Okay.  Now, as you switch to a different color

15  marker.

16       A.  Red, blue and orange.

17       Q.  Your pick.

18       A.  Red.

19       Q.  Fine. So now, where did Ms. Canstonguay and Ms.

20  Krause go?

21       A.  First place you want me to put a mark?

22       Q.  Sure.

23       A.  Right by these swings here.

24       Q.  Okay.

25       A.  I'm sorry.  These swings here.

1    Q.  You want to make a circle there and put perhaps

2    "1" so we'll know that's the first mark, the red

3    circle, where the two young ladies went at first?

4    A.  Yes.

5    Q.  Did they move someplace else?

6    A.  Yes.

7    Q.  Where did they move to?

8    A.  To the jungle gym.

9    Q.  Okay.  Want to do a circle and a number "2"

10   there and that will tell us that's where Ms. Krause and

11   Ms. Canstonguay moved to?

12   A.  Moved again.  Okay, that's the first place they

13   -- they were at.

14   Q.  Okay.  Now, at some point witnesses testified to

15   where they were when they heard the sound of shots,

16   correct?

17   A.  Yes.

18   Q.  Okay. First, where did the young men place

19   themselves?

20   A.  Put a green circle?

21   Q.  Yes, we're back to the green.  Yes, green.

22   A.  Coming out of 10 feet in or so into the tree line

23   on their way out at the tree line is when they heard --

24   strike that.  My memory of when they heard four bangs.

25   Q.  And where were the two young ladies at that

1  time?

2    A.   They had moved from here, the three circle over

3  towards the swings with the number 1 and come back this

4  way.

5    Q.   Okay. And can you show the jury where, at the

6  motion hearing, Mr. Foley said he was standing when he

7  saw -- first saw the face of the running man?

8    A.   He stated that he was behind the second set of

9  swings about -- want me to put a mark?

10    Q.   Sure.  Why don't you go back to green though.

11    A.   Green.  Sorry.

12    Q.   No problem.

13    A.   Somewhere close to between the swings and the

14  seesaw here, is the testimony, coming out of the tree

15  line moving towards Faxon Street.

16    Q.   You understand there -- there's a stipulation in

17  this case that Mr. Foley was 175 feet from the running

18  man when he first saw his face?

19    A.   I understand that.

20    Q.   And is that accurate in your opinion?

21     MS. FEE:  Objection.

22     THE COURT:  According to what?  Why don't you

23  rephrase the question.

24     MR. FRIEDMAN:  Excuse me?

25     THE COURT:  Why don't you rephrase the question.

1   BY MR. FRIEDMAN:

2      Q.   Okay. What is your opinion of the distance that

3   Mr. Foley was standing at when he first saw the face of

4   the running man?

5         MS. FEE:   Objection.

6         THE COURT:   Sustained.   Where John Foley is

7   situated is fine.   You need to establish where the

8   running man was, if he recalls.

9         MR. FRIEDMAN:   Sure.

10  BY MR. FRIEDMAN:

11     Q.   According to John Foley's testimony, where was

12  the running man when he first saw his face?

13     A.   Trying to figure out how to answer because there

14  are two answers that he gave.   One was under a

15  streetlight coming around the corner.

16     Q.   You're now pointing to a streetlight that would

17  be just after that parking lot if you turned to the

18  right?

19     A.   Yes, south of 196 Commercial Street going --

20  going south -- heading south on Faxon Street.

21     Q.   And that would be to the left on that diagram?

22     A.   Yes.

23     Q.   Okay.

24     A.   Right -- right here.   But he later said that it

25  was between the first and second houses an individual

1   turned as a result of hearing something, and that's when

2   he made the ID.  So it's either rounding this corner or

3   somewhere between these two. He gave two different --

4   two different versions.

5       Q.  And with regards to the stipulation, would you

6   agree that that's a fair estimate of the distance that

7   he was when he first saw the face of the running man?

8           MS. FEE:  Objection.

9           THE COURT:  I'll allowed it.  Overruled.

10          THE WITNESS:  Giving another -- I don't know how to

11  answer that.  He was further away but I'll take 175.

12  BY MR. FRIEDMAN:

13      Q.  Now, did you do any measurements to start?

14      A.  Yes.

15      Q.  What were your measurements?

16      A.  We measured both at the motion to suppress and

17  then later where we marked at the trial and it was no

18  less than 185 feet up to 200.

19      Q.  Okay.  Now, while you're at that scale diagram,

20  there's some testimony from, I think, Ms. Canstonguay

21  or Ms. Krause that the running man, quote, ran into the

22  woods.  What were they referring to at that time?

23      A.  Well, they were referring to an area, again,

24  south of Commercial Street past the point where the

25  van -- the square green van was parked beyond this last

1   house on this diagram.  It -- it becomes (indiscernible

2   speech - 9:24:22).

3       Q.   Okay.  Thank you.  You may resume the stand.

4            Sir, the first indictment of Mr. Weichel was

5   dismissed on February 3, 1981.  Can you tell the jury

6   how that happened?

7       A.   Yes.

8       Q.   How did it happen?

9       A.   Prior to that date, we had had a -- and after

10  getting the discovery information with the people -- the

11  different statements about what had occurred in the

12  course of the investigation, there was a motion to

13  suppress the identifications, and at that hearing, there

14  was testimony given by three of the four individuals,

15  and based on their testimony and comparing their

16  testimony to what then Trooper Sprague said under oath

17  to a grand jury, I filed a motion to dismiss the case

18  based on essentially false testimony being given to a

19  grand jury.

20      Q.   Did the prosecution agree with you?

21      A.   No.

22      Q.   Did it go to a motion hearing of some sort.

23      A.   We had a full hearing before Judge Mulcurd in

24  Norfolk Superior Court on the issue of misconduct on the

25  part of Sprague.

1     MS. FEE:  Objection.

2     THE COURT:  No, I'll allow it.  Go ahead.

3  BY MR. FRIEDMAN

4     Q.  And what was the result of that motion?

5     A.  Judge Mulcurd (phonetic) dismissed the indictment

6  without prejudice.

7     Q.  After the indictment was dismissed, was a new

8  indictment issued?

9     A.  Yes.

10    Q.  And who testified in support of that indictment?

11    A.  Sprague again.

12    Q.  Did anyone else testify?

13    A.  No.

14    Q.  At the first the indictment, did anyone testify

15  other than John Sprague?

16    A.  No.

17    Q.  During the course of your representation, did

18  you receive documents regarding a person named Freeman

19  "Punchy" Clifford?

20    A.  Yes.

21    Q.  And did you receive any documents indicating an

22  investigation of him or his murder by the police?

23    A.  See if I understand.  A -- a document regarding

24  the investigation concerning the murder of Punchy

25  Clifford or Freeman "Punchy" Clifford?

1     Q.   Yes.

2     A.   I received no documents from the government about

3 that event; however, his name was prominent in the first

4 part of the investigative file.

5     Q.   Was there ever any physical evidence in this

6 case that connected Mr. Weichel to this murder?

7     A.   No.

8     Q.   Could you explain to the jury what the terms

9 "exculpatory evidence" means?

10    A.   Sure.  Exculpatory evidence, in general terms,

11 means information that could assist a defendant in the

12 defense of his case either by demonstrating that he was

13 not guilty of the crime, someone else might have been,

14 other investigative steps that should have been taken

15 not that -- that were not taken. Basically anything that

16 can help a defendant in the course of a defense to a --

17 to a criminal charge would be considered exculpatory

18 evidence.

19    Q.   Did you file a motion for the prosecution to

20 provide you with exculpatory evidence?

21    A.   I did.

22    Q.   And did they provide you with exculpatory

23 evidence?

24    A.   They provided me nothing more than what I had

25 already received from them pre the filing of that

1   motion, which would have been before the trial and the

2   trial was August of 1981.

3       Q.   Okay.

4       MR. FRIEDMAN:   Your Honor, at this time I would

5   like to mark for identification this document.  It's

6   referred to as the Buker binder.  That says "murder" on

7   it.

8       THE COURT:  All right. Identification.

9       THE CLERK:  H for ID, your Honor.

10   (Exhibit H, Buker binder, marked for identification.)

11       THE CLERK:  How do you spell Buker?

12       MR. FRIEDMAN:  B-U-K-E-R.

13       THE CLERK:  Thanks.

14       MR. FRIEDMAN:  Can you make it darker so we can see

15   the label?

16       MS. FEE:  Objection, your Honor.  This has been

17   marked for identification.

18       THE COURT:  Yes.  Why don't you show it to the

19   witness and if at any point it becomes an exhibit, we'll

20   be able to present it to the jurors.

21   BY MR. FRIEDMAN:

22       Q.   Look at this.

23       A.   Yes.

24       Q.   Have you seen this before?

25       A.   No -- strike that. I saw that in connection with

1   the proceeding a few years ago, but are you talking

2   about at the time of the trial?

3       Q.  By the time of the trial, yes.

4       A.  Never.

5       Q.  And did you have a chance to look at it today?

6       A.  I've looked at it, yes.

7       Q.  Yes.

8           MR. FRIEDMAN:  And let's mark this as -- well, for

9   identification as a June 9, 1980 from Lance Leahy.

10          THE COURT:  All right.  Identification.

11          THE CLERK:  Identification I for ID.

12  (Exhibit I, marked for identification.)

13  BY MR. FRIEDMAN:

14      Q.  Show this to you.

15      A.  Yes.

16      Q.  This we'll call the Leahy report.  Did you

17  receive this report at any time during the criminal

18  prosecution?

19      A.  No.

20      Q.  When did you first receive the report?

21      A.  I saw it probably 19 -- strike that, 2017, '16.

22      Q.  And do you know where this report was found?

23      A.  Braintree Police Department.

24      Q.  Have you looked -- have you read the report?

25      A.  Yes.

1    Q.   Okay.  And it says at the top "Captain Buker."

2  Do you know who that was?

3    A.   Yes.

4    Q.   Who was that?

5    A.   He was one of the chief detectives or chief of

6  detectives homicide, etcetera, Braintree.

7    Q.   And the date --

8    A.   Braintree Police Department to be exact.

9    Q.   The date of this document is June 9, 1980.  How

10  does that date relate to when the composite was sent

11  out?

12        MS. FEE:  Objection.

13  BY MR. FRIEDMAN:

14    Q.   I'm sorry.  The composite of -- in this case,

15  that was used in this case?

16        MS. FEE:  Objection.

17        THE COURT:  Composite by John Foley?

18        MR. FRIEDMAN:  Composite by John Foley, yes.

19        THE COURT:  Okay.  Overruled.

20        THE WITNESS:  Within a day or so after it had been

21  in the newspaper.

22  BY MR. FRIEDMAN:

23    Q.   And do you know who Detective Wilson was in

24  relation --

25    A.   Yes.

1    Q.  -- to this case?

2    A.  Yes.

3    Q.  And do you know something regarding Detective

4    Wilson on this document?

5    A.  I noticed that he was supposed to follow up.

6    Q.  Okay.

7    A.  And he was the detective assigned by Braintree to

8    this investigation.

9    Q.  And based on that, do you have a view as to

10   whether this document found in the Buker binder

11   regarding this investigation was connected to the

12   murder of Robert LaMonica?

13        MS. FEE:  Objection.

14        THE COURT:  Overruled.

15        THE WITNESS:  Repeat.  Has a connection to the

16   murder of Robert LaMonica?

17        MR. FRIEDMAN: Yes.

18        THE WITNESS:  Absolutely.

19   BY MR. FRIEDMAN:

20   Q.  Why do you say that?

21   A.  In the report there's a reference to the

22   individual by the name Rocco Balliro who was, at the

23   time of the shooting, on furlough.

24        MS. FEE:  Objection.

25        THE COURT:  Yup, that's sustained. Why don't you --

1  sustained.  Establish more foundation.

2        MR. FRIEDMAN: Well, first, your Honor, I would move

3  to admit Exhibit I for ID, the Leahy report, for

4  evidence.

5        THE COURT:  All right.

6        MS. FEE:  Objection, your Honor.

7        THE COURT:  That's overruled. So ID-I is into the

8  next exhibit. Madam clerk, what is that number?

9        THE CLERK:  24, your Honor.

10       THE COURT:  Thank you.

11  (Exhibit 24, Leahy report, marked as an exhibit.)

12       MS. FEE: Your Honor, could we be heard briefly at

13  sidebar?

14       THE COURT:  Yes.

15  (Sidebar discussion not transcribed; begins at 9:33:50.)

16       THE COURT:  All right.  Jurors, that objection --

17  at this point, I'll give you some limited instructions.

18  You're going to have an opportunity, I'm sure, as it is

19  an exhibit, to review what Exhibit 24 contains and what

20  it indicates.

21            Exhibit 24 is to show the relevance of

22  police investigation. It's -- does not go for the truth

23  of the actual matter of the report. So what that means

24  is -- do you mind, Attorney Friedman, just putting in

25  Exhibit 24.

1          As you'll see, Exhibit 24 discusses what

2     some correction officers observed the composite to be --

3     whom they believed it to be. That does not come in for

4     the truth that these correction officers believe that

5     the composite was so-and-so. It goes into -- this is

6     relevant -- as in relevance to what type of police

7     investigation was done as a result of this report. All

8     right.

9          Go ahead, Attorney Friedman.

10    BY MR. FRIEDMAN:

11      Q.  Did you receive this report at any point during

12    the criminal case against Mr. Weichel?

13      A.  No.

14      Q.  If you had received it, what would you have

15    done?

16        MS. FEE:  Objection.

17        THE COURT:  No, overruled.  Go ahead.

18        THE WITNESS:  A number of things. Certainly first

19    conducted my own investigation into the information

20    that's contained on that -- on that report regarding

21    individuals who knew Mr. Rocco Balliro very well and had

22    identified the composite, which was a very important

23    piece of information in the case, as looking exactly

24    like Rocco Balliro who was, at the time, according to

25    this report, of the murder of Robert LaMonica out on a

1    furlough from which he had not returned.

2              So I would have conducted an investigation

3    as to who these individuals were that made this

4    identification, the circumstances under which they made

5    the identifications, who showed them the composite, what

6    their reactions were, the composite. Also, I would have

7    gotten the photograph of -- of Mr. Rocco Balliro that

8    was a fair and accurate description of what he looked

9    like around the time of the event to compare it with the

10   composite.

11             And I certainly would have followed up on

12   whether or not following the time that Detective Leahy

13   went and had ten Bridgewater corrections officers

14   identify that composite as Rocco Balliro, I would have

15   followed up whether anything happened after that to

16   demonstrate what -- what investigative efforts were

17   taken or not taken by the Commonwealth following the

18   receipt of this information.

19   BY MR. FRIEDMAN:

20     Q.  And would this document be in that category of

21   exculpatory evidence?

22     A.  Extremely so.

23       MR. FRIEDMAN:  I'd like to have another document

24   marked for identification, your Honor.

25             THE COURT:  Yes.

1        THE CLERK:  J for ID, your Honor.

2    (Exhibit J, Balliro Photograph, marked for

3    identification.)

4    BY MR. FRIEDMAN:

5        Q.  Look at this.

6        A.  Yes.

7        Q.  Look at what we marked as Exhibit J for

8    identification.  Do you recognize that photograph?

9        A.  Yes.

10       Q.  Who is that photograph of?

11       A.  Rocco Balliro.

12       Q.  Did you know what Rocco Balliro looked like or

13   did you know that?

14       A.  I did at some point.  Not during the time of

15   Mr. Weichel's trial but after, following that, I did

16   know what he looked like.

17       Q.  How did you come to know that?

18       A.  I was visiting with clients and I can't remember,

19   it was quite a few years ago, in either Norfolk prison

20   or Walpole state prison, and in the visiting rooms

21   there, there are two lines of chairs that inmates would

22   come in, check in with the front desk and then go and

23   sit with whom they are visiting.

24            I was sitting with two individuals and an

25   individual was at that front desk.  I don't know if he

1   was coming in or leaving but he was at the front desk

2   and my -- the two people I was sitting with, one of them

3   said:  That's Joe Balliro's cousin.

4        MS. FEE:  Objection.

5        THE COURT:  I don't have a reference of when this

6   occurred.  If you can just narrow it down.

7        THE WITNESS:  I can.

8        THE COURT:  And also I'm going -- assuming that the

9   objection is hearsay.

10        MS. FEE:  Yes.

11        THE COURT:  Let me hear the -- let's establish a

12   little bit more of a foundation.

13        MR. FREIDMAN:  Sure.

14   BY MR. FRIEDMAN:

15        Q.  Do you know when exactly this took place?

16        A.  I'm going to say it was sometime between 1995.

17   '92 to around 1999, somewhere in that -- again, I can't

18   be more specific than that approximate ten-year period.

19        Q.  At that point, did you know information about

20   Rocco Balliro?

21        A.  Yes.

22        Q.  What did you know?

23        A.  Well, besides he was a cousin of Joe Balliro, I

24   knew the Balliro family.  I've never met personally or

25   been introduced to Rocco, but I did know Joe's cousin

1    was in jail for first-degree murder.  His name was

2    Rocco.

3        Q.  Who is the Joe Balliro you're referring to?  I

4    think there are more than one.

5        A.  There was two Joe Balliros -- the Balliro family

6    was quite big.  Joe Balliro that I'm referring to, there

7    were two.   One was his cousin, first cousin Joe, and

8    then there was Joe that I knew who was a lawyer.  So one

9    was called Joe the hoodlum and Joe the lawyer, and

10   that's how people would refer to who -- did you meet

11   Joe?  Yeah, which -- did you see Joe Balliro?  Which

12   one?  And Joe the lawyer is the one that I saw.  But Joe

13   Balliro was a prominent criminal defense lawyer in

14   Boston for many, many years.

15       Q.  Before actually seeing Rocco Balliro, did you

16   know anything about him?

17       A.  About Rocco Balliro?

18       Q.  Yes.

19       A.  Yes. I mean, I -- I just -- I knew of the -- the

20   -- that he had been convicted of first-degree murder and

21   that his brother Salvatore, he had a twin brother, who

22   was out was arrested with him in -- in -- in the course

23   of that, and that Rocco Balliro was the only one that

24   went to jail and that Salvatore's brother was basically

25   exonerated by his brother in the murder case.

1    Q.   Okay.  When you say his "twin," were they

2    identical twins?

3    A.   I never seen the birth certificate to know, but

4    they looked very much alike so I would -- I would -- I'm

5    assuming they were identical

6    Q.   And based on that, are you able to identify

7    Exhibit J for identification as a photograph of Rocco

8    Balliro?

9    A.   Yes.

10    MS. FEE:   Objection.

11    THE COURT:   And this is based from 1992 to 1999

12    observation of Rocco Balliro, around that time?

13    THE WITNESS:   Yes.

14    BY MR. FRIEDMAN:

15    Q.   And this is a photograph of him from 1981?  Let

16    me ask one more question.

17    THE COURT:   Yes, please.

18    BY MR. FRIEDMAN:

19    Q.   When you saw this man, did you notice something

20    distinctive about Mr. Balliro?

21    A.   Yes.

22    Q.   What's that?

23    A.   His nose.

24    Q.   What was it about his nose?

25    A.   Well he looked like he had been a boxer and that

1   is something I'm very familiar with.  I boxed my whole

2   life, and that's one first thing I noticed about it,

3   that he had clearly somebody who had been involved in

4   boxing at some point in his life.

5        MR. FRIEDMAN:  At this point, I move to admit that

6   as an exhibit, your Honor.

7        MS. FEE:  Objection.

8        THE COURT:  Can you ask him that last question that

9   you were going to ask him, if he recognizes him and how

10  he recognizes him.

11       MR. FRIEDMAN:  I'm sorry, your Honor?

12       THE COURT:  If the witness recognizes that ID-J and

13  how.

14       MR. FRIEDMAN:  Sure.

15  BY MR. FRIEDMAN:

16    Q.  Do you recognize the photograph we marked as J

17  for identification as a photograph of Rocco Balliro?

18    A.  Yes.

19    Q.  How do you recognize it?

20    A.  From observing him and also noticing a particular

21  feature that was clearly obvious from where I was

22  sitting and that is that he had a boxer's nose, kind of

23  crushed it at the bridge area.

24       MR. FRIEDMAN:  With that, your Honor, I move to

25  admit Exhibit J as a full exhibit.  Exhibit J for

1   identification as a full exhibit.

2       MS. FEE:  Objection.

3       THE COURT:  That's overruled.  That exhibit is the

4   next exhibit as Exhibit 24.

5       THE CLERK:  25, your Honor.

6       THE COURT:  25, I'm sorry.

7   (Exhibit 25, Balliro Photograph, marked as an exhibit.)

8       MR. FRIEDMAN:  May I publish it to the jury, your

9   Honor?

10      THE COURT:  Yes.

11      MR. FRIEDMAN:  Thank you.

12  BY MR. FRIEDMAN:

13      Q.  Now, Mr. Cardinale, do you have a binder like

14  this in front of you?

15      A.  I do.

16      Q.  Excellent.  Before we go to that, there's been

17  talk of a furlough.  Can you explain to the jury what

18  the furlough program was?

19      MS. FEE:  Objection.

20      THE COURT:  No, I'll allow it.  If he knows.

21      THE WITNESS:  I do know. The furlough program that

22  was in existence in time at question was a program that

23  permitted individuals, even individuals doing life

24  sentences, an opportunity to leave the facilities they

25  were incarcerated in for a period of time.  They had to

1    indicate where they were going, where they were going to

2    be, who they were visiting, and they would be released

3    depending on the circumstances from, you know, a matter

4    of a day or a matter of hours, etcetera, but there was a

5    program that people would be released and able to go to

6    visit with family or go to a funeral or some other --

7    other event, but it was a program that then existed and

8    was used in the -- in the Department of Corrections.

