EXHIBIT 5

232

## COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.                                    SUPERIOR COURT
                          DOCKET NOS. 1980-76394 & 1981-77144


### COMMONWEALTH

### vs.

### FREDERICK WEICHELL


### FINDINGS OF FACT, RULINGS OF LAW, AND ORDER
### ON DEFENDANT'S THIRD MOTION FOR NEW TRIAL

### INTRODUCTION

Nearly thirty years after being convicted of first-degree murder, the defendant Frederick Weichell ("Weichell" or "the defendant") learned of a document which appeared to cast into question the testimony of the sole witness who had identified him at trial as the man running from the scene shortly after shots had been fired. Early in the investigation, that same witness had helped police to produce a composite picture of the suspect, and the police had published the composite in a local newspaper to gain the public's assistance in identifying the running man. The recently discovered document appeared to be a memorandum from a detective stating that he had received such assistance and that "at least 10 guards" at M.C.I. Bridgewater believed the image in the composite to be that of a convicted murderer who happened to have escaped from that institution on the same weekend as the murder for which Weichell had been charged. The document, dated nine days after the murder and about two months before Weichell's arrest, had never been disclosed to the defendant or his attorney. Weichell now moves for a new trial. The Commonwealth opposes. For the reasons herein set forth, the motion is ALLOWED.

1

NORFOLK COUNTY
CLERK OF THE COURTS
2017 APR 10  PM 1:11
RECEIVED & FILED

Weichel 258D 004165

## FINDINGS OF FACT

*BACKGROUND:*

1.  With respect to the general background of this case, the identification of the defendant,

    and his trial, the court adopts the description offered in *Commonwealth v. Weichell*, 390,

    Mass. 62 (1983), which is as follows:

"*The shooting.* [The victim, Robert W. LaMonica,] worked for the Boston Water and

Sewer Commission. He worked from 4 P.M. to midnight. He would usually drive straight home

from his job to his [Braintree] apartment, customarily arriving there between 12:15 A.M. and

12:30 A.M. He would turn off Faxon Street to park his [automobile] in a parking lot adjacent to

his apartment building. Faxon Park is across from the entrance to the parking lot. [The victim]

followed this routine on the morning of May 31, 1980. He parked and got out of his

[automobile]. Four shots were fired, two of them hitting [the victim]. A bullet entered through

his neck and penetrated the brain. A second bullet entered his back and lodged in his right rib

cage. [The victim] died in the parking lot.

"*Identification.* Shortly before midnight on May 30, 1980, John Foley, Jean Castonquay,

Frederick Laracy, and Lisa Krause went to Faxon Park, after attending a drive-in movie together.

Foley testified the group had been drinking and that he had consumed four or five beers during

the movies. At 12:15 A.M., Foley was walking away from a wooded area of the park. He heard

four `bangs' and saw a man run out of the parking lot and turn up Faxon Street to a waiting car.

Krause screamed. The man looked toward the group briefly but continued running. Foley

testified that he had a full-face view of the man for approximately one second as the man passed

2

under a street light. Foley and Laracy went across Faxon Street to the parking lot where they found the body of the victim on the ground. The police arrived shortly thereafter.

"Foley described to the police the man he saw running as being five feet, nine inches tall, 175 pounds, wearing jeans and a pullover shirt. [At the time of his arrest, the defendant was five feet, seven inches tall, and weighed 155 pounds.] He said that the man had dark curly hair, bushy eyebrows, and sideburns. He also stated that the man had a slightly crooked nose, `as if it had been broken.' At trial, he identified the defendant as the man he saw running that night.

"Later that morning, Foley assisted Detective Wilson of the Braintree police department in making a composite drawing. After indicating that he could not draw a face by himself, Foley gave Wilson a general description. With the aid of an Identikit, Wilson and Foley assembled a composite. Foley examined the composite and asked for changes. Wilson then changed elements of the composite and put together a different face. Wilson used a pencil to alter the nose. After Foley altered the hair style, he declared that the composite `looks like him.' A photostatic copy of the composite was introduced in evidence at trial.

"The next day, Foley was shown an array of nine photographs. He picked the defendant's picture as `a pretty good likeness' of the man. Several months later, he again identified the defendant's photograph out of the same array but which now included one additional photograph.

"On June 12, 1980, two State troopers, Foley, and the victim's two brothers drove through the streets of South Boston in a van. The [two brothers] gave directions, but did not speak to Foley. Eventually, Foley picked, out of a group of young men, an individual whom he thought was the man he saw running. The van was driven around the corner and passed the group for a second time. Foley stated, `That's the guy.' A State trooper took a photograph of the individual which was introduced in evidence and identified as a photograph of the defendant.

Weichel 258D 004167

Weichel 026257

"Jean Castonquay also testified that she heard four shots and saw a man running. At trial, she was unable to say whether the defendant was the man she saw. Moments later, she tentatively identified another person sitting in the back of the courtroom as the man [the victim's brother]. On three occasions Castonquay was shown the same array of photographs as Foley, but was unable to pick out any one photograph. Instead, she picked out two or three photographs each time, always including that of the defendant. Neither Laracy nor Krause made any identification." *Id*. at 65–67.

"Other evidence offered by the Commonwealth was admitted to create an inference that the defendant was conscious of his guilt. After the shooting, but before his arrest, the defendant asked Francis Shea and Dennis King if the police were looking for him. He said, 'Why would I want to kill Bobby? He was the only one who gave my brother money when he was in jail.'" *Id*. at 67 n.4.

On the issue of motive, the Commonwealth submitted evidence that in the weeks preceding the victim's death, the defendant and his friend, Thomas Barrett, had a series of confrontations, some involving physical altercations and threats, with the abovesaid Shea and Shea's friends, which included LaMonica, King, and a Chuckie Carr. *Id*. at 64–65.

*"The defendant's case.* At trial, the defendant's counsel [Anthony M. Cardinale], through cross-examination, attempted to bring out whatever discrepancies existed in Foley's testimony. He emphasized that Foley had indicated that the man he saw running had thick sideburns and bushy eyebrows. Foley admitted, however, that the defendant's eyebrows were different. It also appears that the defendant did not have any sideburns. Despite some evidence to the contrary, the jury could have concluded that the defendant had curly hair at the time of the murder. The

4

Weichel 258D 004168

Weichel 026258

defendant also attempted to show that the lighting in the area was poor[1] and that the identification process was unreliable. The defendant did not testify.

"The defendant also sought to establish a defense of alibi. Three witnesses[2] testified on his behalf. One witness's testimony placed the defendant in downtown Boston until midnight. The other witnesses placed the defendant at the Triple O Lounge in South Boston at, or shortly after, the time of the shooting.

"In rebuttal, the Commonwealth introduced evidence that the defendant could have left downtown Boston shortly before midnight and driven to [the victim's] apartment by the time of the shooting. A trip to the Triple O Lounge from the victim's apartment would have taken only another fifteen or twenty minutes. The Commonwealth also attacked the credibility of the two witnesses who placed him at the Triple O Lounge. Both were long-time friends of the defendant, and one [Mahoney] was engaged to Thomas Barrett's sister. The other witness [Weeks] failed to explain why he never came forward until one week before the trial." *Id.* at 67-68.

2. The apparent murder weapon, a stolen .38 caliber handgun, was found less than a half mile away the following day. (Lead State Police Investigator's report, p. 1).

3. Early in the investigation, LaMonica's girlfriend and several members of his family told police they could offer no explanation for the shooting except perhaps as retaliation for the death of one Freeman "Punchy" Clifford. Approximately five years earlier in Hull, Massachusetts, Clifford was shot and killed by LaMonica's father, Paul LaMonica, Sr., in what police suspected to be a loan sharking dispute. The elder LaMonica was later convicted of manslaughter and sentenced to a brief period of incarceration and a lengthy

---

[1] The Commonwealth introduced contrary evidence.

[2] Kevin McCormack, Leo Mahoney, and Kevin J. Weeks.

Weichel 258D 004169

Weichel 026259

term of parole. Robert LaMonica, the deceased, was also involved and given a suspended sentence.

4. The distance from which Foley made his observations was and continues to be disputed by the parties. However, Judge Mulkern, in ruling upon the defendant's motion to dismiss, found that "Foley was no less than 180 feet from the running man when he made his nighttime observation." (Exhibit No. 37, p. 7). This court accepts and adopts that finding.

