UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FREDERICK WEICHEL, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:20-cv-11456-IT |
| | * | |
| TOWN OF BRAINTREE, et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |

MEMORANDUM & ORDER

June 25, 2025

TALWANI, D.J.

This action charged wrongdoing by law enforcement officers, including now-deceased
Boston Police Detective Edward Walsh, resulting in the wrongful conviction for first-degree
murder and decades-long incarceration of Plaintiff Frederick Weichel. The Estate of Edward
Walsh (the "Walsh Estate"), the sole remaining Defendant, seeks summary judgment on all
claims. For the following reasons, the court GRANTS the Walsh Estate's Motion for Summary
Judgment [Doc. No. 287].

**I.        Legal Standard**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate
when "the movant shows that there is no genuine dispute as to any material fact and the movant
is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when, under
the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 248 (1986); Baker v. St. Paul Travelers, Inc., 670 F.3d 119, 125 (1st
Cir. 2012). A dispute is genuine if a reasonable jury could return a verdict for the non-moving
party. Anderson, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This burden can be satisfied in two ways: (1) by submitting affirmative evidence that negates an essential element of the non-moving party's claim or (2) by demonstrating that the non-moving party failed to establish an essential element of its claim. Id. at 323–24.

Once the moving party establishes the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to set forth facts demonstrating that a genuine dispute of material fact remains. Id. at 324. The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of [the] pleadings." Anderson, 477 U.S. at 248, 248. Rather, the non-moving party must "go beyond the pleadings and by [his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). Disputes over facts "that are irrelevant or unnecessary" will not preclude summary judgment. Anderson, 477 U.S. at 248.

When reviewing a motion for summary judgment, the court must take all properly supported evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment . . . ." Anderson, 477 U.S. at 255.

## II.    Factual Background Viewed in the Light Most Favorable to Weichel

### A.    The Backdrop

The investigation of the murder of Robert LaMonica and the flawed prosecution of Weichel for that murder occurred during the period when "reputed underworld figure" James

"Whitey" Bulger, Sprague Rep., Walsh Ex. B at 19 [Doc. No. 288-2], was known in South Boston to engage in violence against those who crossed him. See, e.g., Mot. for New Trial Hearing Tr. I, Pl.'s Ex. 7 at 150:20–151:19 [Doc. No. 294-7]. Whitey Bulger had a sexual and/or intimate relationship with the mother of Weichel's friend, Thomas Barrett, and was keen on keeping police attention away from Barrett, who was 23 years old at the time and lived with his mother. Weichel Dep. Tr., Pl.'s Ex. 2 at 129:1–19, 253:16–19 [Doc. No. 294-2]; Weeks Dep. Tr., Pl.'s Ex. 36 at 62:11–67:16 [Doc. No. 294-36]. After Weichel was convicted for LaMonica's murder, Barrett confessed to having killed LaMonica. Weichel Dep. Tr., Pl.'s Ex. 2 at 100:24–101:11 [Doc. No. 294-2]; Barrett Letter, Pl.'s Ex. 8 at 1 [Doc. No. 294-8].

### B.    Plaintiff Weichel

Weichel was not involved in Bulger's criminal enterprise but lived in a neighborhood where Bulger "would talk to [people] just to find out what was going on. . . . He'd be picking their brains." Weeks Dep. Tr., Pl.'s Ex. 36 at 47:1–12, 52:17–24, 61:15–22 [Doc No. 294-36].

Both Weichel and Barrett occasionally went to the Triple O Lounge in South Boston, which Bulger frequented and owned. Id. at 58:11–19; Weichel Dep. Tr., Pl.'s Ex. 2 at 124:16–19 [Doc. No. 294-2]; Search Warrant Hearing Tr., Pl.'s Ex. 27 at 5:7–12 [Doc. No. 294-27]; Sprague Rep., Walsh Ex. B at 19 [Doc. No. 288-2]. Weichel did not personally know Bulger before Bulger paid him a number of visits, as detailed below. Weichel Dep. Tr., Pl.'s Ex. 2 at 232:9–22 [Doc. No. 294-2].