9    BY MR. FRIEDMAN:

10       Q.  And as a criminal defense lawyer, were you

11   familiar with the recordkeeping in the Department of

12   Corrections in the Commonwealth of Massachusetts back

13   in 1980?

14       A.  I was.

15          MS. FEE:  Objection.

16          THE COURT:  Allow it. Overruled.

17   BY MR. FRIEDMAN:

18       Q.  What did you understand about the recordkeeping

19   at the Department of Corrections in 1980?

20       A.  Well I had been involved in a number of hearings,

21   disciplinary hearings, etcetera, that occur if somebody

22   violates rules and regulations of the -- of the jail

23   they're in, and from that experience what I can tell you

24   is the recordkeeping was sparse, normally handwritten.

25          This was, again, pre-computer days. Everything

1    was written down by hand and it wasn't the most exact

2    science that was going on, if you can understand my

3    meaning.

4        Q.   Before I move on to the records regarding the

5    furlough, if you look at the Leahy report, do you note

6    the date that it says that Mr. Balliro went out on

7    furlough?

8        A.   Yes.

9        Q.   What does it say?

10       A.   It said he left from Friday and it says:  May 31,

11   1980 at 9:30 and he did not return.

12       Q.   And do you know what the date of Friday -- was

13   there a Friday, May 31 in 1980?

14       A.   No.

15       Q.   What day was that?

16       A.   30th.

17       Q.   Okay. So if you had that document at the time,

18   what would you have done with regard to that?

19       A.   I would have certainly subpoenaed or demanded

20   access to the Department of Corrections records

21   regarding the release on furlough of an individual that

22   was picked out by ten people as being the -- as bearing

23   the likeness of the person that's in the composite to

24   establish that he was in fact available and at large at

25   the time in question.

1      Q.   Oh, okay.  If you go to your binder and you turn

2    to Exhibit 7, you see that parole violation report?

3      A.   Just give me one second.  This is the first time

4    I've seen this document.  Yes.

5      Q.   Okay.  And this is a document of parole

6    violation report regarding Rocco Balliro, correct?

7      A.   Yes.

8      Q.   If a person does not return to furlough, would

9    that be considered a violation of parole?

10     A.   Yes

11     Q.   And if you read this report more than halfway

12    down it says:  Statement of violations to correspond

13    with conditions set out above.  Do you see that line?

14     A.   I do.

15     Q.   And below that, what does it say?

16     A.   That Rocco Balliro left MCI Bridgewater on 5:30,

17    Friday.

18     Q.   Okay.  And he had a 12-hour furlough?

19     A.   A 12-hour furlough, was due back at nine and

20    failed to return.

21     Q.   Okay.  Now, it -- have you at an earlier time

22    had occasion to review records from the Department of

23    Corrections regarding this furlough?

24     A.   I -- again, I need to see it again to see if it's

25    something I've seen.  For example, this document, this

1   is the first time I'm seeing this document.

2       Q.  Let's go -- let's go now to Exhibit 10 in your

3   binder.

4       A.  Yes, sir.  I see it.

5       Q.  This would be a document indicating that

6   Mr. Balliro could go on furlough, correct?

7       A.  Yes.

8       Q.  Okay.  Okay.  Let's -- let's go now to Exhibit

9   12.

10      A.  I see it.

11      Q.  Okay. This is a disciplinary report for

12  Mr. Balliro?

13      A.  Yes.

14      Q.  And what's the date?

15      A.  May 31, 1980.

16      Q.  Okay.  And can you tell from this document when

17  Mr. Balliro went out on furlough?

18      A.  No.

19      Q.  Now, if you turn to the next page, Exhibit 13,

20  are you familiar with this sort of Department of

21  Corrections document?

22      A.  Can I just look at it quick?

23      Q.  Sure.

24      A.  Yes.

25      Q.  Can you tell from this document when Mr. Balliro

1  went out on furlough?

2      A.  No.

3      Q.  Okay. Now, let's look at Exhibit Number 15.

4  What kind of document is this?

5      A.  I believe it's an indictment.

6      Q.  And can you tell from this when Mr. Balliro was

7  out on furlough?

8      A.  No.

9      Q.  Now, go to what's marked as Exhibit 16.

10     A.  Yes.

11     Q.  Again, can you tell from this document when

12  Mr. Balliro went out on furlough?

13     A.  No.

14     Q.  If you go to Exhibit 17.

15     A.  I've looked at it.

16     Q.  Can you tell from this when Mr. Balliro went out

17  on furlough?

18     A.  No.

19     Q.  And now if you look at Exhibit 18.

20     A.  Yes.

21     Q.  Can you tell from this when Mr. Balliro went out

22  on furlough?

23     A.  No, you cannot.

24     Q.  If you had received the Leahy report shortly

25  after it was written in June of 1980, would you have

1  been able to determine when Mr. Balliro went out on

2  furlough?

3      A.  In all likelihood, yes.

4      MR. FRIEDMAN:  Document I would like to have that

5  marked for identification.

6      THE COURT:  Yes.

7      THE CLERK:  K for ID, your Honor.

8  (K for id, marked)

9  BY MR. FRIEDMAN:

10     Q.  Showing you what's been marked as Exhibit K for

11 identification.

12     A.  Yes.

13     Q.  Did you see this document during the course of

14 your representation of Mr. Weichel?

15     A.  No.

16     Q.  And have you learned that this document was

17 ultimately found inside the Buker binder?

18     A.  I've been told that.

19     Q.  And does this document look like anyone that had

20 any relationship to the murder investigation of Robert

21 LaMonica?

22     A.  Not according to any information that I

23 discovered through the course of the -- the case having

24 been given information by the prosecution --

25 prosecutors.

1          MR. FRIEDMAN:  At this point, your Honor, I move to

2   admit this as an exhibit.

3          THE COURT:  Any objections?

4          MS. FEE:  No, your Honor.

5          THE COURT:  All right.  26.

6   (Exhibit 26, marked as an exhibit.)

7          MR. FRIEDMAN: May I publish this to the jury?

8          THE COURT:  Yes.

9   BY MR. FRIEDMAN:

10     Q.  Now, this is a composite.  Does the composite

11  look in any way like Rocco Balliro?

12     A.  No.

13     Q.  Does it look any way like Mr. Weichel?

14     A.  No.

15     Q.  Are you aware of any witness in this case it

16  does look like?

17     A.  Any witness?

18     Q.  Anyone.

19     A.  Anyone?

20     Q.  Anyone at all?

21     A.  No.  Sorry.  No connection that I can see

22  whatsoever.

23     Q.  From this document in the investigation --

24     A.  Yes.

25     Q.  -- the case?  Thank you.

1        During the prosecution of Mr. Weichel, did you

2   obtain any information -- exculpatory information or

3   otherwise from the Commonwealth with regard to a

4   Mr. Thomas Barrett?

5        A.   No.

6        Q.   Were you ever advised Mr. Barrett was to be a

7   witness in the case?

8        A.   No.

9        Q.   Did anyone inquire of you as to where

10   Mr. Barrett was?

11        A.   Never.

12        Q.   Now, in the trial -- the criminal trial of

13   Mr. Weichel, what was the most important issue at the

14   trial?

15        A.   Identification.

16        Q.   When you say "identification," it was

17   identification of the running man?

18        A.   Yes.

19        Q.   And why was this the most important issue?

20        A.   Because without an identification that was

21   accurate and reliable, there would be no case against

22   Mr. Weichel.

23        Q.   Did you retain an expert on eyewitness testimony

24   to present at the trial?

25        A.   I did.

1     Q.   Who was that?

2     A.   It was Dr. Bouckhoult

3     Q.   B-U-C-K-H-O-U-L -- H-O-U-L-T.   Yes.

4     A.   Buckhoult.

5     Q.   Okay.  And what subject was he to testify about?

6     A.   He was --

7          MS. FEE:  Objection.

8          THE COURT:  Allow it.  Overruled.

9          THE WITNESS:  He was the director of a

10   psychological program, representative psychology at

11   Brooklyn College and he was going to testify about the

12   impact of different things upon the reliability of an

13   eye witness identification including impacts that would

14   have to -- that it would be to an individual's memory

15   and impacts to the perception that would cause an

16   eyewitness identification to be unreliable and

17   untrustworthy.

18   BY MR. FRIEDMAN:

19    Q.   Was he allowed to testify at the trial?

20    A.   He was not.

21    Q.   Why not?

22         MS. FEE:  Objection.

23         THE COURT:  Overruled.

24         THE WITNESS:  The Commonwealth objected to it and

25   the trial judge upheld their objection.

1   BY MR. FRIEDMAN:

2       Q.   Was expert testimony typically presented back in

3   1980?

4       A.   Not in 1980.

5       Q.   You say that -- did -- did things change at some

6   point?

7       A.   Absolutely.

8       Q.   When did they change?

9       A.   Mid -- after 2010, around that -- around that era

10  things changed in terms of the -- the state of the law

11  and it became admissible.

12      Q.   Now, on the subject of identification, at the

13  criminal trial, did Ms. Canstonguay testify?

14      A.   She did.

15      Q.   And was she asked to identify the person she saw

16  as the running man?

17      A.   Yes.

18      Q.   And what happened then?

19      A.   She picked an individual seated at the back row

20  of the courtroom.  Mr. Weichel was sitting right next to

21  me in the table closest to the court -- strike that.

22  Second table. She pointed over the top and pointed to an

23  individual in the back -- very back row and said:

24  That's the guy. Essentially.

25      Q.   At the trial did you have evidence of some other

1  person who had motive to kill Mr. LaMonica?

2      A.  Yes.

3      Q.  And who was that?

4      A.  People connected to -- well, two -- two different

5  ones -- strike that.  The -- the -- the main person was

6  in retaliation for --

7          MS. FEE:  Objection. .

8          THE COURT:  Let me see you at sidebar.

9  (Sidebar discussion not transcribed; begins at

10  10:20:27.)

11         THE COURT:  All right. That objection is sustained.

12             Attorney Friedman, why don't you rephrase

13  the question.

14         MR. FRIEDMAN:  Just one moment, your Honor.  I'm

15  going to move on for a moment, your Honor.

16  BY MR. FRIEDMAN:

17     Q.  During the course of your representation of

18  Mr. Weichel, was there ever an offer by the prosecution

19  for him to enter a guilty plea?

20     A.  Yes.

21     Q.  When did that happen?

22     A.  After the Canstonguay misidentification, if you

23  will.

24     Q.  What was the offer?

25     A.  Plea to second-degree murder.

1    Q.   And what effect would that have had on

2  Mr. Weichel?

3    A.   That would have permitted him to be paroled on

4  the charge after 10 or 15 -- 15 on the outside, but 10

5  years.

6    Q.   What was the penalty for first-degree murder?

7    A.   Life without parole.

8    Q.   Did you discuss the plea offer with Mr. Weichel?

9    A.   Yes.

10     MS. FEE:   Objection.

11     THE COURT:   Allow it.

12  BY MR. FRIEDMAN:

13     Q.   And as a result of that discussion, what

14  happened?

15     A.   No plea was accepted. It continued with the

16  trial.

17     Q.   Did you do an investigation into the background

18  of Mr. Foley?

19     A.   Yes.

20     Q.   And what did you learn with regard to Mr. Foley?

21     MS. FEE:   Objection.

22  BY MR. FRIEDMAN:

23     Q.   Did Mr. Foley have criminal charges against him?

24     A.   He did.

25     Q.   Okay. Can you explain that?

1    A.   Yes.  At the time of the trial, Mr. Foley was --

2    had pending charges, two of which he was on, if I recall

3    correctly, in default status. In other words, he didn't

4    show up to court. One was for an operating under the

5    influence offense that happened before Mr. Weichel's

6    arrest and another for drug possession.  Again, on

7    default status. It was -- it was -- it was an open case.

8    And a third that occurred after the events of the

9    morning of May 31 and the date of the trial which was in

10   August of 1981 where he was charged with multiple counts

11   of possession with intent to distribute various drugs

12   including, I believe, mescaline, grass.

13       MS. FEE:  Objection.

14       THE COURT:  I'll allow it.

15       THE WITNESS:  And I believe -- I'm not certain.

16   Someone said there were four different drugs.

17   BY MR. FRIEDMAN:

18   Q.   And did you learn of any further charges against

19   him during the course of the investigation before the

20   trial?

21   A.   Yes. That's the -- that's the -- the last one I

22   spoke of that he was arrested for possession with intent

23   to distribute a number of controlled substances.

24   Q.   Did you inquire about that during the course of

25   the trial?

1    A.   I asked him whether they -- the charges existed,

2   yes. I asked him whether or not --

3    Q.   Go ahead.

4    A.   -- he had any promises about what would happen in

5   those cases as a result of his testimony in the case

6   involving Mr. Weichel.

7    Q.   How did he respond to that?

8    A.   Whether there were any agreements?  Sorry.

9    Q.   How did he respond?

10   A.   He said:  No, absolutely none.  He had no

11  agreement whatsoever.

12   Q.   Did you learn what happened to those criminal

13  charges after Mr. Weichel was found guilty?

14   A.   Yeah.  Within two months, all the charges were

15  essentially dropped.

16   Q.   Okay.

17       MR. FRIEDMAN:  Okay.  May I approach the witness,

18  your Honor, I would like to show him what I marked as

19  Exhibit C for identification.

20       THE COURT:  ID -- ID-C.

21       MR. FRIEDMAN:  ID-C.

22       THE COURT:  Okay.

23       MS. FEE:  I'm so sorry, I can't hear.

24       THE COURT:  Page 9.

25       MR. FRIEDMAN:  Page 9.

1        THE WITNESS:  Yes.  Yes.

2   BY MR. FRIEDMAN:

3      Q.  Going back to the subject of motive.

4      A.  Yes.

5      Q.  Did you learn from a police report a reason why

6   people who were related to Freeman "Punchy" Clifford

7   might have had a motive to kill Robert LaMonica?

8      A.  Yes, I did.

9      Q.  And what is that?

10      A.  When Mr. Clifford was murdered, two people were

11   arrested, Robert LaMonica and his father; and ultimately

12   his father went to jail for his involvement in that and

13   the younger son, Robert, the alleged victim in this

14   case.

15        MS. FEE:  Objection, your Honor. I'd like to be

16   seen at sidebar.

17        THE COURT:  Okay.

18   (Sidebar discussion not transcribed; begins at 10:11:55)

19        THE COURT:  All right.  Objection is overruled.

20   You can have the question or he can continue the answer.

21   BY MR. FRIEDMAN:

22      Q.  Looking at the report at the bottom of the page,

23   what did you learn with regard to the LaMonica murder?

24      A.  Yes.  Immediately following the murder, the

25   police spoke with the father of Robert LaMonica, his

1  brother and his girlfriend and all three said they

2  believe that the motive for the murder was Robert

3  LaMonica's involvement in the killing of Freeman "Punch"

4  Clifford and that, in fact, even though the father of

5  Robert LaMonica essentially took the -- the weight of

6  that case to let his son essentially walk, Robert

7  LaMonica was the principal actor in the murder of Punchy

8  Clifford.  And, again, all of them said that was their

9  immediate thought about why -- what had happened had

10  happened.

11      Q.  During the course of your representation of

12  Mr. Weichel in this trial, did anyone ever suggest to

13  you from the prosecution that actually Thomas Barrett

14  was the person who shot Robert LaMonica?

15      A.  Never.

16          MR. FRIEDMAN:  All right.  I have no other

17  questions.

18          THE COURT:  All right. Cross-examination?

19          MS. FEE:  Thank you, your Honor.

20                          CROSS-EXAMINATION

21  BY MS. FEE:

22      Q.  Good morning, Mr. Cardinale.

23      A.  Good morning.

24      Q.  You testified on direct that you were

25  Mr. Weichel's defense attorney in his criminal trial in

1   1981?

2      A.   That's correct.

3      Q.   You were hired by him to defend him?

4      A.   That's correct.

5      Q.   Shortly after his arrest in August of 1980 is

6   when you were hired?

7      A.   Yes.

8      Q.   For a fee, do I have that right?

9      A.   Yes.

10     Q.   It was your first homicide case?

11     A.   It was.

12     Q.   And you testified on direct that while

13   representing Mr. Weichel in his criminal case, you

14   hired an engineering firm to do a drawing of the scene

15   of the crime?

16     A.   Yes.

17     Q.   And I'll direct you to -- it's actually still up

18   next to you.   It was Exhibit 2 in the trial that you

19   made markings on.

20     A.   Yes.

21     Q.   Was this -- this was the map the engineering

22   firm made for you?

23     A.   Excuse me, say it again.

24     Q.   This was the map that was made after you were

25   hired by Mr. Weichel?

1    A.   Yes.

2    Q.   And a version of this map was used as an exhibit

3    in a motion to suppress hearing; do I have that right?

4    A.   Correct.

5    Q.   And a version of this map was used in

6    Mr. Weichel's criminal case?

7    A.   Correct, several of them in the criminal case,

8    one in the motion to suppress, and two -- at least two

9    during the course of the trial, one for Foley, one for

10   Canstonguay.

11   Q.   That was going to be my next question.  So at

12   the criminal trial, several versions of this map were

13   used, one version where Mr. Foley made markings on it;

14   do I have that right?

15   A.   Yes.

16   Q.   And one version where Ms. Canstonguay made

17   markings on it; do I have that right?

18   A.   Correct.

19   Q.   And a version of it was shown to some of the

20   police detectives who testified; do I have that right?

21   A.   In all likelihood, yes.

22   Q.   You reviewed the trial testimony in the case,

23   right?

24   A.   I have but not in quite some time.

25   Q.   Sure.  But -- thank you.  And the -- fair to

1  say, the issue of the distance between Mr. Foley and

2  the man he saw running was hotly contested at trial,

3  right?

4      A.  It's difficult to say that because the -- the

5  numbers were the numbers. It was 180 feet, 185 feet,

6  always in that range, up to 200 feet.  So there was no

7  contest as far as I was concerned. He was and he placed

8  himself on that and both times, motion to suppress and

9  at the trial, a distance of no less than 180 feet away.

10     Q.  It was an important fact in the trial, right?

11     A.  Absolutely.

12     Q.  It was a dispute between yourself and the

13  prosecution, right?

14     A.  I don't think there's any real dispute about the

15  distance, honestly.

16     Q.  I understand that you feel that way, Mr.

17  Cardinale.

18     A.  No, I --

19     Q.  Certainly Ms. Hanlon -- who -- who was the

20  prosecutor in the case?

21     A.  Sure.  Absolutely.  Now Judge Hanlon.

22     Q.  Certainly Ms. Hanlon put in evidence that

23  disputed the distance between Mr. Foley and the running

24  man?

25     A.  It didn't dispute it.  She --

1    Q.   I understand. I understand your --

2    A.   A little bit closer, yes.

3    Q.   Different evidence?

4    A.   Essentially if you want to -- yeah, different but

5  not that different, let's put it that way.

6    Q.   In your opinion, understood. And the -- so you

7  -- today during your testimony, you've made some

8  markings on Exhibit 2 in red ink and green ink?

9    A.   Yes.

10    Q.   And the trial was in 1981, right?

11    A.   Yes.

12    Q.   Over 40 years ago?

13    A.   Yes.

14    Q.   And I'm not sure you testified to this, but

15  you've been a member of the bar since 1977?

16    A.   I have been.

17    Q.   As a criminal defense attorney?

18    A.   Yes.  January 10. January 10, 1977.

19    Q.   Thank you, sir.  And since 1981, I imagine

20  you've gone to trial in at least several dozen criminal

21  cases?

22    A.   Many.

23    Q.   Maybe over a hundred criminal cases?

24    A.   Definitely.

25    Q.   Many of those involving eyewitness

1  identifications?

2      A.   Some.

3      Q.   And in about 1990 or 1991, you actually turned

4  over your criminal file in Mr. Weichel's case to

5  another attorney; do I have that right?

6      A.   That's correct.

7          THE COURT:   What was the year?

8          MS. FEE:   1990 or 1991.

9          THE COURT:   Okay.

10 BY MS. FEE:

11     Q.   Is that right sir?

12     A.   Correct.

13     Q.   And you never requested it back from that

14 attorney?

15     A.   I have not.  I have seen but certainly before 19

16 -- strike that.  2016, '17, I -- I saw the transcript of

17 the trial on -- both of the transcripts of the trial and

18 also the motion to suppress, not the entire file.

19     Q.   Right.  And, I mean, just looking at my desk, I

20 have many pieces of paper in my file that are not just

21 the transcript. I imagine your file included much

22 beyond merely the transcripts in the case?

23     A.   And I've certainly seen copies of motions that

24 were filed both on my part and the part of the

25 Commonwealth.

 1     Q.   Sure.   But notes -- your notes from trial

 2    notes --

 3     A.   No.

 4     Q.   -- notes from your investigators, notes from

 5    your paralegal who might have assisted you, all of

 6    those things would be in your -- your -- your criminal

 7    file, I imagine?

 8     A.   Correct.

 9     Q.   And that criminal file was turned over to

10    another attorney in 1990 or '91?

11     A.   Yes.

12     Q.   You have not requested it back?

13     A.   I never got it back, no.

14     Q.   So you have not reviewed your files in the case

15    since at least 1990 or 1991?

16     A.   I reviewed it last week.   I reviewed it in 2016

17    or so before my testimony in another matter.   I reviewed

18    what was available to me including the transcripts,

19    motions, etcetera.

20     Q.   Understood.   So you've reviewed the court

21    filings and you reviewed the testimony?

22     A.   Yes.

23     Q.   But the other items that would have been in your

24    criminal folder meet -- notes from meetings of Mr.

25    Weichel, notes from witnesses, notes from interviews,

1    notes from the trial itself, other -- all the other

2    things that would ordinarily be in an attorney's

3    criminal case file, you certainly haven't reviewed

4    those since 1990 or 1991?