5. At a hearing pursuant to the defendant's pretrial motion to suppress evidence, Foley added to his description of "the running man." Foley stated that the man had a "kind of crooked, kind of large" nose, and "something like mine but it was just a little bit crookeder." He further explained, "It wasn't a straight nose. I just noticed it was crooked. That was the first thing that hit me when he looked at me. He looked like maybe at one time or another he might have broken it." (Suppression hearing transcript, at 2-152 – 2-153). Foley struggled to explain what he meant by a "bump" on the nose and stated that he "must have looked through 300 noses' in helping to assemble the composite picture. (*Id.* at 2-153 – 2-155). He stated that the man's eyebrows were "black" and "thick" and "like and Italian's eyebrows." (*Id.* at 2-159). He described the man's hair as "black, thick, curly" and the man's sideburns as black and curly and extending "down to the jaw." (*Id.* at 160-161). He estimated that the man was "somewhere between five ten and a half and five eleven and a half, just under six foot basically" and weighing "about `175 pounds, 180 pounds." (Id. at 2-158). He further stated, "He had a good gait going. He was a fast runner, athletic." (Id. at 161).

6

Weichel 258D 004170

Weichel 026260

6. The composite picture which Foley helped to create ("the Foley composite") was
   published in the Patriot Ledger on June 3, 1980 and accompanied by an article which,
   among other things, stated that the depicted image was that of "a man wanted for
   questioning in connection with the murder of a South Boston man early Saturday
   morning." Robert LaMonica was named as the murder victim, and the crime scene was
   given as "the parking lot at the rear of 196 Commercial Street (Braintree)." The names
   of no witnesses were given. Detective Robert Wilson was quoted in the article and
   named as the person who drew the composite picture. Anyone with helpful information
   was instructed to call Braintree Police Captain Theodore K. Buker or a named State
   Trooper of the Office of District Attorney William Delahunt.  (Exhibit No. 15).

7. The lead State Police investigator testified at trial that at the time of the creation of the
   Foley composite, police had no suspect in the case. (Trial Testimony 6/114). However,
   that same investigator, in his narrative report, stated the following:

   > As a result of the investigation conducted by this officer and Detective Wilson,
   > information has been received from several confidential informants concerning
   > LaMonica's murder. All sources have indicated that Frederick Weichell and
   > Thomas Barrett were the ones who shot and killed Robert LaMonica.
   >
   > Information has also been received from Detective Edward Walsh, Boston Police
   > Department Intelligence Unit. Detective Walsh stated that a proven and reliable
   > informant has told him that Subject Robert LaMonica was killed by Freddy
   > Weichell and Thomas Barrett. Detective Walsh's source also stated that the
   > "whole thing" was over a street "beef."

   (Exhibit No. 2, Investigator's Report).

8. At least some of this informant information apparently had been received by police
   within thirty-six hours of the murder. The lead State Police investigator had included a
   photograph of the defendant in the array shown to witnesses, including Foley, on the

7

Weichel 258D 004171

Weichel 026261

morning of Sunday, June 1, 1980, (Trial Transcript 6/119-6/123), the day after the

murder and two days before publication of the Foley composite in the newspaper.

9.  Prior to trial, Attorney Anthony Cardinale, on behalf of the defendant, filed a motion for

production of "exculpatory or 'arguably' evidence." In it, he included among the matters

"specifically" being requested "[a]ny information in the hands of the Commonwealth, or

under its control, concerning identifications or descriptions purportedly made by

witnesses at the scene of the incident." (Hearing Exhibit No. 36).

10. On behalf of the Commonwealth, Assistant District Attorney Sidney Hanlon, now an

Associate Justice of the Massachusetts Appeals Court, responded to this motion and to

the other discovery requests from the defendant. Her response was forthright and

thorough, given the information made available to her at the time. She described her

efforts to the trial judge as follows: "I have complied with every, single discovery

agreement and had an open file policy since the beginning." (Trial Transcript, III at 338).

"Every diagram in my possession and every diagram Trooper _____ has ever had,

and I believe I have gone through the Braintree Police files, every diagram they have Mr.

Cardinale has had since December [1980]." (Id. at 348.) It is important to note, however,

that former ADA Hanlon had not been part of the initial investigation of this case. She

had not been connected to the case at the time of the publication of the Foley composite.

(Hearing Testimony of Hanlon). Her involvement likely did not commence before the

time that police had applied for a warrant authorizing a wiretap upon the defendant's

telephone in August, 1980.

11. At the conclusion of his trial, on August 20, 1981, the defendant was found guilty of

murder in the first degree and sentenced to life imprisonment without possibility of

8

Weichel 258D 004172

Weichel 026262

parole. His conviction was affirmed by the Supreme Judicial Court at *Commonwealth v. Weichell*, 390 Mass. 62 (1983).

12. On August 5, 1991, the defendant filed a motion for new trial, claiming that his trial counsel was ineffective in disallowing the defendant from testifying. On August 8, 1991, the motion was denied by the trial judge without a hearing. (See Docket, Paper No. 46).

13. On January 23, 2002, the defendant filed a second motion for new trial. The motion was based centrally upon a letter by the defendant's friend, Tommy Barrett, to the defendant's mother. In the letter, postmarked March, 1982, Barrett confessed to the shooting of Robert LaMonica. At a hearing upon the motion, the defendant claimed that he did not know the letter's contents and did not ask his mother to reveal them earlier because he had been threatened by James ("Whitey") Bolger and Stephen ("The Rifleman") Flemmi against doing so.[3] Also at the hearing, Barrett invoked his Fifth Amendment privilege not to testify. Though the hearing judge allowed the motion, the ruling was overturned by the Supreme Judicial Court, which concluded that the letter was not covered by "the newly discovered evidence" doctrine because its contents were known or reasonably could have known by the defendant s at the time of his first motion for new trial. Also, the Court   concluded that Barrett's statements were inadequately corroborated and bore insufficient indicia of trustworthiness. See *Commonwealth v. Weichell*, 446 Mass. 785, 799-806 (2006).

*IMPORTANT OF IDENTIFICATION EVIDENCE:*

---

[3] The defendant testified that he had been visited by Bulger and Flemmi four times on the matter and that Bulger had told him, "'I do not want you to bring up Tommy Barrett's name ever.' Bulger threatened to harm the defendant or his family should he disregard the warning. The defendant understood that the visit was intended to ensure that he never spoke of Barrett." *Commonwealth v. Weichell*, 446 Mass. 785, 793 (2006).

Weichel 258D 004173

Weichel 026263

14. It was abundantly clear to both sides in this case early on that a successful prosecution of the defendant would rest upon his identification as "the running man." There were no eyewitnesses to the actual shooting. (Exhibit No. 37, p. 2). No physical evidence connected the defendant to the scene. The murder weapon revealed no fingerprint or other evidence. (Lead State Police Investigator's Report, p.1). The "waiting car" was never located. A wiretap upon the defendant's telephone produced no incriminating evidence. (Exhibit No. 2, Lead State Police Investigator's Sprague report to O'Donovan, p. 2).

15. At trial, Weichell hinged his defense upon evidence that he was elsewhere at the time of the murder and an energetic attack upon the testimony of John Foley, the single witness identifying the defendant at trial.[4] During his cross examination of the witness, defense counsel drew from Foley the admission that in several respects (i.e. eyebrows and sideburns) the defendant's appearance varied from that of the composite image the witness had helped to create just hours after the murder. The defendant sought leave to supplement its challenge by presenting expert testimony from a Dr. Robert Buckhout, the Director of the Center of Responsive Psychology at Brooklyn College, Brooklyn, New York. According to the proffer, Dr. Buckhout was prepared to testify concerning "the elements which effect the retention stage of memory, matters which may add to or alter an individual's memory based upon post-event information, such matters as those which cause witnesses to label or guess, or cause non-existent details to become

---

[4] The defendant also sought to introduce evidence of LaMonica's involvement in the 1974 killing of one Freemen "Punchy" Clifford as tending to show that persons other that the defendant (i.e. compatriots of Clifford) would have a reason for killing LaMonica. However, the trial judge excluded the evidence as being too remote in time and too attenuated in motive. (Hearing Exhibit No. 40).

Weichel 258D 004174

Weichel 026264

incorporated in memory, and … the effect of various factors on the retrieval stage of
memory, which … may add to, alter or subtract from the witness's initial sense
impression and perception." (Hearing Exhibit No. 39). Additionally, the defendant
sought to introduce expert testimony from a photographer who had endeavored to
reproduce what might have been perceived by a witness at the subject parking lot under
measurably similar lighting conditions. (Trial transcript, 8-92 – 8-122).  Both these
requests were denied by the trial judge. In his closing, Attorney Anthony Cardinale on
behalf of the defendant argued that identification in this case was "the ultimate issue."
(Hearing Exhibit No. 51)

16. The point was not lost on the prosecutor, who, displaying the Foley composite before the
jury,[5] argued its resemblance to the defendant detail by detail:

> THE PROSECUTOR: "He saw him that night. He did a picture of him, and I ask
> you to look at the picture of Fred Weichell that Mr. Foley did, and compare it
> with the camera's picture taken two months later. Now, I ask you to look at the
> hair in this picture. Wouldn't you describe it as bushy and curly? And look at the
> eyebrows. Aren't they thick? Look, particularly, at the nose and see how good the
> match is between the nose in Mr. Foley's picture of Mr. Weichell, and the
> camera's picture of Mr. Weichell. Look at the mouth. Look, if you would, at the
> little marks under his lip here in the camera picture and see if that isn't here in Mr.
> Foley's picture. Look at the shape of the chin."
>
> DEFENSE COUNSEL: "Objection."
>
> THE JUDGE: "Your objection is overruled, sir."