### C.    Detective Edward Walsh

Boston Police Detective Edward Walsh was not assigned to the LaMonica murder investigation but provided the first confidential informant tip that pointed the finger at Weichel. See Sprague Dep. Tr. II, Pl.'s Ex. 20 at 98:3–9 [Doc. No. 294-20]. Walsh provided a second tip approximately two weeks into the investigation. Wilson Police Rep., Walsh Ex. C at 1 [Doc. No.

288-3]. Walsh knew Bulger, as well as Bulger's compatriots Kevin Weeks and Steve Flemmi, and at least toward the end of his career was considered their "friend." Weeks Dep. Tr., Pl.'s Ex. 37 at 166:20–167:10 [Doc. No. 294-37].

**D.    March and April 1980: The Litif Murder**

In April 1980, Louis Litif was murdered. Litif v. United States, 682 F. Supp. 2d 60, 70 (D. Mass. 2010), aff'd, 670 F.3d 39 (1st Cir. 2012). Litif was a top echelon informant for the FBI and his handler was FBI Agent John Connolly. Id.[1] "While Litif was out on bail, he approached an attorney, Kevin Curry, to seek advice about potential cooperation with the district attorney's office. Litif offered to incriminate Bulger and others in a drug scheme." Id.

"Curry in turn approached Boston Police Detective Edward Walsh to share this information. . . . In the presence of Connolly, [who was not known to Curry at the time,] Curry related to Walsh what Litif said about Litif's willingness to incriminate Bulger. Three weeks later, Bulger and his accomplices murdered Litif." Id.[2]

**E.    May 18, 1980: The Barrett-Shea Altercation**

On May 18, 1980, a street fight occurred between Barrett and Frank Shea. Sprague Rep., Walsh Ex. B at 9, 11 [Doc. No. 288-2]. Weichel was across the street in a car and intervened: he "got out of the car and [he] walked over and [he] said if you [Barrett] don't let [Shea] go, you're going to kill him, and [Barrett] let [Shea] go." Weichel Dep. Tr., Pl.'s Ex. 2 at 104:6–15 [Doc. No. 294-2]. LaMonica, who was a friend of both Shea and Weichel, drove past the fight and

---

[1] Connolly was later convicted of the second-degree murder of another man for providing Bulger information and being "the primary mover who started the murder in action." Connolly v. State, 172 So. 3d 893, 897–98 (Fla. Dist. Ct. App. 2015).

[2] In that case, the court made a finding "infer[ring] that Connolly leaked to Bulger Litif's willingness to incriminate Bulger[,]" leading to Litif's murder. Id. The court made no findings as to any involvement by Walsh in Litif's murder.

4

returned to the scene "at or about the time of [the fight's] completion." Sprague Rep., Walsh Ex. B at 9, 11 [Doc. No. 288-2].

### F.    May 31, 1980: The LaMonica Murder

Robert LaMonica was shot to death in Braintree in the early hours of May 31, 1980. Id. at 1. "Everybody in Southie," including Whitey Bulger, "basically knew it was Tommy Barrett" who killed LaMonica. Weeks Dep. Tr., Pl.'s Ex. 36, 43:24–45:22 [Doc. No. 294-36].

### G.    May 31, 1980: The Investigation Begins

The Braintree Police Department and other law enforcement officers responded to the shooting, gathering evidence and identifying witnesses. Walsh Statement of Material Facts ("Walsh SMF") ¶¶ 1–3 [Doc. No. 288].[3] State Trooper John Sprague was assigned as the lead investigator for the Massachusetts State Police. Id. ¶ 2.

John Foley, one of four young witnesses congregating in a nearby park at the time of the shooting, informed Braintree detectives that he had observed a white male with thick curly hair of approximately 22-25 years of age running from the scene into a waiting vehicle after shots were fired. Sprague Rep., Walsh Ex. B at 6 [Doc. No. 288-2]. Foley assisted the detectives in completing a composite sketch of the person he saw running. Walsh SMF ¶ 5 [Doc. No. 288]. This composite sketch was based on Foley, who had drunk four to five beers, glimpsing the face of a man for one second while that man was running in the dark at least 180 feet away. Findings of Fact on Def.'s Mot. for New Trial, Pl.'s Ex. 13 ¶¶ 1, 4, 79 [Doc. No. 294-13].