5        A.   No.

6        Q.   Over 20 years ago?

7        A.   Yes.

8        Q.   And you testified today, I think, that before

9    coming here today, you reviewed the testimony from a

10   motion to suppress hearing from Mr. Weichel's case?

11       A.   Yes.

12       Q.   That happened in February of 1981?

13       A.   Yes.

14       Q.   And then you also -- I think you just now said

15   you reviewed the trial testimony of Mr. Weichel's

16   criminal case in August of 1981?

17       A.   Correct.

18       Q.   And I believe you testified that maps were used

19   at both hearings, February and August?

20       A.   Yes.

21       Q.   And different marks were made on those maps in

22   February and August?

23       A.   When you say "different," do you mean different

24   people or different places?

25       Q.   Both.

1    A.   Well, it's certainly two different people, but

2    the places didn't change very much between the two

3    events.   Maybe within ten feet of each other.

4    Q.   But it's your testimony you remember exactly

5    where those places were, sitting here today 42 years

6    later?

7    A.   It was a very important issue to me. I remember

8    it as if it was yesterday.

9    Q.   Now, going back to Mr. Weichel's criminal trial,

10   you gave a closing argument in that trial, right?

11   A.   I did.

12   Q.   In 1981?

13   A.   Yes.

14   Q.   At the end of the trial?

15   A.   Yes.

16   Q.   Just days after Mr. Foley had testified in that

17   trial?

18   A.   Correct.

19   Q.   And just days after he's -- he had put his

20   markings on the map that you testified about, right?

21   A.   Yes.

22   Q.   And in your own closing at trial, you yourself

23   actually references -- referenced, excuse me, a few

24   different distances Mr. Foley and the man he saw

25   running; do I have that right?

 1     A.   Probably.

 2     Q.   You, at one point, said 185 feet was that

 3 distance?

 4     A.   Correct.  That was the -- that was the finding of

 5 Judge Mulcurd.

 6     Q.   Sir, you once testified that 185 was that

 7 distance?  I'm sorry, not testified.  You said in your

 8 closing argument at one point that 185 feet was that

 9 distance?

10     A.   Correct.  That's from the motion to suppress.

11     Q.   You said at one point --

12        MS. FEE:  Your Honor, strike that.

13        THE COURT:  No, I'll allow it.

14 BY MS. FEE:

15     Q.   You said at one point in your closing argument

16 that he was 165 feet away from the running man?

17     A.   I don't remember specifically saying that but

18 there were different -- different -- different points.

19     Q.   And you said at one point in your closing

20 argument that he was 150 feet from the running man?

21     A.   That was because that was the closest.  He said

22 he was about 50 yards away, but he was wrong.

23     Q.   I understand that you feel he was wrong.

24     A.   No, he --

25     Q.   But in your closing argument you gave three

1   different distances - 185 feet, 165 feet and 150 feet;

2   do I have that right?

3       A.   Not -- not -- not necessarily. Again, what --

4   what was --

5       Q.   Well, how does the numbers --

6           THE COURT:  Just let him finish the questions.

7           THE WITNESS:  Can I tell you where the numbers came

8   from?

9           MS. FEE:  Sorry.

10          THE WITNESS:  He never ever put a mark on that

11  diagram that was 150 feet away. What he did say:  I was

12  about 50 yards away. That's where 150 comes from.  185

13  comes from where he put himself on that diagram, exactly

14  where he put himself, and that, again, is consistent

15  with what he said in the course of the motion to

16  suppress, but indicated after that that he might have

17  moved ahead a little bit.  While he was seeing the

18  person running, he might have moved up a little bit.

19  That's where the next number comes from.

20  BY MS. FEE:

21      Q.   His own testimony that he might have drifted

22  northwest?

23      A.   He might have drifted, yes.

24      Q.   And I think at trial you even asked Mr. Foley at

25  one point -- I think you were just testifying about

1    this -- about how far he thought he was when he first

2    saw the running man and he admitted to be bad at

3    judging distances, right?

4        A.   He was very bad at judging distances, yes.

5        Q.   But he told you it was about 45 or 50 yards

6    maybe?

7        A.   Fifty yards.

8        Q.   Was it that much?

9        A.   That's where that number came from.

10       Q.   And you used the map when you cross-examined

11   Mr. Foley at trial; do I have that right?

12       A.   Yes.

13       Q.   And at the motion to suppress hearing?

14       A.   Yes.

15       Q.   And Mr. Foley pointed out that there were

16   problems with the map, didn't he?

17       A.   He was wrong, but yes, he did say that.

18       Q.   He said it was missing sidewalks?  In his view,

19   it was missing sidewalks?

20       A.   Well, there was no sidewalk.  I don't know what

21   he was talking about.  It's just a -- it's a -- it's a

22   tarred area along the side -- if you look at this

23   diagram, you see utility poles are to the -- to the west

24   away from Faxon Street.  There is a strip approximately

25   three feet or so made with black tar macadam, whatever.

1   It's not a sidewalk as what you think is a sidewalk,

2   like a cement sidewalk you see here in Boston. It was

3   kind of a walkway.

4      Q.   And Mr. Foley testified that in his view, the

5   map didn't depict -- didn't depict the sidewalk?

6      A.   No, he never said that. He never said it didn't

7   depict what was there correctly. He didn't see the -- he

8   didn't see the sidewalk. There was a sidewalk such as it

9   was whether he -- he disagreed with that being the

10  sidewalk.  I have no idea what was in his mind, but the

11  only thing I remember him saying is he didn't remember

12  there was a box where it says "equipment storage box" at

13  the bottom near the edge of the tree line.  He said

14  that's where he was walking out from the tree line next

15  to the swings.  He was between the seesaw and the swings

16  in that area but he doesn't remember seeing the

17  equipment storage box there. The fact is, it was there.

18     Q.   Well, Mr. Cardinale, his testimony was:  You

19  don't have any sidewalks or anything like that here,

20  right?

21     A.   That's what he said. That's what he said.

22     Q.   And I think he also testified that the map, in

23  his view, depicted a streetlight in the middle of the

24  street?

25     A.   No, it -- there's no streetlights in the middle

1   of the street. All of the streetlights are adjacent to

2   the -- the paved walking area.  Essentially, those poles

3   are in that walkway.

4       Q.  But he testified at trial that he -- in his

5   view, the map depicted a streetlight in the middle of

6   the street?

7       A.  Again, if you show it to me, maybe. I don't

8   remember.  I just -- there was no even looking at this.

9   There is no streetlight indicating that it was in the

10  middle of the street anywhere on this document. So I

11  don't -- if he said -- I have no memory.  If he did say

12  it, he was wrong.

13      Q.  Certainly he testified -- I would like to point

14  out something -- at the time, I wasn't really -- I

15  can't understand the utility pole being out in the

16  middle of the street.  He also testified that items in

17  the park that he felt were there in real life weren't

18  -- he couldn't find on the map?

19      A.  I'm sorry, say that again.

20      Q.  He testified that items in the park that he said

21  were there in real life weren't there on the map?

22      A.  I don't recall that. You can refresh my

23  recollection.

24      Q.  Yes, sir.  I can certainly do that.

25  Understanding it's been 42 years.  Well, let me ask it

1   this way:  He testified that the swings on the map

2   weren't oriented correctly; that they were actually

3   sideways instead of one behind the other as indicated

4   on the map?

5       A.   He -- he -- he may well have.  Again, he may be

6   wrong. This is exactly where the items were, the

7   dimensions where the items were, and the relative

8   position of them vis-à-vis Commercial Street and Faxon

9   Street.

10      Q.   And that items called "swings" on the map

11  weren't actually swings in real life.  He testified to

12  that too?

13      A.   I don't recall that, but if he did, he was wrong.

14  Again, there were three sets of swings that you can see

15  on this -- on this engineering diagram.

16      Q.   In fact, at trial Mr. Foley placed himself on

17  the map relative to the position of a swing set that he

18  said was probably in the wrong place on the map?

19      A.   Again, I don't remember his exact testimony, but

20  he put himself next to the swing set that's consistent

21  with what Canstonguay said he was behind her by the

22  swing set.  So where I have that circle, that green

23  circle by the swing set is where he said he was when he

24  made the observation of an individual running very fast

25  down Faxon Street.

1    Q.   Sure.  And so I -- I -- I hear your testimony

2    today has been Mr. Foley placed himself relative to

3    swings that were indicated on the map?

4    A.   Yup, specifically those swings. I mean not the

5    other ones further up there.

6    Q.   Right.  So if I can have you take a look at

7    this, Mr. Foley's testimony from the motion to suppress

8    hearing.  It's page 2-140.  If you can start at line 14

9    and just read to the bottom of the page.

10       MS. FEE:  Thank you for allowing me to approach,

11   your Honor.

12       THE WITNESS:  Want me to keep reading or just that

13   page?

14   MS. FEE:

15   Q.   Just that page, sir.

16   A.   Fine.

17   Q.   And this isn't a -- questions about the swing on

18   the map?

19   A.   Yes.

20   Q.   The question is:  Do you have a recollection as

21   to where those are?

22       The answer is:  Basically yes but not really in

23   that order. I think they go the other way.

24       The question:  Sideways?

25       The answer:  Yes.

 1          The question:  Instead of one behind the other?

 2          The answer:  Yes.

 3          The question:  All right.

 4          And the court says:  You say the swings go

 5   sideways one beside the other?

 6          And Mr. Foley answers:  They are not all

 7   swings -- if you can turn to the next page -- one of

 8   them is just like a jungle gym.

 9     A.  Yes.

10     Q.  And the court's question is:  But in any event,

11   they go sideways instead of the way they are indicated

12   there?

13          The witness's answer is:  Yes.

14     A.  Yes.

15     Q.  Does that refresh your recollection that

16   Mr. Foley's testimony was that the orientation of the

17   swings wasn't how he remembered them to be on the map?

18     A.  He remembered them to be in a parallel line with

19   the swings that he said he was next to instead of one in

20   front of the other and one -- one behind. He had them

21   going sideways across going -- going south on Faxon

22   Street as opposed to being one in front of the other. He

23   had -- his recollection was the swings from where that

24   circle I put there earlier went sideways to the south of

25   Faxon Street -- south of Commercial Street, yes.

1    Q.  So in other words, he thought the swings were

2   oriented the wrong way on the map?

3    A.  Right.

4    Q.  And he placed himself on the map relative --

5   relative to where the swings were?

6    A.  I don't understand the question.  He put himself

7   exactly where I put that circle, and that there were

8   swings there.  His memory was that they went along on a

9   parallel line. They did not.  They were in a vertical

10  line. That's neither here nor there. That's where he put

11  himself.

12   Q.  Next to swings that he testified were oriented

13  the wrong way?

14   A.  Sorry?

15   Q.  Next to swings that he testified he believed

16  were oriented the wrong way?

17   A.  Incorrectly, yes.

18   Q.  And I believe you already testified to this that

19  in your memory, Mr. Foley testified that after hearing

20  the sounds that we now know were gunshots, he started

21  moving in a northwest direction?

22   A.  He started moving from the tree line, the first

23  green circle, towards the swing set, so that would be --

24  yes, that would be southwest.  He said about 10 feet

25  past there, past the tree line.

1     Q.   And that's your memory of exactly where he was

2   and exactly the dot he put on that map 42 years ago?

3     A.   Without question.

4     Q.   And to be perfectly clear, Mr. Cardinale, you

5   weren't in the park on May 31, 1980, right?

6     A.   No, but I've seen aerial photographs and that is

7   what it looks like.

8     Q.   Oh, sure, but you have no personal knowledge of

9   where any of those teenagers were standing?

10    A.   Of course, I wasn't there.

11    Q.   Right.

12    A.   Neither was the cops, neither was the prosecutor

13   or anyone else.

14    Q.   Right, but you're testifying today.  I'm just

15   clarifying.  I know the Court's done it as well.

16    A.   I understand.

17    Q.   You weren't present --

18    A.   No.

19    Q.   -- after midnight on May 31, 1980?

20    A.   No, I wasn't.

21    Q.   And, again, you were hired as Mr. Weichel's

22   criminal defense attorney whose job was to zealously

23   defend him, right?

24    A.   I'm sorry?  Zealously defend him, yes.

25   Absolutely.

1 Q. You testified on direct this morning a little

2 bit about Thomas Barrett?

3 A. Yes.

4 Q. You said you received no exculpatory evidence

5 regarding Thomas Barrett?

6 A. The only information -- you want to know what I

7 learned about Mr. Barrett?

8 Q. No.  I can back up.

9 A. I don't remember anything -- talking about

10 exculpatory to Fred Weichel.

11 Q. You testified this morning --

12 A. Right.

13 Q. -- when asked by Mr. Friedman -- I believe he

14 asked you, he asked you about whether you received

15 police reports in this case, right?

16 A. He did.

17 Q. Back when you were the defense attorney --

18 A. Sure.

19 Q. -- as was the regular course --

20 A. Yes.

21 Q. -- you requested police reports about the

22 LaMonica murder?

23 A. Of course, yes.

24 Q. Which is what you've probably done in every case

25 where you represented a criminal defendant?

1      A.   Many, many times, yes.

2      Q.   And you received those reports?

3      A.   Some, yes.

4      Q.   Well, you received reports from the --

5      A.   I did.

6      Q.   -- from the police?

7      A.   I did.

8      Q.   From the assistant district attorney?

9      A.   Yes.

10     Q.   And I believe Mr. Friedman's question was about

11     whether you received any police reports that were

12     exculpatory about Thomas Barrett.  Did I get that

13     question right?

14     A.   I'm not sure. Did I get any exculpatory -- my

15     understanding was did I get any exculpatory information

16     regarding Mr. Barrett and no, I never got any

17     exculpatory information that I recall regarding

18     Mr. Barrett.

19     Q.   But you did get information about Mr. Barrett in

20     the police report that you got from the prosecution,

21     right?

22     A.   He was certainly mentioned, yes.

23     Q.   He was mentioned in the police reports you got

24     that were drafted by Detective Sprague?

25     A.   Correct.

1    Q.  And the person you requested those police

2    reports from would have been the prosecutor in the

3    case, right?

4    A.  Yes.

5    Q.  Which I believe you testified in this case was

6    Ms. Sydney Hanlon?

7    A.  Correct.

8    Q.  And you spoke with her throughout representation

9    of Mr. Weichel in the criminal case, right?

10    A.  I did.

11    Q.  And she gave you information about the

12    Commonwealth's case, her client, Mr. Weichel, right?

13    A.  She gave me all the reports. I don't recall ever

14    sitting down and telling me what she thought or what her

15    version of the facts were.

16    Q.  Sure.

17    A.  I got the reports.  We fought it out.  Simple.

18    Every case is like that.

19    Q.  Sure.  And in the course of fighting it out, you

20    learned about her theory of the case and she learned

21    about your theory of the case?

22    A.  No.  She was quite closed-mouth about her version

23    of the case.  The only thing I got was strictly

24    according to the rules.  Again, I got what I got. She

25    never explained anything to me about what her version of

1    the -- of the facts were or anything. Nor did I give her

2    my version.

3        Q.   Absolutely. And I misspoke.

4        A.   That's okay.

5        Q.   But you exchanged information like witnesses the

6    Commonwealth intended to call?

7        A.   Yes.

8        Q.   And you received information like evidence that

9    the Commonwealth intended to rely on?

10       A.   Yes.

11       Q.   So you were aware that the Commonwealth's

12   investigation had revealed that after midnight May 31,

13   1980 is someone shot Mr. LaMonica several times and

14   then ran to a waiting car that drove off?

15       A.   Essentially, yes.

16       Q.   And in 1980 and 1981, you were aware that

17   Mr. Barrett and Mr. Weichel were good friends?

18       A.   How good friends, I don't know. I know they were

19   together according to the information that I received on

20   other occasions prior to the -- prior to the event we're

21   talking about, the -- the shooting on the early morning

22   hours of the 31st of May.

23       Q.   So the Commonwealth had developed evidence in

24   their investigation that Mr. Weichel's friend, Thomas

25   Barrett, had gotten into a fight with Mr. LaMonica's

1  friends and Mr. Weichel had gotten involved?

2     A.   No.   You want my version of what that was?

3     Q.   You received information that the Commonwealth

4  had developed evidence that there had been a fight

5  between Mr. Barrett and a friend of Mr. LaMonica's?

6     A.   That's correct.

7     Q.   And that Mr. Weichel had been present for part

8  of that fight?

9     A.   Yes.

10     Q.   And that Mr. Weichel had helped Mr. Barrett

11  leave that fight?

12     A.   I don't remember that.

13     Q.   And the Commonwealth developed evidence that

14  Mr. Weichel had afterward been a part of threats

15  related to that fight between Thomas Barrett and

16  Mr. LaMonica's friend?

17     A.   Again, I don't accept that characterization.

18     Q.   But you received that --

19     A.   No, I received evidence. You want to know what I

20  received?  I received evidence that the fellow who was

21  supposedly the victim of the Barrett fight, street

22  fight, a guy named Shea, supposedly observed from a

23  couple blocks away Mr. LaMonica and Mr. Weichel having

24  some kind of conversation that to him he perceived it as

25  confrontational.

1     Q.   And that Mr. Weichel had gone to Mr. Shea's

2   house after Mr. Shea talked to the police, right?

3     A.   I'm -- I have some memory but there was no

4   evidence presented about that. Let's put it that way.

5   So it didn't --

6     Q.   There was no testimony at the trial about that?

7     A.   I don't recall.  Again, sitting here, I'm not

8   saying you're wrong.  I'm not saying you're wrong. I do

9   know there was evidence presented in the trial about the

10   alleged confrontation of a week or two, whatever, after

11   the Shea street fight, but as far as Mr. Weichel doing

12   something specific to Mr. Shea, you said...

13     Q.   Going to Mr. Shea's house and asking him what he

14   said to the police?

15     A.   See I -- I recall that from documents.  I don't

16   remember.  Again, like you said, it was a while ago.  I

17   do remember quite a bit.  It was an important case to

18   me. I remember a lot of it like it was yesterday.  As

19   far as --

20     Q.   Not all of it.

21     A.   It -- was there evidence introduced in the trial

22   about the matter you're talking about, there very well

23   could have been, but that's not something that really

24   stuck in my mind.  Again, I remember reading a report

25   about that. I have no specific recollection as I sit

1  here today that that was actually part of the testimony

2  in the case.

3      Q.  And --

4      A.  It very well could have been.

5      Q.  And about another gentleman, Mr. King, who

6  overheard threats between Mr. Weichel and

7  Mr. LaMonica's friends?

8      A.  Again, I recall that name.  I recall reading

9  something about that.  I have no, again, direct specific

10  recollection of the trial transcript. If you got

11  something that would help me, I'll be glad to tell you

12  whether or not it did occur in the trial.

13     Q.  And you also received -- you also received from

14  the Commonwealth police reports?

15     A.  Correct.

16     Q.  Regarding their investigation that revealed

17  evidence that 1980 wasn't the first time that

18  Mr. Weichel had stepped in to defend Mr. Barrett after

19  Mr. Barrett got into a fight?

20     A.  Repeat that time -- timing again.  I apologize.

21  I'm confused about when I learned about another --

22  another fight.

23     Q.  That's right. So you said that when you were

24  defending Mr. Weichel in 1980 --

25     A.  Yes.

1     Q.  -- that you received police reports from the

2   Commonwealth?

3     A.  Yes.

4     Q.  And in those police reports was information

5   about their investigation into the LaMonica murder?

6     A.  Yes.

7     Q.  And information about their investigation into

8   Mr. Weichel?

9     A.  Yes.

10     Q.  And some information about their investigation

11   into Mr. Barrett?

12     A.  Other than what specifically related to

13   Mr. Weichel and the events regarding Frank Shea, I don't

14   recall seeing anything other than -- other than that.

15   There might have been another reference about some -- an

16   event, I think, about -- an unsuccessful event, if you

17   will, where the prosecutors were trying to have

18   Mr. Weichel contacted and told that he was about to be

19   arrested.

20         They had gone to Mr. Barrett, my recollection is.

21   This, again, this wasn't in the trial.  This was in the

22   documents. They went and got an order to put a wire on

23   Mr. Barrett's phone and then went to see Mr. Barrett and

24   told him that Fred Weichel, his friend Fred Weichel was

25   about to be arrested for the murder of LaMonica, then

1   turned around and left.

2       Q.   Yeah.   And then the report indicated that

3   Mr. Barrett tried to call Mr. Weichel six or seven

4   times?

5       A.   I don't remember the times but a few times

6   thereafter tried to make a call after being told that

7   they were on their way to arrest him, yes.

8       Q.   I was actually referencing something different

9   that hopefully you cut off some of my questions for

10  later this morning.   That you received a police report

11  indicating that the Commonwealth's investigation had

12  revealed that 1980 wasn't the first time Mr. Weichel

13  had stepped in to defend Mr. Barrett after he got in a

14  fight?

15      A.   As I sit here today, as far as the documents, all

16  the documents that were given to me in the course of --

17  particularly focusing mostly on the Sprague report, if

18  it's in the Sprague report, I got it. If it isn't, I

19  didn't get it. But I have no specific memory because it

20  didn't have anything to do with the trial as I recall.

21      Q.   Let me see if this refreshes.

22      A.   Sprague report.

23          MS. FEE:   Your Honor, if we could mark this exhibit

24  identification K.

25          THE CLERK:   Next one is L.

1       MS. FEE:  L.  Excuse me.

2  (ID-L was marked.)

3       THE COURT:  All right. The witness has it. All

4  right. Next question. ID-L.

5       THE WITNESS:  Can I just read this?  I don't -- I

6  don't have any present recollection of ever seeing this

7  document.

8       MS. FEE:  Of course, sir.

9       MR. FRIEDMAN:  While he's reading this, your Honor,

10  can we go sidebar?