---

[5] Admitted in evidence over the defendant's objection.

Weichel 258D 004175

Weichel 026265

THE PROSECUTOR: "The shape of the chin here, ladies and gentlemen, in Mr.
Foley's picture, and the shape of the chin in the camera's picture. John Foley told
you he tried to match the plastic foils to the picture he had in his mind. I ask you
to take some time to see how good that picture matches with the camera's
picture."

*Weichell,* at 69 n6.

17. The identification evidence in this case was also the cause of an early derailment of the
defendant's charge. Frederick Weichell was indicted twice for the murder of Robert
LaMonica. The defendant's initial murder indictment was dismissed due to the grand
jury testimony of the Commonwealth's lead investigator, a Massachusetts state trooper
then assigned to the Norfolk County District Attorney's Office. The damning portion of
that testimony dealt with the identification of the defendant. In allowing the defendant's
motion to dismiss, the court ruled that testimony to be "flagrantly false information on
an issue critical to the determination of probable cause." (Hearing Exhibit No. 37, at
10).The indictment was dismissed without prejudice to the Commonwealth's right to
seek a subsequent indictment, and the defendant was later re-indicted following a second
grand jury presentment.

18. At the hearing upon this motion, that lead State Police investigator (now retired) was
given an opportunity to explain his behavior before the first grand jury. The investigator
stated that he had been "careless" in using the word "they" instead of "he" and that the
occasion had been a "terrible learning experience" for him. That explanation does not sit
comfortably with this court. A review of the motion judge's decision reveals that the
matter was not an isolated word choice or a slip of the tongue. The investigator correctly

Weichel 258D 004176

Weichel 026266

told the grand jurors that police had interviewed four witnesses who had heard shots at Flaxon Park that evening. He then incorrectly and repeatedly lumped the four witnesses together in his narrative of the various phases of the defendant's identification. He testified that "they comprised a composite of the man they saw running from the parking lot," when in fact only one of the witnesses, Foley, participated in the composition. The investigator testified that "they felt (the composite) was fair and accurate," when in fact only Foley stated his satisfaction with the composite. The remaining three witnesses weren't even shown the composite by police. The investigator testified that a picture of the defendant was later included in an array of photographs and that "[w]e showed them to the witnesses who had seen the assailant running…and they did in fact pick out the picture of Frederick Weichell as the man they saw running from the parking lot." In fact, only Foley selected the defendant's photograph exclusively as a "look-alike," and he did so on two occasions. Laracy, on the other hand, told police he could not identify the running man because he was just a blur.  Krause, shown the array, "selected two or possibly three photos" and stated that any one of them could be a "look-alike." Castonguay, shown the array, "… was less than certain…less than definitive; she selected a photo of the defendant and one or two others as being possibles but couldn't say 'that was the man.'"[6] [7] Additionally, the investigator, again making no effort to distinguish among the four witnesses, testified that "they" had been driven in a van along the streets of South Boston and, upon seeing the defendant, stated that "they" thought

---

[6] From testimony of lead State Police investigator at the hearing on the motion to dismiss.

[7] Castonguay, at a second showing of the array subsequent to the indictment, selected the defendant's photograph, declaring it to be "wicked good."

Weichel 258D 004177

Weichel 026267

him to be the man they saw running in the parking lot. In fact, only Foley among the four witnesses was in the van, and only Foley made an identification. (Exhibit No. 37).

19. The discrepancies were not inconsequential lapses. The fact that three companion witnesses showed an inability or only a qualified ability to make an identification provided a basis to question the capacity of the fourth witness to identify a stranger from observations made under seemingly similar circumstances. And the lead State Police investigator in this case appeared to attempt to divert the fact-finder's attention from that question. Indeed, that was the very point defense counsel attempted to demonstrate at trial when he confronted the investigator with his earlier incautiousness before the grand jury.[8]

20. The court makes note of these points because the lead State Police investigator continued in his role to the conclusion of the case, at the defendant's conviction. It was this lead State Police investigator who served as the chief liaison between the Braintree Police Department and the Norfolk County District Attorney's Office.[9] It was he who likely knew the history of the investigation and the state of the evidence in this particular case better than anyone else. And it was he who very plainly knew both the importance and

---

[8] Question: "Do you recall giving this testimony to the grand jury, sir: 'We went down and we got some photos of Mr. Weichell. We then showed them to the witnesses, who had seen the assailant running from the parking lot where Robert W. LaMonica was murdered on 5/31/80 and they did, in fact, pick out the picture of Frederick Weichell as the man that they saw running from the parking lot, but as you know, photos can be a couple of years old and they wanted to be sure. We then brought them in a van with one-way glass and I drove them through the streets of South Boston, and at one particular time they said there is a man I think is the man who shot Robert W. LaMonica.' Do you recall that? Answer: I recall the subject, sir. I don't have a conscious memory of stating those words."

[9] For certain periods of time, the trooper, as lead investigator, may have been the exclusive liaison between the District Attorney's Office and the Braintree Police Department. Detective Wilson, beset with health problems, had not been working for at least two months prior to the trial, occurring in August, 1981. These problems had grown so severe that Detective Wilson was unable to testify at trial. (See testimony of Dr. Eugene Tirrell at Trial transcript VII 4-14).

14

Weichel 258D 004178

Weichel 026268

the vulnerabilities of the identification evidence. According to his hearing testimony, the lead State Police investigator worked on the LaMonica case "everyday for several months." He worked with Detective Wilson, but he (the lead State Police investigator) believed himself to have "primary jurisdiction" over the investigation.

_DISCOVERY OF THE LEAHY MEMORANDUM:_

21. On June 2, 2010, attorneys on behalf of the defendant sent a letter to the Braintree Police Department pursuant to the Massachusetts Public Record Law, G.L. c. 66, § 10, seeking "[a]ll exculpatory evidence your agency has in its possession which tends to show that Frederick Weichel[10] was not involved in the 5/31/1980 murder of Robert LaMonica" and, more generally, "[a]ny documents your agency has in its possession regarding the 5/31/1980 murder of Robert LaMonica."

22. As a consequence, Lt. Kevin Ware of the Braintree Police Department conducted a search of the "basement archives" located in what had once been the department's indoor firing range. The "basement archives" were in a disorganized condition. Its materials, some of which were contained in plastic bins, were arranged in no particular order. Some of the materials had earlier been stored in a trailer behind the police station. Nevertheless, Lt. Ware there located a file cabinet bearing the name of Captain Buker, whom he knew to have been a former head of the department's detective unit. Within the file cabinet, Lt. Ware found a black three-ring binder bearing a gum label reading:

MURDER

LAMONICA, Robert W.

---

[10] The spelling of the defendant's name has varied in this case. Defense advocates have most frequently used "Weichel," while prosecution advocates have most often used "Weichell." The court has opted for the latter to be consistent with that selected by the Supreme Judicial Court.

Weichel 258D 004179

Weichel 026269

5/31/80
Capt. T.K. Buker

23. Believing the binder to be what was being sought by the public records request and
because "[i]t looked like it was everything," Lt. Ware made photocopies of the complete
contents of the binder and mailed them to the requesting attorney's address, along with a
bill for approximately $75.00 in copying costs. Based upon this contact with the binder,
Lt. Ware testified that he had no reason to believe any of its contents had been misfiled.
(Hearing Testimony of Ware). It is unclear whether at that time Lt. Ware returned the
binder to the "basement archives" or delivered it to the then chief of the Braintree
department, Paul Frazier.

24. The photocopied contents of the black binder contained a memorandum ("the Leahy
memorandum") seeming to be a communication to Captain Buker from a Detective
James F. Leahy. It read as follows:

June 9, 1980
8:00 a.m.

Captain Buker:

Friday, June 6, 1980, received a phone call at home
from a person who is known to me for several years who
stated that he had seen the composite and that there was no
doubt in his mind that it was Rocco Balliro. He is known
to him and he was also aware that Rocco had weekend leave
Friday, May 31, 1980, 9:30 a.m., and that he did not
return.

Sunday, June 8, 1980, the writer went to Bridgewater
(MCI) and showed the composit (sic) to at least 10 guards and
they all seemed to think it was Rocco.