---

[3] Citations to the Walsh SMF are for facts undisputed by Weichel.

**H.     May 31, 1980: Walsh's First Informant Tip**

As early as the first day of the investigation, Trooper Sprague made contact with Walsh. Sprague Dep. Tr. III, Pl.'s Ex. 22 at 86:10–22 [Doc. No. 294-22]; Sprague Dep. Tr. II, Pl.'s Ex. 20 at 98:3–9 [Doc. No. 294-20]; Mot. to Suppress Hearing Tr., Walsh Ex. E at 1-41:10–23 [Doc. No. 288-5]; see also Findings of Fact on Def.'s Mot. for New Trial, Pl.'s Ex. 13 ¶¶ 7–8 [Doc. No. 294-13]. Trooper Sprague "received information from Detectives Derby and Walsh of the Boston Police Department that there had been street information from their informant sources that Mr. Weichell [sic] had shot Mr. LaMonica." Mot. to Suppress Hearing Tr. I, Pl.'s Ex. 25 at 1-96:9–17 [Doc. No. 294-25]; Mot. to Suppress Hearing Tr., Walsh Ex. E at 1-42:21–1-43:9 [Doc. No. 288-5].

No written report substantiated this informant tip, the existence of the informants, or the reliability of their information, which may be "inconsistent with what a well-trained and experienced investigator would do." Trial Expert Rep., Pl.'s Ex. 38 ¶ 2.15 [Doc. No. 294-38].

Trooper Sprague explained to the Grand Jury in 1981 that Weichel was identified as a suspect and his photograph was placed in a photo array based in part on "information from [sic] the Boston Police department told us." Grand Jury Tr., Pl.'s Ex. 31 at 5:11–14 [Doc. No. 294-31]. Weichel was the only individual the investigators "were interested in" during the morning hours of June 1, 1980. Mot. to Suppress Hearing Tr. I, Pl.'s Ex. 25 at 1-42:3–20 [Doc. No. 294-25].

**I.     June 1, 1980: The Photo Array**

The day after the shooting, Braintree Police Detective Robert Wilson and Trooper Sprague compiled a photo array that included Weichel's photo and showed it to Foley and the other three witnesses. Sprague Rep., Walsh Ex. B at 6 [Doc. No. 288-2].

No police reports identify why Weichel's photo was included in the array. Trial Expert Rep., Pl.'s Ex. 38 ¶ 2.14 [Doc. No. 294-38]. Trooper Sprague may not have been aware of the Barrett-Shea altercation at the time of compiling the photo array. Mot. to Suppress Hearing Tr., Walsh Ex. E at 1-43:10–1-44:5 [Doc. No. 288-5]. Weichel's photo, and arguably one other, were the only photos in the array showing men with hair resembling the hair of the running man as described by Foley. Mot. to Suppress Hearing Tr. II, Pl.'s Ex. 26 at 2-134:16–135:14, 2-203:15–22 [Doc. No. 294-26]; Mot. to Suppress Hearing Tr. I, Pl.'s Ex. 25 at 1-180:3–12 [Doc. No. 294-25].

Foley and one of the three other young witnesses identified Weichel in the photo array as a "look-alike of the assailant" from the night of the shooting. Sprague Rep., Walsh Ex. B at 6–7 [Doc. No. 288-2].

### J.    June 12, 1980: Walsh's Second Informant Tip

In a report dated June 13, 1980, Detective Wilson wrote:

> On June 12, 1980, this Officer received information from Detective Edward Walsh of the Boston Police Department. . . . Detective Walsh was told by a few informers independant [sic] of each other that Fred Wiechel [sic] of South Boston was involved in the Robert LaMonica murder which took place in Braintree a couple of weeks ago.

> Detective Walsh also stated the information was that Wiechel [sic] was the actual gunman and that the information is reliable. The reason given for the cause of the murder was that a fight which occurred some time in May involved about four different parties and Weichel and LaMonica were involved and had argued with threats made of a serious nature.

Wilson Rep., Walsh Ex. C at 1 [Doc. No. 288-3].