11       THE COURT:  Yes.

12  (Sidebar discussion not transcribed; begins at 10:45:49)

13       MS. FEE:  Thanks, Mr. Cardinale.

14       THE WITNESS:  No problem.

15  MS. FEE:

16    Q.  During that conference, were you able to review

17  the document that's marked -- that has been marked for

18  identification as Exhibit L?

19    A.  I have.

20    Q.  Do you recognize this?

21    A.  No.

22    Q.  You don't remember ever receiving this?

23    A.  No.

24    Q.  A document to Colonel Donovan from Trooper

25  Sprague?

1      A.   Yes. The only report I ever got from Sprague is

2   this one, the exhibit which this says "Exhibit C."

3      Q.   It's your testimony that's the only police

4   report that you received from Ms. Hanlon when you

5   requested discovery in Mr. Weichel's criminal case?

6      A.   I'm suggesting that this is the only one I

7   recall.  I don't recall ever receiving this document.

8      Q.   Okay.  So you're not testifying that you -- that

9   that's the only report you received?

10      A.   There may have been other reports.  Again, I

11   don't specifically recall any of them right now. There

12   were certainly statements of -- most of the other

13   statements that I got from them were statements that

14   were taken by Braintree police, like the -- the first

15   statements --

16      Q.   That you recall?

17      A.   Yeah.

18      Q.   And in any event, if I received this, I know I

19   filed motions to exclude evidence in the case. If I

20   received this, take a look at that. If it's there, it's

21   there.  And if it is there, then this was all excluded,

22   not put before the jury in Mr. Weichel's case.

23      Q.   Let me see if I can help refresh you on that.

24      MS. FEE:  May I have this marked as the next

25   identification?

 1          THE CLERK:  M.  That will be M.

 2          THE COURT:  Madam clerk, here's L.

 3          THE CLERK:  Thank you.

 4   (ID-M, marked.)

 5   BY MS. FEE:

 6      Q.  Mr. Cardinale, if you can look at M for a minute

 7   and let me know if you had a chance to review?

 8      A.  Okay.  Again, I say I have no present --

 9   immediate recollection of seeing this document, but as I

10   said, if I did, it would have been the subject because

11   none of this would have been admissible in the trial.

12   It didn't come in the trial.  That's probably why I

13   didn't recognize it because I did file a successful

14   motion to exclude any of this.

15      Q.  Sure, but in reviewing the motion, does that

16   refresh your recollection that you did --

17      A.  Yes.

18      Q.  -- receive this report?

19      A.  Yes.

20      Q.  Okay.  In reviewing again on L, sir, the one

21   page document --

22      A.  Yes.

23      Q.  -- reviewing the -- one, two, three -- fourth

24   paragraph to yourself, does this refresh your memory

25   that you received a report of an incident where

1   Mr. Weichel had previously intervened to defend

2   Mr. Barrett against another individual?

3       A.   Generally, yes.

4       Q.   In preparing your defense in Mr. Weichel's case,

5   you discussed the police reports you received with

6   Mr. Weichel?

7       A.   I'm sure we did.

8       Q.   And you discussed their contents?

9       A.   Yes.

10      Q.   In 1980 or 1981, Mr. Weichel never gave you any

11   instructions about Mr. Barrett, did he?

12      A.   No.

13      Q.   Is it your testimony that the two of you never

14   discussed Mr. Barrett?

15      A.   No, I couldn't say that because obviously that

16   was the element that instead of the Clifford murder that

17   LaMonica was involved in, that was the element that they

18   relied upon -- when I say "they," the prosecution -- and

19   Sprague relied on for motive evidence as opposed to the

20   motive of retaliation for Robert LaMonica killing Punchy

21   Clifford.

22      Q.   So you -- you talked to Mr. Weichel about the

23   evidence the Commonwealth had about his relationship

24   with Mr. Barrett?

25      A.   Certainly. In general terms, that was again part

1  of the case that the --

2      Q.  Right, the motivation.

3      A.  Right.  The lie for motive.  Exactly.

4      Q.  Right.  You never interviewed Mr. Barrett as

5  part of your case?

6      A.  Never.

7      Q.  Right?

8      A.  Never met him.

9      Q.  Even though Commonwealth was arguing the motive

10  for the LaMonica murder?

11      A.  Yes.

12      Q.  Even though he had been involved in the

13  phone-tapping event and the car-tapping event?

14      A.  Yes, because nothing -- again, nothing ever came

15  of either the tap --

16      Q.  Sure.

17      A.  -- in the phone or a bug they put in Fred's car

18  that was in any way inculpatory.

19      Q.  Sure.  But you interviewed other witnesses for

20  your case, right?

21      A.  Certainly.

22      Q.  But never Mr. Barrett?

23      A.  He wasn't a witness.

24      Q.  Did Mr. Weichel instruct you not to?

25      A.  Never.

1    Q.  Mr. Cardinale, I think you already testified

2    about this.  You were present when one of the teenage

3    witnesses, Ms. Jean Canstonguay, testified at trial.

4    You were there when she testified, right?

5    A.  Of course, yes.

6    Q.  And she was a young teenager, 15 or 16 years

7    old?

8    A.  No.  No.  At the time, probably 18.  I think she

9    was 16 at the time of the event, 17 or so, if I recall

10   correctly.  I'm sure her date of birth is somewhere we

11   can establish if it's important, but she was a younger

12   woman, yes.

13   Q.  And to your mind, do you recall that she seemed

14   very afraid in the courtroom?

15   A.  She was very afraid because she saw the person

16   that she believed --

17   Q.  I -- I --

18   A.  -- thought did the shooting.  Yes.  Yes.  She was

19   very afraid --

20   Q.  You certainly don't -- you certainly don't know

21   what was in her mind but, in your view, she appeared to

22   be very afraid?

23   A.  What I observed was, yes, she was very afraid of

24   having to pick out the person she saw come from around

25   the corner.  Having seen him in the courtroom was afraid

1    to point him out.

2        Q.  Absolutely.  Absolutely.  And another of the

3    teenage witnesses was Ms. Lisa Krause?

4        A.  Yes.

5        Q.  And you were present when she testified at the

6    motion hearing or the pretrial hearing but she did not

7    testify at trial?

8        A.  She did not.

9        Q.  She was also a young teenager?

10       A.  Same age.

11       Q.  Fifteen or sixteen years old?

12       A.  Again, we -- we quibble with 16, 17.  You know,

13   somewhere, you know, late -- you know, late teen years.

14   Okay. Let's put it that way.

15       Q.  And you said she testified at a pretrial hearing

16   a few months before the trial but not at the trial?

17       A.  Correct.

18       Q.  And in 1980 and 1981, you worked at a law firm,

19   right?

20       A.  Correct.

21       Q.  The Law Offices of F. Lee Bailey?

22       A.  Correct.

23       Q.  Between May 1980 and Mr. Weichel's criminal

24   trial in August 1981, did you ever go to Lisa Krause's

25   house?

1    A.   If -- I have no -- I had an investigator by the

2    name of Joseph Gaudette and I know that he approached a

3    number of people going to their house and everything. I

4    have no recollection of me going to anyone's house; just

5    have no present recollection --

6    Q.   But --

7    A.   -- doing that.

8    Q.   -- did you send your investigator to Lisa

9    Krause's house?

10   A.   I sent him to interview anybody he could.

11   Q.   To try to change her mind?

12   A.   Of course not.  To find out what their -- what

13   their story is, to get a version, their version of what

14   happened, not to -- the inference you're giving is to

15   scare her from coming and testifying, is that what your

16   saying?

17   Q.   No, sir, I'm not making an inference at all. I'm

18   asking you whether you have a memory of sending an

19   investigator to her house?

20   A.   I have no present memory of sending anyone

21   specifically.  If I did, it would have been Joseph

22   Gaudette in the normal course of investigative efforts

23   to try to talk to individuals.

24   Q.   And you don't know anybody else from your law

25   firm that would have gone to Lisa Krause's house?

1      A.   No one would have.

2      Q.   So I want to go back to -- change topics and go

3   back to what was marked as Exhibit 24.

4      A.   Which is?

5      Q.   The memorandum by --

6      A.   Yes.

7      Q.   -- Detective James T. Bailey?

8      A.   Yes.

9      Q.   And you testified you did not see this document

10  during your representation of Mr. Weichel in 1980 and

11  1981, right?

12     A.   Absolutely not.

13     Q.   That the first time you saw this document was in

14  2012 or 2013, right?

15     A.   Again, I could be wrong about that. It was around

16  the time that Michael Brachute was representing

17  Mr. Weichel in the course of a motion for new trial --

18     Q.   About 30 -- about 30 years laterish?

19     A.   30-ish, yeah.

20     Q.   So I'm looking at this document that's been

21  marked as Exhibit 24. There's no heading at all on this

22  document, is that right?

23     A.   Not that I can see.

24     Q.   It's certainly not on any kind of letterhead?

25     A.   Well, my sense of that is that --

1    Q.  I didn't ask for your sense, just asked you --

2    A.  A copy -- that's a copy of what was on a

3  letterhead document probably.  In all likelihood, from

4  my experience, again, that would have been a -- a

5  mimeographed, almost copy, if you will, of that report.

6    Q.  But there's nothing at the top to indicate that

7  it's on Braintree Police Department letterhead?

8    A.  Not on that document.

9    Q.  And there's nothing on here to indicate the case

10  name; do I have that right?

11    A.  I have to see it again.  I'm not --

12    Q.  Is it in front of you, sir?  I'm sorry.

13    A.  I'm sorry.  No.

14      MS. FEE:  May I approach the witness?

15      THE COURT:  Yes.

16      THE WITNESS:  You want this one back?  And this

17  one? Thank you.

18      MS. FEE:  Sorry about that, sir.

19  BY MS. FEE

20    Q.  Sir, again, you testified that upon this piece

21  of paper right here that you're looking at --

22    A.  Yes.

23    Q.  -- the letterhead, it doesn't indicate at the

24  top Braintree Police Department?

25    A.  Right.

1    Q.   There's no case name on the document?

2    A.   Correct.

3    Q.   There is no case number on the document?

4    A.   There wouldn't have been a case number, I don't

5    think. I mean, an indictment number.  He wasn't indicted

6    then. I don't know --

7    Q.   Oh, I'm sorry.  Internal police department --

8    A.   Yeah.

9    Q.   -- case number?

10   A.   I have no idea if they even did that.

11   Q.   Or a Massachusetts State Police department case

12   number?

13   A.   Well, this isn't from a -- this is from a

14   Detective Leahy, Braintree.  So there wouldn't be no

15   state -- there would be no state police number on it.

16   But that's -- I don't want to quibble with you. There's

17   no -- you know, there's no police -- it's not a document

18   that has a number or the name of the police, but Leahy

19   was definitely a detective and Wilson was the lead

20   detective from Braintree in the -- in the investigation

21   involving the LaMonica homicide.

22   Q.   And you're aware that the Massachusetts State

23   Police has jurisdiction over homicide investigations?

24   A.   Sometimes.

25   Q.   There are times that they don't?

1    A.   Sure.   Boston, for example. I'm thinking maybe

2    Worcester.   Other places, I'm not sure.   To be honest

3    with you, even today Braintree would do it automatically

4    or the state police would do it automatically. If you

5    say so, I'll take that but...

6    Q.   The state police worked with the police

7    department in Braintree when the homicide happened in

8    Braintree?

9    A.   Of course.

10   Q.   Now, this document has a pretty big typo on it,

11   do I have that right, with respect to the date, Friday

12   May 31, 1980?

13   A.   Sorry?

14   Q.   There's a date on this document?

15   A.   Yes.

16   Q.   It's Friday May 31, 1980; do I have that right?

17   A.   Yes, it's on that document.

18   Q.   And that's a pretty big typo, right, because

19   there is no such thing as a Friday, May 31, 1980?

20   A.   Well, there's certainly a Friday.   That's what I

21   take from it.   And whether it's the 31st because that's

22   the date right after, 15 minutes after Friday night,

23   after Saturday morning was the 31st.   My sense is that's

24   what was going on.   He heard this fellow that he left on

25   furlough on Friday, didn't return and --

1     Q.   Right. But what this says is --

2     A.   May 31.

3     Q.   What this says is:  Had weekend leave from

4  Friday, May 31, 1980, a date that doesn't exist at 9:30

5  a.m., and did not return, right?

6     A.   Yes, that's what it says.

7     Q.   Right.  So you're reading it that that means

8  Friday at 9 a.m. but one could read it that that means

9  May 31st at 9 a.m.  It's a typo?

10    A.   Whether it's a typo or whether it was what he was

11 told, I know that March (sic) 31 -- at some point on

12 March (sic) 31, in the evening or whenever it was on

13 March (sic) 31, that's when the DOC declared that

14 Balliro was in violation of his furlough.  He did not

15 return.  That's when it was marked down.  Where these

16 dates -- why there's that mistake, I don't know.

17    Q.   Right.

18    A.   Obviously, to me, Friday is the important day.

19    Q.   Right.  Right.

20    A.   More important than the day.

21    Q.   More important than May 31, which would have

22 been a Saturday, indicating that he actually left for

23 his 12-hour furlough on Saturday morning at 9 a.m.,

24 nine hours after the murder of Mr. LaMonica?

25    A.   That would be true if there 's document in the

1   DOC that said that, and there is none.

2        THE COURT:  Attorney Fee, why don't we -- are you

3   going to keep asking about the document?

4        MS. FEE:  Yes, your Honor.

5        THE COURT:  Let's just wait for that and then we'll

6   take a break.  Go ahead.

7        MS. FEE:   This is a fine time to take a break.

8        THE COURT:  All right. That's fine.  So we're going

9   to take a morning break, jurors, and we'll bring you

10  back.

11  (Jury is not present)

12       THE WITNESS:  Thank you.

13  (Speaking to the attorneys; not transcribed; 11:06)

14  (Jury is present)

15       THE COURT:  Welcome back, jurors.  We're going to

16  resume with cross-examination.

17       MS. FEE:  Thank you, your Honor.

18  BY MS. FEE:

19  Q.  Thank you, again, Mr. Cardinale.  I want to jump

20  to one quick thing about that 19-page police report by

21  Trooper Sprague.  I believe you testified that the

22  police report did not contain exculpatory evidence

23  about Mr. Barrett but it contained inculpatory evidence

24  about Mr. Barrett; do I have that right?

25  A.  No.  It has information.  I wouldn't call it

1    inculpatory.  As to Mr. Barrett?

2       Q.   As to Mr. Barrett.

3       A.   No, other than he had a fight with the --

4    supposedly had a fight with Frank Shea.

5       Q.   No -- it's your testimony that there's no other

6    information received during the course of the

7    investigation that appears in the report that it's

8    inculpatory about Mr. Barrett?

9       A.   Nothing that I would give any credence to, let's

10   put it that way.

11      Q.   But it's in there?

12      A.   Street talk.

13      Q.   Yeah, I'm just asking if the information is in

14   the police report?

15      A.   Mr. Barrett is mentioned in the police report,

16   yes.

17      Q.   Inculpatory information about Mr. Barrett is in

18   the police report?

19      A.   Not relating to the LaMonica murder.

20      Q.   Do you have exhibit -- what's been marked for

21   identification as C in front of you, Mr. Sprague (sic)?

22      A.   I'm sorry.  Let me think before I -- before I --

23   again, as far as anything that would ever be considered

24   admissible evidence, there's nothing in here that would

25   be inculpatory. As far as information generally, things

1  heard on the street kind of stuff, maybe it's in there.

2     Q.  And you never interviewed Mr. Barrett as part of

3  your defense of Mr. Weichel?

4     A.  No.

5     Q.  Okay.  So jumping back, hopefully quickly, to

6  Exhibit 24, that memo drafted by Detective James Leahy

7  from the Braintree Police Department.

8     A.  Yes, sir.

9     Q.  Again, Detective Leahy worked for the Braintree

10  Police Department; I have that right?

11     A.  Correct.

12     Q.  And you did not know him to be working on the

13  LaMonica murder investigation, right?

14     A.  I did not.

15     Q.  The document also mentions a Captain Buker.  You

16  did not know Captain Buker, did you?

17     A.  I knew who he was.

18     Q.  And you knew he was the captain at the Braintree

19  Police Department, right?

20     A.  Head of all the detectives including Wilson,

21  etcetera, and Leahy.

22     Q.  Okay. But you did not personally know of him

23  being directly involved in the LaMonica murder

24  investigation other than the supervisor of detectives?

25     A.  And recipient perhaps of -- of items that were

1    developed in the course of the investigation.

2        Q.   And the document also mentions, and you said the

3    name already, a Detective Wilson?

4        A.   Yes.

5        Q.   Who I believe you testified was working on the

6    LaMonica murder investigation on behalf of the

7    Braintree Police Department?

8        A.   He was the assigned detective, yes.

9        Q.   But you do not know what other cases Detective

10   Wilson was assigned to in June of 1980; do I have that

11   right?

12       A.   No clue.

13       Q.   Or what other cases he was asked to work on in

14   June of 1980?

15       A.   No clue. But I would say during this period of

16   time, it was every day on this murder case because it

17   doesn't happen a lot in Braintree. So this was a big

18   deal in Braintree at the time. So was he working on the

19   cases?  Perhaps.

20       Q.   And looking at Exhibit 24, I think it makes

21   direct reference to a composite or the composite; do I

22   have that right?

23       A.   The composite, yes.

24       Q.   And you're aware that when that report was found

25   by the Braintree Police Department inside of the black

1    Buker binder, there was a composite directly behind it

2    in the binder; do I have that right?

3        A.   You can tell me that but I don't know that to be

4    a fact.  I don't -- again, that's the first time I ever

5    seen that. I've seen this, but the actual book, the

6    murder book itself, first time.

7        Q.   But you had seen Exhibit 26 before?

8        A.   I was shown that exhibit.

9        Q.   Today or before today?

10       A.   Yesterday.

11       Q.   So you don't know where this was found?

12       A.   No clue.

13       Q.   You don't know if it was in the Buker binder or

14   not?

15       A.   No.

16       Q.   And you don't know if it was directly behind

17   Detective Leahy's memo in that binder when it was found

18   by the Braintree Police Department?

19       A.   No idea.

20       Q.   You testified that Rocco Balliro, who's named in

21   Exhibit 24, again, Detective Leahy's memo, had a twin?

22       A.   Yes.

23       Q.   But he was a fraternal twin, right?

24       A.   Again, I haven't seen the medical records.

25   Perhaps they look alike, yes.

1       Q.   And you don't -- you don't know if his twin --

2   his fraternal twin brother -- that was a tongue

3   twister. You don't know if his fraternal twin brother

4   was a boxer, do you?  Do you have personal knowledge of

5   that?

6       A.   Again, I -- I don't have personal knowledge, but

7   I know the -- the group.  When I say "the group," I know

8   the family and I know guys did at that time, and maybe

9   Rocky more than Salvatore, I don't know.

10      Q.   And you don't -- you don't know if Salvatore had

11  a broken nose from boxing, do you?

12      A.   He may have.

13      Q.   You don't know?

14      A.   I don't know that, no.

15      Q.   How old was Rocco and Salvatore Balliro in 1980?

16      A.   Best guess.

17      Q.   They were in their forties, right?

18      A.   I'm not sure.  He was pretty young in the time of

19  the charges against him.

20      Q.   Which were in 1965; do I have that right?

21      A.   If you say so, I'll accept it.  So he would be 35

22  -- I'd say he's in his twenties then. So if it's 10

23  years, 15 years later, you know, add 25. So maybe 35.  I

24  don't know.

25      Q.   But the DOC records might indicate that he was

1    in his forties?

2        A.   Again, his birthday is a fact beyond any -- any

3    question.

4        Q.   Just to be a hundred percent clear,

5    Mr. Cardinale, you do not work for the Department of

6    Correction, right?

7        A.   No.

8        Q.   And you never worked for the Department of

9    Correction?

10       A.   No.

11       Q.   Not in 1980 or any other time?

12       A.   Never.

13       Q.   You have never approved a furlough?

14       A.   No.

15       Q.   Or administered a furlough?

16       A.   No.

17       Q.   Or had anything to do with administration of the

18   DOC's furlough program?

19       A.   No, other than having disputes about -- about it,

20   no.

21       Q.   And you yourself had never issued a discipline

22   report at the DOC or a D report?

23       A.   Never.

24       Q.   And you've never created records for the DOC?

25       A.   No.

1    Q.   You're certainly not the recordkeeper for the

2    DOC?

3    A.   Absolutely not.

4    Q.   And you never -- you yourself have never been

5    granted a furlough by the DOC?

6    A.   Not yet.

7    Q.   Anything you testified about today regarding

8    furloughs is based on your general understanding from

9    being in the criminal defense business?

10   A.   Particularly around that -- that time there were

11   -- there were all kinds of problems that led to -- to --

12   to a lot of changes because of the problems with people

13   not coming back from furloughs.

14   Q.   And you were representing individuals who

15   presumably had escaped from furloughs?

16   A.   Either -- I'm trying to remember a specific case

17   but it had furlough issues, whether they came back late

18   or something like that, I definitely -- but I can't give

19   you any specific item.

20   Q.   If we can look, again, I think you still have it

21   in front of you, maybe to your right, this white joint

22   exhibit binder. And I believe Mr. Friedman showed you a

23   couple of Department of Correction documents that were

24   in this binder.  If I can direct you to the one behind

25   Tab 11.

1      A.   11?

2      Q.   Yes, sir.

3      A.   Yes.

4      Q.   And so this appears to -- April 29, 1980 to the

5   superintendant of the Department of Correction from a

6   first associate commissioner stating that while the

7   department has chosen to allow Mr. Balliro to continue

8   on the furlough program, the commissioner, his designee

9   and/or the furlough panel may exercise their authority

10  to regulate the number of hours used.  From the time

11  being, Mr. Furlough (sic) will be restricted from

12  overnight furloughs.  Did I read that right?

13     A.   You did.

14     Q.   So an overnight furlough would be a 24-hour

15  furlough, right?