(signed James F. Leahy)
_____
Det. James F. Leahy

16

Weichel 258D 004180

Weichel 026270

25. The memorandum was typed on what appears to be plain stationary showing no heading. At its bottom, someone had handwritten: "Det. Wilson to check this report out."[11] Braintree Police Chief Russell Jenkins, a past co-worker of Captain Buker, offered his opinion that the handwriting appeared to be that of Captain Buker. (Hearing Testimony of Jenkins).

26. As of the date of the memorandum, June 9, 1980, Rocco Balliro was in escape status from M.C.I. Bridgewater, where he had been serving two concurrent life sentences for a double homicide.[12] Photographs taken of Balliro during this general timeframe show him with a full head of curly hair, thick eyebrows, thick sideburns, and a broad nose, the bridge of which appeared flattened in such a way as to suggest a storied past.

27. Foley had earlier described "the running man" as being approximately 5'11" in height, weighing approximately 170 pounds, and being about 20-25 years in age. Weichell at the time of his arrest was 5'7" in height, weighed, and was 28 years old. (Lead Investigator's Report). However, Foley, in his trial testimony, stated that the photograph of the defendant which he selected from the array shown to him on the day after the murder appeared "a lot cleaner" and "just maybe possibly younger" with "not as much hair" as the man he sawing running the night before. (Trial Testimony of Foley at 6/632). Rocco Balliro, 5'11 ½" in height, was 44 years old at the time. According to various institutional records, his weight ranged from 165 to 190 pounds over the course

---

[11] No evidence has been presented to this court concerning any subsequent inquiry or "checking out" of the matters discussed in the Leahy memorandum by Detective Wilson or any other law enforcement official.

[12] This double murder occurred in 1963, after Balliro had escaped from the New Bedford House of Correction. (See Exhibit No. 25A at p. 135.)

Weichel 258D 004181

Weichel 026271

of several decades. One record of uncertain date listed him at 170 pounds. (Exhibit Nos. 25 and 33).

28. During the entire course of the prosecution of the defendant as well as the litigation of his earlier two motions for new trial, the Leahy memorandum had never been provided or otherwise disclosed to him or his attorneys. The public records response of 2010 was his first notice of the existence of the document.

29. Representing the Commonwealth in 2004, pursuant to the defendant's second motion for new trial, was Assistant District Attorney Robert C. Cosgrove, now an Associate Justice of the Massachusetts Superior Court. Owing to the particular issues raised in that motion, former ADA Cosgrove had no occasion to review the case-related records then held by the Braintree Police Department, including the Buker black binder. He accordingly did not do so. (Stipulation of the parties).

30. On March 15, 2013, attorneys on behalf of the defendant made another request upon the Braintree Police Department pursuant to the Massachusetts Public Record Law seeking documents pertaining to the defendant and the LaMonica investigation. This request resulted in Braintree Chief of Police Russell Jenkins having Detective Sergeant Edward Querzoli search for the requested records in the "basement archive" in the former indoor range. Initially unable to locate the records, the sergeant sought the assistance of the department's records clerk, Mary Lydon, who located the Buker black binder in the "basement archive" in a plastic bin. Sergeant Querzoli then photocopied the entire contents of the binder and delivered the binder to Chief Jenkins. (Hearing testimonies of Querzoli and Lydon). Either the chief or the sergeant then arranged to have the photocopies of the binder's contents delivered to the defendant's attorneys by way of the

18

Weichel 258D 004182

Weichel 026272

Braintree Town Solicitor. The mailed contents once again contained the Leahy memorandum.  (See Exhibit No. 29).

31. Captain Theodore Buker was in charge of the Braintree Police Department's detectives unit at the time of the LaMonica homicide and during its investigation. (Hearing testimony of Hanlon). He was present at the crime scene at the outset of the investigation. (Trial Transcript at 6/109).  Detective Robert Wilson was a member of that unit at that time and was dispatched to the crime scene shortly after police discovery of LaMonica's body at around 12:30 a.m. on May 31, 1980. Detective Wilson continued to be the department's lead investigator on the case throughout the investigation. Detective James Leahy, a member of that same unit, was listed in Detective Wilson's initial report as being at the scene at 4:25 a.m. and  photographing a spent .38 caliber projectile located by Sergeant James McGuiness, the assigned State Police ballistician.(Exhibit No. 2).

32. Captain Buker and Detective Robert Wilson are now deceased. Detective James Leahy suffers from a mental condition which has left him with no memory of the events of 1980 generally and of June 9, 1980 specifically. (Stipulation of the parties).

*AUTHENTICITY OF THE LEAHY MEMORANDUM:*

33. The Leahy memorandum is an authentic record of the Braintree Police Department.

34. As described above, the Leahy memorandum was located at least twice by employees of the Braintree Police Department in fulfillment of their duties pursuant to the Massachusetts Public Record Law. It was found at the headquarters of the Braintree Police Department in an area which, though unorganized, was inaccessible to the public, generally secure from unauthorized searches, and used for the purpose of storing older

Weichel 258D 004183

Weichel 026273

documents and other materials for a sufficient period of time to acquire the name "basement archive."

35. Though not appearing on an official departmental form often associated with police reports, the Leahy memorandum was created in a format typically used by the Braintree Police Department during the early 1980's for internal communications, often related to ongoing investigations. The record before the court contains numerous instances of this same format (i.e. typed on plain paper, dated, with a signature line for the author) having been used by Detective Leahy, Detective Wilson, Captain Buker, Chief Polio, and others. (See Exhibit Nos. 30, 31, 32 and 51).

36. Additionally, though this court professes no expertise in handwriting identification, the signature shown on the Leahy memorandum appears to be most consistent with the dozens of examples of Detective Leahy's signature shown on various reports and other documents seemingly authored by him in 1980 and 1981. (See Exhibit Nos. 2 and 51).

*THE LEAHY MEMORANDUM RELATES TO THE LAMONICA HOMICIDE:*

37. As discussed above, the Leahy memorandum was discovered pursuant to the defendant's public records request in 2010 in a black binder labeled: "MURDER, LAMONICA, Robert W., 5/31/80" and bearing the name of the head of the Braintree Police Department's detective unit at the time of its investigation into that homicide.

38. As a result of an order of this court, the above-described black binder was delivered on August 20, 2014 to the custody of this court, where it has remained ever since.[13]

---

[13] The black binder and its contents have periodically been made available to the parties for their supervised inspection and examination.

Weichel 258D 004184

Weichel 026274

39. Excluding the Leahy memorandum, the binder holds eighty-four pages by means of its
loose-leaf rings. By this court's measure, at least seventy-seven of those pages have a
demonstrable connection to the LaMonica homicide. Additionally, the front flap of the
binder contains thirty-one loose pieces of paper and two stapled collections of papers.
Thirteen of the loose papers have a clear connection to the LaMonica case. One is a copy
of the Foley composite. There are two copies of a newspaper article concerning the
Weichell conviction. There are four photographs of persons. The two stapled collections
appear to be identical assemblages of the police or probation record of a male named L.
Estrella. The remainder are handwritten notes, often of names and phones numbers,
some of which are identifiably connected to the LaMonica investigation. The rear flap of
the binder contains a second copy of the Leahy memorandum and ten pages of Braintree
police reports, all stapled together and all pertaining to the LaMonica homicide.

40. The black binder (Exhibit No. 2), at the time it came into the court's custody, contained
three copies of composite pictures. Two of them were copies of Foley composite, which
appeared in Patriot Ledger on June 3, 1980 (Exhibit No. 15), six days before the stated
date of the Leahy memorandum.

41. The third composite picture, depicting an image of a mustachioed man, is undated and
bears no identifying information known to the court or otherwise pointed out by the
parties. Nevertheless, it was this third composite picture which, at the time of the court's
taking custody of the black binder, appeared on the page immediately following the
Leahy memorandum. Largely for this reason, the Commonwealth has interposed the
hypothesis that the Leahy memorandum pertains to the composite picture of the

21

mustachioed man and has no connection at all to the LaMonica homicide investigation. The court does not so find.

42. First and perhaps foremost, the Commonwealth has searched the records of the Braintree Police Department and has identified no instance in May or June of 1980 where that department made use of a composite picture other than the LaMonica homicide. (Stipulation of the parties).

43. Moreover, the composite picture of the mustachioed man bears little resemblance to the approximately fifteen[14] photographs of Rocco Balliro introduced into the record. The composite picture shows a man with straight hair, perhaps with a wavy forelock. The photographs of Balliro, particularly those taken in the early 1980s, show a full head of distinctively curly hair. Those photographs also show thick eyebrows while the mustachioed man's eyebrows are obscured by a pair of thick-brimmed glasses. Only a single photograph of Rocco Balliro shows him possibly wearing glasses.[15] It is dated 1994. Also, only one of these photographs show Rocco Balliro with a mustache. It is combined with a goatee and appears as a part of a newspaper article dated June 2, 1980, though the photograph itself is undated. The ears of the mustachioed man in the composite picture are covered entirely by his hair. That is not the case in any of the photographs of Rocco Balliro, who appears to have large ears. To the eye of this writer, the most prominent feature of the face of Rocco Balliro, quite evident in all of his

---

[14] Owing to repetitive photocopying, it was not always clear whether these photographs were distinctive or duplicative.