In an undated homicide report written after June 12, 1980, Trooper Sprague stated: "Information has also been received from Detective Edward Walsh, Boston Police Department Intelligence Unit[.] Detective Walsh stated that a proven and reliable informant has told him that Subject Robert LaMonica was killed by Freddy Weichell [sic] and Thomas Barrett. Detective

Walsh's source also stated that the 'whole thing' was over a street 'beef'." Sprague Rep., Walsh Ex. B at 18 [Doc. No. 288-2].[4] The report is unclear as to whether it is referring to the same June 12 tip referenced in Detective Wilson's report, or the tip Trooper Sprague received from Walsh as early as the first day of the investigation. See Sprague Dep. Tr. II, Pl.'s Ex. 20 at 98:3–9 [Doc. No. 294-20]. The report notes another informant tip from Boston Police Detective Walter Derby, which "provided that Subject LaMonica was shot by Frederick Weichell [sic] and driven from the scene by Thomas Barrett." Sprague Rep., Walsh Ex. B at 19 [Doc. No. 288-2].

**K.    June 12, 1980: Foley's Drive-By Identification**

That same day, June 12, 1980, Foley was "secreted in a van with one-way glass and driven through the streets of Boston. . . . Foley observed a subject . . . who he identified, with a reasonable degree of certainty, as the assailant of Robert LaMonica. The Subject picked out by Mr. Foley was known to [Trooper Sprague] as Frederick F. Weichell [sic]." Id. at 6–7.

**L.    July and August, 1980: The Truncated Investigation Into Barrett**

Barrett and Weichel were the only two suspects listed in Trooper Sprague's homicide report. Id. at 19.[5] An undated follow-up report by Trooper Sprague states that a warrant was

_____

[4] Eyewitness accounts of the Barrett-Shea fight may have been fabricated after the LaMonica murder to support the investigators' focus on Weichel as the suspect. Weichel Dep. Tr., Pl.'s Ex. 2 at 107:4–108:13 [Doc. No. 294-2]. According to such eyewitnesses, "LaMonica stated . . . that Frank Shea had been beaten quite severely and because he was a friend of his, he [LaMonica] was going to kill/shoot Weichell [sic] and Barrett." Sprague Rep., Walsh Ex. B at 9 [Doc. No. 288-2]. "Weichell [sic], hearing these threats, interjected that Mr. Shea would not have an opportunity to carry out his threats because he, 'would kill him (Shea) first, and his body would never be found.' Mr. Shea remembers that victim LaMonica then interceded on his behalf and that words of violence and aggression were then exchanged between victim LaMonica and Subject Weichell [sic]." Id. at 11; see also, e.g., id. at 9 (according to another witness's account, "an attitude of mutual threats and aggression was implied").

[5] The police reports did not document the results of investigations into other potential leads— such as a stolen car ring in which LaMonica was implicated, and a murder in which LaMonica and his father had been involved—which the LaMonica family suggested may have been the

issued on July 24, 1980, to wiretap Barrett's telephone for a 24-hour period. Id. at 1 (Sprague

Follow-up Report), ECF p.20. On July 29, 1980, Trooper Sprague and Boston Detectives Wilson

and Derby entered Barrett's home "and attempted to question him relative to the LaMonica

homicide. . . . Upon introduction of the identity and purpose of the officer present, Subject

Barrett advised that he had nothing to say and all inquiries should be made through his attorney.

All officers present then left the premises without incident." Id. The telephone monitoring device

was then activated, and Barrett attempted to call Weichel several times. "At one point, Subject

Barrett was heard calling Subject Weichell's [sic] name into the phone, seemingly beckoning

him to answer. . . . Barrett was heard remarking that Subject Weichell [sic] had removed the

telephone wall plugs, a procedure which assures the subscriber an uninterrupted sleep[.]" Id. at

1–2, ECF pp. 20–21. Pursuant to the warrant, the monitoring was terminated. On August 4, 1980,

another warrant was issued to use an eavesdropping device during a 12-hour period in Weichel's

car, but "it became apparent . . . that the conditions necessary for the successful monitoring of

incriminating conversations . . . were not likely to occur in the near future" and so the

surveillance was terminated. Id. at 2, ECF p.20.