16     A.   Or 18 or depending on what time he got out, but,

17  you know, he could have got out at five o'clock and come

18  back five o'clock the next morning.  That would be 12

19  hours.  Again --

20     Q.   Sure, but in your --

21     A.   What I agree is that I don't know that 12 hours

22  means overnight but -- but I -- again --

23     Q.   Sure.  So this letter would indicate to you that

24  Mr. Balliro was allowed to go on 12-hour furloughs but

25  not overnight 24-hour furloughs?

1    A.   Well, it doesn't say the numbers of hours, but

2   not overnight.

3    Q.   All right.  And so then turning to the document

4   behind Tab 12 --

5    A.   Yes.

6    Q.   -- this one is a Department of Correction

7   disciplinary report; do I have that right?

8    A.   Yes.

9    Q.   And it says here under Description of Offense:

10   Rocco Balliro SE2527 was declared escaped at 10:15 p.m.

11   on May 31, 1980 from furlough.  Subject failed to

12   return after a 12-hour furlough.  He was due back at 9

13   p.m.

14        Did I read that right?

15    A.   You did.

16    Q.   And you would agree with me that 12 hours before

17   9 p.m. May 31, 1980 was 9 a.m. May 31, 1980?

18    A.   In general empirical terms, that's correct.

19    Q.   And that would be approximately nine hours after

20   the murder of Mr. LaMonica?

21    A.   Yeah, but according to this, that's when he was

22   declared escaped but that doesn't mean that he wasn't

23   back then before then.  That's when he was declared

24   escaped.  That's when they filled out the documents

25   regarding his failure to return.

1      Q.   So this discipline report that's dated May 31,

2   1980 that refers to his -- he was due back at 9 p.m. --

3      A.   It doesn't say that. It says that he was declared

4   escaped. He was due -- I'm sorry, he was due back at 9

5   p.m., but it doesn't say December -- strike that, May

6   31, 1980.

7      Q.   It says May 31, 1980 --

8      A.   The date.  The date -- certainly the date --

9      Q.   Yeah.

10     A.   -- of the document is when they filled out this

11  report.  I take their word for it, the 31st, but that

12  wouldn't mean anything to me in terms of investigation I

13  would conduct that they said that he was declared

14  escaped, particularly when you have the other documents

15  saying he left Friday.

16     Q.   That other document is not drafted by the DOC?

17     A.   Right, but the --

18     Q.   Drafted by -- excuse me.  Sorry.

19     A.   And there were ten guards that apparently backed

20  that up.

21     Q.   That -- that document is not drafted by ten

22  guards.  That document is drafted by Detective Leahy at

23  the Braintree Police Department; do I have that right?

24     A.   After he talked to ten guards that said that

25  looks like him and he was available to conduct that

1    incident.

2        Q.   And Mr. Balliro --

3        A.   That's what I take from --

4        Q.   Mr. Balliro wasn't in the custody of the

5    Braintree Police Department in May of 1980; do I have

6    that right?

7        A.   No, but he was in the custody of the Bridgewater.

8    I don't know -- cut -- you know, he was in the custody

9    of the Bridgewater -- at MCI Bridgewater and the guards

10   that were interviewed, according to this document, were

11   guards at that time.

12       Q.   Sure.  But this document is drafted by the

13   Department of Correction?

14       A.   Yes.

15       Q.   Who had custody of Mr. Rocco Balliro?

16       A.   Yes.

17       Q.   Indicates that he was due back on 9 p.m. on this

18   discipline report and this discipline report is dated

19   May 31, 1980; do I have that right?

20       A.   That's what the words say. That's not what -- I

21   wouldn't take it as meaning -- as I explained, I don't

22   mean to quibble with you, but this would be the subject

23   of investigation obviously.

24       MS. FEE:  I have no further questions, your Honor.

25       THE COURT:  All right. Any redirect?

1                         REDIRECT EXAMINATION

2     BY MR. FRIEDMAN:

3         Q.   Mr. Cardinale.

4         A.   Yes.

5         Q.   There was a question on cross-examination about

6     your recall of this event. How is it that you were to

7     recall this particular case?

8         A.   Well, try to be succinct as I can. First of all,

9     it was my first murder case where I was lead counsel and

10    sole counsel and so it was a very important matter to

11    me. I also remember it because having visited that scene

12    both during the day and at night and putting myself in

13    the position that I understood these people put

14    themselves in, I found it impossible that anybody could

15    make an identification of anyone running fast around

16    that corner, and so that is something that has stuck

17    with me and has affected me almost every day since --

18    since -- since Mr. Weichel's conviction. So it's

19    something that's been on my mind the whole time.

20        Q.   When did you have that scale survey of the area,

21    you know, when was it finally done?

22        A.   Again, I can't give you a specific date, but it

23    was done within the first two months of me representing

24    Mr. Weichel, so August, September, October.  In that era

25    area of 1980.

1     Q.   It was the same year as the event --

2     A.   Yes.

3     Q.   -- correct?

4     A.   Within -- again, somewhere beyond a month or two

5     months.

6     Q.   And did the prosecution also use this as a scale

7     diagram or survey of the area?

8     A.   They did.  They took my -- my poster and used it

9     as their exhibit.

10    Q.   Did they contest the location of any playground

11    equipment?

12    A.   No.

13    Q.   To your knowledge, was any playground equipment

14    moved May of 1980 or the August or fall of 1980?

15    A.   No.  In fact, the prosecutor introduced that as

16    her own exhibit indicating that it was exact and it --

17    it had accurately depicted the -- the area in question.

18    I mean including all of the items that are -- are shown

19    on that -- on that diagram.

20    Q.   And what -- back in 1980, was it your standard

21    procedure to send investigators to speak to witnesses?

22    A.   At least attempt to do so. Most of the time they

23    wouldn't speak, but at least they would -- I would make

24    an attempt. Obviously, I wouldn't do any case without

25    trying to speak to potential witnesses in the case or

1  having someone, not necessarily myself, or having

2  someone do that.

3      Q.  Now, back in -- in June of 1980 when the Leahy

4  report was written, do you have an idea of how often

5  Detective Sprague was working on this case?

6      A.  My understanding is full-time.

7      Q.  And Detective Wilson from the Braintree Police

8  Department was working with him as a team --

9      A.  Yes.

10      Q.  -- is that right?

11          MR. FRIEDMAN:  No other questions.

12          THE COURT:  Any recross?

13          MS. FEE:  No questions, your Honor.

14          THE COURT:  All right. Thank you Attorney

15  Cardinale.  You're all set.

16          THE WITNESS:  Thank you.

17          THE COURT:  You can just leave it there.  Yes.  Can

18  you remove whoever's exhibits and ID's there are.

19          MR. FRIEDMAN:  Yes, Judge.

20          THE COURT:  Thank you.  That's been marked already?

21          MR. LEOVY-REYES: Yes.

22          THE COURT:  Next witness.

23          MR. LEOVY-REYES:  Plaintiff is going to call Sydney

24  Hanlon.

25                      SYDNEY HANLON, SWORN

1     THE COURT:  Good morning

2     THE WITNESS:  Good morning, your Honor.

3          I have cough drops because I had an asthma

4   attack outside.

5                    DIRECT EXAMINATION

6   BY MR. LEOVY-REYES:

7   Q.  Good morning.  Can you please state your name.

8   A.  Sydney Hanlon.

9   Q.  Ms. Hanlon, you were the lead prosecutor in Fred

10  Weichel's criminal trial, is that right?

11  A.  Yes.

12  Q.  And you represented the Commonwealth in that

13  case?

14  A.  Yes, sir.

15  Q.  That would be the same Commonwealth for the

16  defendant here, is that right?

17  A.  Apparently, yes.

18  Q.  Obviously you're a lawyer, correct?

19  A.  Yes, sir.

20  Q.  You had been since 1975?

21  A.  Yes, sir.

22  Q.  Would it be fair to say that when you first got

23  involved in the LaMonica murder investigation, you were

24  approximately five years out of law school?

25  A.  Yeah, that sounds about right.

1    Q.  And, in fact, the Robert LaMonica murder case

2  was the only murder case you ever prosecuted, isn't

3  that right?

4    A.  No.

5    Q.  You prosecuted some afterwards?

6    A.  I handled a murder case before that that ended in

7  a plea. And I was assigned to prosecute a homicide case

8  after that that got delayed because the lawyers were

9  stuck in a very long federal trial and it hadn't gone to

10  trial yet when I left the office.

11    Q.  Fair enough.  The Robert LaMonica murder case

12  was the only murder case you ever took to trial?

13    A.  Yes.

14    Q.  When you were assigned the Robert LaMonica

15  murder investigation, you were working in the rape

16  unit, isn't that right?

17    A.  Among other things.

18    Q.  And you don't know why it was that you were

19  assigned to work on this case, do you?

20    A.  I do.  I think I got pulled in to help with the

21  wiretap.

22    Q.  Okay.  Would you agree that John Sprague was the

23  primary source of evidence that you presented at trial?

24    A.  Well, he was the lead investigator.

25    Q.  Right.

1    A.   I think the evidence came from the civilian

2    witnesses -- witnesses really more than him.

3    Q.   Do you recall sitting for a deposition?

4    A.   Yes.

5    Q.   You had testified at deposition that John

6    Sprague was the primary source of evidence that you

7    received.  Would you disagree with that?

8    A.   I -- I -- I think he was the lead investigator.

9    I -- I guess he was the primary source in the sense of

10   being the first person who told me certain things, and

11   then I spoke with the witnesses myself, obviously,

12   before I called them on the witness stand.

13   Q.   When you were gathering information, John

14   Sprague was your primary source, was he not?

15   A.   I guess.  I'm sorry, I'm trying -- I'm not -- I'm

16   trying not to give you a hard time.  I guess it's the

17   word "primary" I'm struggling with. He was lead

18   investigator. He did a lot -- most of the work, but I

19   worked with at least one other police officer,

20   significant police officer and a lot of others and the

21   -- and the civilians who testified.

22   Q.   In your deposition you were, in fact, the person

23   who used the word "primary source," isn't that right?

24   A.   If you say so. I never seen a transcript of that.

25   Q.   Can we have transcript number 31.

1      MR. LEOVY-REYES:  Judge, may I approach?

2      THE COURT:  Yes.

3  BY MR. LEOVY-REYES:

4      Q.  I'm going to give you what's been -- I'll

5  represent this is transcript number 31. I'm going to

6  ask you to turn to page 24, please.

7      A.  Getting there.

8      Q.  That's okay.

9      A.  24.

10     Q.  I want to direct your attention to the bottom

11 line 24 -- line 20 to the top of page 25, line 1.

12     A.  Say that again. In the -- got it.

13     Q.  Yes.  Did I ask you this question:  I'm just

14 trying to figure out.  So when you were trying to

15 gather information about the prosecution, who was your

16 primary source for the evidence that you were going to

17 present regarding the LaMonica murder?

18         Answer:  Trooper Sprague was the primary source.

19         Did I ask that and did you give that answer?

20     A.  Apparently.  According to this transcript, I did.

21     Q.  Now, there was no physical evidence that ever

22 tied Fred Weichel to the murder scene, was there?

23     A.  No.

24     Q.  There was no fingerprint evidence, isn't that

25 right?

1    A.   Right.

2    Q.   Fingerprints weren't found on the murder weapon,

3  isn't that right?

4    A.   No.   The murder weapon was picked up by a little

5  boy and waved around with --

6    Q.   Right.   The question was --

7    A.   Lots of people touched it.

8    Q.   His fingerprints were not on the murder weapon,

9  were they?

10   A.   We never recovered any fingerprint evidence from

11  the gun.

12   Q.   Okay.   Which would include you never recovered

13  Fred Weichel's fingerprints, right?

14   A.   That's right.   That's right.

15   Q.   There was no gun powder residue evidence ever

16  found, isn't that right?

17   A.   Where?   What do you mean?   On the body, on

18  Mr. LaMonica's body?

19   Q.   Let me ask you this:   Was there ever  --

20   A.   Was the gun powder residue on Fred Weichel?   No.

21  We didn't stop him for weeks.

22   Q.   Well, there was no gun powder residue in his

23  car, was there?

24   A.   He wasn't driving.

25   Q.   Was there any evidence that there was any gun

1    powder residue in the car?

2        A.   What car?

3        Q.   His car?

4        A.   I don't -- I don't even remember that he had a

5    car. He jumped in the -- the night of the --

6        Q.   Hold on.  You answered the question.

7        A.   Okay.  Okay.

8        Q.   Was there any evidence that there was any gun

9    powder residue in Mr. Weichel's house?

10       A.   Not that I ever heard of.

11       Q.   Was there any evidence that there was blood of

12   the victim on any of his clothes?

13       A.   No.

14       Q.   Was there any evidence that there was any blood

15   of the victim inside Mr. Weichel's car.

16       A.   There was no such evidence.

17       Q.   Was there any evidence that there was any blood

18   from the victim inside Mr. Weichel's house?

19       A.   Didn't you just say that?

20       Q.   I said the car, not the house.

21       A.   Oh, okay.  I thought you said the house before.

22   Was that gun powder residue?

23       Q.   Yes.  No, it was just about the blood, I'm

24   sorry. Was there any -- was there any evidence that the

25   victim's blood was found in Mr. Weichel's house?

1     A.   No.   There was never any victim's blood found

2     except on Mr. LaMonica himself.

3     Q.   Right.   And, in fact, the evidence showed that

4     Mr. LaMonica was shot at close range, correct?

5     A.   The first shot, the medical examiner said was

6     from a distance that would have dropped him and then the

7     second shot was close range up into his head.

8     Q.   So the answer is yes, there was evidence that he

9     was shot in close range, correct?

10     A.   That's my memory of what the medical examiner

11     said.

12     Q.   So you would expect the shooter to have

13     Mr. LaMonica's blood on him or her, isn't that right?

14     A.   Not a month later.

15     Q.   That's not the question.   The question is you

16     would expect that whoever shot Robert LaMonica that

17     night had blood on his murder (sic)?

18     A.   I don't know enough to answer that to be honest

19     with you.   I'm not trying to give you a hard time, but

20     I --

21     Q.   You're not aware that the murder weapon was ever

22     subsequently tested for DNA, isn't that right?

23     A.   They couldn't do DNA analysis in 1980 in the

24     Boston -- in the state police lab.

25     Q.   That's why the question said subsequently.   Was

1    there -- was it ever subsequently tested for DNA?

2        A.   Not to my knowledge.

3        Q.   And you are aware, are you not, that DNA

4    evidence collection has gotten much more advanced over

5    the years, isn't that right?

6        A.   Yes.

7        Q.   That now you can take swabs from things and find

8    DNA from 20 years ago, right?

9        A.   I think so.  I mean, I don't -- I honestly don't

10   know if you can get a swab from something that was 20

11   years old or if the swab subsequently tested produces

12   the DNA.

13       Q.   But you're not aware of there being any

14   subsequent tests for DNA of the murder weapon that ever

15   tied Fred Weichel to that weapon, isn't that right?

16       A.   That's correct.

17       Q.   Now, John Foley was the only evidence that was

18   ever presented that tied Fred Weichel to the murder

19   scene, isn't that right?

20       A.   By the time of trial, yes.

21       Q.   You would agree that his reliability was a key

22   part of the trial?

23       A.   Yes.

24       Q.   And, in fact, one of the teenagers who came and

25   testified at trial, pointed to the back of the

1    courtroom and identified the victim's brother, isn't

2    that right?

3        A.  Yes.  Yes, she did.

4        Q.  Now, you would also agree that the ability to

5    see at night is less than the ability to see during the

6    daytime?

7        A.  Well, depending on the lighting.  The evidence

8    was that it was under a streetlight, directly under a

9    streetlight.

10       Q.  That wasn't the question.  The question is you

11   would generally agree that at nighttime you're less

12   able to see than you are in the daytime?

13       A.  Well, it depends on what the light is. And you

14   know if it was light outside, I could see pretty -- just

15   as well as I can see now.

16       Q.  Did you talk to anybody about your testimony

17   today before coming today?

18       A.  About the fact that I was going to testify?

19       Q.  No. No.  About the substance of your testimony?

20       A.  Not really.  I spoke to Mr. Shekatok last night

21   who I asked to represent me.

22       Q.  Did you talk to anyone else?

23       A.  I said hello to Mr. Cardinale in the hallway. We

24   didn't talk about -- I mean, I understood the witnesses

25   were sequestered.

1    Q.  Did you talk to any -- any of the lawyers in

2    this case about your testimony?

3    A.  I spoke briefly to the prosecutors to say hello

4    and then I was here.

5    Q.  Did you say anything --

6    A.  Asked if anybody had any idea if and when I was

7    going to get called and they said Mr. Cardinale was on

8    the stand and after, you know, done with him --

9    Q.  I'm sorry, I didn't mean to cut you off.  Did

10   you have any conversations with anybody regarding your

11   testimony today?

12   A.  Not really.  I asked them what was going on.

13   They said briefly what was going on.

14   Q.  Okay. What did they say was going on?

15   A.  That Mr. Cardinale was testifying, that youI were

16   going to cross-examine him and then a brief break, and

17   you might be asking specifically about why we reindicted

18   him after the indictment was dismissed, and they may

19   have said another thing.  I don't remember right now.

20   Q.  All right.  So as you sit here today, you would

21   not generally agree that somebody at nighttime has less

22   of an opportunity to view somebody than they do in the

23   day, is that right?

24   A.  If there's no ambient light, of course.

25   Q.  Okay.

1    A.  If there's ambient light, it depends on the

2    amount of the lighting.

3    Q.  Do you remember when I deposed you I told you at

4    the beginning of the deposition if there's a question I

5    ask you that you don't understand, please let me know

6    and I'll rephrase it; do you remember that?

7    A.  No.

8    Q.  Okay.

9    A.  I'm not saying you didn't say that.  I just don't

10   remember that.

11   Q.  No, that's fair.  I understand.  I'm going to

12   ask you to turn to page 68 of transcript 31.

13   A.  Page 68, okay.

14   Q.  All right.  Bottom of the page, lines 21 to 24.

15   Did I ask you this question and did you give me this

16   answer?

17   A.  Yes.

18   Q.  "You would agree that the ability to see at

19   nighttime is less than it is to see during the daytime,

20   would you not."

21   A.  I did say yes. Then you said was it at nighttime

22   and I said --

23   Q.  You answered my question.  I asked you 21

24   through 24.

25   A.  You don't want to hear the next thing?

1    Q.  I do not.

2    A.  That I said to clarify that.

3    Q.  No, you've answered the question as I asked.

4    A.  Fair enough.

5    Q.  You're a lawyer.  You know that's the way it

6    works, right?  The lawyer asks the questions and it's

7    the witness's answers to questions?

8    A.  Yes.

9    Q.  You were also a judge too, correct?

10   A.  Yes, sir.

11   Q.  Now, you don't recall anybody from the

12   prosecution side looking at night from Faxon Park to

13   see if they could see a face from the distance that

14   Foley was, do you?

15   A.  I -- my memory is I went there with Trooper

16   Sprague and I have a vision of it at nighttime with the

17   -- under that streetlight.  Now, I can't -- I -- it's,

18   you know -- I know you know how long ago it was.  I

19   don't -- I can't tell you for sure that I was on the

20   other side of that field myself and looked at the

21   streetlight.

22   Q.  Well, in fact, you testified that you sat in the

23   car when you went there with Mr. Sprague, didn't you?

24   A.  When did I say that?

25   Q.  During your deposition.

1    A.   All right.  I mean, if you say so.  I -- like I

2    said, I have a memory what it was like whether that was

3    through hearing the witnesses or if that was being

4    there.  I know I was there more than once, a number of

5    times.

6    Q.   Okay. I'll ask you to turn the page.

7    A.   I sat in the car that night.  We drove, you know,

8    from the Exchange to the -- out there and then back to

9    the Triple O's, but I was out of the car more than once

10   at the scene -- where the place where the shooting was.

11   Q.   All right. I'm going to ask you to go to page 70

12   of your deposition, please, which is in front of you.

13   Lines number 9 and 10.

14        Did you give this testimony:  And we did that at

15   night but I didn't get out of the car and look from the

16   park.  Did you testify to that?

17   A.   But that refers specifically to what I said. I

18   did drive with Trooper Sprague to the location; the

19   route from the bar that was known as the Exchange, there

20   and back to the Triple O's, the bar that was known as

21   the Triple O's, to get a look at the timing. And we did

22   it that night, but I didn't get out of the car and look

23   from the park. That was that night.

24   Q.   So my original question to you was, though:  You

25   don't recall anybody from prosecution side ever getting

1    out of the car, going into Faxon Park and looking to

2    see if they could see a -- see a face and identify a

3    face from the same distance that Foley is, isn't that

4    true?

5         A.   Oh, we went there a lot --

6         Q.   That's not the question.  The question is --

7         A.   -- and viewed there.  Just I don't -- this refers

8    to that night.  I don't have a specific memory. I told

9    you that of being there and looking at across the park

10   myself. I don't --

11        Q.   And you don't have a memory of an investigator

12   going there and looking from across the park, do you?

13        A.   No, really I don't.  I mean, at night?

14        Q.   Right.

15        A.   We all did it from the daytime.

16        Q.   Okay.  You don't know if it ever happened at

17   night, isn't that right?

18        A.   I can't say whether it did or didn't. I don't

19   have a memory of it.

20        Q.   You would agree that in the early 1980s a

21   semi-afro was in style in South Boston?

22        A.   I -- they called it the southy cut. I have no

23   idea what it -- I never heard the term. I don't have any

24   memory of hearing the term "semi-afro."

25        Q.   But you agree, though, that it included curly

1  hair, isn't that right?

2     A.   Yeah. Yes.  I'm sorry.

3     Q.   That's fine. Now, as far as you know, Thomas

4  Barrett didn't have a cut like that, did he?

5     A.   Thomas -- oh, Mr. Barrett.  No, Mr. Barrett

6  didn't look anything like the composite.