[15] The poor quality photograph to which the Commonwealth alludes as an example of Balliro wearing glasses (Exhibit No. 25, p. 63) appears to be a duplicate of the sixth Balliro photograph shown in Exhibit No. 43. It is the court's opinion that Balliro is not shown wearing glasses in any photograph shown in the clearer Exhibit No. 43.

Weichel 258D 004186

Weichel 026276

photographs, is his nose. It is unusually broad and flat at its bridge and bulbous at the

nostrils. It is starkly different from the unremarkable nose of the mustachioed man.

44. The court assigns little significance to the fact that the composite picture of the

mustachioed man is currently situated on the page directly following the Leahy

memorandum in the black binder. The contents of the binder have been unbound and

copied several times since the 2010 Public Records request. Additionally, there is

impressive scientific evidence that those contents have been rearranged from time to

time during the preceding thirty years or so.  According to the testimonies of two

credentialed document examiners, certain physical characteristics of the Leahy

memorandum and the Foley composite provide a basis for determining whether the two

documents had been in close proximity to one another for an appreciable period of time.

The Leahy memorandum was described by at least one examiner as "an original

typewritten letter" and the Foley composite as "[a]n original machine produced

composite sketch…produced on glossy type photo paper which is attached to a larger

piece of paper (the carrier paper) by means of clear adhesive tape at three (3) locations."

Both descriptions were consistent with observations by this court.  These experts

testified that the two documents in question had undergone deterioration over time and

that the chemical processes associated with this deterioration had had the effect of

transferring impressions of certain features of one document upon the other. Employing

different techniques, both experts identified a series of features on the reverse side of the

Leahy memorandum which corresponded to features on the front side of the Foley

composite, including the outline of the photograph upon the carrier paper and the size

23

Weichel 258D 004187

Weichel 026277

and angles of the strips of adhesive tape. One expert[16] described the arrangement of the features upon the two documents as being "virtually identical," suggesting that the documents had been stored in contact with one another for a period of "at least long enough to make such an impression."   The other expert,[17] alluding to the intensity of the impressions, opined that the two documents had been "closely proximate and likely in direct contact" with one another and had been so situated for "a minimum of five years." (See Exhibit Nos. 3 and 7 and corresponding hearing testimony).

45. The record's various photographic images of Rocco Balliro have other relevance to the instant motion. The Commonwealth has argued that the defendant, at the time of his arrest, bore an "uncanny" resemblance to the Foley composite, and the Supreme Judicial Court, in ruling upon the defendant's second motion for new trial, called the resemblance "striking." This writer shares neither opinion, though I confess to a very poor track record. In forty-four years of trying criminal cases --- as a defense attorney, prosecutor, and now as a trial judge --- I have yet to be moved to characterize a resemblance between a composite picture and a suspect as "uncanny" or "striking." That record continues. Nevertheless, I acknowledge that not all resemblances are equal. The images of the defendant and Rocco Balliro as they appeared in the early 1980's present an example. Comparing both images with the Foley composite, this writer offers the opinion that the Balliro image wins hands down.

46. Former ADA Hanlon had no knowledge of the Leahy memorandum prior to trial. When eventually becoming aware of the memorandum, subsequent to its discovery in 2010,

---

[16] Alan T. Robillard

[17] Paul Messier

Weichel 258D 004188

Weichel 026278

she was "stunned" and initially believed the document to be a "fake." Nevertheless, she

concluded that the document, authentic or inauthentic, related to the LaMonica

homicide. At hearing, she testified that, had she known of document's existence prior to

trial, she "absolutely" would have provided a copy to the defendant's counsel. The court

thoroughly credits this testimony. Furthermore, the court adopts its attendant

conclusions: the Leahy memorandum pertains to the investigation into the LaMonica

homicide, and the composite to which it referred is the Foley composite.

47. Former ADA Hanlon had no knowledge of the composite of the mustachioed man.

*THE PROBLEM OF THE WHEREABOUTS OF ROCCO BALLIRO:*

48. Another connection between the LaMonica murder and the Leahy memorandum is their

seeming relation to the identical weekend. Robert LaMonica was shot minutes after

midnight on May 31, 1980, and the Leahy memorandum stated that Rocco Balliro, then

an inmate at M.C.I. Bridgewater, "had weekend leave Friday, May 31, 1980, 9:30 a.m.,"

from which he had not returned.

49. However, "Friday, May 31, 1980" never existed.  May 31, 1980 was a Saturday.

Additionally, certain departmental records and newspaper stories at the time reported

that Balliro had been granted a 12-hour leave and had been scheduled to return to M.C.I.

Bridgewater at 9:00 p.m., Saturday night. If these accounts were accurate, Balliro would

not have been released from custody until 9:00 a.m., Saturday morning, nearly nine

hours too late to have committed the LaMonica murder.

50. But the matter is far from settled. Contemporaneous records of the Department of

Corrections on the matter seem not to exist. Despite maintaining records of the precise

times of Rocco Balliro's comings and goings for court appearances both before and after

25

Weichel 258D 004189

Weichel 026279

his post-escape return to custody (i.e January, 1981), the Department of Corrections has produced no record of the actual time that he departed from M.C.I. Bridgewater to begin his leave. (See Exhibit No. 25).[18] At least one subsequent record, a Parole Violation Report, states that Rocco Balliro "left MCI-B on 5-30-80…with a twelve hour furlough and was due back at 9:00 p.m. the same evening" and was "officially classified by D.O.C. as an escapee." Also, at least two witnesses testified that the Department of Correction's furlough program of that era was laxly supervised, with early releases and late returns often being tolerated. (See hearing testimony of Cardinale and O'Shea). The court notes that Balliro was granted a two-hour grace period before his absence was reported, and a warrant for his arrest was not sought until two days later. Moreover, Balliro's escape was the third such misadventure suffered by the Department within the week. (See Exhibit No. 49). [19] Additionally, Balliro had been granted furloughs exceeding twelve hours in the months preceding May, 1980, and he viewed the authorization for only twelve hours as a "set back." As a result, the Superintendent of M.C.I. Bridgewater, with the support of the Classification Board, had been seeking a reconsideration by the Associate Commissioner. (See Exhibit No. 25, p. 72). This request was tersely denied due to "the serious nature of the current offense." However, the seeming arbitrariness of the explanation raises the question in the mind of this writer whether further reconsideration may have been sought.

---

[18] The Inmate VAX Movement History included as part of the DOC record of Rocco Balliro appears to be a reconstruction, making repeated use of default times where actual times were unknown. Accordingly, the court views such record as an unreliable indicator of the when Balliro departed the facility prior to his escape.

[19] Brockton Enterprise, June 2, 1980, page 1.

Weichel 258D 004190

Weichel 026280

51. Moreover, turning to the Leahy memorandum itself, it is hard to see how "at least ten guards," seemingly with firsthand knowledge of the details of Balliro's absence, would have all overlooked the impossibility presented by their own identifications of him as the prime suspect in a murder occurring when he was still in their custody just eight days earlier.

52. Rocco Balliro remained in escape status for several months. He was arrested near San Francisco, California in late summer by police responding to a complaint of a noisy party. He assaulted an officer and was found in possession of cocaine. By his account, he seemed to have spent his months of freedom to the fullest. He explained to the Classification Committee upon his return that the purpose of his escaping was to prove that he was no longer a threat to society. He stated that, using the name Nicholas A. Tzannos, he travelled to Toledo, Ohio to meet and attempt to reconcile with his estranged wife. The effort was unsuccessful, and Balliro continued on to California, where he met up with some old friends. He claimed that, using the name Louis A. Monteforte, he obtained a driver's license, became employed fulltime as an automobile salesman, and got married. He described his lifestyle at the time as "normal." After his arrest, he was released, but apparently his Massachusetts warrant caught up with him. He ended up being detained in San Francisco for about two months before his return to Massachusetts in January, 1981. He received several endorsements from his California detention facility as "a good and decent person" who was "helpful and respectful" during his stay. Even allowing for possible embellishments by Balliro in telling his tale, there appears little likelihood that he could have travelled so far and for so long without the assistance of others.

27

_OTHER FINDINGS:_

53. Rocco Balliro had a twin brother, Salvatore (sometimes known as Rudy), who also had a violent criminal past and who was at his liberty at the time of the LaMonica murder. No photograph of Salvatore Balliro was made part of the record. However, Floyd Hamilton, the sole witness claiming to be familiar with both twins, testified that the two looked very much alike and that he "mistook one for the other often."