Barrett was not questioned about his whereabouts the night of the murder. Mot. for New

Trial Hearing Tr. I, Pl.'s Ex. 5 at 142:7–24 [Doc. No. 294-5]. His photo was not shown to any of

the eyewitnesses. Id. at 142:1–6; Mot. for New Trial Hearing Tr. II, Pl.'s Ex. 10 at 52:8–53:14

[Doc. No. 294-10].

---

reason for LaMonica's murder. See Findings of Fact on Def.'s Mot. for New Trial, Pl.'s Ex. 13
¶ 3 [Doc. No. 294-13]; Sprague Dep. Tr. I, Pl.'s Ex. 15 at 264:10–17 [Doc. No. 294-15]; Trial
Expert Rep., Pl.'s Ex. 38 ¶ 1.16 [Doc. No. 294-38].

**M.      Summer 1980: Bulger's Multiple Threats to Weichel to Not Mention Barrett**

Before Weichel was arrested, Bulger came to him and threatened him on four separate occasions, saying, "Don't you bring up Tommy Barrett's name ever. . . . Fred, if you do, . . . if I can't get to you, I'll get to your family[.]" Weichel Dep. Tr., Pl.'s Ex. 2 at 238:8–239:14, 242:3–13, 244:24–245:20 [Doc. No. 294-2] (first visit); id. at 257:8–259:5 (second visit); id. at 262:1–264:6 (third visit); id. at 277:20–278:7 (fourth visit). After Weichel's arrest and while Weichel was out on bail, Bulger visited him again asking if he had mentioned Barrett's name. Weichel said, "I haven't and I won't," and Bulger told him "you have nothing to worry about[.]" Id. at 275:12–276:10.

**N.      1981: Weichel's Conviction**

Of the four young witnesses at the park on the night of the murder, only Foley testified in court that Weichel was the man he saw running from the scene. See Findings of Fact on Def.'s Mot. for New Trial, Pl.'s Ex. 13 ¶¶ 1, 27 [Doc. No. 294-13]. In August 1981, Weichel was found guilty of murder in the first degree and sentenced to life imprisonment without possibility of parole. Id. ¶ 11. His motion for a new trial based on ineffective assistance of counsel was denied, id. ¶ 12, and his conviction was affirmed by the Supreme Judicial Court, Commonwealth v. Weichell, 390 Mass. 62, 79, 453 N.E.2d 1038 (1983).

**O.      1982: Barrett's Confession**

Two years after the murder, Barrett wrote in a letter to Weichel's mother: "I haven't had a good night sleep in almost a year. Because I know Fred did not kill Bobby LaMonica. I did! Yes Gloria I killed Bobby LaMonica." Barrett Letter, Pl.'s Ex. 8 at 1 [Doc. No. 294-8].[6]

---

[6] Twenty years later, in 2002, Weichel filed a motion for a new trial based on the letter, and the hearing judge allowed the motion. Commonwealth v. Weichell, 446 Mass. 785, 797–78, 847 N.E.2d 1080 (2006). That ruling was overturned by the Supreme Judicial Court in part on the

### P.    2017 - 2022

Weichel was granted a motion for a new trial in 2017 after other exculpatory evidence came to light, Findings of Fact on Def.'s Motion for New Trial, Pl.'s Ex. 13 ¶ 85 [Doc. No. 294-13], and the district attorney's office subsequently filed a <u>Nolle Prosequi</u> dismissing the criminal charges against him, Walsh SMF ¶ 25 [Doc. No. 288]. In 2022, in proceedings against the Commonwealth of Massachusetts, a civil jury found by clear and convincing evidence that Weichel had proven his innocence of the murder of LaMonica, as well as his innocence of being an accessory after the fact. Jury Verdict Slip, Pl.'s Ex. 23 ¶¶ 1–2 [Doc. No. 294-23].