7     Q.   Right.

8     A.   Or like Mr. Weichel.

9     Q.   Right.  Mr. Barrett had light hair, correct?

10     A.   I don't remember what he looked like.

11     Q.   He had straight hair though?

12     A.   If you say so.  I truly -- I -- I don't recall

13  ever being in the same room -- well, no, as Tommy

14  Barrett.

15     Q.   Okay. You would agree that you shared every

16  police report that you received --

17     A.   No, I did.  I'm sorry, I did see Mr. Barrett

18  riding around with Mr. Weichel and we were trying to

19  have the bug in the car.

20     Q.   Okay.

21     A.   I don't recall any -- at all truly --

22     Q.   Got it.

23     A.   -- what he looks like.

24     Q.   Got it.

25     A.   Or looked like 40 years ago.

1    Q.  You shared every police report that you received

2    about the LaMonica murder investigation with the

3    defense, didn't you?

4    A.  With Mr. Cardinale, yes.

5    Q.  Yes.  And that was your practice?

6    A.  Absolutely.

7    Q.  And you never saw -- show you what's marked as

8    ID-H.  You never saw this binder before, isn't that

9    right?

10   A.  Did I see it?

11   Q.  During your prosecution?

12   A.  In the 1980s?

13   Q.  Yes.

14   A.  Well, I can't see what that is. I don't believe

15   -- if you're talking about the other composite and the

16   -- and the Jim Leahy report, I never saw that.

17   Q.  Right.  And right now --

18   A.  This is captain --

19      THE COURT:  Hold on.  Let's do one at a time.

20      MR. LEOVY-REYES:  Yes, Judge.

21      THE COURT:  Question.

22   BY MR. LEOVY-REYES:

23   Q.  I'm just talking about the binder.  Have you

24   ever seen the binder before?

25   A.  I don't -- I don't have any idea. Is this Captain

1   Buker's file?

2       Q.   Well I --

3       A.   What was described to me as Captain Buker's file.

4       Q.   Let me just represent to you, on the front it

5   says "Murder LaMonica, Robert," and then it says

6   "Captain Buker."

7       A.   I can see that but I -- I'm sorry, I just -- I --

8   I looked at everything they told me they had. I -- I

9   represented that I had seen it all and I -- and I gave

10  everything that I had to Mr. Cardinale. I can't say

11  whether I saw this particular binder before.

12      Q.   Sure.  Sure.

13      A.   Except I -- I think I did during the deposition

14  or the motion for new trial process.

15      Q.   Right.  Right.  And if you had seen anything in

16  that binder, you would have turned it over to

17  Mr. Cardinale?

18      A.   Anything that was any different from what I've

19  already seen.

20      Q.   Right.

21      A.   I mean, this is newspaper clippings afterwards

22  and -- and -- and police reports that I -- yeah.

23      Q.   But it was your practice to turn over anything

24  you received to the defense, is that right?

25      A.   Absolutely.

1     Q.  I'm going to take that back if you don't mind.

2   Thank you. I'm going to show you what's been marked as

3   Exhibit 24. You just referenced that you never saw the

4   Leahy Report?

5     A.  I saw it in a motion for new trial, but I never

6   saw it at that time.  If I did, I had no memory,

7   certainly not in connection with the Weichel case.

8     Q.  Exactly.  So and that's -- I guess that's my

9   question.  During your prosecution back in 1980, '81,

10   you never saw Exhibit 24, isn't that right?

11     A.  Absolutely not.

12     Q.  And if you had seen it, you would have given it

13   to Mr. Cardinale?

14     A.  If I had seen it, the first thing I would have

15   done was to figure out what the heck it was -- the

16   juvenile officer was doing investigating the state

17   police case, but I would have given it if -- if I

18   thought it had any relation to this case, I certainly

19   would have given it to Mr. Cardinale.

20     Q.  And when you say "the juvenile officer," you're

21   talking about Detective Leahy?

22     A.  Yes, I am.

23     Q.  Detective Leahy was a detective in the Braintree

24   Police Department, right?

25     A.  Yes.

1    Q.  And at the bottom of this page it says:

2  Detective Wilson to check this out. Sorry, you can't

3  see that. Isn't that right?

4    A.  Yes.

5    Q.  Now, it's your understanding Detective Wilson

6  was the lead Braintree detective on the LaMonica

7  investigation?

8    A.  He was the only Braintree detective to work with

9  us and he did work with us.

10    Q.  And in fact --

11    A.  I don't think that was his only case, but he did

12  work with us.

13    Q.  Right.  And, in fact, that would have been the

14  primary case that summer, right?

15    A.  I -- I can't say.  This is right after, right,

16  right after the murder?  I don't remember.

17    Q.  Now, this is dated --

18    A.  Wilson had more than one case.

19    Q.  Right. This is dated June 9.  So about nine days

20  after the murder.

21    A.  Okay.

22    Q.  All right.  Now you, fair to say, that you

23  relied on the investigators to tell you the work that

24  they were doing on the LaMonica murder investigation?

25    A.  Yes.

1    Q.  You would agree that Exhibit 24, which you just

2  saw, would be exculpatory evidence if it related to the

3  LaMonica murder?

4    A.  Yes, if it -- if it in fact related to the

5  LaMonica homicide.

6    Q.  Right.  Right. Now, you're aware the Department

7  of Corrections had a furlough program in the 1980s,

8  isn't that right?

9    A.  I think so. It seemed to me it had something to

10  do with an issue in the Dukakis election.

11   Q.  That was one of my questions.   In 1988 that was

12  an issue in the election, right?

13   A.  Right.  So that's how I -- I -- it wasn't really

14  my wheelhouse, but that's my sense.

15   Q.  In fact, in the 1980 election there was a tag

16  that basically said Michael Dukakis --

17     MS. FEE:  Objection; relevance.

18     THE COURT:  No, that's fine. I'll allow it.  Why

19  don't you finish the question.

20     MR. LEOVY-REYES:  Sure, Judge.

21  BY MR. LEOVY-REYES:

22   Q.  Michael Dukakis had this furlough program that

23  let -- allowed murderers out on the street?

24   A.  I don't -- something like that.  I don't remember

25  exactly, but yeah, I remember.

1    Q.   The famous Willie Horton ad?

2    A.   Yes, exactly.

3    Q.   And the furlough program let convicted people

4  out -- basically out on the street, isn't that right?

5    A.   I think so.  Be honest with you, I -- I -- you

6  know, that was -- that sort of thing happened well after

7  what I was doing. I didn't know for sure. I think that's

8  right. I know he wasn't on parole.  Mr. Horton wasn't on

9  parole, because I remember the former chair of the

10 parole board was a little wound up that he kept getting

11 accused of letting him out and he didn't.

12   Q.   When you were --

13        THE COURT:  And this is -- just for the record, an

14 individual that's not at issue at this case.

15        MR. LEOVY-REYES:  Absolutely.

16        THE COURT: Next question.

17        MR. LEOVY-REYES:  State of mind.

18        THE COURT:  Next question.

19        MR. LEOVY-REYES:  All right.

20 BY MR. LEOVY-REYES:

21   Q.   I'm going to show you what's been marked as

22 joint Exhibit Number 7.  All right. I'm going to ask

23 you to take a look at joint Exhibit Number 7.  You have

24 a camera -- a monitor right in front of you, and ask

25 you if you ever saw this before?

1      THE COURT:  Why don't you give her the file.  She

2  might be able to see it better.  The binder.

3      MR. LEOVY-REYES:  Yes.

4      THE WITNESS. Is that Rocco Balliro?

5  BY MR. LEOVY-REYES:

6      Q.  Easier to see on the paper.

7      A.  Sorry.  It's a combination of near-sidedness.

8  Parole violation.  Okay.  Got it.

9      Q.  All right.

10     A.  Yes, I can see. I couldn't see the name at the

11  bottom.

12     Q.  Of course.  It's much easier that way.

13         So on -- during your investigation or during

14  your prosecution in 1980, '81, do you recall ever

15  seeing this document?

16     A.  No, I don't think I ever -- I could be wrong.  I

17  don't think I've ever seen this document.

18     Q.  All right.  I'm just going to highlight right

19  here where it says "Subject left MCI 530-80."  Did you

20  ever see that during prosecution?

21     A.  I -- no, definitely not.

22     Q.  Okay.

23     A.  I --

24     Q.  Now, you're aware, are you not, James Leahy did

25  do some work in the LaMonica murder investigation?

1    A.  I don't believe so.  You know, you -- I could --

2    it could have been something somebody told me or

3    something I don't remember after 40 years, but as I --

4    can I just say, he -- he was -- my understanding, I had

5    done a lot of work with him. He was the juvenile

6    officer. State police had control of investigations. The

7    district attorney law passed or something that said that

8    state police ran the investigation.  So we worked with

9    Wilson, but I don't -- it would be shocking to me that

10   in that time a police officer from Braintree did work on

11   that homicide investigation without telling us. You

12   know, if -- if it -- I don't know. That would be

13   startling to me.

14   Q.  Well, and Exhibit Number 24 kind of agrees with

15   you. At the bottom says:  Wilson to check it out, isn't

16   that right.

17   A.  Well, assuming to the -- that doesn't -- there's

18   no name on the Leahy letter.  Wilson had more than one

19   case.

20   Q.  Okay.  But Exhibit 24 said:  Wilson to check it

21   out, isn't that right?

22   A.  It did say that.

23   Q.  All right.  Let's switch gears.  Let's talk

24   about Thomas Barrett.  At some point you learned that

25   Thomas Barrett was living outside Massachusetts,

1    correct?

2        A.   Yes.

3        Q.   And you would agree it's not illegal to move

4    from Massachusetts to California, correct?

5        A.   I don't believe so.

6        Q.   Now, in fact, you learned he was living in the

7    Bay area of California, didn't you?

8        A.   I don't remember where, but I know that I knew at

9    the time we were going to trial because we were trying

10   to get him to cooperate.

11       Q.   If he testified at one of the motions for new

12   trial that you knew he was in the Bay area, you would

13   not dispute that, would you?

14       A.   No.

15       Q.   In fact, you sent a couple Massachusetts state

16   troopers to find him, didn't you?

17       A.   Yes, we did.

18       Q.   You sent Trooper -- you sent Trooper Allyn,

19   correct?

20       A.   Yes.

21       Q.   You wanted to interview him, right?

22       A.   Yes.

23       Q.   You had an idea where he was, didn't you?

24       A.   Yes.

25       Q.   You got an address?

1    A.  I don't remember that. I remember that we knew he

2    was out of state.  We thought he might be more willing

3    to talk out of South Boston and -- and they would --

4    where they would go and see if they could interview him.

5    Q.  But you didn't send two Massachusetts state

6    troopers out and say:  Hey, go to the Bay area, walk

7    around and see if you can find this guy?

8    A.  Wouldn't have been in those words, but they

9    were --

10    Q.  Right.

11    A.  -- pretty good investigators.

12    Q.  Right.

13    A.  I mean, they had some kind of a lead.

14    Q.  Right.

15    A.  I don't know.  I don't know that they had an

16    address.  They may have had.

17    Q.  There was an idea where he could be found,

18    correct?

19    A.  Apparently, yes.

20    Q.  In fact, they found him, didn't they?

21    A.  I don't know that they actually did. I think they

22    found -- they spoke with someone who said he had been

23    there or maybe they found him and he wouldn't talk to

24    them.  I remember them not being -- producing anything

25    that I could use at the trial.

1     Q.  I'm going to ask you to turn to page 94 of your

2  deposition.

3     A.  My deposition, okay.

4     Q.  Yes, exactly.

5     A.  May I put this up here, your Honor, with --

6         THE COURT:  Yes.

7         MR. LEOVY-REYES:  I can grab it.

8         THE WITNESS:  No.  I just needed a little more room

9  here. 94.

10  BY MR. LEOVY-REYES:

11     Q.  Yes. Going to direct your attention to line 14.

12  I'm going to read on to the next page.  Did I ask you

13  this question:

14         At the time of your prosecution of Mr. Weichel,

15  what efforts, if any, did you make to find Thomas

16  Barrett?

17         Answer:  Well, apart from, you know, what you

18  heard at some point, I don't remember how it came about

19  I knew state troopers went to California.  We have some

20  information he was there. I have a memory that it was

21  his sister that was out there and he had gone to be

22  with her. I could be wrong but there was a woman.  It

23  could have been a romantic interest, but my -- my best

24  memory is that it was his sister who gave us an address

25  and the troopers went to talk to him and he -- I don't

1    think they ever met with him. I think they saw him and

2    they went with the local police and he was gone by the

3    time they got there.  That's my best memory.

4            Did you give that testimony?

5    A.   Yes.  And that's -- that -- that -- that's a

6    better memory than I have today.  I think that's right.

7    Q.   Right. You don't dispute that?

8    A.   No.

9    Q.   They didn't arrest them, did they?

10   A.   Beg your pardon?

11   Q.   They didn't arrest Thomas Barrett, did they?

12   A.   They did not.

13   Q.   Now, did you ever see any investigation that was

14   done about whether the LaMonica murder was committed

15   because Robert LaMonica had some involvement in a car

16   theft ring?

17   A.   I don't think so.

18   Q.   Did you ever see any report that indicated that

19   it was an investigation that Robert LaMonica was killed

20   because of his involvement in the murder of Freeman

21   "Punchy" Clifford?

22   A.   Yes, that I think there was -- I filed a motion

23   in limine to keep that out.

24   Q.   I understand that.  Did you ever see a police

25   report that said:  I went out and talked to the

1    associate of Punchy Clifford and here's what they told

2    me?

3        A.   No.

4        Q.   In fact, you don't know any report that anybody

5    talked to the associates of Punchy Clifford, do you?

6        A.   I can't say -- I do not know of any report that

7    says anybody went and talked to the associates of Punchy

8    Clifford.

9        Q.   Now, you would agree John Foley was a

10   cooperative witness for the prosecution?

11       A.   Yes.

12       Q.   And there were charges pending against him when

13   he testified, isn't that right?

14       A.   Yes.

15       Q.   He was arrested by the Braintree Police

16   Department at some point during the LaMonica murder

17   investigation, correct?

18       A.   Yes.

19       Q.   Had to do with drugs?

20       A.   Yes.

21       Q.   Let's switch subjects again.  You would agree a

22   witness who picks out two to three photographs in a

23   photo lineup has not made a positive identification of

24   one person?

25       A.   Yes.

1    Q.   And, in fact, you never claimed that to be the

2    case, that there was a positive identification when a

3    witness says:  Could be these two or three people?

4    A.   Not in those -- not in those words as you said

5    them.

6    Q.   As a prosecutor, you don't recall ever

7    authorizing a police officer to drive a witness around

8    neighborhoods to look for a suspect, do you?

9    A.   I heard about that afterward.

10   Q.   Right.  My question, though, is:  You never

11   authorized such a thing as a prosecutor?

12   A.   No.

13   Q.   And, in fact, you never heard of it happening

14   outside of the investigation related to the LaMonica

15   murder, isn't that right?

16   A.   No.  I don't think so.

17   Q.   And would you ever authorize an identification

18   procedure with the victim's brothers being present

19   during that procedure, would you?

20   A.   The rules are different than they were in 1980. I

21   -- I -- likely if I had known in advance, I would have

22   said that was better. They all testified they didn't

23   speak at all and I accepted that testimony.

24   Q.   My question, though, is you would not authorize

25   that to happen, would you?

1    A.  I did haven't any control over that. Well, that

2    -- that specifically, I did not authorize it.  I didn't

3    know it was going to happen in advance.

4    Q.  Right.  And you would not have authorized it,

5    would you?

6    A.  I can't speculate.  It would depend on what

7    Trooper Sprague said and what else was going on. I

8    didn't.  So...

9    Q.  So there might be --

10   A.  I don't think in 2022, I don't think that's the

11   best approach and I would tell somebody not to do that.

12   What I would have done in 1981 -- '80, '81, I can't tell

13   you.

14   Q.  In fact, it's utterly improper, isn't it?

15   A.  I -- I -- I don't know that.

16   Q.  Okay.  You would agree that you talked to the

17   prosecution witnesses before they testified?

18   A.  Yes.

19   Q.  In motion hearing or trial?

20   A.  Yes.

21   Q.  And there is nothing improper for a lawyer to do

22   that, correct?

23   A.  Right.

24   Q.  In fact, I would say you might almost be, you

25   know, engaging in misconduct if you don't talk to your

1   witnesses before, is that fair?

2       A.   Right.

3       Q.   You did prepare John Foley to testify at the

4   motion to suppress hearing and at trial, isn't that

5   right?

6       A.   Yes.

7       Q.   And John Sprague was present both times that you

8   did that, wasn't he?

9       A.   I'm sure he was.

10      Q.   You also prepared Frank Shea to testify at

11  trial, did you not?

12      A.   Yes.

13      Q.   John Sprague was present when you did that?

14      A.   I'm sure he was because you -- you got to have a

15  witness.

16      Q.   Okay.  And you -- you prepared Dennis King to

17  testify, did you not?

18      A.   Yes.

19      Q.   John Sprague was there for that, wasn't he?

20      A.   I -- I -- either Trooper Sprague or another

21  police officer.  I -- I think it would have been

22  inappropriate for me to speak to people alone because I

23  needed -- you know, you need a witness.

24      Q.   Now, at some point you found out that John

25  Sprague had lied to the grand jury, right?

1    A.   I -- my understanding is he misspoke.

2    Q.   Okay.

3    A.   I don't remember the specifics.

4    Q.   All right.  Is it --

5    A.   I don't believe he lied.

6    Q.   Is it your testimony that he misspoke ten times?

7    A.   I'm going to tell you the truth, I don't lie --

8    as I have throughout, I don't -- I remember that the

9    indictment was dismissed.  My memory is that he

10   misspoke. I -- I don't have any memory.  Nobody's

11   brought this up. I haven't looked into this at all. I

12   have no memory of the specifics.

13   Q.   Now, you were not the prosecutor who was

14   representing the Commonwealth at the grand jury when he

15   lied, were you?

16   A.   No.  Warren Powers did all the grand jury stuff

17   in those days.

18   Q.   John Sprague never came to you and said:

19   Assistant District Attorney Hanlon, I want to let you

20   know I misspoke at least ten times at the grand jury.

21   We should dismiss this indictment?

22       MS. FEE:  Objection.

23       THE COURT:  Sustained. Next question.

24   BY MR. LEOVY-REYES:

25   Q.   Did -- was John Sprague the one who came to you

1  and said:  Hey, I made a mistake on this?

2      A.  I don't have any memory of that part of that

3  time.

4      Q.  In fact, you found out about the lies only when

5  Mr. Cardinale filed a motion to suppress, isn't that

6  right?

7      A.  I'm not going to agree with your characterization

8  that they were lies. I -- I think he misspoke and I

9  don't remember about what.  And I don't remember when

10  -- Mr. Cardinale would have a better memory of this than

11  I would.  But maybe when I saw the grand jury minutes,

12  maybe when I saw his motion and looked at the grand jury

13  minutes.

14      Q.  Now, you were the -- you were the prosecutor at

15  the motion to suppress evidence and to dismiss the

16  indictment, were you not?

17      A.  I don't -- I didn't remember that they were

18  combined.  It's not unlikely they were.

19      Q.  But you were the prosecutor?

20      A.  I was definitely the prosecutor for both.

21      Q.  And at that motion hearing, John Sprague

22  testified.  At least this time he didn't say all the

23  teenagers identified Fred Weichel, he said two did. Do

24  you remember him testifying to that?

25      A.  I don't have a present memory of that.

1    Q.   All right.   There's absolutely no evidence that

2    there were ever two witnesses who positively identified

3    Fred Weichel, isn't that right?

4    A.   One witness saw nothing. Two witnesses picked

5    photos out and they would always pick a couple photos

6    and they were different photos, but one of them was

7    always Weichel.

8    Q.   Right.

9    A.   Then my memory is that John Foley picked

10   Mr. Weichel out of that.   But that was a process that

11   was done with the police officers and not with me as a

12   witness.

13   Q.   Absolutely.   And, in fact, those two young

14   women, Ms. Krause and Ms. Canstonguay, they picked the

15   two or three photos out of that photo lineup that had

16   curly-type hair, isn't that right?

17   A.   I don't remember that.

18   Q.   Well, there's no reason why you would know

19   because there's no report to show you, is there?

20   A.   I would have known what photos they picked I

21   think. But I know I keep saying 40 years. I -- I don't

22   remember what photos they picked instead.

23   Q.   Do you recall police reports that said Krause,

24   Canstonguay picked out at least two or three photos and

25   let me tell you which ones they were?

1    A.   I don't have a present memory of seeing a police

2    report that said that.

3    Q.   You would agree -- you would agree, would you

4    not, that a police officer lying under oath is

5    exculpatory?

6    A.   Yes.  Yes.

7    Q.   And the jury already heard exculpatory means

8    that it's something that would undermine somebody's

9    guilt, isn't that right?

10   A.   That's kind of a loose definition, but, you know,

11   arguably close enough.

12   Q.   Okay.  Try to keep it as easy to understand as

13   possible.

14   A.   I'm doing the best I can to follow, Counsel.

15   Q.   And I am too.  You're not aware of anybody

16   reporting to Sprague supervisors:  Hey, this guy might

17   have lied under oath, are you?

18        MS. FEE.  Objection.

19        THE COURT:   Sustained.

20   BY MR. LEOVY-REYES:

21   Q.   Do you recall any report about Sprague so that

22   criminal defendants would realize that he had

23   potentially lied under oath?

24        MS. FEE.  Objection.

25        THE COURT:   Sustained.

1  BY MR. LEOVY-REYES:

2     Q.  Did you ever take the grand jury transcript to

3  anybody so that the Commonwealth would know this guy's

4  got an issue of lying under oath, any criminal

5  defendant should know about that?