54. The Leahy memorandum is the sole piece of evidence in the record that the Foley composite garnered any results. Though the Commonwealth has asserted that the composite drew "a lot of tips" (See Affidavit of ADA Marguerite Grant), the record is bare of any support for the claim. Moreover, perhaps the most comprehensive narrative account of the investigation, the report of the lead State Police investigator, discussed the creation of Foley composite while making no mention of whether the composite generated any responses. Though the report stated that police received several tips suggesting that the defendant was the killer of Robert LaMonica, in no instance did any described tip refer to the Foley composite.

55. There is no evidence in the record that, after June 9, 1980, Detective Wilson or any other investigator ever visited M.C.I. Bridgewater or spoke to employees of that institution in connection with the LaMonica murder investigation.

56. The defendant was arrested for the LaMonica murder on August 13, 1980.

57. During his trial testimony, the lead State Police investigator stated that Castonguay had twice been shown photo arrays and on both occasions had selected the defendant's photograph along with one or two others. The investigator admitted, however, that he could not recall what the witness had said to explain her selection of the photographs of

28

other people. He further testified that he had taken no notes concerning who the alternative selections were.  When asked why on cross examination, he answered, "Neither (of) those two other people were suspects," and later, "My only concern was that he (the defendant) was a suspect and he was the only suspect at the time." (Trial Testimony at 7/42). Additionally, the investigator explained that no other witness was offered to participate in a ride through the streets of South Boston because "we went with our strongest witness and our best witness."  (Trial testimony at 7/44-7/48).

58. Ten days before LaMonica was killed, Rocco Balliro was disciplined for assaulting a fellow inmate, also named LaMonica. Any connection between the two LaMonicas is currently unknown.

59. Balliro had once shot at and threatened to kill Freeman "Punchy" Clifford, the same person whom LaMonica's father had shot and killed in a crime in which LaMonica, the deceased, was also involved. See *Commonwealth v. Balliro,* 349 Mass. 505, 507-508 (1965).

**RULINGS OF LAW**

60. Pursuant to Rule 30 (b) of the Massachusetts Rules of Criminal Procedure, a trial judge "upon motion in writing may grant a new trial at any time if it appears that justice may not have been done."  Such a motion "is thus committed to the sound discretion of the judge*." Commonwealth v. Scott*, 467 Mass. 336, 344 (2014).

61. Suppression by the government of requested material evidence which is favorable to a defendant is a denial of due process, irrespective of the good faith or bad faith of the prosecution. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Under certain circumstances,

Weichel 258D 004193

Weichel 026283

such nondisclosure may warrant reversal of a criminal conviction. *United States v. Agurs*, 427 U.S. 97, 106-107 (1976).

62. Similar to today, under the rules of criminal discovery operable in 1980 and 1981, on a motion of a defendant, the prosecution had a duty to provide exculpatory information "within the possession, custody, or control of the prosecutor." See Mass. R. Crim. P. 14 (a) (1) (C), 378 Mass. 874 (1979), see also *Commonwealth v. Beal,* 429 Mass. 530, 532 n.1 (1999). This obligation has been amplified over the years, but even then the requirement extended to exculpatory information in the possession of both the prosecutor and the police. See *Commonwealth v. Campbell*, 378 Mass. 680, 702 (1979).

63. Exculpatory information includes "evidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness." *Commonwealth v. Gregory,* 401 Mass. 437, 442 (1988), quoting *Commonwealth v. Ellison*, 376 Mass. 1, 22 (1978). Evidence may be favorable or exculpatory, and thus requiring disclosure, even where it is less than totally destructive of the prosecution's case or particularly demonstrative of the defendant's innocence. *Commonwealth v. Daniels*, 445 Mass. 392, 401 (2005).

64. "To secure a new trial on the basis of exculpatory evidence, the defendant must establish three elements. First, the evidence must have been in the possession, custody, or control of the prosecutor or a person subject to the prosecutor's control….Next, the defendant must establish that the evidence is exculpatory….Finally, after showing that the withheld evidence was potentially exculpatory, a defendant seeking a new trial must establish

30

prejudice." *Commonwealth v. Murray*, 461 Mass. 10, 19-21 (2011) (new trial justified where undisclosed police affidavit would have supported defendant's claim of self defense and witnesses' motives to lie).

65. "Undisclosed exculpatory evidence is 'material' if, 'evaluated in the context of the entire record,' it 'creates a reasonable doubt that did not otherwise exist.'" *Commonwealth v. Gregory*, 401 Mass. 437, 442 (1988), quoting *United States v. Agurs,* supra at 112.

66. "When a defendant makes a specific request for reasonably identified evidence, the evidence is deemed material even if it only provides 'a substantial basis for claiming materiality exists.'" *Id.*, quoting *Commonwealth v. Wilson*, 381 Mass. 90, 108-109 (1980). The Supreme Judicial Court has since restyled this standard slightly by stating that a defendant making a specific request need only demonstrate that "a substantial basis exists for claiming prejudice from the nondisclosure." *Commonwealth v. Tucceri*, 412 Mass. 401, 412 (1992) (new trial granted where undisclosed police photograph of defendant showed him to be mustachioed on the night the victim said her attacker was clean shaven). However, the Leahy memorandum does not fit into this category. It was not specifically requested or reasonably identified. The reason was simple enough: neither the defense attorney nor the prosecutor knew of its existence prior to trial. Moreover, the defendant's request for "[a]ny information in the hands of the Commonwealth, or under its control, concerning identifications or descriptions purportedly made by witnesses at the scene of the incident" did little to assist the discovery of the Leahy memorandum. The request could reasonably have been read to pertain only to the identifying statements and conduct of Foley, Castonguay, Krause, Laracy, and perhaps people present at the nearby apartment building (i.e. "witnesses at

31

Weichel 258D 004195

Weichel 026285

the scene").  In the absence of a report or other evidence that the Foley composite had generated any responses at all, it is difficult to see how the defendant's vague request could reasonably have drawn the prosecutor's attention toward a document about which she had no reason to be aware. Under such circumstances, the defendant's request really gave the prosecutor no reasonable notice that a document of the nature of the Leahy memorandum was being sought.

67. Nevertheless, the lack of a request does not relieve the prosecution of its duty to disclose evidence of an "obviously exculpatory character." See *United States v. Agurs*, supra at 106-107. As more fully explained below, the court finds the Leahy memorandum to be "obviously exculpatory."

68. "[W]hen the defendant has made no request or … only a general request for exculpatory evidence…[t]he judge must determine whether there is a substantial risk that the jury would have reached a different conclusion if the evidence has been admitted at trial." *Commonwealth v. Tucceri*, supra at 412-413. "The judge does not decide whether the verdict would have been different, but rather 'whether the new evidence would probably have been a real factor in the jury's deliberations.'" *Commonwealth v. Murray*, supra at 20, quoting *Commonwealth v. Grace*, 397 Mass. 303, 305 (1986).

69. The defendant has met his burden under the first prong of *Murray*. The Leahy memorandum was certainly in the possession of someone under the prosecutor's control. Furthermore, by its content, physical condition, and the circumstances of its location, the document appears to have been in the prosecution's control at all times relevant to these proceedings, including the pretrial discovery stage. The Leahy memorandum is an authentic record of the Braintree Police Department. See Mass.Guide to Evid., §

Weichel 258D 004196

Weichel 026286

901(b)(&)(A) (satisfied by "[e]vidence that a document was recorded or filed in a public office as authorized by law, or that a purported public record or statement is from the office where items of this kind are kept"). It was located at the Braintree Police Headquarters by police personnel responding to a public records request from the defendant. It was found in a file cabinet bearing the name of Captain Theodore Buker, the former head of the detective unit, in a black binder labelled "Homicide, Robert LaMonica." Captain Buker was the immediate supervisor of Detective Wilson, and it was Captain Buker to whom the Leahy memorandum was addressed. Also, it was Captain Buker who was the announced contact person for responses to the newspaper publication of the Foley composite. Clearly, Captain Buker was a significant participant in the LaMonica investigation. As such, he along with other participants within his unit had a legal obligation to notify the prosecutor of the existence of exculpatory information in order to facilitate disclosure, even under the law as it had evolved in 1980. See *Commonwealth v. St. Germain*, 381 Mass. 256, 262 n.8 (1980), quoting *Barbee v. Warden, Maryland Penitentiary*, 331 F.2d 842, 846 (4th Cir.1964) ("The police are also part of the prosecution, and the taint on the trial is no less if they, rather than the State's Attorney, were guilty of the nondisclosure").