### III.    Discussion

### A.    Count I: Due Process Under 42 U.S.C. § 1983

The Walsh Estate asserts that "Plaintiff's § 1983 due process claim is put forth as a claim that Walsh fabricated evidence." Def.'s Mem. ISO Mot. for Summ. J. ("Def.'s Mem.") at 9 [Doc. No. 289]. A fabrication of evidence claim requires: "(1) fabrication of inculpatory evidence that is (2) material / causal to the conviction and (3) deliberate deception." <u>Cosenza v. City of Worcester, Mass.</u>, 651 F. Supp. 3d 311, 318 (D. Mass. 2023), <u>appeal dismissed sub nom.</u> <u>Cosenza v. Hazelhurst</u>, 2023 WL 9596753 (1st Cir. Dec. 6, 2023); <u>see also</u> <u>Limone v. Condon</u>, 372 F.3d 39, 44–45 (1st Cir. 2004) (prohibition against deliberately fabricating evidence to frame individuals is fundamental to the American system of justice); <u>Haley v. City of Boston</u>, 657 F.3d 39, 50 (1st Cir. 2011) (deliberate suppression standard).

---

ground that the letter's contents were known or reasonably could have been known by Weichel at the time of his first motion for a new trial and therefore were not covered by the "newly discovered evidence" doctrine. <u>Id.</u> at 799–801.

Viewed in the light most favorable to Weichel, a jury could reasonably infer that the inculpatory evidence from informants that Walsh passed on to the officers investigating the murder was false. But to survive summary judgment, Weichel must show that a jury could find it was more likely than not that Walsh passed on his tips in bad faith, i.e., that he fabricated them or knew they were not reliable.

The court finds that a jury could not reach such a conclusion based on the evidence in the record. Weichel's theory is that Walsh was in league with Bulger based on (1) the circumstances of the Litif murder where Bulger was tipped off about Litif's willingness to incriminate Bulger; and (2) the fact that Walsh provided the only information implicating Weichel at the time of the photo array in the first days of the investigation, information which was undocumented in any report by Walsh, and which in turn led to a series of events resulting in Weichel's arrest and conviction.

As to the first point, where both Connolly and Walsh were told about Litif's willingness to incriminate Bulger, and Connolly has been found to have tipped off Bulger, a jury has no basis to find that Walsh also tipped off Bulger.

On the second point, a necessary predicate of this theory is that Weichel was implicated in order to turn the authorities' attention away from Barrett as a suspect. No evidence supports that predicate. Instead, it is flatly contradicted by Trooper Sprague's homicide report which details that: "Detective Walsh stated that a proven and reliable informant has told him that Subject Robert LaMonica was killed by Freddy Weichell [sic] and Thomas Barrett." Sprague Rep., Walsh Ex. B at 18 [Doc. No. 288-2] (emphasis added). Walsh could not have aided Bulger in turning attention away from Barrett by fabricating a tip implicating both Weichel and Barrett

with equal weight—which would have the opposite effect of focusing the investigation on Barrett as well.[7]

Thus, even if Weichel could establish that Walsh passed on false tips that brought Weichel to the investigators' attention, a jury could not reasonably find that Walsh deliberately fabricated that evidence when he passed on his informant tip implicating both Weichel and Barrett as the likely killers.[8] Accordingly, the Walsh Estate is entitled to summary judgment on Count I.

### B.    Count II: Federal Malicious Prosecution Under 42 U.S.C. § 1983

#### 1.    State Law Malicious Prosecution

As to Count II, the court begins by clarifying what the parties call the "malicious prosecution claim." The Walsh Estate argues that "plaintiff's malicious prosecution claim fails as a matter of law," and cites to the state law standard for malicious prosecution. See Def.'s Mem. at 13 [Doc. No. 289] (upper-case removed). Weichel addresses "the state law malicious prosecution claim" under the same standard, see Opp. at 21 [Doc. No. 299] (upper-case removed), but separately addresses "plaintiff's claim of prosecution without probable cause

---

[7] The court assumes the Sprague report describes a tip provided by Walsh on June 12, 1980, in greater detail than Detective Wilson's report of a tip received by Walsh on the same day. However, it is immaterial whether the tip described in the Sprague report was actually: (a) the tip provided in the first days of the investigation; (b) the same tip received by Detective Wilson on June 12; or (c) a third tip of unknown date. The timing of the tip is unimportant where its content undermines the asserted motive for providing a bad tip.