6        MS. FEE.  Objection.

7        THE COURT:   Sustained.

8        MR. LEOVY-REYES:  I don't have any other questions.

9  Let me just check with my colleague.

10  (A pause in the proceeding.)

11       MR. LEOVY-REYES:  One more -- one more quick

12  question.  Judge, may I approach the witness?

13       THE COURT:   Yes.

14  BY MR. LEOVY-REYES:

15     Q.  I'm going to show you what's marked as ID-D. Ask

16  you to look at the front page of ID-D and tell me if

17  you recognize what that is.

18     A.  This is -- this is part of an affidavit for a

19  wiretap.

20     Q.  Right.  And this was an affidavit that was done

21  by Sprague and Wilson, isn't that right?

22     A.  Yes.

23     Q.  And Mr. Sprague testified here that he was the

24  one that drafted this.  You would not disagree with

25  that, would you?

1     A.   If Trooper Sprague testified and now Mr. Sprague

2  testified to that, I expect that's right.

3     Q.   Okay.  I'm just going to draw your attention --

4     A.   You can see it was to ADA Connelly.  Like I said,

5  I got pulled in at or about -- after that time.

6     Q.   Right.  You came in right around this time when

7  the wiretap was being sought, correct?

8     A.   That's my memory.  Mr. Connelly was the wiretap

9  expert in the office and he tended -- he did at least

10  the first one, I know.

11     Q.   I'm going to direct your attention to the first

12  sentence underneath paragraph Roman numeral I?

13       MS. FEE:  Objection, your Honor.

14       THE COURT:   Let me see you at sidebar.

15  (Sidebar conference not transcribed held at 12:19:40)

16       THE COURT:   Objection is overruled.  You can have

17  the next question.

18       MR. LEOVY-REYES:  Thank you, Judge.

19  BY MR. LEOVY-REYES:

20     Q.   I'm going to direct your attention to the

21  sentence underneath where it says "ID," and it reads:

22  All eyewitnesss have picked out the aforementioned

23  suspect -- meaning Fred Weichel -- from a spread of

24  nine photos as the look-a-like, the assailant.

25       Did you ever see this during your prosecution?

1    A.   I'm sure I did.

2    Q.   And that wasn't true, was it?

3    A.   Well, as a look-a-like that's different positive

4    identification.

5    Q.   It wasn't true, was it?

6    A.   I -- I don't -- I think it was.

7    Q.   Well, there's no evidence that Laracy ever said

8    that he could possibly identify anybody, is there?

9    A.   Laracy said he didn't see anything.

10   Q.   Okay.  All right. Let's go to the next page of

11   ID-D?

12   A.   His father --

13   Q.   First sentence.

14   A.   Where am I going?  Sorry.

15   Q.   The next page, page 2, paragraph two.  I'm going

16   to read you just part of that first sentence.  It

17   reads: A composite compiled by Detective Wilson,

18   Braintree Police Department, in conjunction with

19   eyewitnesses.

20        That was false, wasn't it?

21   A.   Well, eyewitness singular.

22   Q.   Okay.  There was only one witness who did that

23   composite, correct?

24   A.   Right.

25   Q.   All right.  So this is not a true statement, was

1   it?

2       A.   I think it's imprecise.

3       Q.   Imprecise, okay. And that affidavit that's in

4   front of you was used to present to a court to get a

5   wiretap, isn't that right?

6       A.   That's right.

7           MR. LEOVY-REYES:  All right. No more questions.

8               THE COURT:   All right. Recross -- I'm

9   sorry, cross-examination?

10          MS. FEE:  Thank you, your Honor.

11          THE WITNESS:  Attorney Leovy-Reyes, you want this

12   back? I mean, they are not in the way -- just if you

13   want them. Okay.

14                        CROSS-EXAMINATION

15   BY MS. FEE:

16      Q.   Good afternoon.

17      A.   Good afternoon.

18      Q.   You testified on direct that from 1975 to 1982

19   you were an assistant district attorney; do I have that

20   right?

21      A.   Yes, ma'am.

22      Q.   In Norfolk County?

23      A.   Yes, ma'am.

24      Q.   As an assistant district attorney, you were

25   involved in a criminal matter concerning the murder of

1  Robert LaMonica?

2     A.  Yes.

3     Q.  And, in fact, were the assistant district

4  attorney who prosecuted Mr. Weichel?

5     A.  Yes.

6     Q.  There was a different assistant district

7  attorney who handled the case before you; do I have

8  that right?

9     A.  Yes.

10     Q.  And who -- who was that?

11     A.  Well, I know -- I -- I -- I -- Matt Connelly did

12  that first wiretap.  Jerry Kirby was too. I know he

13  helped.  He was sort of a mentor and helped.

14     Q.  And --

15     A.  Matt was the official.  Mr. Connelly was the

16  official prosecutor.

17     Q.  And your best memory, you became involved in the

18  case late June or early July of 1980?

19     A.  Thereabouts. I mean, I can't say when in June.

20  Certainly after -- I wasn't around in the very

21  beginning.

22     Q.  And as your work as an assistant district

23  attorney, you knew then Detective Trooper John Sprague?

24     A.  Yes.

25     Q.  And how did you know him?

1      A.   The -- it was called CPAC, Crime Prevention and

2    Control.   That was an investigative unit in the District

3    Attorney's Office and the state police, and so you

4    worked with them on -- certainly on homicides but on

5    sometimes other things they were assigned to, and John

6    Sprague was assigned to this case.

7      Q.   And you said just on homicides.   What do you

8    mean by that?

9      A.   Well, as I say, the district attorney had, by

10   statute, I believe, not in Suffolk because Boston Police

11   kept the murders, but in -- in the other counties it was

12   a CPAC that did the murder investigations, sometimes

13   often working with at least one local police officer but

14   mostly -- but they were in control of the state police.

15     Q.   I just got that wrong at the last minute.   So if

16   you were outside of Boston, the state police is running

17   the homicide investigation?

18     A.   Right.   Exactly.

19     Q.   Working with --

20     A.   A local office exactly, right.   Boston -- the big

21   controversy later about that, Boston homicide, kept the

22   homicides in Boston.

23     Q.   And I think you testified that it was your

24   practice to speak to witnesses yourself before they

25   testified on the stand?

1    A.   Oh, absolutely.  You went through every question

2    you were going to ask so people weren't surprised.

3    Q.   And so as part of your work as the prosecutor on

4    Mr. Weichel's case, you interviewed three of the

5    teenage witnesses?

6    A.   Yes.

7    Q.   Mr. Foley, Ms. Canstonguay and Ms. Krause.  And

8    I think you started to say something about Mr. Laracy

9    on direct?

10   A.   His father was a Quincy police officer and -- and

11   the scuttlebutt was --

12        MR. LEOVY-REYES:  Objection.

13        THE WITNESS:  Fair enough.  He -- he saw nothing.

14   BY MS. FEE:

15   Q.   So but you did --

16   A.   That's what I was told, he saw nothing.

17   Q.   And so getting back to the interviews you did, I

18   think you said you interviewed three of the four

19   witnesses in advance of them giving testimony in court?

20   A.   Yes.

21   Q.   And as part of the interview, do you recall

22   showing those three witnesses a set of photographs?

23   A.   Yes.  And I have a present memory of it but that

24   would have been the practice.

25   Q.   And I'm going to direct you to Exhibit Number 8.

1        MS. FEE:  Your Honor, may I approach?

2        THE COURT:   Yes.

3        THE WITNESS:  My goodness.  Yes, ma'am.

4   BY MS. FEE:

5     Q.  Looking at Exhibit Number 8, are these the

6   photographs that you showed these teenage witnesses?

7     A.  I have no present memory of that, I have to say.

8     Q.  But you remember showing them photographs?

9     A.  Yes.  It may be -- it may have been Trooper

10  Sprague kept custody of the photographs they were shown

11  in my presence.

12    Q.  And to be clear, you didn't interview the three

13  teenagers all at once, right?

14    A.  Oh, no.

15    Q.  You did?

16    A.  No, I did not.

17    Q.  You interviewed them one at a time, right?

18    A.  Yes.

19    Q.  And even some of them on different days, I

20  think?

21    A.  Likely.

22    Q.  And do you recall who else was at these

23  interviews besides yourself?

24    A.  Likely Detective Wilson, I would say, but I'm not

25  sure of that.

1    Q.  And starting with your interview of Mr. Foley,

2  do you recall what happened when you showed him the

3  photographs?

4    A.  No.  I mean, I remember -- no, I can't say that I

5  do.

6    Q.  Is -- is that true about your interviews with

7  all the witnesses, you don't recall precisely what

8  happened with the photographs?

9    A.  No.  As I say, I remember -- Mr. Foley, I

10  remember a positive identification of Mr. Weichel.  With

11  the two young women, I remember that they picked several

12  photographs and they -- and Mr. Weichel was always --

13  was one of them, but they didn't positively -- one of

14  them might have picked it earlier, but I can't be

15  precise about that and I don't want to be misleading.

16    Q.  Do you have a memory of whether you or a police

17  officer did or said anything to any of those witnesses

18  during those interviews to influence their selection of

19  photographs?

20    A.  I -- I don't have a present memory, but like --

21  but not -- I can't imagine that we would have done that

22  even in 1980.  That wasn't the procedure.

23    Q.  Turning now -- you knew from those interviews

24  and from your work on the case that the teenage

25  witnesses the night of the murder had heard gunshots?

    1      A.   Yes.

    2      Q.   And seen a man running from the back of the

    3  apartment building --

    4      A.   Yes.

    5      Q.   -- at 196 Commercial Street?

    6      A.   Yes.

    7      Q.   And seen that man run to a waiting car?

    8      A.   Yes.

    9      Q.   Which he got inside of?

   10      A.   The passenger side, yes.

   11      Q.   And then the car almost immediately drove away?

   12      A.   Yes.

   13      Q.   So the Commonwealth investigation was looking

   14  for both the shooter and the driver of that car?

   15      A.   Yes.

   16      Q.   Through the police investigation there was an

   17  eyewitness John Foley identify Mr. Weichel as the man

   18  he seen running, right?

   19      A.   Yes.

   20      Q.   But none of the teenage witnesses had seen the

   21  driver of that car?

   22      A.   Right.

   23      Q.   And the Commonwealth is actively investigating

   24  and developing evidence about who the driver might be?

   25      A.   Yes.

1    Q.  As part of that investigation, the Commonwealth

2  sought a wiretap warrant to listen to Mr. Weichel's

3  communications with Mr. Barrett?

4    A.  Yes.

5    Q.  And you were part of that process?

6    A.  Yes.

7    Q.  And you dropped in an application for a warrant

8  pursuant to 272, Section 99 requesting to intercept

9  communications of Mr. Barrett and Mr. Weichel in

10  Mr. Weichel's car?

11    A.  Yes.

12    Q.  And part of the reason for seeking this warrant

13  was because there had already been an attempt to listen

14  to Mr. Barrett's phone calls with Mr. Weichel?

15    A.  I can't remember the sequence. We -- I know --

16  and I -- I don't know which one was Mr. Connelly.  I

17  know there was a wiretap authorization to put the -- a

18  bug in the car.  You had to drive around and be close to

19  it, so there were, you know, troopers and prosecutors

20  riding around trying to be close to it.  And then at

21  some point there was a wiretap on Mr. Barrett's phone,

22  but I thought that -- my best memory was that was after

23  they didn't talk at all in the car, but I could be

24  wrong. And they --

25        MS. FEE:  May I have this marked as the next

1    exhibit for identification?

2         THE COURT:  Why don't you show it to plaintiff.

3              All right, sir.  ID.

4         THE CLERK:  N for I D.

5         THE COURT:   N.

6    (ID-N, marked.)

7         MS. FEE.  Thank you. May I approach the witness?

8         THE COURT:   Yes.

9    BY MS. FEE:

10    Q.  I'm handing you now what's been marked N for ID.

11   Take a look at that.  Let me know when you had a

12   chance --

13    A.  So this is -- yes, I see this.

14    Q.  This is your application for that wiretap

15   warrant we were just talking about?

16    A.  This is absolutely an application for a wiretap

17   warrant.

18    Q.  And if you turn to page 2 starting at paragraph

19   eight, it goes on to page 3. I think it describes the

20   wiretap that had been placed on the -- Mr. Barrett's

21   telephone?

22    A.  Yes.

23    Q.  So would that refresh your recollection that the

24   car wiretap application was after the phone wiretap had

25   happened?

1     A.   Can I just --

2     Q.   Of course.  Of course.

3     A.   Apparent -- apparently, yes. Okay.

4     Q.   Do you recall that you were actually present and

5  heard the phone wire tap when it was activated?

6     A.   Yes.  I have a present memory of that. Although

7  this has more than I remembered, but yes.

8     Q.   That you heard Mr. Barrett's attempts to call

9  Mr. Weichel that night?

10    A.   Yes. Yes.

11    Q.   Do you recall how many times Mr. Barrett tried

12  to call Mr. Weichel?

13    A.   I don't.  I mean, I would just refresh my

14  recollection, but I remember -- what I remember him

15  saying was pick up --

16        MR. LEOVY-REYES:  Objection, Judge.

17        THE COURT:   Yes. What was said is sustained. Next

18  question.

19        MS. FEE:  Thank you, your Honor.

20  BY MS. FEE.

21    Q.   And these phone calls happened after the police

22  had been at Mr. Barrett's house and confronted him

23  about the LaMonica murder and his possible involvement

24  in it?

25    A.   Yes.

1    Q.   And then the court later issued the warrant you

2  applied for to monitor conversations between

3  Mr. Weichel and Mr. Barrett in Mr. Weichel's car?

4    A.   Yes.

5    Q.   You started to talk about this, but what

6  happened with that?

7    A.   My memory is that they didn't talk at all. I mean

8  they -- there was virtually no conversation. It may have

9  been an innocuous thing, but there was nothing. I

10  remember, you know, everybody driving around trying to

11  get close enough to hear something, but they didn't --

12  there wasn't anything substantive at all.  They were

13  together quite a lot but not conversations.

14    Q.   You were in one of those cars?

15    A.   Yes.

16    Q.   Based on what you saw and being in the car, did

17  Mr. Weichel and Mr. Barrett see you?

18       MR. LEOVY-REYES:  Objection, Judge.

19       THE WITNESS:  I don't know what they say.

20       THE COURT:   Sustained.

21       THE WITNESS:  Sorry.

22       THE COURT.  That question is withdrawn or struck.

23       MS. FEE:  Thank you, your Honor.

24  BY MS. FEE

25    Q.   Do you recall any other steps, investigative

 1   steps taken by the Commonwealth to develop evidence

 2   about the driver of that waiting car?

 3       A.   I know Trooper Sprague was trying to find out if

 4   anybody got a license plate to see if we could follow up

 5   on that.  I don't -- I know we didn't produce anything.

 6   I don't remember what happened from that.  And then sent

 7   the -- you know, the troopers to talk to Mr. Barrett

 8   himself to see if he would talk about what happened when

 9   he was in South Boston.

10       Q.   I think you -- the words you used on direct were

11   to try to get him to cooperate, do I have that right?

12       A.   Yes.

13       Q.   What was the plan with Mr. Barrett?

14       A.   It was, I think, basically to say, you know, we

15   can offer you a deal, you know, we can -- if you tell us

16   what really happened.  I mean, we can -- if you

17   cooperate with us, we can offer something less. They

18   didn't. The troopers weren't authorized to make a

19   specific promise.  We'll make it X or Y or -- but that

20   they -- that's my memory is that they were supposed to

21   talk to him and see if he would cooperate and saw what

22   really happened.

23       Q.   Because you thought you knew, right?

24       A.   Yes.  We were convinced he drove the car.

25           MR. LEOVY-REYES:  Objection, Judge.

1          THE COURT:  Sustained.

2          THE WITNESS:  Sorry.

3          THE COURT:  That answer is struck.

4          THE WITNESS:  I'm sorry, I'll -- I'll be slower.

5    BY MS. FEE:

6      Q.  And we just heard him testify that Mr. Anthony

7    Cardinale was Mr. Weichel's defense counsel?

8      A.  Yes.

9      Q.  And -- and as an assistant district attorney in

10   1980, you followed a policy relative to discovery of

11   police reports with Mr. Cardinale, is that right?

12     A.  Yes.

13     Q.  You gave him all the police reports that you

14   had?

15     A.  Yes.

16     Q.  Any police report that you had related to the

17   LaMonica murder case, you gave to Mr. Cardinale?

18     A.  Yes.

19     Q.  Fair to say with those police reports, you made

20   Mr. Cardinale aware that the Commonwealth's

21   investigation had included investigation of

22   Mr. Barrett?

23     A.  Yes.

24     Q.  And you testified to this already.  At some

25   point, you became aware that Mr. Barrett had left the

1    Commonwealth for California?

2        A.   Yes.

3        Q.   That was during the criminal trial; do I have

4    that right?

5        A.   I think that's right.

6        Q.   And that troopers went to try to talk to him but

7    they were unsuccessful?

8        A.   Yes.

9        Q.   I think you said this on direct, that in 1980

10   and '81 you were familiar with how Mr. Barrett looked?

11       A.   I would have see him driving around in the car. I

12   don't recall what he looked like.

13       Q.   Well, if you can turn to Exhibit 4 in that white

14   binder that's in front of you.

15       A.   Yes.

16       Q.   Do you recognize that?

17       A.   Yes.

18       Q.   What do you recognize that to be?

19       A.   That's the composite that Mr. Foley made the

20   night of the murder.

21       Q.   And based on your knowledge of what Mr. Barrett

22   looked like in 1980 and '81, did he look like this

23   composite?

24       A.   No.

25       Q.   The principal eyewitness in this case was

1   Mr. John Foley?

2      A.  Yes.

3      Q.  And Mr. Foley -- he testified to this.

4   Mr. Foley had open cases in criminal court at the time

5   of Mr. Weichel's criminal trial?

6      A.  The time of the trial.  He was arrested during

7   the time between the shooting and the trial, yeah.

8      Q.  Did anyone in the District Attorney's Office

9   make any deals with Mr. Foley in exchange for his

10  testimony in the Weichel case?

11         MR. LEOVY-REYES:  Objection, Judge.

12         THE COURT:   Why don't you ask about her.

13  BY MS. FEE:

14     Q.  Ms. Hanlon, did you make any deals with Mr.

15  Foley in exchange for his testimony in the Weichel

16  case?

17     A.  Absolutely not.

18     Q.  Are you aware of any other district -- any other

19  assistant district attorney in the District Attorney's

20  Office who made any deals with Mr. Foley in exchange

21  for his testimony in Mr. Weichel's case?

22     A.  I am not.

23     Q.  And how do you -- how do you know that?

24     A.  I -- that's the kind of -- that -- that is

25  exculpatory and I would have been -- I would certainly

1   have told Mr. Cardinale.  And I'm not saying nobody did

2   anything for him afterwards.  I didn't know if they did.

3   I didn't know anything about it.  But certainly, no -- I

4   didn't know of any promises made to him during -- before

5   he testified or until the end of the trial.

6        Q.  And you were not responsible for the prosecution

7   of Mr. Foley?

8        A.  Absolutely not.

9        Q.  As the prosecutor in the case, fair to say you

10  were present for the trial in August of '81?

11       A.  Yes, ma'am.

12       Q.  And any testimony that happened in pretrial

13  hearings in February of 1981?

14       A.  Yes.

15       Q.  So if I can direct you to Tab 2 in that white

16  binder.

17       A.  Yes, ma'am.

18       Q.  Do you recognize this exhibit that's been marked

19  as a joint Exhibit Number 2.

20       A.  Yes.

21       Q.  And what do you recognize it to be?

22       A.  It's the 196 -- it says 196 Commercial Street.

23  So it looks like where the apartment building is where

24  the murder -- where the shooting happened in the parking

25  lot and then -- and then I gather this open space is

1    Faxon Park.

2       Q.   Do you remember this map or a version of this

3    map being used at the pretrial hearings or at trial?

4       A.   There certainly would have been a map. I don't

5    have a present memory of it looking like this, but there

6    certainly had been a map because that was part of it.

7       Q.   And I understand this was 42 years ago, but do

8    you have a present memory of where Mr. Foley placed

9    himself on this map either at the pretrial hearing or

10   the trial?

11      A.   He was at the far end of the field.  The two

12   young -- I believe, frankly, the two young men went to

13   relieve themselves on the other side of the field, and

14   the two young women stayed closer up.

15      Q.   When you say "the far end of the field," I just

16   want to make sure I understand what you mean when you

17   say "the far end of the field"?

18      A.   The bottom of the page, you know, down swing --

19   it says "swings" there.  That seems, you know, that was

20   in that vicinity.

21      Q.   But certainly 42 years later you don't have a

22   memory sitting here today of exactly where Mr. Foley

23   put a mark on that map?

24      A.   Not exactly.  He wasn't -- he wasn't up on Faxon

25   Street.

1    Q.   Okay.   The testimony at the pretrial hearing and

2    at trial was that the running man was obviously

3    running, right?

4    A.   Yes.

5    Q.   Moving down Faxon Street away from 196

6    Commercial Street?

7    A.   Yes.

8    Q.   On the west side or what would be the top side

9    of the street on this map?

10   A.   Yes.  Yes.  Well, yes. I -- he may have been

11   running in the street. I remember -- yeah. But...

12   Q.   And the testimony from Mr. Foley was that he was

13   moving too, right?

14   A.   That sounds right.

15   Q.   But he was drifting northwest after he heard the

16   shots?

17   A.   I don't remember that, but that sounds -- that's

18   not unlikely. I don't remember anything to the contrary.