70. Additionally, the defendant has met his burden of establishing that the Leahy memorandum was exculpatory. "'Exculpatory' in this context is not a narrow term connoting alibi or other complete proof of innocence, ... but rather comprehends all evidence `which tends to "negate the guilt of the accused" ... or, stated affirmatively, "supporting the innocence of the defendant."'" (Citations omitted.) *Commonwealth v. Healy*, 438 Mass. 672, 679 (2003), quoting *Commonwealth v. St. Germain*, 381 Mass.

Weichel 258D 004197

Weichel 026287

supra at 261 n.6 (1980). Again, "exculpatory" evidence for purposes of assessing whether a new trial is warranted "need not be dispositive evidence." *Commonwealth v. Daniels*, 445 Mass. supra. The Leahy memorandum was such evidence. The trial prosecutor forthrightly granted the point in her hearing testimony. Though never having been made aware of the Leahy memorandum during her involvement in the case and initially believing it to be a "fake" when she subsequently viewed it following the public records request, the former prosecutor did not quibble. She testified that she immediately understood the document's connection to the LaMonica investigation and that, had she known earlier of its existence, she "absolutely" would have disclosed the Leahy memorandum to the defense as part of her ethical and legal obligations. She clearly saw what others had missed, or perhaps had ignored. She plainly appreciated the Leahy memorandum's implications. This was a case which rested upon a tenuous identification, the product of a fleeting observation by a single witness from a considerable distance. That witness had memorialized his observation with a composite picture, created just several hours later. That very composite stood as a pillar of the prosecutor's closing argument as she meticulously pointed out to the jurors its similarities to the face of the defendant, one feature at a time. Now, decades later, confronted with a strange, fragile, gray document, she read that "at least ten guards" had believed that the very same composite resembled someone else, a convicted murderer with the guards had had close and regular contact until he failed to return from a furlough on the very same weekend as the murder she had prosecuted. Not only that, the guards had made their information known to police within eight days of the murder, and at least one of them had said "there

34

was no doubt in his mind."  The Leahy memorandum squarely contradicted the core of

the Commonwealth's case.

71. The Leahy memorandum is also exculpatory because it contains information that would

have led its reader to consider an alternative suspect, in this instance, Rocco Balliro.

"Withholding knowledge of a second suspect conflicts with the Supreme Court's

directive that 'the criminal trial, as distinct from the prosecutor's private deliberations,

[be preserved] as the chosen forum for ascertaining the truth about criminal

accusations.'" *United States v. Jernigan*, 492 F.3d 1050, 1056-1057 (9th Cir. 2007),

quoting   *Kyles v. Whitley*, 514 U.S. 419, 440 (1995). Third-party culprit evidence may

be admissible if there are "substantial connecting links" between the third party and the

crime charged. Mass. Guide to Evid., §1105. An identification of a different suspect by

"at least ten" persons and a recent fight between that suspect and a person with the same

last name as the murder victim could arguably have been the requisite "connecting

links."  In the alternative, the identification would certainly have given the defendant a

basis to investigate whether further "connecting links" existed. The Commonwealth's

argument on this point that the Leahy memorandum is not exculpatory because Balliro

was in custody at the time of the murder hardly closes the subject, particularly in the

absence of any contemporaneous record of when Balliro actually left M.C.I.

Bridgewater. If anything, the argument highlights yet another aspect of the prejudice

suffered by the defendant from the thirty-year delay in the disclosure of the Leahy

memorandum. A timely inquiry, of course, would likely have settled the matter of the

whereabouts of Rocco Balliro at the critical hour. But the defendant was precluded from

even attempting that timely inquiry. Also, the Commonwealth's argument overlooks the

35

possible --- and completely uninvestigated --- involvement of Balliro's look-alike twin brother Salvatore.

72. Also, the Leahy memorandum is exculpatory because it would have provided the defendant with the basis to mount a defense pursuant *Commonwealth v. Bowden*, 379 Mass. 472 (1980). "The failure of the authorities to conduct certain tests or produce certain evidence (is) a permissible ground on which to build a defense in the circumstances of this case. (citations omitted). The fact that certain tests were not conducted or certain police procedures not followed could raise a reasonable doubt as to the defendant's guilt in the minds of the jurors." *Id.* at 485-486. Here, the Commonwealth has claimed that the Foley composite generated a "lot of tips." However, the only evidence of any such tip is that discussed in the Leahy memorandum, and, but for the actions of Detective Leahy, there is no record that anyone ever pursued or "check(ed) this report out." The seeming lack of police follow-up in this regard is precisely within the scope of exculpatory information contemplated by *Bowden*. Moreover, if the Commonwealth's assertion of multiple tips is accurate, it raises a variety of other questions pertinent to the instant motion. Was any investigator --- other than Detective Leahy --- paying any attention to whether or not the composite was achieving the purpose for which it had presumably been published? Did any of these generated tips support the identification of the defendant as the person depicted? Did any --- excepting those referenced in the Leahy memorandum --- support an alternative identification? Did any investigator recognize the potential evidentiary value of the information offered in this "lot of tips?" Did any investigator appreciate the importance of sharing this information with the prosecutor, who might offer another perspective on

36

its potential evidentiary value?  Or were all these questions ignored because the investigators had already made up their minds? The notion of early closed-mindedness on the part of the lead State Police investigator was clearly one of the points the defendant's counsel attempted to develop at trial.  (See Trial transcript at 7/44-47). The Leahy memorandum, admissible to show the incompleteness of an investigation under Mass. Guide to Evid., § 1107 could have assisted that effort significantly.

73. The Leahy memorandum had exculpatory value going beyond its content. It was also potentially exculpatory for the fact of its nondisclosure. Certainly, one of the more challenging aspects of the case for the defendant was the fact that the lead State Police investigator, earlier rebuked for giving "flagrantly false information" to bolster the identification evidence before the initial grand jury, was the very same witness testifying to the pretrial identification procedures undergone by the Commonwealth 's key witness, Foley. The doubtless purpose of this testimony was to bolster Foley's in-court identification of the defendant as the so-called "running man."  The testimony seemingly accomplished that purpose. The investigator testified that Foley had viewed two photo arrays on two different occasions before participating in the South Boston ride. The investigator further testified that on each occasion Foley had selected the defendant as looking like "the running man," being most forceful of the third occasion (.i.e. "That's the guy!").  Upon cross-examination, however, the investigator testified that he could not recall conversation possibly attending the display of the two photo arrays as well as conversation during portions of the South Boston ride, where two members of the victim's family were inexplicably present and giving directions to the driver. Defense counsel cross-examined on the subject of the false grand jury testimony, but the

37

investigator continued not to recall. He testified several times that he didn't recall the actual statements he had given. Even when confronted with a transcript of his own testimony, he repeated, "I recall the subject, sir. I don't have a conscious memory of stating those words." At the hearing upon the instant motion, the lead State Police investigator testified that he had never seen the Leahy memorandum prior to 2014, despite having "primary jurisdiction" over the case upon which he had worked "everyday for several months." Had defense counsel been armed with the Leahy memorandum at trial, he perhaps could have pushed the witness's claims of a lack of recollection to a point beyond juror credulity. He also might have asked the lead State Police investigator whether he paid any attention at all to responses to publication of the Foley composite or whether he simply ignored information not in keeping with the tip or tips he had received concerning the defendant within hours of the murder.

74. Finally, the defendant has met his burden under the third prong of *Murray*; he has established that he was prejudiced by the nondisclosure of the Leahy memorandum. He was prejudiced by being precluded from introducing or otherwise utilizing the exculpatory information discussed above ---

    a.  The defendant was denied information which pointedly placed into question a pivotal component of the prosecution's case against him: his identification by Foley as the so-called "running man" and his contended likeness to the composite picture which Foley had created in the immediate aftermath of the murder;

    b.  The defendant was denied information by which he could have presented, or at least investigated, a credible third-party culprit defense: an alternative identification of a convicted murderer who may have been at liberty at the time of

Weichel 258D 004202

Weichel 026292

the LaMonica murder and who also had a twin brother with a significant criminal background;

c.   Without the Leahy memorandum, the defendant was deprived of the opportunity to demonstrate by clear example the incompleteness --- and perhaps closed-mindedness --- of the police investigation, thereby possibly raising reasonable doubt in the minds of his jurors, as contemplated in *Commonwealth v. Bowden*, supra;

d.   The defendant in these circumstances was also deprived of a significant additional avenue by which to cross examine the lead State Police investigator on his knowledge of the overall investigation, his choice of identification procedures, and his recollection of the details of those procedures. Moreover, the defendant was deprived of the opportunity to appreciate the importance of calling to the stand Captain Buker, Detective Wilson, and Detective Leahy to be cross-examined on those same subjects.