[8] Weichel makes additional arguments about the suppression of exculpatory evidence. See Pl.'s Opp. to Mot. for Summ. J. ("Opp.") at 15–17 [Doc. No. 299]. Weichel argues that by hiding the fact of the fabrication and Walsh's ties to Bulger, Weichel was unable to make arguments that could have been used to undermine or suppress the evidence against him. See id. But because a jury could not find that it was more likely than not that Walsh fabricated his tips, knew that they were unreliable, or passed them on at Bulger's behest, a jury could not find that he suppressed any exculpatory evidence relating to his tips.

(AKA malicious prosecution)" under a Fourth Amendment standard, see id. at 18 (upper-case removed). But the Amended Complaint does not raise a cause of action for malicious prosecution under state law; Count II is the only cause of action for malicious prosecution and has the heading, "42 U.S.C. § 1983 – Federal Malicious Prosecution." Am. Compl. ¶¶ 220–229 [Doc. No. 93]. That cause of action refers to Weichel's being "unreasonably seized without probable cause and deprived of his liberty, in violation of [his] rights secured by the Fourth and Fourteenth Amendments." Id. ¶ 222. That cause of action further alleges that "Defendants deprived Plaintiff of fair state criminal proceedings, . . . and Massachusetts law does not provide an adequate state-law tort remedy to address that harm." Id. ¶ 224.

In the First Circuit, "[t]he law is settled that a garden-variety claim of malicious prosecution garbed in the regalia of § 1983 must fail. There is no substantive due process right under the Fourteenth Amendment to be free from malicious prosecution[.]" Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 256 (1st Cir. 1996) (citations omitted). Furthermore, there is "the availability of a plainly adequate remedy under Massachusetts law" for malicious prosecution. Id. (citing Beecy v. Pucciarelli, 387 Mass. 589, 593–94, 441 N.E.2d 1035 (1982)). However, "[i]t is an open question whether the Constitution permits the assertion of a section 1983 claim for malicious prosecution on the basis of an alleged Fourth Amendment violation." Nieves v. McSweeney, 241 F.3d 46, 54 (1st Cir. 2001) (citations omitted).

The court thus construes Count II as a claim for federal malicious prosecution under Section 1983, based on a Fourth Amendment seizure-without-due-process violation. This entails one primary distinction: "[t]he plaintiff in a common law malicious prosecution claim must, as the name implies, demonstrate that the defendant officer acted with subjective malice. A plaintiff alleging a purely constitutional Fourth Amendment claim, on the other hand, usually need

establish only that his seizure was objectively unreasonable." <u>Hernandez-Cuevas v. Taylor</u>, 723 F.3d 91, 99 (1st Cir. 2013). Ultimately, the distinction may be immaterial: "in most cases, the showing required to prove a Fourth Amendment malicious prosecution claim under a purely constitutional theory will be almost indistinguishable from that required in the circuits using a blended constitutional/common law approach to a Fourth Amendment malicious prosecution claim." <u>Id.</u> at 101. And the court may nevertheless "look to the common law for guidance." <u>Id.</u>

### 2.     Seizure Without Probable Cause

Under the First Circuit's approach to a claim of seizure without probable cause in violation of the Fourth Amendment and Section 1983, Weichel must show that there is a genuine issue of material fact as to whether Walsh "(1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." <u>Hernandez-Cuevas</u>, 723 F.3d at 101 (citation omitted). It is undisputed that the criminal proceedings terminated in Weichel's favor.

Causation is not restricted to the paradigmatic example of a person formally swearing out a complaint against a defendant. <u>Limone v. United States</u>, 579 F.3d 79, 89 (1st Cir. 2009). "If an individual induces another person (say, a police officer or prosecutor) to lodge formal criminal charges, he may be held to have instituted the criminal proceedings. . . . So, too, if an individual either exercises a peculiar degree of control over the charging official or adamantly presses that official to bring a criminal complaint, he may be held responsible for the institution of the prosecution." <u>Id.</u> (citations omitted).