19   Q.   Sitting here today over 40 years later, you

20   don't recall -- it's impossible to recall where

21   Mr. Foley put his mark precisely on that map?

22   A.   Right. I think...

23   Q.   We talked a little bit about the grand jury that

24   was convened in this case. Again, I believe it was your

25   testimony that Assistant District Attorney Warren

1  Powers presented all matters to the grand jury at that

2  time?

3      A.   That's my memory, yeah.

4      Q.   And so you did not present --

5      A.   No.

6      Q.   -- this case or other cases?

7      A.   No.

8      Q.   And ultimately that indictment from that first

9  grand jury was dismissed?

10     A.   Yes.

11     Q.   And a new grand jury was convened?

12     A.   Yes.

13     Q.   Six months after the first?

14     A.   Couldn't have said when.

15     Q.   But certainly after the pretrial hearing where

16  that indictment was dismissed?

17     A.   Yes.

18     Q.   After February of 1981?

19     A.   Okay. Yes, sounds right.

20     Q.   For the benefit of those who don't present cases

21  to the grand jury, it was a whole new group of people

22  when another grand jury convened?

23     A.   Yes. Yes.

24     Q.   Mr. Weichel was reindicted?

25     A.   Yes.

1    Q.   By that new grand jury?

2    A.   Yes.

3    Q.   For a murder in the first degree?

4    A.   Yes.

5    Q.   You testified on direct about the various police

6    officers you worked with on the LaMonica murder

7    investigation, and I believe you said from the state

8    police it was Detective Trooper John Sprague?

9    A.   Primarily, yes.

10   Q.   And from the Braintree police it was Detective

11   Bob Wilson?

12   A.   Yes.

13   Q.   And you testified another Braintree police

14   officer Detective Leahy who, to your knowledge, was not

15   involved in the LaMonica murder investigation?

16   A.   That's correct.

17   Q.   He might have taken photos; you have no memory

18   of him working on the investigation after that?

19   A.   That's right.

20   Q.   Because you knew Detective Leahy as a juvenile

21   officer from working with him on child sexual assault

22   cases?

23   A.   Yes.

24   Q.   But you did not work with him on the LaMonica

25   murder investigation?

1    A.  Not that I remember.  The -- the photograph thing

2  rings a bell, but I don't have a present memory of that.

3    Q.  And then Exhibit 24 that you were already

4  showed --

5      MS. FEE:  May I approach, your Honor?

6      THE COURT:   Yes.

7      THE WITNESS.  Okay.

8  BY MS. FEE:

9    Q.  That memo by Detective Leahy?

10    A.  Yes.

11    Q.  And it purports to be by Detective Leahy. To be

12  absolutely clear, you had never seen it; you did not

13  see it in 1980 or 1981?

14    A.  That's correct.

15    Q.  And looking closer at Exhibit Number 24, there's

16  a name on it, Rocco Balliro, do you see that?

17    A.  Yes.

18    Q.  Was the name Balliro familiar to you in 1980 or

19  1981?

20    A.  Yes.

21    Q.  How?  How was it?

22    A.  Joe Balliro was dean of the Boston criminal

23  defense establishment. I had another murder case with

24  him.  That's really how I knew the name Balliro. I -- I

25  think I learned other things later, but...

1     Q.  In 1980 or 1981, the name Balliro would have

2     rung a bell for you because it would have -- you knew

3     the other individual, Joe Balliro?

4     A.  Yes.  As I say, I had the Damana case (Phonetic)

5     with him in 1979 or '80.  I can't remember exactly.

6     Q.  And that document, Exhibit Number 24, also makes

7     a reference to the composite.  Do you see that?

8     A.  Yes.

9     Q.  It -- it -- and are you aware that when the

10    Leahy memo was discovered by personnel from the

11    Braintree Police Department, that there was a composite

12    directly behind that memo when they found it?

13    A.  I knew there was another composite in the folder.

14    I didn't know it was directly behind.

15    Q.  It's been marked as Exhibit Number 26.  Do you

16    recognize this as the other composite?

17    A.  I can barely see the page.  Yes.  I did -- I saw

18    that in an earlier -- in preparation for earlier

19    proceeding.

20    Q.  And that -- you certainly never saw that

21    composite in 1980 or 1981?

22    A.  Absolutely not.

23    Q.  And never saw it in relationship to your work on

24    the LaMonica murder case?

25    A.  Absolutely not.

1    Q.   Does that composite look like Mr. Barrett in

2  1980 or 1981?

3    A.   I don't think so. I can't say. I mean, what

4  Mr. Barrett looked like, I guess I don't have a present

5  memory what Tom Barrett looked like.  But I -- I never

6  heard that before. I mean...

7    Q.   All right.

8         MS. FEE:  No further questions.  Thank you.

9         THE COURT:  All right. Any redirect?

10        MR. LEOVY-REYES:  Just a few.

11                  REDIRECT EXAMINATION

12  BY MR. LEOVY-REYES:

13    Q.   Ms. Hanlon, you just testified that you were

14  part of a photo lineup regarding those four teenagers,

15  correct?

16    A.   I was part of a photo lineup?

17    Q.   Well, yeah.  You showed a photo lineup to those

18  four teenagers?

19    A.   Well, I don't recall ever talking to Mr. Laracy.

20  I understood he didn't want to talk to us at all. I know

21  I spoke with Jean Canstonguay and Lisa Krause and

22  certainly Mr. Foley.

23    Q.   Right.

24    A.   I believe I would have shown them the photos in

25  preparation for the testimony for the motion to

1    suppress.

2      Q.   In fact, that would have been the third time

3    those photos were shown to those three witnesses, isn't

4    it?

5      A.   I don't know. It was more than once.  It wasn't

6    the first time certainly.

7      Q.   And the investigators, including John Sprague,

8    didn't tell you when you were showing the photo lineup

9    to the three witnesses:  By the way, you've shown this

10   photo lineup already twice, did they?

11     A.   Excuse me. I'm pretty sure I would have known

12   they would have shown it once. I mean, the procedures

13   have tightened up a lot in the meantime.  I wouldn't

14   have thought I was doing it for the first time.

15     Q.   And you had no concerns at all for showing this

16   photo lineup for the third time that that might have

17   prejudiced Fred Weichel, did you?

18     A.   Well, certainly not with the young women because

19   their testimony never got any more definite from any of

20   that.  I see the argument with Mr. Foley, but I didn't

21   know that at the time.

22     Q.   You testified that there was an active

23   investigation about finding out who the driver was.

24   You didn't see one police report that ever showed that

25   police went to Fred Weichel who they thought knew who

1   the driver was and said tell us who the driver is?

2        MS. FEE:  Objection.

3        THE COURT:  Can you give a time frame?

4   BY MR. LEOVY-REYES:

5   Q.  Any point during your prosecution you saw no

6   police report that said we questioned Fred Weichel who

7   the driver was, did you?

8   A.  I never saw a police report that said they asked

9   him that question before he was arrested. I'm pretty

10  sure they did after he was arrested, but I don't have a

11  present memory of that and I didn't see it in a report.

12  Q.  You would actually expect them to question the

13  person they've arrested, wouldn't you?

14  A.  Once -- once he's -- yes, once he's arrested,

15  yeah.

16  Q.  One of the things you want to see if you could

17  do is get a confession, right?

18  A.  Yeah.

19  Q.  Did you see one report that police ever talked

20  to Fred Weichel about the Robert LaMonica murder?

21  A.  I did not see a report that said that.

22  Q.  You just testified about the indictment.  Did

23  you ever see any evidence at any point that Robert

24  LaMonica was somehow related to Punchy Clifford?

25  A.  There had been an earlier case involving, as I

1    recall, a shooting of Punchy Clifford and -- and I can't

2    -- if he had an assault and battery conviction coming

3    out of it or if it was dismissed, his father had a

4    conviction.

5        Q.   My question though is:  Did you ever see a

6    police report that said:  Hey, Freeman "Punchy"

7    Clifford is related to the LaMonica saga?

8        A.   Well, we're getting back -- I mean -- what do you

9    mean by related?

10       Q.   Well, let me ask you this question:  There was

11   never any allegation, claim, evidence at all that the

12   killing of Punchy Clifford was a domestic issue, right?

13       A.   I didn't know very much about it.  I -- I -- I

14   believe it was several years before.  I believe it was

15   unrelated.  I filed a motion in limine to keep it out

16   and Judge Barton allowed that motion. That's -- and I

17   understood that Mr. LaMonica Senior had some conviction

18   and that Robert -- but it was five or six years earlier.

19   That's the best I can do for you on that one.

20       Q.   Got it.  But you had no evidence that at the

21   time that there was any evidence that there was a

22   family relationship between Robert LaMonica and Punchy

23   Clifford, isn't that right?

24       A.   I don't have a memory of knowing that.

25            MR. LEOVY-REYES:  That all I have.

1          THE COURT:  Any recross?

2          MS. FEE:  No.

3          THE COURT:  All right. Thank you very much.  You're

4     all set.  Thank you.

5          THE WITNESS:  Am I excused, your Honor?

6          THE COURT:  Yes.

7          THE WITNESS:  Thank you very much.

8          MR. FRIEDMAN:   I would like to call Melissa

9     Greenwood.

10          THE COURT:  Okay.  Ms. Hanlon, take your stuff.

11                    MELISSA GREENWOOD, SWORN

12          THE COURT:  Good afternoon.

13          THE WITNESS:  Hello.

14          THE COURT:  Could you put the mic closer to you.

15     Great. All right.  Attorney Rowlands

16                    DIRECT EXAMINATION

17     BY MR. ROWLANDS

18     Q.  Good afternoon, Ms. Greenwood.  Can you spell --

19     state and spell your name for the jury.

20     A.  Sure.  It's Melissa Greenwood.  M-E-L-I-S-S-A.

21     W-E-R -- I almost spelled my maiden name.  I'm sorry.

22     Nervous.  Sorry, guys. Greenwood is G-R-E-E-N-W-O-O-D.

23     Q.  And what do you do for a living?

24     A.  I currently work at Darmouth Hitchcock Medical

25     Center as a senior analyst -- senior telecommunications

1   analyst.  Give me a second.

2       Q.   And how do know the plaintiff, Fred Weichel?

3       A.   He's my uncle; my father's brother.

4       Q.   Can you share with the jury any of your earliest

5   memories with your uncle?

6       A.   Sure.  One of my earliest memories I have of him

7   is I was probably like four or five maybe. My birthday

8   was on a weekend, and he came to my house, my mom's

9   house and he showed up and surprised me.  The toy store

10  was closed and he made a big deal of opening the toy

11  store up for me.

12          I remember walking up there and this guy is doing

13  all this thing to -- he's making a big deal of it.

14  Opened the door and the grates going up, and I'm all

15  excited.  You know, we're the only one in the toy store.

16  I have the toy store to myself. And he comes in and you

17  can have anything you want. And it's like rows of toys

18  and toys and toys, and I just remember looking up to him

19  and saying:  Put me on your shoulders.  I want to see

20  everything.  So that was one of my earliest memories.

21      Q.   What -- did you know your uncle to be close with

22  your grandmother?

23      A.   My grandmother, yes.  My nana, yes.

24      Q.   Okay.  Do you have early childhood memories of

25  your uncle and your grandmother together?

1     A.   Yes, I do actually. I know my nana used to go to

2     the -- I forget the name of the restaurant -- to pick me

3     up to go to breakfast and she would always be like

4     poking out and looking out to see if Freddy was coming,

5     you know, and then come -- he would come in and pay for

6     lunch and stuff like.

7          And then or -- we would go and he would -- he's

8     always running around Castle Island and we would go

9     travel around to try to find him. I remember back in the

10    day when no seat belts were -- I was standing up next to

11    my nana with my arm around her.  We would do like be

12    cruising Castle Island, try to catch him running, you

13    know.

14    Q.   How old were you when your uncle went to prison?

15    A.   I was six going on seven.

16    Q.   So first, second grade. Did you ever visit your

17    uncle in prison?

18    A.   Yes.

19    Q.   When you went to visit your uncle in prison,

20    what did you all discuss?

21    A.   Just how we were doing.  How's school. How the

22    rest of the family was doing.  What's going on outside.

23    You know.  That's pretty much.

24    Q.   Would he ever talk about what he was

25    experiencing inside prison?

1    A.  Not around me, no.  No.

2    Q.  Did you ever receive any calls from your uncle

3  in prison?

4    A.  Yes.  Yes.

5    Q.  Would he ever talk about what he was

6  experiencing in prison during the calls?

7    A.  No, not around me.

8    Q.  Did you ever receive any letters from your

9  uncle?

10    A.  Yes.  Yes.

11    Q.  Can you describe those letters?

12    A.  Very short, quick.  It was like:  I'm thinking of

13  you kids, love ya, you know.  And every year on my

14  birthday, never failed, never failed, I got a card from

15  him.

16    Q.  Did you receive cards or letters on holidays

17  other than --

18    A.  Sometimes.  Sometimes, yeah. Not like every

19  Valentine's Day I would get something. Not every

20  Halloween I would get something. Always on my birthday

21  and they would always be like little -- short, little,

22  like, you know, love you.  I'm thinking of you.

23    Q.  And in those letters would he ever describe what

24  he was experiencing inside of prison?

25    A.  No, not with me.

1    Q.  Do you remember when you learned that your uncle

2    would be released?

3    A.  Yes.  I was there that day.

4    Q.  Okay.  Can you tell the jury about that

5    experience?

6    A.  Sure.  They were having court down in Dedham and

7    I remember going there and meeting up with Steve and

8    friends of his, and we were talking before we went in.

9    They actually told me that if he was granted bail, he

10   would be --

11        MS. FEE:  Objection.

12        THE COURT:  Sustained. The conversation is struck.

13   Next question.

14   BY MR. ROWLANDS

15   Q.  Do you recall what will -- what year it was?

16   A.  2017.

17   Q.  Do you recall what month?

18   A.  April.

19   Q.  Okay.  Did you have to work that day?

20   A.  I think I took the day off, yes.

21   Q.  Okay.  You were in the courtroom?

22   A.  I was in the courtroom, yes.

23   Q.  Did you ever greet your uncle after you realized

24   he was going to be released?

25   A.  Yeah.  I was right outside.

1    Q.   Okay.  Tell us about that greeting.

2    A.   I ran up. Well, I walked up to him and he gave me

3  a kiss and a hug.

4    Q.   Is he a two-arm hugger or one-arm hugger?

5    A.   Oh, yeah he is.  Two arms.

6    Q.   Did Fred -- did your uncle ever move into your

7  families house?

8    A.   Yes.  He moved in with my mother.

9    Q.   Okay.  About how long did he stay with your

10  mother that you know?

11    A.   Couple years. I actually -- like he never left.

12  He's there all the time.  So a couple years he was with

13  her.

14    Q.   I want to ask you some questions about whether

15  you personally observed anything about Fred's -- your

16  uncle's behavior since returning home from prison?

17    A.   Okay.

18    Q.   Had you observed anything about the way he

19  expresses his feelings?

20    A.   He doesn't. Every day is a good day.  He doesn't

21  express his feelings.  How you doing, Uncle Freddy?

22  Every day is good day in freedom.  That's all I get.

23    Q.   Have you observed anything about his physical

24  pain?

25    A.   No.  I can see anxiety.  I can see -- I don't

1   know, like when large groups of people come up, it's

2   like you think he's going to hang around for a little

3   bit longer and discuss things and all of a sudden it

4   just -- all right, kiddo, I'm out of here.  I'm like

5   where's he going?  Okay.  You know, just needs to remove

6   himself from the situation.

7       Q.  Have you observed anything about the way he uses

8   technology?

9       A.  He doesn't.  He doesn't.

10      Q.  Can you explain.

11      A.  He has a -- like, renewing his license, he could

12  do it online.  Don't have to stand in line going

13  through -- and show him how to do it.  I had to renew

14  his license for him. When he has tolls to pay now that

15  they send mail to you, he doesn't know how to do it. I

16  do it online for him.  I've done that. Hooking up a blue

17  -- wireless bluetooth radio so that he can have his

18  music go to his phone, go to it.  I hooked up that.

19  Stuff like that.  He's not computer ill -- literal --

20  no, literate.

21      Q.  We'll talk about food.  Have you observed

22  anything about the way he orders food?

23      A.  He doesn't know how to make his own decisions.

24  Like, when we first -- when I first started going out

25  and hey, let 's go to dinner, he would order whatever

1    you ordered, and I noticed that a couple of -- after a

2    couple of times going out with him.  I was like -- he's

3    like:  Oh, I don't like that. Why did you get it?  I

4    don't know. I just didn't know what to order.  He

5    doesn't know how to make decisions like that for

6    himself.

7       Q.  Have you observed anything about the way he eats

8    food?

9       A.  Yeah, he -- he made me -- when he came over to my

10   mom's house before he actually moved in, he made me a

11   dinner and his dinner was like a rice and steak, and he

12   would cut up a tomato and throw it on there and stuff

13   like that. We're sitting down.  He made enough rice -- I

14   think he made, like, a pound of rice for each person but

15   he put the plate down and he's like:  Oh, it's the best

16   meal.  And I'm like: Uh-huh.  I'm like:  But I don't

17   like tomatoes.  He says:  Don't worry about that.  He

18   reaches over and grabs the tomatoes with his hands. I'm

19   like:  I can't eat that.  I don't know where your hands

20   have been.  But, like, he eats with his fingers and, you

21   know, yeah, that's --

22      Q.  Have you observed anything about the way he

23   stores food.  Stores food?

24      A.  Yes.  He loves cooking.  He loves baking.  He

25   loves making spaghetti sauce and stuff like that.  And

1   he makes abundance of it so he would break it up.

2        Now, we all now, like he Tupperware bowls and

3   lids and stuff like that.  He would use ziploc bags and

4   put them in the freezer and he would use ziploc bags to

5   commute them to hand them to a friend and stuff like

6   that.  There's a bowl you can put it in and carry it.

7   This is going to break and pop.  And yeah.  Yeah.

8        Q.  You stated that you were about six when he went

9   to prison?

10      A.  Yes.

11      Q.  How old were you when he was released?

12      A.  Forty-three. Five years ago.

13      Q.  Okay.  I just want to ask you a few more

14  questions.  Do you -- who do you live with?

15      A.  I live with myself, my son.

16      Q.  Okay. How old is your son?

17      A.  My son, Daniel, is going to be 15 in December.

18      Q.  What's his name?

19      A.  DJ.

20      Q.  Does he have any special needs?

21      A.  He's a high-functioning autistic. He has central

22  auditory processing disorder, and that's all I can say

23  right now because it gets me upset.

24      Q.  And has your uncle been in his life since he has

25  been released?

1   A.   Yes.

2   Q.   Can you tell the jury about that.

3   A.   This is where I'm going to get emotional because

4   it's with my son. Give me a second. He has shown my

5   son -- I don't know how to explain it. He helped him

6   grow so much since he's been out. Sorry. So sorry. Darn

7   kids.  My son has grown so much since Freddy's been out.

8   He's taken him fishing, done things that I never -- I

9   don't fish.  I don't go to sporting games.  I don't go

10  to anything.

11       He actually took my son to his first Bruins game,

12  took him to a baseball game. He got my son to eat a hot

13  dog. I'm dead serious, my son doesn't eat anything,

14  nothing. He's very sensitive with food and stuff and I

15  have no clue how he did it, but he got him to eat a hot

16  dog.

17       He's given my -- my son self-confidence in

18  himself. He's teaching him -- like they would go out

19  walking to -- around Castle Island.  Castle Island is a

20  big thing with Freddy, Castle Island and stuff. They

21  would have their man time.  Because, you know, I'm a

22  female.  Boys 15, 14.  So he's been -- I can't even --

23  words can't express what Fred means to me, what he's

24  doing with my son. So...

25  Q.   And what have you -- you said his "man time."

1   What have you observed Fred teaching him as a young

2   man?

3        MS. FEE:  Your Honor, I'm going to object.

4        THE COURT:  Sustained.

5   BY MR. LEOVY-REYES:

6     Q.   Now, did it ever feel like Fred was deprived of

7   memories with his family?

8        MS. FEE:  I'm going to object.

9        THE COURT:  Yeah, sustained.

10       MR. LEOVY-REYES:  No further questions.

11       THE COURT:  Any cross-examination?

12       MS. FEE:  No, your Honor.

13       THE COURT:  Thank you, ma'am.  You're all set.

14       THE WITNESS:  Thank you.

15       THE COURT:  Excused. Can I see the attorneys at

16  sidebar?

17       MR. LEOVY-REYES:  Yes, Judge.

18  (Sidebar conference was held and not transcribed at

19  1:04:50.)

20  (Judge is speaking to jurors)

21

22

23

24

25

```
 1
 2                    C E R T I F I C A T I O N
 3
 4      I, SARA ADAMS, APPROVED COURT TRANSCRIBER, DO HEREBY
 5  CERTIFY THAT THE FOREGOING IS A TRUE AND ACCURATE
 6  TRANSCRIPT FROM THE DIGITAL RECORDING PROVIDED TO ME IN
 7  THE ABOVE-ENTITLED MATTER.
 8      I, SARA ADAMS, FURTHER CERTIFY THAT THE FOREGOING IS
 9  IN COMPLIANCE WITH THE ADMINISTRATIVE OFFICE OF THE
10  TRIAL COURT DIRECTIVE ON TRANSCRIPT FORMAT TO THE BEST
11  OF MY ABILITY.
12      I, SARA ADAMS, FURTHER CERTIFY THAT I NEITHER AM
13  COUNSEL FOR, RELATED TO, NOR EMPLOYED BY ANY OF THE
14  PARTIES TO THE ACTION IN WHICH THIS HEARING WAS TAKEN,
15  AND FURTHER THAT I AM NOT FINANCIALLY NOR OTHERWISE
16  INTERESTED IN THE OUTCOME OF THE ACTION.
17
18
    SARA E. ADAMS
19
20
    Sadams9603@msn.com
21  (413)244-9036
22
23
24
25
```