75. The nondisclosure of the Leahy memorandum prejudiced the defendant in yet another most important way. Its appearance quite possibly --- and to the mind of this court, very likely --- would have made a pivotal difference in the defendant's attempt by motion to introduce expert testimony on the issue of eyewitness identification. (See Hearing Exhibit Nos. 38 and 39). Rather than merely offering a general discussion of factors affecting perception and the retention and retrieval of memory, the defendant armed with the Leahy memorandum could have made a decisively more specific and pertinent argument. The Leahy memorandum provided the defendant with a concrete example of a divergent opinion concerning the composite picture that was created by the sole witness

39

Weichel 258D 004203

Weichel 026293

who identified the defendant at trial. That very same composite picture was later introduced into evidence by the Commonwealth to support that in-court identification. It was undeniably a central feature of the Commonwealth's case, and the divergent opinion concerning it was held by "at least 10" ascertainable persons who had had close and regular contact with the alternative suspect whom they all had identified. With such a difference of opinions and with evidence already heard by the jury, Dr. Buckout, the defendant's proposed expert, would doubtlessly have had numerous case-related illustrations upon which to base his discussion of factors affecting eyewitness identification testimony.

76. Not to be overlooked, a simpler and more direct approach would have been available to the defendant had he known of the Leahy memorandum. He could have displayed for the jurors the Foley composite flanked by the defendant's photograph and that of Rocco Balliro, regardless of his whereabouts on May 31, 1980. It's hard to imagine the triptych not making an impression and having an impact upon the trial. It would have all but precluded the Commonwealth from inviting the jury to engage in a binary comparison of the defendant's face with that of the composite image, feature-by-feature. Moreover, it would have permitted defense counsel to employ the same strategy to opposite effect. The defense counsel could have used the image of Rocco Balliro to invite the jury to consider whether his black curly hair, thick "Italian (if you will)" eyebrows, full sideburns, and distinctive nose were not all seemingly more consistent with Foley's verbal description than the face of the defendant. From such things, doubt in the jurors' minds could have reasonably been raised.  However, the defendant never had the opportunity to present such a display.

Weichel 258D 004204

Weichel 026294

77. The law respecting eyewitness identification has changed considerably since the defendant's trial. We now have model jury instructions which "provide juries with more comprehensive guidance to evaluate and weigh eyewitness identifications." *Commonwealth v. Gomes*, 470 Mass. 352, 377 (2015). Quite probably, a number of the points Dr. Buckout likely would have made, had he been allowed to testify at the defendant's trial, would today come directly from the judge. Of course, our current model jury instructions and their associated rules do not apply to an analysis of a trial occurring in 1981. See *Commonwealth v. Alcide*, 472 Mass. 150, 165 (2015). Nevertheless, in instances where courts are today called upon to examine past proceedings, are guided to be mindful of the concerns which gave rise to our more recent instructions and rules. *Id.* at 167 n.23. To the view of this court, those concerns are here triggered. Foley's identification of the defendant during the above-described South Boston ride subsequent to his being shown the defendant's photograph twice is most troubling. A credentialed expert in the field of eyewitness identification[20] testified at the hearing upon the instant motion that the ride-around procedure, under the circumstances in which it was conducted, was "unreliable." Indeed, the reliability of the various identification procedures employed by the police in this case seems to have been a valid issue for jury consideration. The court notes that Justice Liacos, in his dissent from the denial of the defendant's initial appeal, opined that the Foley composite should not have been admitted into evidence at trial without any showing by the Commonwealth of the reliability of the composite process and of the procedures employed in creating the composite being offered. *Weichell*, supra at 81 (Liacos, dissenting).

---

[20] Dr. Geoffrey Loftus

Weichel 258D 004205

Weichel 026295

78. The court declines to accept the Commonwealth's argument that the Leahy
memorandum is inadequate to support the instant motion because it is not admissible as
evidence. In the first place, the document would likely have been admissible on several
theories, including as *Bowden* evidence and as third-part culprit evidence, as earlier
mentioned. However, and perhaps more importantly, the Leahy memorandum has the
reasonable potential to lead to admissible evidence. To provide the basis for a motion for
new trial, exculpatory information need not be admissible in itself. To hold otherwise is
to incentivize nondisclosure. This case is an example. It took thirty years for the Leahy
memorandum to be uncovered and disclosed. In that time, three of the four investigators
likely to have had contact with it have become unavailable to testify. Additionally,
Rocco Balliro has died, and the records of when precisely he departed from M.C.I.
Bridgewater apparently no longer exist, if they ever did. An exculpatory document
should not lose its utility as the basis for a motion for new trial simply because it has
lingered longer than the three witnesses whose names appear on it.

*CONCLUSION:*

79. In this case, there was evidence of ill will between a group which included the defendant
and a rival group which included LaMonica. However, little else connected the
defendant to LaMonica's murder. There were no eyewitnesses to the shooting. No
physical evidence recovered from the crime scene established any connection to anyone.
The murder weapon, recovered several blocks away, yielded no fingerprints. Though a
vehicle had been observed leaving the scene at about the time of the fatal shots, no one
could offer a suitable description of it, and consequently it was never found. Four youths
were at a nearby park when, shortly after hearing the shots, three of them observed a

42

Weichel 026296

man running from an adjacent apartment complex to a waiting vehicle, which drove away after he had entered the passenger's side. Only one of the youths, John Foley, would ultimately identify the defendant at trial as "the running man." From a distance of no less than 180 feet, Foley, having had four or five beers earlier in the evening, saw "the running man" turn toward the youths for about one second while beneath a street light. That was the connection upon which the Commonwealth's case rested.

80. Within a few hours of his observation, Foley worked, apparently with some ardor, with a police detective to assemble a composite picture of "the running man" by using an Identikit. When elements of the kit were inadequate to satisfy Foley, the detective used a pencil to alter certain features, including the nose and hairstyle. Finally, Foley was satisfied, declaring that the composite picture "looks like him." The police later caused the composite to be published in the newspaper for the express purpose of soliciting information which could help lead them to a murderer, a purpose doubtlessly known to Foley when he helped to assemble the composite and endorsed its accuracy.

81. That composite was Foley's earliest and most comprehensive effort to memorialize his observation of the face of "the running man." The composite had been created before police had received any tips concerning the defendant and before Foley had ever viewed a photograph of the defendant. The Foley composite, accordingly, had unique value to this case, and the prosecutor made full use of it in her closing argument. The Foley composite and the defendant's photograph were the only two exhibits the prosecutor displayed while arguing that one face resembled the other, feature by feature, and that therefore the two images were of the same person.

43

Weichel 258D 004207

Weichel 026297

82. However, "at least 10" people had a different opinion. Viewing that same composite picture, they believed that it portrayed someone else, a person whom they knew well. That was the contradiction contained in the undisclosed Leahy memorandum, a document prepared by a Braintree police detective and delivered to his captain and referred to the lead local investigator only nine days after the murder.

83. This plainly exculpatory document was among records in the custody of an agent of the prosecution, and its nondisclosure was prejudicial to the defendant in numerous respects, including those earlier discussed. The defendant has accordingly established the three elements required under *Commonwealth v. Murray*, supra for seeking a new trial.

84. Furthermore, though not having made a specific discovery request for the information contained in the Leahy memorandum, that information had an "obviously exculpatory character," See *United States v. Agurs*, supra at 106-107, and the defendant has met the resulting standard of establishing that "there is a substantial risk that the jury would have reached a different conclusion if the evidence had been admitted at trial." *Commonwealth v. Tucceri,* supra at 413. Had the Leahy memorandum been seasonably discovered and disclosed, it conceivably could have had a profound effect upon the investigation, perhaps eliminating or seriously altering many of the issues herein discussed. But the hypothesis which this court must consider is the seasonable disclosure of the Leahy memorandum without any effect upon the investigation. In that case, the jury would likely have become aware of a number additional matters, including: (1) that, upon viewing the very same composite picture offered as critical support for the Commonwealth's sole eyewitness, "at least 10" ascertainable persons had identified someone else; (2) that the police investigation was so incomplete as not to include any

44

inquiry of these ascertainable persons; (3) that the police investigation was so incomplete that it kept no record of the tips received as a result of the newspaper publication of that very same composite picture; (4) that an identifiable third-party culprit (and maybe two) could have been known to police upon pursuit of one of its own reports; (5) that there existed a body of knowledge based upon experimentation and study concerning the limitations of human perception, retention and retrieval of information, and suggestive influences upon identification procedures, and that there consequently existed scientific explanations for the differences that sometimes occur between memory and reality.

85. There is accordingly a most substantial risk that a jury so informed would have reached a very different conclusion from that announced on August 20, 1981. For these reasons and others discussed earlier above, the defendant is entitled to a new trial.

## **ORDER**

For the above-stated reasons, it is hereby **ORDERED** that the Defendant's Third Motion for New Trial be **ALLOWED**.

Raymond P. Veary, Jr.
Justice of the Superior Court

April 10, 2017

45

Weichel 258D 004209

Weichel 026299