Weichel has offered no evidence allowing even for the inference that Walsh exercised such control as to induce Trooper Sprague or Detective Wilson to seize and prosecute Weichel. The cases Weichel cites do not support the facts on this record. In <u>Santiago v. Fenton</u>, for

example, an <u>arresting officer</u> was found liable for his role in "instituting the action against" the criminal defendant there. 891 F.2d 373, 387 (1st Cir. 1989). Although it could be inferred that Walsh was the but-for cause of Weichel's photo being inserted into the photo array, Foley's subsequent positive identifications and evidence from other sources about Weichel and LaMonica's presence at a fight between their associates (even assuming they themselves exchanged no fighting words) were superseding causes of Weichel's arrest and prosecution, in which Walsh is not alleged to have been further involved.

Moreover, as discussed above, a jury could not find that Walsh's motive in passing on his informant tips was to redirect attention away from Barrett at Bulger's request. Even if they could make such a finding, it is insufficient that Walsh "mere[ly] transmit[ted] [] information to a police officer, who using his or her independent judgment, then pursue[d] the matter and institute[d] criminal proceedings[.]" <u>Correllas v. Viveiros</u>, 410 Mass. 314, 318, 572 N.E.2d 7 (1991); <u>cf.</u> <u>Limone v. United States</u>, 497 F. Supp. 2d 143, 206 (D. Mass. 2007), <u>aff'd on other grounds</u>, 579 F.3d 79 (1st Cir. 2009) ("But the FBI was more—far more—than an ordinary information-giver. They were in <u>de facto</u> and active control of this prosecution.").[9] This is particularly true where the investigation into Barrett appears to have been dropped <u>despite</u> Walsh pointing to Barrett as a suspect in the murder.

Because Weichel cannot establish a genuine issue of material fact on the element of causation, the court need not address whether Weichel was arrested without probable cause, nor

---

[9] Weichel cites <u>Schand v. City of Springfield</u>, which is inapposite because summary judgment was entered for defendants on the malicious prosecution claim due to qualified immunity. 380 F. Supp. 3d 106, 135 (D. Mass. 2019). Weichel's pincite is to the court's discussion of another claim. <u>See</u> <u>id.</u> at 137.

the parties' arguments about qualified immunity. The Walsh Estate is entitled to summary judgment on Count II.

### C.    Count III: Conspiracy Under 42 U.S.C. § 1983

A civil rights conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages." Est. of Bennett v. Wainwright, 548 F.3d 155, 178 (1st Cir. 2008) (citation omitted). "[M]ore often than not such an agreement must be inferred from all the circumstances," and "individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it." Earle v. Benoit, 850 F.2d 836, 843 (1st Cir. 1988) (citation omitted).

For the reasons discussed above, a jury could not find that Walsh entered into a conspiracy with Bulger, Trooper Sprague, or Detective Wilson to fabricate an informant tip and turn attention away from Barrett by pointing the finger at Weichel. Contrary to Weichel's conspiracy theory, Walsh pointed the finger at both Barrett and Weichel. The Walsh Estate is therefore entitled to summary judgment on Count III.

### D.    Count IV: Failure to Intervene Under 42 U.S.C. § 1983

Weichel "agrees that he does not have evidence to advance this claim to trial." Opp. at 21 [Doc. No. 299]. The Walsh Estate's motion for summary judgment is granted as unopposed as to Count IV.

### E.    Count V: Intentional Infliction of Emotional Distress

Under Massachusetts law, an intentional infliction of emotional distress ("IIED") claim requires showing "(1) that [Walsh] intended, knew, or should have known that his conduct would cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct

17

caused emotional distress; and (4) that the emotional distress was severe." <u>Polay v. McMahon</u>,
468 Mass. 379, 385, 10 N.E.3d 1122 (2014).

For the reasons discussed above, a jury could not find that Walsh passed on his informant
tip in bad faith. Passing on information for a murder investigation without a showing of bad faith
is not extreme and outrageous conduct.

Accordingly, the Walsh Estate is entitled to summary judgment on Count V.

**F.    Statute of Limitations**

Because the court grants the Walsh Estate's motion for summary judgment on all counts,
the court need not address the parties' arguments about the statute of limitations.

**IV.    Conclusion**

For the foregoing reasons, Walsh Estate's <u>Motion for Summary Judgment</u> [Doc. No. 287]
is GRANTED as to all counts.

IT IS SO ORDERED.

June 25, 2025                          /s/ Indira Talwani
                                       United States District Judge

18